1  KESSLER TOPAZ MELTZER
   & CHECK, LLP
2  RAMZI ABADOU (Bar No. 222567)
   One Sansome Street, Suite 1850
3  San Francisco, CA 94104
   Tel:   (415) 400-3000
4  Fax:   (415) 400-3001
   rabadou@ktmc.com
5
   *Liaison Counsel*
6
   [Additional counsel listed on signature page]
7

8                  UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA
9

10 MARK H. DESTEFANO, individually and        Case No.  CV  12  4007
   on behalf of all others similarly situated,
                                              **CLASS ACTION**        JSW
11
          Plaintiff,

12        v.                                  **CLASS ACTION COMPLAINT FOR
                                              VIOLATIONS OF THE FEDERAL
13 ZYNGA, INC., MARK PINCUS, DAVID M.         SECURITIES LAWS**
   WEHNER, JOHN SCHAPPERT, MARK
14 VRANESH, REGINALD D. DAVIS,
   CADIR. B. LEE, WILLIAM GORDON,             **JURY TRIAL DEMANDED**
15 REID HOFFMAN, JEFFREY
   KATZENBERG, STANLEY J.
16 MERESMAN, SUNIL PAUL, OWEN VAN
   NATTA, MORGAN STANLEY & CO., LLC
17 GOLDMAN, SACHS & CO., J.P. MORGAN
   SECURITIES LLC, MERRILL LYNCH,
18 PIERCE, FENNER & SMITH
   INCORPORATED, BARCLAYS CAPITAL
19 INC., and ALLEN & COMPANY LLC,

20        Defendants.

21

22

23

24

25

26

27

28

1    Plaintiff Mark H. DeStefano ("Plaintiff"), individually and on behalf of all other persons
2    similarly situated, by his undersigned attorneys, alleges the following against Zynga, Inc.
3    ("Zynga") and the other defendants based upon personal knowledge as to himself and his own
4    acts, and information and belief as to all other matters. Plaintiff's information and belief is based
5    upon, *inter alia,* the investigation conducted by and through his attorneys, which included,
6    among other things: (i) a review of the defendant's public documents; (ii) conference calls and
7    announcements made by the defendants; (iii) United States Securities and Exchange Commission
8    ("SEC") filings; (iv) wire and press releases published by and regarding Zynga; (v) securities
9    analysts' reports and advisories about Zynga; and (vi) information readily obtainable electronic
10    information. Plaintiff believes that substantial evidentiary support will exist for the allegations
11    set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

13    1.    The clams asserted herein arise under and pursuant to Sections 11, 12(a)(2), and
14    15 of the Securities Act of 1933, 15 U.S.C. §77k (the "Securities Act") and Sections 10(b) and
15    20(a) of the Securities Exchange Act of 1934, (15 U.S.C. §78j(b) and §78t(a)) (the "Exchange
16    Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

17    2.    This Court has jurisdiction over the subject matter of this action pursuant to 28
18    U.S.C. §1331, Section 22 of the Securities Act and Section 27 of the Exchange Act.

19    3.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities
20    Act and Section 27 of the Exchange Act, because Zynga's headquarters are located within this
21    District, Zynga conducts substantial business in this District, and many of the acts and
22    practices complained of herein occurred in substantial part in this District.

23    4.    In connection with the acts, conduct and other wrongs alleged in this Complaint, the
24    defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,
25    including but not limited to, the United States mails, interstate telephone communications and
26    the facilities of the national securities markets.

27
28

1

## PARTIES

2       5.      Plaintiff acquired Zynga common stock during the Class Period (defined

3   herein), as set forth in the attached certification, and has been damaged thereby.

4       6.      Defendant Zynga is a Delaware corporation headquartered at 699 Eighth Street,

5   San Francisco, California 94103. Zynga was originally organized in April 2007 as a California

6   limited liability company under the name Presidio Media LLC, converted to a Delaware

7   corporation in October 2007, and changed its name to Zynga, Inc. in November 2010. Zynga

8   completed its initial public offering in December 2011 and its Class A common stock is traded

9   on the NASDAQ Global Select Market, which is an efficient market, under the symbol

10  "ZNGA."

11      7.      Defendant Mark Pincus ("Pincus") founded Zynga in 2007 and at all relevant

12  times served as Zynga's Chief Executive Officer, Chief Product Officer, and Chairman of

13  Zynga's Board of Directors. Defendant Pincus signed the Registration Statements in connection

14  with Zynga's Initial Public Offering (the "IPO") and Secondary Offering (defined herein).

15  Defendant Pincus sold approximately 16.5 million shares of Zynga stock during the Class Period

16  for proceeds of approximately $200 million.

17      8.      Defendant David M. Wehner ("Wehner") at all relevant times served as Zynga's

18  Chief Financial Officer. Defendant Wehner signed the Registration Statements in connection

19  with Zynga's IPO and Secondary Offering. Defendant Wehner sold approximately 386,000

20  shares of Zynga stock during the Class Period for proceeds of approximately $4.6 million.

21      9.      Defendant John Schappert ("Schappert") at all relevant times served as Zynga's

22  Chief Operating Officer and as a director of Zynga. Defendant Schappert signed the Registration

23  Statements in connection with Zynga's IPO and Secondary Offering. Defendant Schappert sold

24  approximately 322,000 shares of Zynga stock during the Class Period for proceeds of

25  approximately $3.9 million.

26      10.     Defendant Mark Vranesh ("Vranesh") at all relevant times served as Zynga's

27  Chief Accounting Officer. Defendant Vranesh signed the Registration Statements in connection

28

COMPLAINT                                                                              -2-
Case No.

1  with Zynga's IPO and Secondary Offering. Defendant Vranesh sold approximately 375,000
2  shares of Zynga stock during the Class Period for proceeds of approximately $4.3 million.

3  11.  Defendant Reginald D. Davis ("Davis") at all relevant times served as Zynga's
4  Senior Vice President, General Counsel, and Secretary. Defendant Davis sold approximately
5  315,000 shares of Zynga stock during the Class Period for proceeds of approximately $3.8
6  million.

7  12.  Defendant Cadir B. Lee ("Lee") at all relevant times served as Zynga's Chief
8  Technology Officer. Defendant Vranesh sold approximately 1.1 million shares of Zynga stock
9  during the Class Period for proceeds of approximately $13.6 million.

10  13.  Defendant William Gordon ("Gordon") at all relevant times served as a director of
11  Zynga. Defendant Gordon signed the Registration Statements in connection with Zynga's IPO
12  and Secondary Offering.

13  14.  Defendant Reid Hoffman ("Hoffman") at all relevant times served as a director of
14  Zynga. Defendant Hoffman signed the Registration Statements in connection with Zynga's IPO
15  and Secondary Offering.

16  15.  Defendant Jeffrey Katzenberg ("Katzenberg") at all relevant times served as a
17  director of Zynga. Defendant Katzenberg signed the Registration Statements in connection with
18  Zynga's IPO and Secondary Offering.

19  16.  Defendant Stanley J. Meresman ("Meresman") at all relevant times served as a
20  director of Zynga. Defendant Meresman signed the Registration Statements in connection with
21  Zynga's IPO and Secondary Offering.

22  17.  Defendant Sunil Paul ("Paul") at all relevant times served as a director of Zynga.
23  Defendant Paul signed the Registration Statements in connection with Zynga's IPO and
24  Secondary Offering.

25  18.  Defendant Owen Van Natta ("Van Natta") at all relevant times served as a director
26  of Zynga. Defendant Van Natta signed the Registration Statements in connection with Zynga's
27  IPO and Secondary Offering.

28

COMPLAINT                                                                          -3-
Case No.

19. Defendants Pincus, Wehner, Schappert, Vranesh, Davis, Lee, Gordon, Hoffman, Katzenberg, Meresman, Paul, and Van Natta are collectively referred to as the "Individual Defendants."

20. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter in connection with Zynga's IPO and Secondary Offering, and created and distributed the accompanying Prospectuses.

21. Defendant Goldman, Sachs & Co. ("Goldman Sachs") served as an underwriter in connection with Zynga's IPO and Secondary Offering, and created and distributed the accompanying Prospectuses.

22. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter in connection with Zynga's IPO and Secondary Offering, and created and distributed the accompanying Prospectuses.

23. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter in connection with Zynga's IPO and Secondary Offering, and created and distributed the accompanying Prospectuses.

24. Defendant Barclays Capital Inc. ("Barclays") served as an underwriter in connection with Zynga's IPO and Secondary Offering, and created and distributed the accompanying Prospectuses.

25. Defendant Allen & Company LLC ("Allen") served as an underwriter in connection with Zynga's IPO and Secondary Offering, and created and distributed the accompanying Prospectuses.

26. Defendants Morgan Stanley, Goldman Sachs, J.P. Morgan, Merrill Lynch, Barclays, and Allen are collectively referred to as the "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

27. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Zynga during the Class Period. Excluded from the Class are the officers and directors of Zynga at all relevant times, members of their immediate families and

1 their legal representatives, heirs, successors or assigns and any entity in which the defendants have

2 or had a controlling interest.

3 28. The members of the Class are so numerous that joinder of all members is

4 impracticable. Throughout the Class Period, the Zynga's common stock was actively traded on

5 the NasdaqGS. While the exact number of Class members is unknown to Plaintiff at this time,

6 and can only be ascertained through appropriate discovery, Plaintiff believes that there are at

7 least hundreds of members in the proposed Class.[1] Members of the Class may be identified from

8 records maintained by Zynga or its transfer agent, and may be notified of the pendency of this

9 action by mail using a form of notice customarily used in securities class actions.

10 29. Plaintiff's claims are typical of the claims of the members of the Class, as all

11 members of the Class are similarly affected by the defendants' wrongful conduct in violation of

12 federal law that is complained of herein.

13 30. Plaintiff will fairly and adequately protect the interests of the members of the Class

14 and has retained counsel competent and experienced in class and securities litigation.

15 31. Common questions of law and fact exist as to all members of the Class and

16 predominate over any questions solely affecting individual members of the Class. Among the

17 questions of law and fact common to the Class are:

18 (a) whether the federal securities laws were violated by the defendants' acts

19 as alleged herein;

20 (b) whether statements made by the defendants to the investing public during

21 the Class Period misrepresented or failed to disclose material facts about the business,

22 operations, and management of Zynga; and

23

24

25 [1] As of December 31, 2011, Zynga had outstanding 121,381,032 shares, and 109 holders of record, of Class A common stock, 579,694,083 shares, and 1,461 holders of record, of Class B common stock, and 20,517,472 shares, and one holder of record, of Class C common stock.

26 According to Zynga, the actual number of Class A and Class B stockholders is greater than these numbers of record holders, and includes stockholders who are beneficial owners, but

27 whose shares are held in street name by brokers and other nominees. This number of holders of record also does not include stockholders whose shares may be held in trust by other

28 entities.

1  (c)  to what extent the members of the Class have sustained damages, and the
2  proper measure of damages.

3  32.  A class action is superior to all other available methods for the fair and efficient
4  adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the
5  damages suffered by individual Class members may be relatively small, the expense and burden
6  of individual litigation make it impossible for members of the Class to redress individually the
7  wrongs done to them. There will be no difficulty in the management of this action as a class
8  action.

9  **SUBSTANTIVE ALLEGATIONS**

10  33.  This is a securities class action on behalf of all persons or entities who purchased
11  or otherwise acquired the securities of Zynga during the period from February 28, 2012 to July
12  25, 2012, inclusive (the "Class Period"), seeking to pursue remedies under Sections 11, 12(a)(2)
13  and 15 of the Securities Act and Sections 10(b) and 20(a) of the Securities Exchange Act of
14  1934.

15  34.  Zynga develops, markets, and operates online social games as live services on
16  the Internet, social networking sites, and mobile platforms.  The online social games offered
17  by Zynga include FarmVille, Words With Friends, Matching With Friends, Scramble With
18  Friends, The Ville, Bubble Safari, Ruby Blast, Draw Something, Zynga Slingo, CastleVille,
19  CityVille, Hidden Chronicles, Zynga Poker, Zynga Bingo, Zynga Slots, Empires & Allies, The
20  Pioneer Trail, and Mafia Wars.  Zynga's games are available on various platforms, including
21  Facebook and other social networks, as well as mobile platforms, such as Apple iOS and
22  Google Android worldwide.

23  35.  Zynga operates its online games as live services that allow players to play for
24  free.  Zynga generates revenue primarily from the in-game sale of virtual goods and
25  advertising in connection with those games.  Specifically, Zynga provides its game players
26  with the opportunity to purchase virtual goods that enhance their game-playing experience.
27  According to Zynga, "[w]e believe players choose to pay for virtual goods for the same
28  reasons they are willing to pay for other forms of entertainment. They enjoy the additional

COMPLAINT                                                                                    -6-
Case No.

1 playing time or added convenience, the ability to personalize their own game boards, the

2 satisfaction of leveling up and the opportunity for sharing creative expressions. We believe

3 players are more likely to purchase virtual goods when they are connected to and playing with

4 their friends, whether those friends play for free or also purchase virtual goods."

5 36. The primary online distribution, marketing, promotion, and payment platform

6 for Zynga's games is Facebook, Inc. ("Facebok"). Zynga has acquired substantially all of its

7 online users through the Facebook platform and generates substantially all of its online gaming

8 and advertising revenue through games, applications, and advertisements on the Facebook

9 platform. Zynga earns approximately 80% of its bookings[2] through the Facebook platform.

10 37. On December 16, 2011, Zynga completed its IPO and issued 100 million shares

11 of Class A common stock in the IPO. The market valued Zynga at approximately \$10 billion,

12 and Zynga common stock opened trading at an initial price of \$11.00 per share, 10% above the

13 \$10 per share offering price. At the time of the IPO, Defendant Pincus owned 16% of Zynga's

14 Class B shares, providing him with 38.5% of Zynga's voting power.

15 38. According to "Management's Discussion and Analysis of Financial Condition

16 and Results of Operations" contained within the IPO's Prospectus:

17 In 2010, Zynga's revenue and bookings were \$597.5 million and \$838.9
million, respectively, which represented increases from 2009 of \$476.0
18 million and \$510.8 million, respectively. Consistent with our free-to-play
business model, compared to all players who play our games in any period,
19 only a small portion are payers. Because the opportunity for social
interactions increases as the number of players increases, we believe that
20 maintaining and growing our overall number of players, including the
number of players who may not purchase virtual goods, is important to the
21 success of our business. As a result, we believe that the number of players
who choose to purchase virtual goods will continue to constitute a small
22 portion of our overall players as our business grows.

23

24 \* \* \*

25
_____

26 [2] Bookings is a key financial metric used by Zynga to "evaluate the results of our
operations, generate future operating plans and assess the performance of our company."
Bookings - revenue less fees paid for use on web platforms such as Facebook, Inc. - depicts
27 the total value of virtual goods sold to users in Zynga's web games. According to Zynga,
"[b]ookings, as opposed to revenue, is the fundamental top-line metric we use to manage our
28 business, as we believe it is a better indicator of the sales activity in a given period."

1    *We are making significant investments in 2011 to drive long-term growth.*
     We continue to invest in game development, creating both new games and
2    new features and content in existing games designed to engage our players.
     We are also investing in other key areas of our business, including
3    international market development, mobile games and our technology
     infrastructure. During the fourth quarter of 2011, we expect to make capital
4    expenditures of approximately $50 million to $70 million as we invest in
     network infrastructure *to support our expected growth and to continue to*
5    *improve the player experience.*

6    (Emphasis added).

7        39.    Pursuant to the Prospectus filed with the SEC on December 16, 2011 for the

8    IPO, Zynga's officers and directors, including the Individual Defendants, agreed to certain

9    lock-up provisions, restricting their sale of Zynga common stock:

10       All of our officers and directors and the holders of substantially all of our
         capital stock have entered into lock-up agreements with us which provide
11       that they will not offer, sell or transfer any shares of our common stock
         beneficially owned by them for 165 days, subject in certain cases to
12       extension under certain circumstances, following the date of this prospectus.
         We have agreed with Morgan Stanley & Co. LLC and Goldman, Sachs &
13       Co. not to waive these lock-up restrictions without their prior consent.

14       40.    The lock-up restrictions were scheduled to expire on May 28, 2012.

15                    **Defendants' False and Misleading Statements and Omissions**

16       41.    On February 28, 2012, Zynga issued a press release on Form 8-K and filed a

17   corresponding Annual Report Form 10-K with the SEC announcing its financial results for the

18   fourth quarter and full year 2011. For the fourth quarter of 2011, Zynga reported record

19   bookings of $306.5 million, up 26% year-over-year and up 7% from the prior quarter. Zynga

20   reported full year 2011 record bookings of $1.16 billion, up 38% year-over-year, and revenue

21   of $1.14 billion, up 91% year-over-year. In response to these results, Defendant Pincus stated:

22       2011 was another milestone year for Zynga's mission of connecting the
         world through games. We are seeing social games and more broadly play
23       become one of the most popular pastimes on web and mobile. Zynga set new
         records in the year in terms of audience size, revenues and bookings. We saw
24       great momentum in mobile and advertising and ended the year with a strong
         pipeline of new games. We are excited about the opportunities in front of us
25       to continue delighting our current players and to bring play to millions of
         new people.

26       42.    In announcing its 2012 outlook, Zynga stated that "Bookings are projected to be

27   in the range of $1.35 billion to $1.45 billion. We expect that growth will be *weighted towards*

28   *the back-half of the year* with slower sequential growth in the first half of the year."

COMPLAINT                                                                                    -8-
Case No.

1  (Emphasis added).

2  43.  Upon announcement of these financial results, Zynga common stock reached a

3  February 28, 2012 trading high of $13.49 per share. On March 2, 2012, Zynga common stock

4  reached a Class Period trading high of $15.91 per share.

5  44.  On March 14, 2012, Zynga filed a Form S-1 Registration Statement and

6  Prospectus with the SEC in connection with a secondary offering of 49,414,526 shares of

7  Zynga's Class A common stock (the "Secondary Offering") for certain insider shareholders,

8  including the Individual Defendants. According to a statement issued by Zynga, "[t]he

9  principal purposes of the offering were to facilitate an orderly distribution of shares and to

10  increase the company's public float."

11  45.  According to "Management's Discussion and Analysis of Financial Condition

12  and Results of Operations" contained within the Prospectus:

13  In 2011, our revenue and bookings were $1.14 billion and $1.16 billion,
   respectively, which represented increases from 2010 of $542.6 million and
14  $316.6 million, respectively. Consistent with our free-to-play business
   model, compared to all players who play our games in any period, only a
15  small portion are payers. Because the opportunity for social interactions
   increases as the number of players increases, we believe that maintaining and
16  growing our overall number of players, including the number of players who
   may not purchase virtual goods, is important to the success of our business.

17  *  *  *

18  *We made significant investments in 2011 to drive long-term growth.* We
   continue to invest in game development, creating both new games and new
19  features and content in existing games designed to engage our players. We
   are also investing in other key areas of our business, including international
20  market development, mobile games and our technology infrastructure. In
   2012, we expect to make capital expenditures of up to $160 million as we
21  invest in network infrastructure *to support our expected growth and to
   continue to improve the player experience.* We expect to make additional
22  capital expenditures of $228 million in connection with the purchase of our
   corporate headquarters. In addition, assuming this purchase is completed, we
23  expect to make capital expenditures of $20 million to $25 million in 2012
   related to improvements for our corporate headquarters.

24  (Emphasis added).

25  46.  According to the Prospectus issued in connection with the Secondary Offering,

26  "[i]n connection with our initial public offering, all of our officers and directors and the

27  holders of substantially all of our capital stock entered into lock-up agreements with us, in

28  which they agreed not to offer, sell or transfer any shares of our common stock beneficially

1  owned by them for 165 days following the date of the initial public offering, subject to
2  extension under certain circumstances. We agreed with Morgan Stanley & Co. LLC and
3  Goldman, Sachs & Co. not to waive these lock-up restrictions without their prior consent.
4  These agreements are scheduled to expire on May 28, 2012."

5  47.   The Prospectus also imposed lock-up restrictions on Zynga employees,
6  prohibiting them from selling their shares of stock, stating that, "[a]s employees of Zynga,
7  however, these employees are subject to our employee trading window "blackout" policy,
8  which prohibits sales of our capital stock until the third business day after we release our
9  earnings for the second quarter, which we currently expect to occur in the last week of April."

10  48.   On March 23, 2012, before the Secondary Offering was completed, Zynga filed
11  an Amendment to Form S-1 with the SEC. The Amended Registration Statement authorized
12  the Secondary Offering of 42,969,153 shares of Class A common stock.   Zynga's March 23
13  Amended Prospectus waived the lock-up restrictions that previously restricted Zynga insiders
14  from selling their common stock until May 28, 2012. Indeed, the Prospectus announced "[w]e
15  are releasing the selling stockholders from these lock-ups to permit them to sell up to
16  49,414,526 shares (including the underwriters' option to purchase additional shares) in this
17  offering." On March 28, 2012, the Registration Statement used for the Secondary Offering
18  received a Notice of Effectiveness from the SEC, and the following day, the Prospectus used
19  in connection with the Secondary Offering was filed with the SEC.

20  49.   The March 23 lock-up restriction waiver enabled Zynga insiders, including the
21  Individual Defendants, to sell their shares of Zynga stock when the Secondary Offering was
22  completed on April 3, sooner than the May 28, 2012 expiration date.

23  50.   The Underwriter Defendants received approximately $15 million in fees by
24  Zynga for the Offerings and were granted over 6.4 million shares of Zynga stock in the
25  Secondary Offering.

26  51.   As detailed below, the Individual Defendants promptly sold the shares they
27  received in the Secondary Offering, for proceeds of over $500 million. While Zynga insiders
28  were able to sell their holdings at $12 per share before Zynga's second quarter financial results

COMPLAINT                                                                          -10-
Case No.

1  were announced, Zynga's non-executive employees and other public shareholders suffered
2  colossal losses on their investments.

3  52.  On April 26, 2012, Zynga issued a press release on Form 8-K with the SEC and
4  filed a corresponding Quarterly Report on Form 10-Q with the SEC announcing its financial
5  results for the first quarter of 2012. Zynga touted its growth in both web and mobile bookings,
6  reporting record bookings of $329 million for the quarter, up 15% year-over-year. The press
7  release announced that "[w]e're pleased with the progress that Zynga has made in the first
8  quarter growing our audience reach 25% year over year and nearly 20% quarter over quarter."

9  53.  In issuing its 2012 outlook, Zynga announced that "Bookings are projected to be
10  in the range of $1.425 billion to $1.5 billion. *We expect growth to be weighted towards the*
11  *second half of the year.*" (Emphasis added).

12  54.  Zynga misrepresented or failed to disclose material adverse facts about its
13  business, operations, and growth prospects including, among other things, that: (1) Zynga had
14  been experiencing a rapid decline in user numbers and virtual goods sold in existing web
15  games; (2) Zynga had faced substantial delays in launching new web games; and (3) Zynga's
16  revenue and bookings were entirely dependent on Facebook's online gaming platform.

17  **THE TRUTH BEGINS TO EMERGE**

18  55.  On July 25, 2012, Zynga announced its financial results for the second quarter
19  of 2012, reporting substantially lower than expected earnings and issuing a dismal forecast for
20  the rest of the year, sharply lowering its 2012 guidance.[3]

21  56.  Zynga reported a net loss of $22.8 million in the second quarter compared to a
22  net income gain of $1.4 million for the same quarter of 2011. Zynga's gross bookings for the
23  quarter decreased 9% to $301.6 million, compared to $329 million for the first quarter.[4] In

24
25  [3]  These results were subsequently reported on July 30, 2012 in the Form 10-Q filed by
Zynga with the SEC.

26  [4]  The July 30 10-Q reported that, "[f]or the three months ended June 30, 2012 and 2011,
we estimate that 80% and 93% of our quarterly bookings, respectively, was generated through
27  the Facebook platform. For the three months ended June 30, 2012 and 2011, we estimate that
87% and 93% of our quarterly revenue, respectively, was generated through the Facebook
28  platform.

COMPLAINT                                                                                              -11-
Case No.

1    addition, Zynga's sales for the quarter were $332.5 million, compared to the $343.1 million
2    that analysts had projected. Zynga also reported a profit of 1-cent per share, 84% less than the
3    expected 6-cents per share.

4        57.    In addition to reporting a dismal second quarter, Zynga announced that it was
5    drastically lowering its full-year outlook for the rest of 2012. Zynga lowered its projected
6    2012 gross bookings to a range of $1.15 billion to $1.23 billion, down from an April
7    projection of $1.43 billion to $1.5 billion. Zynga also lowered its earnings projections to a
8    range of 4-cents to 9-cents a share, compared to its prior expected range of 23-cents to 29-
9    cents a share. Moreover, Zynga decreased its full-year adjusted EBITDA guidance to $180 –
10   250 million, down from $400 – 450 million.

11       58.    Zynga's grim outlook for the second half of 2012, particularly in projected gross
12   bookings, directly contradicted management's prior comments about expected bookings
13   growth that Zynga's bookings would be weighted more heavily towards the second half of
14   2012.

15       59.    Zynga attributed its need to slash guidance for 2012 "to reflect delays in
16   launching new games, a faster decline in existing web games due in part to a more challenging
17   environment on the Facebook web platform, and reduced expectations for *Draw Something*."
18   Defendant Wehner stated that the dramatic forecast reduction reflected the ongoing trends in
19   Zynga's business, primarily the worse-than-expected performance of its existing games in the
20   second quarter.

21       60.    A July 26, 2012 *Seeking Alpha* article entitled "Zynga – A 40% Sell-Off Is
22   Warranted By The Bad Underlying Results" cited Zynga's financial results as "show[ing] that
23   user numbers at Zynga's games are fading quickly and successful games are not lasting very
24   long.    Add to that some runaway expenses, stock-based compensation and expensive
25   acquisitions and you will find the perfect storm that Zynga is witnessing now."

26       61.    A July 26, 2012 *24/7 Wall St.* article entitled "Reminder: Shareholders Do Not
27   Own Zynga" explained that "[Zynga's] core Farmville franchise has faltered. More recently

28

COMPLAINT                                                                                    -12-
Case No.

1 launched products have been flops…Rapid growth and the promise of social networks
2 temporarily blinded investors of those things."

3      62.    Prior to its July 25, 2012 announcement, Zynga had misrepresented and/or failed
4 to fully disclose the true extent to which it had been experiencing a sharp drop-off in users of its
5 most profitable web games and delays in developing new games to launch on social media
6 platforms. Indeed, a myriad of analysts expressed their shock at Zynga's lower than expected
7 earnings and lowered 2012 guidance.

8      63.    Zynga's July 25 announcement was met with negative response from analysts
9 who felt blindsided by Zynga's lower than expected results and slashed guidance, sparking a
10 flurry of analyst downgrades. A July 26, 2012 article from *The Wall Street Journal* entitled
11 "Zynga Shares Tank: Analysts Take Out Scalpel," observed that "Zynga's earnings disaster
12 has prompted analysts to come out swinging."

13      64.    Analysts Ben Schacter and John Merrick of Macquarie Securities Research stated
14 that the "shocking results and guidance raise our worst fears about the stability of the company's
15 business model and competitive positioning."

16      65.    Zynga's previously undisclosed financial problems were so unexpected that BTIG
17 LLC analyst Richard Greenfield issued a note to investors titled "We Are Sorry and Embarrassed
18 by Our Mistake" apologizing to investors for being bullish on Zynga, saying he was "really
19 caught by surprise" by Zynga's failure to monetize its games.

20      66.    In cutting his price target for Zynga stock from $12 to $5 per share, Scott Devitt of
21 Morgan Stanley likewise admitted, "[w]e were wrong about the current state of Zynga's business.
22 The severity of the guidance cut signifies the bear case is playing out, and Zynga faces significant
23 headwinds from its reliance on Facebook and transition to mobile." Likewise, Citigroup cut its
24 price target to $4 from $12, Barclays lowered its price target to $3 from $8, and Goldman Sachs
25 downgraded its rating on Zynga, removing Zynga from its "Americas Buy List."

26
27
28

1    67.    Upon this news, shares of Zynga common stock plummeted 40% down to a July

2    26, 2012 trading low of $2.97 per share, representing a loss in value of over 81% compared to

3    the March 2, 2012 Class Period trading high of $15.91 per share.[5]

4

## INSIDER SALES BY THE INDIVIDUAL DEFENDANTS

5    68.    The Individual Defendants sold off their personally held shares of Zynga stock

6    just a few months before Zynga's negative July 25 announcement.

7    69.    As detailed above, during the Class Period, Zynga insiders, including the

8    Individual Defendants, sold over 43 million personally held shares of Zynga stock at a price of

9    $12.00 per share for proceeds of approximately $516 million.

10    70.    After the announcement of Zynga's poor second quarter earnings, Zynga stock

11    plummeted to $2.97 per share. As noted by a July 26, 2012 *Yahoo Finance* article entitled

12    "Zynga Insiders Who Cashed Out Before The Stock Crashed," "Zynga insiders cashed out at

13    *exactly* the right time." (Emphasis in original).

14    71.    An April 23, 2012 *The Wall Street Journal* report entitled "Zynga insider

15    activity is all selling" reported that:

16        With its recently completed secondary offering, Zynga found an innovative
way to allow its top executives, early investors and other insiders to sell off
17        their stakes – despite IPO restrictions designed to prevent it.

18        As they sell, common shareholders...have watched their investments fall
through the floor.
19

                    *    *    *

20        Between the registration date of the offering and the day it closed on April 3
[2012], Zynga's IPO bankers, led by Goldman Sachs and Morgan Stanley,
21        agreed to modify the lockup restrictions that previously had prevented the
social-game maker's insiders from selling their shares.
22

23        *And sell they did.*

24        By the time the cash register closed, [Defendant Pincus] and other insiders
unloaded more than 49 million shares at a price of $12 per share. The
        offering, which included more than 6 million shares bought by the
25        company's IPO underwriters, generated $593 million for the sellers, while
providing nothing to Zynga or its common shareholders.
26

27

28    <sup>5</sup>   Zynga's stock plunge was so swift and severe that it triggered the SEC's so-called
alternative uptick rule, which aims to limit the impact of short sellers on a stock price.

---

1

As the company said in its April 3 statement, "Zynga did not receive any proceeds from the sale of shares in the offering."

2    (Emphasis added).

3        72.    Since completion of Zynga's Secondary Offering on April 3, Zynga's common

4    stock value has dropped an astounding 75%. The Individual Defendants avoided such losses,

5    having sold 43 million shares of personally held stock at a price of $12.00 per share shortly

6    before publicly announcing Zynga's dismissal financial results.

7        73.    As a July 26, 2012 news article by Gamasutra, an online version of Game

8    Developer Magazine, entitled "Zynga CEO cashed out for $200M before stock implosion,"

9    pointed out, the "fortunate timing of [Zynga insiders] cashouts – conducted in the same quarter

10    when Zynga's business appeared to deteriorate to the point that its share prices collapsed once

11    investors were updated on its status – has raised a few eyebrows." In a post on Business

12    Insider, Henry Blodget also cited the suspicious timing of the insider sales, saying "it doesn't

13    look very good" considering the insider sales occurred in the same quarter that Zynga's

14    business "imploded."

15        74.    During a conference call held by Zynga to discuss its second quarter financial

16    results, BTIG analyst, Richard Greenfield, questioned Defendant Pincus about the timing of

17    Defendant Pincus' sale of his personally held shares. Defendant Pincus declined to address

18    the issue, instead responding off-topic that "we believe in the opportunity for social gaming

19    and play to be a mass-market activity, as it is already becoming."

20                                    **LOSS CAUSATION**

21        75.    Defendants' wrongful conduct, as alleged herein, directly and proximately

22    caused the economic loss suffered by Plaintiff and the Class.

23        76.    During the Class Period, Plaintiff and the Class purchased common stock of

24    Zynga at artificially inflated prices and were damaged thereby. The price of Zynga common

25    stock declined when the misrepresentations made to the market, and/or the information alleged

26    herein to have been concealed from the market, and/or the effects thereof, were revealed,

27    causing investors' losses.

28

1

**SCIENTER ALLEGATIONS**

2      77.    As alleged herein, the defendants acted with scienter in that defendants knew or

3  recklessly disregarded that the public documents and statements issued or disseminated in the

4  name of Zynga were materially false and misleading; knew or recklessly disregarded, that

5  such statements or documents would be issued or disseminated to the investing public; and

6  knowingly participated or acquiesced in the issuance or dissemination of such statements or

7  documents as primary violations of the federal securities laws. As set forth elsewhere herein

8  in detail, the defendants, by virtue of their receipt of information reflecting the true condition

9  of Zynga's business operations and future prospects, their control over, and/or receipt and/or

10  modification of Zynga's allegedly materially misleading misstatements and/or their

11  associations with Zynga, which made them privy to confidential proprietary information

12  concerning Zynga, participated in the wrongful conduct alleged herein.

13

14

**APPLICABILITY OF PRESUMPTION OF RELIANCE THROUGH
FRAUD-ON-THE-MARKET DOCTRINE**

15      78.    At all relevant times, the market for Zynga's common stock was an efficient market

16  for the following reasons, among others:

17            (a)    Zynga's stock met the requirements for listing, and was listed and

18  actively traded on the NasdaqGS, which is a highly efficient and automated market;

19            (b)    As a regulated issuer, Zynga filed periodic public reports with the SEC and

20  the NasdaqGS;

21            (c)    Zynga regularly communicated with public investors via established market

22  communication mechanisms, including through regular disseminations of press releases on

23  the national circuits of major newswire services and through other wide-ranging public

24  disclosures, such as communications with the financial press and other similar reporting

25  services; and

26            (d)    Zynga was followed by several securities analysts employed by

27  major brokerage firms who wrote reports that were distributed to the sales force and

28

COMPLAINT                                                                              -16-
Case No.

1    certain customers of their respective brokerage firms during the Class Period. Each of these

2    reports was publicly available and entered the public marketplace.

3        79.    As a result of the foregoing, the market for Zynga's common stock promptly

4    digested current information regarding Zynga from all publicly available sources and reflected

5    such information in Zynga's stock price. Under these circumstances, all purchasers of

6    Zynga's common stock during the Class Period suffered similar injury through their purchase

7    of Zynga's common stock at artificially inflated prices, and a presumption of reliance applies.

8                                  **NO SAFE HARBOR**

9        80.    Zynga's verbal "Safe Harbor" warnings accompanying its oral forward-looking

10   statements ("FLS") issued during the Class Period were ineffective to shield those statements

11   from liability.

12       81.    The defendants are also liable for any false or misleading FLS pleaded because, at

13   the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

14   authorized and/or approved by an executive officer of Zynga who knew that the FLS was false.

15   None of the historic or present tense statements made by defendants were assumptions underlying

16   or relating to any plan, projection or statement of future economic performance, as they were not

17   stated to be such assumptions underlying or relating to any projection or statement of future

18   economic performance when made, nor were any of the projections or forecasts made by the

19   defendants expressly related to or stated to be dependent on those historic or present tense

20   statements when made.

21                                  **COUNT I**
                          **Violations of Section 11 of the Securities Act**
22                              **(Against All Defendants)**

23       82.    Plaintiff repeats and realleges each and every allegation contained above. For

24   purposes of this Court, however, Plaintiff expressly excludes and disclaims any allegation that

25   could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based

26   solely on claims of strict liability and/or negligence under the Securities Act.

27       83.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k,

28   on behalf of the Class, against all defendants.

COMPLAINT                                                                                    -17-
Case No.

1  84. The Registration Statements issued in connection with Zynga's IPO and
2  Secondary Offering were false and misleading, contained untrue statements of material facts,
3  omitted to state other facts necessary to make the statements made not misleading and omitted to
4  state material facts required to be stated therein.

5  85. Zynga is the registrant and, as such, is strictly liable to Plaintiff and the Class for
6  the misstatements and omissions contained in the Registration Statements.

7  86. The Individual Defendants named in this Count were responsible for the contents
8  and dissemination of the Registration Statements. Each of the Individual Defendants named in
9  this Count signed or authorized the signing of the Registration Statements.

10  87. None of the Defendants named herein possessed reasonable grounds for the
11  belief that the statements and omissions contained in the Registration Statements were true and
12  without omissions of any material facts and were not misleading.

13  88. By reason of the conduct herein alleged, each defendant violated, and/or
14  controlled a person who violated, Section 11 of the Securities Act.

15  89. Plaintiff acquired Zynga stock pursuant to and/or traceable to the Registration
16  Statements.

17  90. Plaintiff and the Class have sustained damages. At the time of their acquisition of
18  Zynga stock, Plaintiff and the other members of the Class were without knowledge of the facts
19  concerning the wrongful conduct alleged herein. Less than one year has elapsed from the time
20  Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is
21  based and the time Plaintiff filed this Complaint. Less than three years elapsed since the stock
22  upon which this Count is brought was bona fide offered to Plaintiff and the Class.

## COUNT II
### Violations of Section 12(a)(2) of the Securities Act
### (Against Zynga and the Underwriting Defendants)

25  91. Plaintiff repeats and realleges each and every allegation contained above. For
26  purposes of this Court, however, Plaintiff expressly excludes and disclaims any allegation that
27  could be construed as alleging fraud or intentional or reckless misconduct, as this Count is
28  based solely on claims of strict liability and/or negligence under the Securities Act.

1    92.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act against all

2    Zynga and the Underwriting Defendants.

3    93.    By means of the defective Prospectuses created and disseminated by Zynga and

4    the Underwriting Defendants in connection with Zynga's IPO and Secondary Offering, Zynga

5    and the Underwriting Defendants assisted in the offering of shares of Zynga stock to Plaintiff and

6    other members of the Class.

7    94.    The Prospectuses contained misrepresentations and untrue statements of

8    material fact, and concealed and failed to disclose material facts, as detailed above. Zynga

9    owed Plaintiff and the other members of the Class who acquired Zynga stock pursuant to the

10   Prospectuses the duty to make a reasonable and diligent investigation of the statements

11   contained in the Prospectuses to ensure that such statements were true and that there was no

12   omission to state a material fact required to be stated in order to make the statements contained

13   therein not misleading.  Zynga, in the exercise of reasonable case, should have known of the

14   misstatements and omissions contained in the Prospectuses as set forth above and/or should

15   have updated investors regarding material information about the Secondary Offering.

16   95.    Plaintiff did not know, nor in the exercise of reasonable diligence could have

17   known, of the untruths and omissions contained in the Prospectuses at the times Plaintiff acquired

18   Zynga stock during the Class Period.

19   96.    By reason of the conduct alleged herein, Zynga and the Underwriting Defendants

20   violated § 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations,

21   Plaintiff and the other members of the Class who acquired Zynga stock pursuant to and/or

22   traceable to the Prospectuses sustained substantial damages.

23   **COUNT III**
     **Violations of Section 15 of the Securities Act**
24   **(Against the Individual Defendants)**

25   97.    Plaintiff repeats and realleges each and every allegation contained above.  For

26   purposes of this Court, however, Plaintiff expressly excludes and disclaims any allegation that

27   could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based

28   solely on claims of strict liability and/or negligence under the Securities Act.

1        98.    This Count is brought pursuant to Section 15 of the Securities Act against the

2 Individual Defendants.

3        99.    Each of the Individual Defendants was a control person of Zynga by virtue of his

4 or her position as a director and/or executive officer of Zynga which allowed each of the

5 Individual Defendants to exercise the power and influence over Zynga and its operations to

6 allowed Zynga to engage in the acts described herein.

7       100.   Each of the Individual Defendants was a participant in the violations of Sections

8 11 and 12 of the Securities Act alleged in the Counts above, based on their having signed or

9 authorized the signing of the Registration Statements and filling the Prospectuses, and having

10 otherwise participated in and had knowledge of the false and misleading statements and

11 material omissions disseminated to Plaintiff and the Class.

12

13

14

**COUNT IV**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

15       101.   Plaintiff repeats and realleges each and every allegation contained above as if

16 fully set forth herein.

17       102.   During the Class Period, the defendants carried out a plan, scheme, and course of

18 conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing

19 public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff

20 and other members of the Class to purchase Zynga's securities at artificially inflated prices. In

21 furtherance of this unlawful scheme, plan and course of conduct, the defendants, both

22 collectively and individually, took the actions set forth herein.

23       103.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made

24 untrue statements of material fact and/or omitted to state material facts necessary to make the

25 statements not misleading; and (c) engaged in acts, practices, and a course of business that

26 operated as a fraud and deceit upon the purchasers of Zynga's securities in an effort to maintain

27 artificially high market prices for Zynga's securities in violation of Section 10(b) of the Exchange

28 Act and Rule 10b-5 thereunder.

1    104. Defendants, directly and indirectly, by the use, means or instrumentalities of
2    interstate commerce and/or the mails, engaged and participated in a continuous course of
3    conduct to conceal adverse material information about the business, operations and future
4    prospects of Zynga as specified herein.

5    105. Defendants employed devices, schemes, and artifices to defraud while in possession
6    of material adverse non-public information, and engaged in acts, practices, and a course of
7    conduct as alleged herein in an effort to assure investors of Zynga's value and performance
8    and continued substantial growth, which included the making of, or participation in the making of,
9    untrue statements of material facts and omitting to state material facts necessary in order to
10   make the statements made about Zynga and its business operations and future prospects in the
11   light of the circumstances under which they were made, not misleading, as set forth more
12   particularly herein, and engaged in transactions, practices and a course of business that operated
13   as a fraud and deceit upon the purchasers of Zynga's securities during the Class Period.

14   106. Defendants had actual knowledge of the misrepresentations and omissions of
15   material facts set forth herein, or acted with reckless disregard for the truth in that they failed
16   to ascertain and to disclose such facts, even though such facts were available. even though
17   such facts were available. Such material misrepresentations and/or omissions were done
18   knowingly or recklessly and for the purpose and effect of concealing Zynga's operating condition
19   and future business prospects from the investing public and supporting the artificially
20   inflated price of its securities. As demonstrated by overstatements and misstatements of
21   Zynga's financial condition throughout the Class Period, if the defendants did not have actual
22   knowledge of the misrepresentations and omissions alleged, they were reckless in failing to
23   obtain such knowledge by deliberately refraining from taking those steps necessary to discover
24   whether those statements were false and misleading.

25   107. As a result of the dissemination of the materially false and misleading information
26   and failure to disclose material facts, as set forth above, the market price of Zynga's securities
27   was artificially inflated during the Class Period. In ignorance of the fact that market prices of
28   Zynga's publicly-traded securities were artificially inflated, and relying directly or indirectly on

COMPLAINT                                                                          -21-
Case No.

1    the false and misleading statements made by the defendants, or upon the integrity of the market in

2    which the common stock trades, and/or on the absence of material adverse information that was

3    known to or recklessly disregarded by the defendants, but not disclosed in public statements by

4    the defendants during the Class Period, Plaintiff and the other members of the Class acquired

5    Zynga common stock during the Class Period at artificially high prices, and were, or will be,

6    damaged thereby.

7    108.    At the time of said misrepresentations and omissions, Plaintiff and other members

8    of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the

9    other members of the Class and the marketplace known the truth regarding Zynga's financial

10    results, which was not disclosed by the defendants, Plaintiff and other members of the Class would

11    not have purchased or otherwise acquired their Zynga securities, or, if they had acquired such

12    securities during the Class Period, they would not have done so at the artificially inflated prices

13    that they paid.

14    109.    As a direct and proximate result of the defendants' wrongful conduct, Plaintiff and

15    other members of the Class suffered damages in connection with their purchases of Zynga's

16    securities during the Class Period.

17    110.    This action was filed within two years of discovery of the fraud and within five years

18    of Plaintiff's purchases of securities giving rise to the cause of action.

19                                              **COUNT V**
                            **Violations of Section 20(a) of the Exchange Act for the**
20                            **(Against Zynga and the Individual Defendants)**

21    111.    Plaintiff repeats and realleges each and every allegation contained above as if

22    fully set forth herein,

23    112.    The Individual Defendants acted as controlling persons of Zynga within the meaning

24    of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

25    positions, agency, and their ownership and contractual rights, participation in and/or

26    awareness of Zynga's operations and/or intimate knowledge of the false financial statements

27    filed by Zynga with the SEC and disseminated to the investing public, the Individual Defendants

28    had the power to influence and control, and did influence and control, directly or indirectly, the

1  decision-making of Zynga, including the content and dissemination of the various statements

2  that plaintiff contends are false and misleading. The Individual Defendants were provided with

3  or had unlimited access to copies of Zynga's reports, press releases, public filings and other

4  statements alleged by Plaintiff to have been misleading prior to and/or shortly after these

5  statements were issued and had the ability to prevent the issuance of the statements or to cause the

6  statements to be corrected.

7  113. In particular, each Individual Defendant had direct and supervisory involvement

8  in the day-to-day operations of Zynga and, therefore, is presumed to have had the power to

9  control or influence the particular transactions giving rise to the securities violations as alleged

10  herein, and exercised the same.

11  114. As set forth above, the defendants each violated Section 10(b) and Rule 10b-5 by

12  their acts and omissions as alleged in this Complaint.

13  115. By virtue of their positions as controlling persons, the Individual Defendants are

14  liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of

15  the defendants' wrongful conduct, Plaintiff and other members of the Class suffered

16  damages in connection with their purchases of Zynga common stock during the Class Period.

17  116. This action was filed within two years of discovery of the fraud and within five

18  years of Plaintiff's purchases of securities giving rise to the cause of action.

19  **WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

20  (d) Determining that this action is a proper class action, designating Plaintiff as

21  Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules

22  of Civil Procedure and Plaintiff's counsel as Lead Counsel;

23  (e) Awarding compensatory damages in favor of Plaintiff and the other

24  Class members against all defendants, jointly and severally, for all damages sustained as a

25  result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

26  (f) Awarding Plaintiff and the Class their reasonable costs and expenses

27  incurred in this action, including counsel fees and expert fees; and

28

1           (g)    Awarding such other and further relief as the Court may deem just and

2    proper.

3    **JURY TRIAL DEMANDED**

4        Plaintiff hereby demands a trial by jury.

5    Dated: July 30, 2012                  **KESSLER TOPAZ MELTZER**

6                                         **& CHECK LLP**

7

8                                        Ramzi Abadou
                                         One Sansome Street, Suite 1850

9                                        San Francisco, CA 94104
                                         Tel: (415) 400-3000

10                                       Fax: (415) 400-3001

11                                       *Liaison Counsel*

12                                       **NEWMAN FERRARA LLP**
                                         Jeffrey M. Norton

13                                       Roy Shimon
                                         1250 Broadway, 27th Floor

14                                       New York, NY 10001
                                         Tel: (212) 619-5400

15                                       Fax: (212) 619-3090

16                                       *Attorneys for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                                      -24-
Case No.



1250 Broadway, 27ᵗʰ Fl.    New York, NY 10001
(t.) 212.619.5400  (f) 212.619.3090

## INVESTOR CERTIFICATION

**I CERTIFY THAT:**

A. I have reviewed the complaint and authorized its filing;

B. I did not acquire the security that is the subject of this action at the direction of counsel or in order to participate in this private action or any other litigation under the federal securities laws;

C. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

D. I represent and warrant that I am fully authorized to enter into and execute this certification;

E. I will not accept any payment to serve as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court;

During the three years prior to the date of this certification, I have not sought to serve or served as a representative party for a class in an action filed under the federal securities law except if detailed below:

F. Except those set forth in the following transaction list, I have made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action (attach additional pages if needed):

| PURCHASES | | | SALES | | |
|---|---|---|---|---|---|
| DATE SHARES PURCHASED | NUMBER OF SHARES | PRICE PER SHARE | DATE SHARES SOLD | NO. OF SHARES | PRICE PER SHARE |
| 7/25/12 | 20,000 | $3.25 | 7/12/12 | 7,950 | $4.83 |
| 7/24/12 | 8,000 | $4.92 | | | |
| 7/17/12 | 10,000 | $4.68 | | | |
| 7/17/12 | 8,000 | $4.50 | | | |
| 7/13/12 | 7,950 | $4.97 | | | |
| 6/12/12 | 2,740 | $5.03 | | | |
| 5/29/12 | 7,000 | $6.10 | | | |
| 5/18/12 | 10,000 | $8.20 | | | |
| 5/18/12 | 5,000 | $8.01 | | | |

### SECURITIES ACQUIRED BY:

☒ Purchased

☐ While an Employee of the Company

☐ Through the Company's 401K or retirement plan

☐ Through the Company's employee stock purchase program

☐ Other (explain): _____

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _7/27/12_

(Signature)

**FAX (212.619.3090) OR EMAIL (rshimon@nfllp.com) THIS DOCUMENT BACK TO US**