Joseph J. Tabacco, Jr. (SBN 75484)
Nicole Lavallee (SBN 165755)
Victor Elias (SBN 262269)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6282
Email: jtabacco@bermandevalerio.com
        nlavallee@bermandevalerio.com
        velias@bermandevalerio.com

Jeffrey M. Norton (Admitted *Pro Hac Vice*)
Roy Shimon (Admitted *Pro Hac Vice*)
**NEWMAN FERRARA LLP**
1250 Broadway, 27th Floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
Email: jnorton@nfllp.com
        rshimon@nfllp.com

Co-Lead Counsel and Attorneys for
Lead Plaintiff David Fee and Named Plaintiff Joy Arjoon-Singh

[*Additional counsel on signature page*]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE ZYNGA INC. SECURITIES LITIGATION | Lead Case No. 3:12-cv-04007-JSW |
| | Consolidated with Case Nos. |
| | 12-CV-4048-JSW |
| | 12-CV-4059-JSW |
| | 12-CV-4064-JSW |
| | 12-CV-4066-JSW |
| This Document Relates To: | 12-CV-4133-JSW |
| All Actions. | 12-CV-4250-JSW |
| | **CONSOLIDATED COMPLAINT** |
| | **CLASS ACTION** |

# TABLE OF CONTENTS

**PAGE**

I.    NATURE OF THE ACTION .................................................................. 1

II.   JURISDICTION AND VENUE ......................................................... 10

III.   THE PARTIES.................................................................................. 11

     A.     PLAINTIFFS ........................................................................ 11

     B.     DEFENDANTS ..................................................................... 11

           1.     The Company ............................................................ 11

           2.     The Officer Defendants............................................ 12

           3.     The Director Defendants ......................................... 13

           4.     The Underwriter Defendants.................................... 14

IV.   CLASS ACTION ALLEGATIONS ................................................... 15

V.    BACKGROUND ............................................................................. 18

     A.     CONFIDENTIAL WITNESSES ........................................ 18

     B.     OVERVIEW OF ZYNGA'S BUSINESS............................. 27

           1.     Zynga's Free-to-Play Model Relied on Sales of Virtual Goods In Its Games To A Small Percentage of Users................................................27

           2.     Zynga's Relationship with Facebook.......................... 30

           3.     Zynga's Key Financial and Operating Metrics ........................ 30

           4.     Overview of Zynga's Revenue Recognition Practices ............................ 32

     C.     THE IPO .............................................................................. 34

     D.     THE SECONDARY OFFERING...................................... 36

VI.   THE EXCHANGE ACT DEFENDANTS' ACTIONABLE CONDUCT ..................... 37

     A.     THE EXCHANGE ACT DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD.................................................................. 37

     B.     THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS............................................. 38

           1.     IPO Materials ............................................................ 38

           2.     Fourth Quarter 2011 ("Q4 2011") Results and 2012 Guidance.............. 42

3.      Secondary Offering Materials ................................................. 48

4.      First Quarter 2012 ("Q1 2012") Results and Revised 2012 Guidance .... 52

5.      J.P. Morgan Global Technology, Media and Telecom Conference ......... 58

C.      THE TRUTH IS REVEALED ......................................................... 61

D.      ADDITIONAL SCIENTER ALLEGATIONS REGARDING THE EXCHANGE ACT DEFENDANTS ..................................................... 69

1.      The Fact That The Exchange Act Defendants Prematurely Removed Lock-Up Restrictions On Their Shares In Order To Engage In Massive Insider Trading On Zynga's Artificially Inflated Stock Price Supports A Strong Inference Of Scienter ..................................... 70

2.      Given Zynga's Internal Monitoring, The Exchange Act Defendants Were Either Aware Of Or Deliberately Ignored That Key Metrics, Such As Bookings, Were Falling And That Game Launches Were Delayed. .............................................................................. 74

3.      Prior To Its Second Quarter Earnings Release, Zynga Had Knowledge Of Facebook's Platform Changes That Would Adversely Affect Zynga's Business ........................................... 80

4.      The Timing Of The Collapse Of Zynga's Business Shortly After The Exchange Act Defendants Issued False Statements Further Supports Scienter ................................................................................ 81

5.      The Misconduct Related To Zynga's Core Business ............................. 82

6.      Defendants Pincus And Wehner's Sox Certifications Further Evidence Their Scienter .................................................................. 83

7.      The Confluence Of These Factors Evidence That Zynga's Reduction In WAL Was Designed To Manipulate Its Revenue Figures In Order To Artificially Inflate The Current Condition Of Its Business ............... 85

8.      Contemporaneous Departures Of Zynga's Top Executives And Undisclosed Management Restructuring Supports A Strong Inference Of Scienter ................................................................. 87

E.      LOSS CAUSATION/ECONOMIC LOSS ........................................ 88

F.      PRESUMPTION OF RELIANCE ................................................... 92

VII.      THE UNTRUE STATEMENTS CONTAINED IN THE OFFERING MATERIALS ARE ACTIONABLE UNDER THE SECURITIES ACT ..................... 93

A.      THE OFFERING MATERIALS CONTAINED UNTRUE STATEMENTS ..... 93

1.      Untrue Statements in the IPO Offering Materials .................................. 93

2.      Untrue Statements in the Secondary Offering Materials ......................... 95

      B.     ADDITIONAL FACTS REGARDING THE FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE DUE DILIGENCE ................................................................................................96

VIII.   NO SAFE HARBOR ...............................................................................97

CLAIMS FOR RELIEF .................................................................................98

     COUNT I ...............................................................................................98

     COUNT II ............................................................................................100

     COUNT III ...........................................................................................103

     COUNT IV...........................................................................................104

     COUNT V .............................................................................................107

     COUNT VI ...........................................................................................108

PRAYER FOR RELIEF ..............................................................................109

Court-appointed Lead Plaintiff David Fee and Plaintiff Joy Arjoon-Singh (collectively, "Plaintiffs"), by and through their undersigned counsel, bring claims arising under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"), individually and on behalf of a class of similarly situated persons and entities, except defendants and their affiliates, who purchased Zynga, Inc. ("Zynga" or the "Company") common stock in an initial public offering completed on December 15, 2011 (the "IPO"), in a secondary offering completed on April 3, 2012 (the "Secondary Offering") (hereinafter collectively referred to as the "Offerings"), and/or on the open market from December 15, 2011 through and including July 25, 2012 (the "Class Period").

Plaintiffs allege the following based upon the investigation of Plaintiffs' counsel, except as to the allegations specifically pertaining to Plaintiffs, which are based upon personal knowledge. The investigation of counsel included, among other things, a review of Zynga's public filings with the United States Securities and Exchange Commission ("SEC"); press releases and other public statements issued by defendants; analyst, media and news reports about the Company; publicly available trading data for Zynga's securities; and discussions with former employees of the Company.

I.      NATURE OF THE ACTION

1.      This action arises from a deliberate scheme by the Exchange Act Defendants (defined *infra*) to defraud Zynga's investors by taking steps to artificially inflate the price of Zynga stock in order to allow certain individual defendants to reap hundreds of millions of dollars in proceeds from the sale of their personally held shares. To carry out their scheme, the Exchange Act Defendants: (a) issued false and misleading information regarding Zynga's revenue, bookings and other key metrics; (b) falsely assured investors not to focus on declining daily active users ("DAU"), stating that there was not a direct correlation between DAU and monetization because as DAU go down, monetization goes up when, in fact, monetization was rapidly declining; (c) failed to disclose delays in product launches; (d) issued aggressive and unsupportable full-year guidance for 2012; and (e) repeatedly assured investors that Zynga's

bookings and business growth would be more heavily weighted in the second half of 2012. Yet all the while, the Exchange Act Defendants were concealing material, adverse information regarding Zynga's real-time bookings and user data and game pipeline available for the second half of 2012. While Zynga's stock was trading at artificially inflated prices, the Exchange Act Defendants, other defendants and insiders obtained an early release on a lock-up of their personally held shares of Zynga common stock 55 days before the lock-up was scheduled to expire. This lock-up removal allowed a select group of Zynga insiders to sell 49.4 million personally-held shares for over $593 million in proceeds, less than four months before, and during the same quarter for which, Zynga revealed to the market that its business was imploding and that it would not come close to meeting previously-issued guidance for the second half of 2012. These revelations led to a one-day stock price drop of over 37%.

2. Zynga is a leading provider of social game services and develops, markets and operates online social games as live services played over the Internet and on social networking sites and mobile platforms, such as Facebook, Inc. ("Facebook") In employing a free-to-play business model, Zynga generates revenue primarily through the in-game sale of virtual currency to users which is used to buy virtual goods to enhance their game playing experience by, among other things, extending their play sessions, personalizing their game environments, accelerating their progress through the game and sending unique gifts to their friends.

3. Zynga's methodology for recognizing revenue enables it to manipulate revenue and perceived growth, including user and game-operating metrics, such as the life of a game, a customer or a virtual good. Under Zynga's revenue recognition practices, funds received for consumable goods were recognized immediately and funds received for durable goods, which made up the majority of the virtual goods sold, were recognized over time based on the weighted average life ("WAL") of the durable good. On a quarterly basis, Zynga calculated WAL by estimating the average playing period for paying players by game, beginning at the time of a payer's first purchase in that game and ending on the date when that paying player is no longer playing the game. As Zynga stated in its March 29, 2012 Form 424B4 Prospectus,

using a management-assigned WAL, Zynga would "record the sale of virtual goods as deferred revenue and then recognize that revenue over the estimated average life of the purchased virtual goods or as the virtual goods are consumed." Thus, the shorter the WAL that Zynga assigned to a virtual durable good, the larger the amount of revenue it could recognize in the immediate, short-term period.

4.    In evaluating the performance of Zynga's business and the strength of its results of operations, Zynga also utilizes a key financial metric known as bookings. Bookings is a non-GAAP financial measure derived from revenue, which represents the dollar-amount of virtual goods sold to game players in the current period, whereas revenue is the amount bought in prior periods amortized over the expected life of the virtual goods. Bookings differs from recorded revenue in that recorded revenue takes into account that durable goods were amortized using a WAL and, thus, the revenue received for such goods was recognized over time. According to Zynga, "[b]ookings, as opposed to revenue, is the fundamental top-line metric we use to manage our business, as we believe it is a better indicator of the sales activity in a given period."

5.    According to the prospectus issued by Zynga in connection with its IPO, "[w]e generate most of our bookings and revenue from the sale of virtual goods in our games. The degree to which our players choose to pay for virtual goods in our games is driven by our ability to create content and virtual goods that enhance the game-play experience. Our bookings, revenue and overall financial performance are affected by the number of players and the effectiveness of our monetization of players through the sale of virtual goods and advertising."

6.    Zynga is a data-driven company that obsessively tracks revenues for its games, bookings and user and game-operating metrics on a real-time basis, providing management with up-to-the-minute updates on the activity and purchases of every user of every game. As a company driven by daily revenue and bookings generated from the number of games played and the amount of virtual goods purchased by users, tracking this data on a real-time basis

enabled Zynga to accurately evaluate the results of its operations, generate future operating plans and assess the performance of every game and the Company as a whole. As described by a July 31, 2012 article in *The Verge*, "[t]hey analyze every action in the game and try to optimize the business."

7. For example, Confidential Witness ("CW") 9,[1] a Senior Producer at Zynga who reported to Zynga's Chief Information Officer, explained that Zynga's headquarters distributed a code to all of its studios to implant into each of that studio's games. This code automatically recorded a game's "output," such as how many times the game was played, how many users played the game and other game-operating metrics. CW9 stated that Zynga servers also tracked revenue and Zynga "kept track of revenue on a per user basis." These statistics were automatically reported to Zynga on a real-time basis and were used by Zynga to calculate actual and expected revenue for each game. According to CW9, all studio managers and Zynga's senior management had the ability to access this real-time output for every game.

8. As several CWs explained, Zynga tracked the number of DAU and revenue on a daily basis through an in-house computer system that generated DAU numbers and revenue results. Zynga also tracked in-game purchases made by users through payment processing systems for all of the platforms to show real-time data on how much money all players were spending daily for Zynga's games.

9. According to numerous CWs, the real-time updates on the number of DAU and the average revenue per DAU and similar metrics were available to anyone at any time. Zynga employees of every office had access to Zynga's computer system in order to view the real-time updates on exactly how well each game was performing. According to CW2, a Quality Control analyst, Zynga had "flat screens" and "monitors" in its offices and employees could "ping the computer" whenever they wanted to "see how many active users were on and how many were spending money."

---

[1] The CWs are further defined in Section V.A., *infra*.

10.     As demonstrated by the accounts of CWs and other reports, because of their access to such real-time data leading up to Zynga's IPO and throughout the Class Period, Zynga's management was privy to inside information revealing that, beginning in mid-2011 (before Zynga's IPO), Zynga became aware of declines in user spending, revenue and bookings that were taking place "across the board."  Notably, CW2 admitted that "we knew the Company was not doing well before the IPO launch."

11.     CW10, a Senior Product Manager, learned of bookings declines in late 2011 and into 2012 due to games not materializing well.  In fact, CW10 had regular meetings with Zynga's Chief Operating Officer and various executive vice presidents to determine and discuss Zynga's actual and expected revenues for games and upcoming quarter estimates.  CW10 stated that every product manager at Zynga was responsible for providing certain members of Zynga's executive-level management (known as "E-Staff") with weekly, monthly, and quarterly projections of expected revenues for each game.  According to CW10, "[e]very game has to get signed off on" by top management before the estimates were finalized.

12.     According to numerous CWs, Zynga's problem monetizing its games amidst decreases in user spending was "was the same story" for the thirty to forty games Zynga had released in mid-2011.  Zynga's difficulties with monetization were not isolated to a select few games.

13.     In addition, Zynga's management received daily reports from project managers providing a detailed breakdown by game of all the money users were spending on Zynga's games, showing exactly how many active users were playing and how much money the users were spending.  CW10 disclosed that a weekly report called the "Executive Summary" was sent to Zynga's E-Staff describing the actual and expected revenues of each game and updating where each unreleased Zynga game was in the process of being designed and scheduled for launch.  For every game that was launched, CW10 said product managers would report actual and expected revenue for their games to the studio general manager on a weekly basis.  The general manager, who was responsible for managing multiple games at his/her studio, would then write a cumulative report on

all games, an Executive Summary, that would go directly to both Zynga's finance department and Zynga's executives. According to CW10, the Executive Summaries and game revenue projections provided to upper management were a collaboration between product managers, studio general managers and certain members of Zynga's E-Staff.

14. In addition to the Executive Summary, CW10 stated that the "Central Product Management" team also published a weekly report to upper management regarding the status of design, delay and launch of all games.

15. As to the knowledge of Zynga executives, CW7, a head director of Zynga's Mobile Division, stated that there was "no way" top executives could not know about all the game delays. CW2 acknowledged that "they all knew the metrics of how many users were playing and how many of them were spending money." CW8, a senior Product Marketing Manager, believed that "Mark Pincus and John Schappert were aware of what was going on" with respect to bookings, revenue and financial results. CW2 believed that "[Mark] Pincus had access to everything."

16. Using its access to this real-time data showing declines in user numbers and user spending and its ability to manipulate reported revenue, Zynga took creative accounting measures leading up to the IPO and throughout the Class Period to artificially inflate Zynga's reported revenue and net income in order to make Zynga's business appear to be stronger than it was in the short-term. To carry out this scheme, the Exchange Act Defendants reduced applicable WAL, and, thus, deceptively shifted losses backwards and pushed reported revenue forward for the period leading up to the IPO and the first quarter of 2012, at the expense of negatively-impacting recognizable revenue for the remainder of 2012. Indeed, Zynga made such changes to its revenue recognition model leading-up to its IPO in order to increase revenue by $27.3 million. This change turned a loss for the six months ended June 30, 2011 into a net profit of $18.1 million.

17. As stated in Zynga's March 29, 2012 Prospectus, "[t]he estimated WAL of durable virtual goods for bookings was 18 months for 2010 compared to 15 months for 2011." However, in September 2011, just prior to the IPO, Zynga reported that the average life of its

virtual goods declined to 11 months in the second quarter of 2011. In 2011, cumulative changes in Zynga's estimated WAL of durable virtual goods for various games resulted in a net increase in revenue of $53.9 million in 2011.

18. While manipulating its reported revenue leading up to the IPO, Zynga took active steps to conceal the true condition of Zynga's business and growth potential. Zynga's management assured investors that there was a growing supply of new games in the pipeline that Zynga could monetize in the second half of 2012. Zynga's management also continuously emphasized that bookings would be more heavily weighted in the second half of 2012. Significantly, when Zynga appeared to be displaying declines in daily game usage, Zynga's management reassured investors that they could not see the whole statistical picture that Zynga was seeing regarding the effectiveness of its monetization of players which purportedly supported Zynga's expected growth in the second half of 2012.

19. Having concealed the true condition of Zynga's business and growth potential for the full year of 2012, Zynga completed its IPO on December 16, 2011, and issued 100 million shares of Class A common stock in the IPO at an offering price of $10.00 per share. Pursuant to the IPO, the Exchange Act Defendants and other defendants and insiders were subject to lock-up provisions which restricted their sale of personally held stock until the lock-up period's expiration date of May 28, 2012.

20. On February 14, 2012, Zynga announced its first earnings as a public company, reporting that its bookings were at a "record level," stating that "[w]e also continue to make progress in monetizing non-payers," and announcing that for 2012, "[w]e expect that growth will be weighted towards the back-half of the year." The market took these financial results and inspiring guidance for 2012 as a prosperous sign for Zynga's outlook for the full year 2012, as Zynga common stock increased 7% to a February 14, 2012, trading price of $14.35 per share.

21. The positive reports issued by Zynga in connection with its IPO, fourth quarter 2011 financial results and 2012 guidance had the intended effect of artificially inflating the

value of its common stock from an IPO price of $10.00 per share to a trading high of $15.91 per share on March 2, 2012.

22.     Continuing to build on the pre-IPO momentum Zynga had manufactured for the market value of its stock, Zynga filed a Registration Statement and Prospectus on March 14, 2012, in connection with a secondary offering of 49.4 million shares of Zynga's common stock for certain insider shareholders of Zynga, purely for the purpose of enriching the Exchange Act Defendants and other defendants and insiders.  Indeed, none of Zynga's other non-executive employees and public shareholders were released from the IPO's lock-up agreement.

23.     Capitalizing on their inside information regarding Zynga's declining bookings and inability to monetize games and Zynga's accounting tactics to push recognized revenue and reported net income forward at the expense of the second half of 2012, Zynga filed an Amendment to its secondary offering Registration Statement on March 23, 2012 announcing that the Underwriter Defendants (defined *infra*) had granted a waiver to a select group of Zynga insiders, including the Exchange Act Defendants, releasing them from the IPO's lock-up period 55 days before it was set to expire on May 28, 2012.

24.     Taking immediate advantage of this premature lock-up waiver, on April 3, 2012, the same day the secondary offering was completed, the released insiders immediately sold 49.4 million of their personally-held shares of stock at $11.64 per share, generating approximately $593 million in proceeds, of which more than 20.2 million shares and proceeds in excess of $235.76 million were sales made by the Exchange Act Defendants, other defendants, and other Zynga officers collectively.

25.     Having already reaped hundreds of millions of dollars in personal profits from selling shares at an inflated price above the IPO price, the Exchange Act Defendants then shocked the market on July 25, 2012, when Zynga announced its financial results for the second quarter of 2012, reporting substantially lower than expected earnings and issuing a dismal forecast for the rest of the year by sharply lowering its 2012 guidance.  In its July 25, 2012 earnings release and earnings call, Zynga confessed that the dismissal results and reduced

outlook were due to declines in bookings and delays in launching new games – the very metrics they were on notice of throughout the Class Period.

26. These drastic changes in 2012 guidance offered a conspicuously different assessment from Zynga's management's prior representations, consistently stressing that growth would be weighted more heavily in the second half of 2012. As a result, the market and analysts were blindsided by this second quarter earnings announcement and struggled to reconcile it with management's prior repeated assertions.

27. As Richard Greenfield, an analyst at BTIG LLC, pointed out in addressing Zynga's management during Zynga's second quarter earnings call:

> [*Y*]*ou specifically said that you were excited about your second half prospects.* Given the magnitude of the decline in EBITDA in the back half of the year in the guidance, it just, I guess the question is *you've always said the year is very back half weighted, it seems that you were always excited about the back half of the year and all the things that were going on in the back half of the year. Yet, almost the entire majority of the downgrade to guidance, is due to the back half of the year and it's just, it's very hard to foot those two statements.*[2]

28. Also unable to reconcile the   second quarter announcement with Zynga management's prior avowals that investors could not see the real-time monetization data that Zynga was privy to regarding the Company's ability to monetize games, Richard Greenfield said the following during a July 26, 2012 interview broadcast by Bloomberg Surveillance:

> [O]ne of the things that management kept reiterating and that we were really focused on them being able to achieve was that you only see daily usage. You don't see monetization.  And given their robust data center and their understandings of the game mechanics, they really believed that they could improve monetization of their games.  Obviously not only was usage falling, but monetization wasn't flat, wasn't up, was actually down as well.  And that was really what really caught us by surprise.

29. Upon Zynga's July 25, 2012 disclosures, Zynga's stock price instantly *plummeted over 37% in value in one day*, down to a July 26, 2012 trading low of $2.97 per share.  This drop represented a loss of 70% of Zynga's stock value from its $10.00 per share IPO price and a loss of over 81% compared to its March 2, 2012 Class Period trading high of

---

[2] Emphasis added unless otherwise note.

$15.91 per share. Tellingly, by August 1, 2012, numerous analysts had reported that Zynga's market value had reached the point where Zynga's business was being valued at "nothing."

30. However, thanks to their access to non-public real-time data and knowledge of inside information of delays in product launches and that Zynga's bookings were declining and its reported revenue had been inflated and were not sustainable in the second half of 2012, the Exchange Act Defendants and other defendants and officers were able to cash out at *exactly* the right time in order to reap hundreds of millions of dollars in profits.

31. Zynga's access to real-time data updates and ability to manipulate its recognized revenue, when combined with: (a) the highly suspicious timing of Zynga's release of positive guidance and continuous assurances that growth would be weighted more heavily in the second half of 2012; (b) the release of lock-up restrictions on shares owned by a select group of Zynga insiders; and (c) the Exchange Act Defendants' sale of those shares *in the same quarter* that they later confessed that Zynga's business was imploding, evidences the Exchange Act Defendants' scienter and intent to maximize the personal profits they could derive from their inside information.

## II. JURISDICTION AND VENUE

32. The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §77k and Sections 10(b), 20(a) and 20A of the Exchange Act, (15 U.S.C. §78j(b), §78t(a) and §78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act and Section 27 of the Exchange Act. Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act. Zynga's headquarters are located within this District, the Company conducts substantial business in this District, and many of defendants' acts and practices complained of herein occurred in substantial part in this District.

33. In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate

commerce, including but not limited to the United States mails, interstate telephone communications and national securities markets.

## III.  THE PARTIES

### A.  PLAINTIFFS

34.  Lead Plaintiff David Fee is a resident of Pigeon Forge, Tennessee.  On January 23, 2013, this Court appointed David Fee to serve as Lead Plaintiff for the Class in this consolidated class action pursuant to the PSLRA.  David Fee purchased a total of 1,955,167 shares of Zynga common stock during the Class Period, as evidenced by his certification, a copy of which was filed herein on October 1, 2012.  (ECF No. 44-2.).  Lead Plaintiff Fee suffered damages as a result of the securities law violations alleged herein.

35.  Plaintiff Joy Arjoon-Singh is a resident of Trinidad, West Indies and purchased 725 shares of Zynga common stock in the IPO as evidenced by her certification, a copy of which is attached hereto as Exhibit A.  Plaintiff Arjoon-Singh suffered damages as a result of the securities law violations alleged herein.

### B.  DEFENDANTS

#### 1.  <u>The Company</u>

36.  Zynga is a Delaware corporation headquartered at 699 Eighth Street, San Francisco, California 94103.  Zynga is a leading provider of social game services and develops, markets and operates online social games as live services played over the Internet and on social networking sites and mobile platforms.  Zynga was originally organized in April 2007 as a California limited liability company under the name Presidio Media LLC.  Zynga converted to a Delaware corporation in October 2007, and changed its name to Zynga Inc. in November 2010.  Zynga has three classes of stock: its Class A common stock has one vote per share; its Class B common stock has seven votes per share; and its Class C common stock has 70 votes per share.  Zynga completed its IPO in December 2011 and its Class A common stock is traded in the NASDAQ Global Select Market, which is an efficient market, under the symbol "ZNGA."

## 2. The Officer Defendants

37. Mark Pincus ("Pincus") founded Zynga in 2007. At all relevant times, he served as Zynga's Chief Executive Officer, Chief Product Officer and Chairman of Zynga's Board of Directors. Pincus signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. He sold 16.5 million shares of Zynga stock in the Secondary Offering for proceeds of over $192 million. At the time of the IPO, Pincus owned 100% of Zynga's Class C shares and 16% of Zynga's Class B shares and controlled approximately 36.2% of the total voting power of Zynga's outstanding capital stock. Pincus has since taken control of Zynga increasing his total voting stake in Zynga to approximately 50.2%.

38. David M. Wehner ("Wehner") served as Zynga's Chief Financial Officer from August 2, 2010 to November 13, 2012. Wehner signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. He sold 386,865 shares of Zynga stock in the Secondary Offering for proceeds of over $4.5 million. Wehner signed the 10-Q for the first quarter of 2012.

39. John Schappert ("Schappert") served as Zynga's Chief Operating Officer from May 2011 to August 8, 2012 and as a director of Zynga from July 2011 to August 8, 2012. Schappert signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Schappert sold 322,350 shares of Zynga stock in the Secondary Offering for proceeds of over $3.75 million.

40. Mark Vranesh ("Vranesh") has served as Zynga's Chief Accounting Officer since August 2010 and as Zynga's Chief Financial Officer since November 13, 2012. In addition, he served as Zynga's Chief Financial Officer from May 2008 to August 2010. Vranesh signed the Registration Statements in connection with Zynga's IPO and Secondary Offering. Vranesh sold 366,216 shares of Zynga stock in the Secondary Offering for proceeds of approximately $4.26 million. Vranesh signed the 10-K for financial year 2011 and the 10-Q for the first quarter of 2012.

41.     Defendants Pincus, Wehner, Schappert and Vranesh are collectively referred to as the "Officer Defendants."  The Officer Defendants and defendant Zynga are collectively referred to as the "Exchange Act Defendants."

### 3.    The Director Defendants

42.     Defendant William Gordon ("Gordon") has served as a director of Zynga since July 2008.  Defendant Gordon signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

43.     Defendant Reid Hoffman ("Hoffman") has served as a director of Zynga since January 2008.  Defendant Hoffman sold 687,626 shares of Zynga stock in the Secondary Offering for proceeds of over $8 million.  Defendant Hoffman signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

44.     Defendant Jeffrey Katzenberg ("Katzenberg") has served as a director of Zynga since February 2011.  Defendant Katzenberg signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

45.     Defendant Stanley J. Meresman ("Meresman") has served as a director of Zynga since June 2011.  Defendant Meresman signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

46.     Defendant Sunil Paul ("Paul") has served as a director of Zynga since November 2011.  Defendant Paul signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.

47.     Defendant Owen Van Natta ("Van Natta") has served as a director of Zynga since August 2010 and served as Zynga's Executive Vice President and Chief Business Officer from August 2010 to November 16, 2011.  Defendant Van Natta signed the Registration Statements in connection with Zynga's IPO and Secondary Offering.  Defendant Van Natta sold 505,267 shares of Zynga stock in the Secondary Offering for proceeds of over $5.88 million.

48.     Defendants Gordon, Hoffman, Katzenberg, Meresman, Paul and Van Natta are collectively referred to as the "Director Defendants." The Officer Defendants and the Director Defendants are collectively referred to as the "Individual Defendants."

### 4.     The Underwriter Defendants

49.     Morgan Stanley & Co. LLC ("Morgan Stanley") maintains offices at 1585 Broadway, New York, NY 10036. Morgan Stanley served as a co-lead underwriter in connection with Zynga's Offerings. Morgan Stanley sold 32,216,745 shares of Zynga stock in the IPO. Morgan Stanley sold 12,890,746 shares in the Secondary Offering.

50.     Goldman, Sachs & Co. ("Goldman Sachs") maintains offices at 200 West Street, 29th Floor, New York, NY 10282. Goldman Sachs served as a co-lead underwriter in connection with Zynga's Offerings. Goldman Sachs sold 26,847,297 shares of Zynga stock in the IPO. Goldman Sachs sold 12,890,746 shares of Zynga stock in the Secondary Offerings.

51.     J.P. Morgan Securities LLC ("J.P. Morgan") maintains offices at 383 Madison Avenue, New York, NY 10179. J.P. Morgan served as an underwriter in connection with Zynga's Offering. J.P. Morgan sold 8,275,862 shares of Zynga stock in the IPO. J.P. Morgan sold 3,850,763 shares of Zynga stock in the Secondary Offerings.

52.     Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") maintains offices at 4 World Financial Center, 250 Vesey Street, New York, NY 10080. Merrill Lynch served as an underwriter in connection with Zynga's Offering. Merrill Lynch sold 8,275,862 shares of Zynga stock in the IPO. Merrill Lynch sold 3,580,763 shares of Zynga stock in the Secondary Offerings.

53.     Barclays Capital Inc. ("Barclays") maintains offices at 745 7th Ave., New York, NY 10019. Barclays served as an underwriter in connection with Zynga's Offering. Barclays sold 8,275,862 shares of Zynga stock in the IPO. Barclays sold 3,580,783 shares of Zynga stock in the Secondary Offerings.

54. Allen & Company LLC ("Allen") maintains offices at 711 5th Ave., New York, NY 10022. Allen served as an underwriter in connection with Zynga's Offering. Allen sold 16,108,372 shares in the IPO. Allen sold 6,445,372 shares in the Secondary Offerings.

55. Defendants Morgan Stanley, Goldman Sachs, J.P. Morgan, Merrill Lynch, Barclays and Allen are collectively referred to as the "Underwriter Defendants."

56. In connection with Zynga's IPO, the Underwriter Defendants received $32.5 million in underwriting discounts and commissions. In connection with the Secondary Offering, the Underwriter Defendants received $15.5 million in underwriting discounts and commissions.

## IV. CLASS ACTION ALLEGATIONS

57. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Zynga common stock during the Class Period and were damaged thereby (the "Class"), including in the IPO and Secondary Offering. Excluded from the Class are: (a) defendants; (b) members of the immediate families of the defendants; (c) the subsidiaries and affiliates of defendants; (d) any person who is an officer, director or controlling person of Zynga; (e) any entity in which any defendant has a controlling interest; (f) defendants' directors' and officers' liability insurance carries, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors or assigns of any such excluded party.

58. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members of the Class at a minimum.

59. As of February 15, 2013, Zynga had 598,057,857 shares of Class A common stock outstanding and 38 record holders of Class A common stock. However, according to Zynga, the actual number of Class A stockholders is greater than the number of record holders because the number of record holders does not include the voluminous stockholders who are beneficial owners whose shares are held in street name by brokers and other nominees.

According to Zynga, it is unable to estimate the number of stockholders represented by these record holders, because many of its shares of Class common stock are held by brokers and other institutions on behalf of stockholders.

60. Members of the Class may be identified from records maintained by Zynga or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

61. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The following are questions of law and fact common to the Class:

- whether defendants engaged in acts or conduct in violation of the federal securities laws as alleged herein;

- whether Zynga issued false and misleading financial statements and information about Zynga's business, operations and growth prospects during the Class Period;

- whether the defendants caused Zynga to issue false and misleading financial statements and information about Zynga's business, operations and growth prospects during the Class Period;

- whether the offering materials contained untrue statements or omitted to state material information;

- whether the misrepresentations were material;

- whether the Exchange Act Defendants engaged in a scheme to defraud investors by artificially inflating Zynga's stock price by, *inter alia*, manipulating Zynga's reported revenue, concealing the rapid decline in bookings for Zynga's games and concealing delays in product launches;

- whether the Exchange Act Defendants acted knowingly or with deliberate recklessness in engaging in the scheme to defraud and issuing false and misleading financial statements and information about Zynga's business, operations and growth prospects;

- whether the market prices of Zynga's securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

- whether the Class members have sustained damages and, if so, what is the proper measure of damages (compensatory and rescissionary).

62. Plaintiffs' claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal law as complained of herein.

63. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

64. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

65. Plaintiffs will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations and omissions during the Class Period;

- the omissions and misrepresentations were material;

- Zynga's securities traded on NASDAQ Global Select Market, which is an efficient market;

- defendants' alleged misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company's securities;

- Plaintiffs and other Class members purchased their Zynga stock between the time defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts;

- as a regulated issuer, Zynga submitted regular public filings to the SEC, such as on Forms 8-K and S-1 Registration Statements and Prospectuses; and

- numerous financial analysts followed Zynga's stock. The Company's stock thus reflected the effect of information disseminated into the market.

66.     Based on the foregoing, all purchasers of Zynga securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices.  A presumption of reliance therefore applies.

## V.     BACKGROUND

### A.     CONFIDENTIAL WITNESSES

67.     Plaintiffs' allegations are supported by, among other things, the information provided by Confidential Witnesses who worked in various positions within Zynga's organization prior to and/or during the Class Period:

68.     Confidential Witness No. 1 ("CW1") worked as a Zynga employee throughout the Class Period, from 2009 through the late Winter of 2012.  CW1 held several positions with the Company's Quality Assurance ("QA") Department, which monitored errors reported in Zynga's games and was part of Zynga's Global Operations.  CW1 worked on QA issues, serving as a QA "Lead" for one of Zynga's games for two years and as the QA Point of Contact ("POC") for three games.  In addition, CW1 held the positions of QA Analyst, QA Security Analyst, and Back-End QA Lead.

      a.     According to CW1, Zynga was "crazy, analytically insane" in collecting and monitoring user and revenue data for its games.  The Company tracked DAU for its games on a real-time basis.  This data was available to Zynga employees on their desktop computers and monitors located through the office.  As CW1 stated, Zynga became aware of declines in user numbers and in revenue companywide and "across the broad" and "it was the same story" for the thirty to forty games Zynga had released in mid 2011."  CW1 acquired this knowledge from discussions in which it participated.

      b.     As CW1 further explained, Zynga's QA Department held two types of "scrum meetings."  The Department held the first type every day to go over the day's activities and determine what needed to be done for that

day. This meeting was attended by QAs. As for the second type of scrum meeting, the QA Department held a meeting once every other week at the "studio level" to coordinate activities weeks in advance for production, program management and development. These "studio level" meetings were attended only by QA leads, with typically approximately 12-30 QA leads attending per meeting. As CW1 noted, revenue and DAU were "always" discussed at these meetings. Beginning in mid-2011, QA leads shared information about decreasing DAU and revenue for their games at the meeting and it was said at the meetings the declines were "across the board" rather than isolated within a few games.

69. Confidential Witness No. 2 ("CW2") worked at Zynga's Austin Quality Control Center ("AQC") as a QA Analyst. CW2 worked on a Zynga game available on the Facebook platform. CW2 also worked on the release of certain games on the Facebook platform and tested games to ensure that they complied with all of the "terms and services" that were part of Zynga's contract with Facebook. CW2 worked for Zynga from before the start of the Class Period until the Spring of 2012.

a. CW2 participated in the daily "scrum meetings" described in further detail by CW1. According to CW2, the daily scrum meetings were run by QA managers. CW2 also attended Point of Contact ("POC") meetings run by project managers. Before these meetings, project managers provided CW2 and others will detailed reports showing the number of game users and amount of money users were spending on all games. As CW2 stated, Zynga issued internal daily reports each morning with updated information.

b. And according to CW2, Zynga maintained a computer system that showed exactly how well each game was performing. Zynga employees at every office had access to the data provided by this system. Further

corroborating CW1's statements, CW2 stated that "[they] all knew the metrics of how many users were playing and how many of them were spending money. They had flat screens and monitors in the office that showed exactly how many users were playing." Indeed, any of Zynga's employees could "ping the computer" whenever they wanted to "see how many active users were on and how many were spending money." According to CW2, the daily users and spending reports were generated by Zynga's headquarters in San Francisco. At the POC meetings attended by CW2, project managers shared and discussed the information contained in the reports.

        c.      Given their knowledge of Zynga's user and revenue data for all of the Company's games, CW2 explained, "we knew the Company was not doing well before the IPO launch." With particular respect to Zynga's ability to monetize its games, by the fourth quarter of 2011, Zynga was aware that users were not spending as much on its games and that this decreased spending "was across the board." At one particular meeting, CW2 recalled hearing CW1 announce to its team that "the numbers show we are losing users every day."

        d.      CW2 received reports showing that revenue for all games was decreasing during Q3 2011 and Q4 2011, and that these decreases were "across the board" for Zynga's games.

70.    Confidential Witness No. 3 ("CW3") worked for Zynga from before the start of the Class Period through the Spring of 2012. CW3 worked for Payments and Revenue and for the Payments Process Unit, which processed in-game sales of Zynga's games. CW3 also worked as a Lead Program and Product Manager.

        a.      According to CW3, Zynga's sales of virtual goods in its games were processed at the Company's San Francisco headquarters. As CW3 stated,

Zynga recorded its sales numbers, or "input data," and then delivered the data to the Company's accounting department through daily reports and an Oracle system.

b. As CW3 further stated, Zynga recorded the average life of durable goods – a measure pertinent to the Company's revenue recognition – for all of its games.

71. Confidential Witness No. 4 ("CW4") acted as Director of Global Technology Operations at Zynga from the Spring of 2011 to the summer of 2012. CW4 reported to Zynga's Chief Information Officer.

a. Further indicating that Zynga relied heavily on the analysis of its data, CW4 stated that Zynga's analytics department was made up of approximately 150 people.

b. As to Zynga's ability to project the impact of results, CW4 also stated that Zynga monitored its outputs and could determine the impact of those outputs.

c. According to CW4, Pincus and Zynga's other senior management "got subset of all reports" that were prepared.

72. Confidential Witness No. 5 ("CW5") worked for Zynga from the Spring of 2011 until the Summer of 2012. CW5 worked within the Company's Finance and Business Architecture Department. CW5 developed familiarity with the analytics system used to collect data and calculate revenue from Zynga's sales of virtual goods.

a. CW5 stated that Zynga used its analytics system to calculate revenue from the sale of virtual goods.

73. Confidential Witness No. 6 ("CW6") worked at Zynga before the Class Period from 2009 to the Fall of 2010.

a. According to CW6, Zynga's product managers conducted weekly reviews with Zynga's senior managers, including Pincus, to discuss the

company's operations and results. As CW6 further stated, other management-level employees who attended the meetings included the Chief Operating Officer, VP of Product, the Chief Creative Officer, Product Manager and the Studio VP.

74. Confidential Witness No. 7 ("CW7") worked for Zynga's Mobile Division from the Spring of 2011 to the Spring of 2012. CW7 worked as part of the Mobile Division's Quality Assurance Department. The head director of the Mobile Division during CW7's tenure was David Ko, who currently serves as Zynga's Chief Operating Officer. CW7's duties included sending production teams to executive producers to provide updates about the status of game developments and delays.

    a.    Corroborating the statements provided by other CWs, CW7 stated that Zynga tracked game revenue. According to CW7, Zynga used a measure of the average revenue per daily user to understand how much money all players were spending daily for Zynga's games. Further, CW7 indicated that revenue information was tracked and easily available to Zynga's management through processing systems on platforms. CW7 further also indicated that Zynga displayed this information on "monitors" and that the information was accessible to Zynga's management at any time.

    b.    According to CW7, Zynga's management knew of game delays prior to 2012. CW7 personally sent production teams to executive producers with information about the status of game developments and delays. In turn, the executive producers informed division directors of the meetings. And the division directors reported the same information to Zynga's management.

    c.    CW7 further recalled that David Ko, the head director of Zynga's mobile division at the time, constantly asked "why hasn't this game been released? Why is this taking so long?" CW7 believed that Ko was in

constant contact with Zynga's top executives about the status of game developments and delays. CW7 thought there was "no way" top executives could not know about the game delays.

    d.       In regard to a change Facebook made in 2011 to its platform, CW7 stated that Zynga was "informed very early on because we were having to prepare and test that." CW7 explained that Facebook provided the changed platform to Zynga "5-6 months" prior to its launch so that Zynga's engineers and QA could conduct beta testing. In response to the change, CW7 stated that "Zynga was aware of the upcoming change, but they didn't do much. They knew it was coming and how they had to make change, but it didn't happen."

75. Confidential Witness No. 8 ("CW8") worked for Zynga from the Spring of 2011 to the Summer of 2012. CW8 worked for Zynga as a Senior Product Marketing Manager. CW8 worked on three games, and used the metric "revenue per daily average ser," which CW8 defined as "revenue that comes in daily from the players."

    a.       CW8 relayed that bookings and revenue results would be "bubbl[ed] up" to e-staff by studio general managers and head product managers and that a "weekly report was sent to higher ups" regarding these numbers. According to CW8, "Mark Pincus and John Schappert were aware of what was going on" in bookings, revenue and financial results.

76. Confidential Witness No. 9 ("CW9") worked for Zynga as a Producer at Zynga Game Network. CW9 worked for Zynga from the Spring of 2011 to the Fall of 2011 and worked in software production.

    a.       CW9 corroborated statements from other confidential witnesses that real-time updates on game user and spending data was readily accessible. According to CW9, Zynga embedded a code, known as a "program code, D++ language code," into each of its games which Zynga's headquarters

distributed to each studio to implant into each of that studio's games. This code automatically recorded a game's "output" for each user of that game, meaning that the code recorded how many times games were played and how many users played the game.

b.    CW9 further explained that Zynga "kept track of revenue on a per user basis." The Company "collected metrics on everything users did in a game, including what they bought and clicked on."

c.    These statistics were automatically reported to Zynga on a real-time basis, which the Company used in turn to calculate revenue. As stated by CW9, anyone with "credentials" could access a game and view that game's output on a real-time basis at any time. All studio managers and Zynga's senior management had such credentials to access a game's output.

77.    Confidential Witness No. 10 ("CW10") worked for Zynga as a Product Manager. CW10 worked for Zynga from May 2011 to September 2012. CW10 served as a Project Manager for at least three of Zynga's titles. As a Product Manager, CW10 was responsible for weekly, monthly and quarterly projections and for reporting findings. Before each quarter, like other product managers, CW10 put together estimated revenue expectations for each game for the upcoming quarter. And like other product managers, CW10 reported the revenue expectations to and worked in conjunction with the studio general manager. CW10 attended meetings with Zynga's COO before each quarter to estimate quarterly revenue for games that CW10 worked on. And like other product managers, CW10 was responsible for providing management with a "daily report" regarding the average revenue per user. Like other product managers, CW10 contributed to a so-called "Executive Summary," which was a weekly report sent to Zynga's upper management "by game, by studio."

a.    CW10 became aware of bookings declines in late 2011 and into 2012, due to the failure of games to materialize well. Indeed, CW10 had

regular meetings with Zynga's Chief Operating Officer and various executive vice presidents to determine and discuss Zynga's actual and expected revenues for games and upcoming quarter estimates.

b.     According to CW10, every product managers was responsible for providing certain members of Zynga's executive-level management (known as "E-Staff") with weekly, monthly, and quarterly projections of expected revenues for each game.

c.     For every game that was launched, CW10 stated that product managers would report actual and expected revenue for their games to the studio general manager on a weekly basis.  The general manager, who was responsible for managing multiple games at his or her studio, would then write a cumulative report on all games, an Executive Summary, that would go directly to both Zynga's finance department and Zynga's executives.  According to CW10, the Executive Summaries and game revenue projects provided to upper management were a collaboration between product managers, studio general managers and certain members of Zynga's E-Staff.

d.     According to CW10, Zynga's "management was always aware of delays."  Further, the status of all games was provided to Zynga's executive management in a weekly Executive Summary, whether the games were in "design mode, beta testing or pre-launch."  CW10 also stated that "there was no reason for the executive team not to be fully aware" of any game delays.  CW10 was specifically aware of delays with respect to the games *CityVille 2*, *FarmVille 2*, *ChefVille* and *Mafia Wars 2*.

e.     CW10 further stated that Zynga's Central Product Management Team projected when all new games would be launched.

f.  The Project Management Team also projected how much money the games were all likely to earn.  But as CW10 stated, "[e]very game has to get signed off on" by Zynga's top management before the estimates were finalized."

g.  Regarding changes to the Facebook platform, CW10 stated that Zynga was first informed that Facebook was planning to launch a platform change that would impact Zynga's games in April 2012.  CW10 also explained, however, that Zynga's executives knew of the change "a few months earlier," having "lots of early information and access into the Facebook change."

h.  CW10 also stated that Zynga's Central Product Management Team also produced a weekly report on any developments relating to the Facebook platform.  CW10 explained that any potential Facebook platform changes were also written into the weekly Executive Summary that went directly to Zynga's upper management.  Indeed, according to CW10, Zynga was even "beta testing one game on the new Facebook" platform before the platform changes were announced.  CW10 further explained that two Zynga executives served on the Facebook Relationship Team.

78.  Confidential Witness No. 11 ("CW11") worked for Zynga at the Company's Central Program Office in San Francisco.  CW11 worked for Zynga from the Winter of 2010 to the Fall of 2012.  CW11 worked on Zynga's Project Management team, also referred to as the Central Product Office, which scheduled game launches and reported on game release schedules for both the Facebook and mobile platforms.

a.  While working at the Company's Central Program Office, CW11 worked on a team that kept Zynga's executives apprised of all studio games in development and where all games were in the process of being launched.  CW11's team sent a weekly report on "new games to the E-Staff," or the

executive suite which included all vice presidents, the general manager of each studio, the CFO of each game and finance personnel. CW11's team was informed of changes to the Facebook platform by a department known as "Dev Rel" (Development Relations).

## B. OVERVIEW OF ZYNGA'S BUSINESS

### 1. Zynga's Free-to-Play Model Relied on Sales of Virtual Goods In Its Games To A Small Percentage of Users

79. As a provider of social game services, Zynga develops, markets and operates online social games played on Facebook and other social networks, mobile platforms, and Zynga.com. The games offered by Zynga include, among others, *Farmville*, *CastleVille*, *CityVille*, *The Ville*, *Draw Something*, *Words With Friends*, *Mafia Wars*, *Matching With Friends, Scramble With Friends*, *Zynga Poker*, *Zynga Bingo* and *Zynga Slots*.

80. As many news reports have noted, Zynga emerged as a leading social game developer by identifying successful games made by other companies, copying those games, and polishing the underlying mechanic and theme. An August 2012 *Seeking Alpha* article notes that Zynga's game *The Ville* copied Electronic Arts' game *The Sims Social* down to the color palate used for avatar skin tones. A September 2010, *SF Weekly* article entitled "FarmVillains: Steal someone else's game. Change its name. Make millions. Repeat," quoted defendant Pincus as having told Zynga employees, "I don't f---ing want innovation. You're not smarter than your competitor. Just copy what they do and do it until you get their numbers." The article further quoted a "former senior employee" as describing "Zynga's motto is 'Do Evil.' I would venture to say it is one of the most evil places I've run into, from a culture perspective and in its business approach. I've tried my best to make sure that friends don't let friends work at Zynga."

81. Zynga also mined its existing games and many of Zynga's games were near reiterations of previous titles. Further, Zynga obtained additional games through acquisitions. Most notably, on March 21, 2012, Zynga purchased the game developer OMGPOP for $180 million, thus acquiring the game *Draw Something*.

82.     At all relevant times, Zynga employed a free-to-play business model.  Zynga touted its free-to-play model in comparison to pay-to-play business models, stating that the free-to-play approach attracted a wider audience of players and increased the number of players who had the potential to become paying users.  However, while Zynga's games were free to play, Zynga generated revenue through the in-game sale of virtual currency that was used to buy virtual goods for players to enhance their game playing experience.  Zynga also generates a small portion of its revenue through in-game advertising.

83.     According to Zynga's December 15, 2011 IPO Prospectus, one of the "key elements" of Zynga's strategy is to:

> **Increase Monetization of Our Games.**  We strive to offer increased selection, better merchandising and more payment options to increase the sales of our virtual goods.  Our players purchase these virtual goods to extend their play sessions, personalize their game environments, accelerate their progress and send unique gifts to their friends.  We will also continue to pursue additional revenue opportunities from advertising, including branded virtual goods and sponsorships.

(Emphasis in original).

84.     With respect to Zynga's monetization of its games, the IPO Prospectus further revealed:

> We generate most of our bookings and revenue from the sale of virtual goods in our games.  The degree to which our players choose to pay for virtual goods in our games is driven by our ability to create content and virtual goods that enhance the game-play experience.  *Our bookings, revenue and overall financial performance are affected by the number of players and the effectiveness of our monetization of players through the sale of virtual goods and advertising*.

(Emphasis in original).

85.     Despite its emphasis and financial dependence on being able to monetize its free-to-play games and generate daily revenue from its users, Zynga only monetized a small portion of its users and it relied on these funds for nearly all of its revenue.  For example, in the first quarter of 2012, paying users represented just 1.9% of the Company's monthly active users.  As Zynga indicated in its December 15, 2011 IPO Prospectus and March 29, 2012 Prospectus, the Company "rel[ied] on a small portion of [its] total players for nearly all of [its]

revenue" and "that the number of players who choose to purchase virtual goods will continue to constitute a small portion of our overall players as our business grows."

86. By buying virtual goods, users could accelerate their progress in games. For example, through the game *Farmville*, Zynga's users acted as digital farmers and purchased virtual goods, such as tractors, seeders and harvesters. Whereas non-paying digital farmers could plow just one plot at a time until they earned enough currency through successful game play to afford farm equipment, paying digital farmers could speed up the process by buying a virtual tractor to plow four plots at a time.

87. Although Zynga designed many of its games to have short-playing sessions, players could also buy virtual goods to play games for longer periods. The Company limited game durations by the replenishable "energy" or "coins" available to players for each session. To play longer sessions, players could buy virtual "energy boost" goods such as batteries in *CityVille*, energy potions in *CastleVille*, or poker chips to play additional hands in *Zynga Poker*.

88. Virtual goods also allowed players to compete more effectively with friends and increase their capabilities. For example, in *Zynga Poker*, players could buy poker chips to play with better players at higher stakes tables. And in *Hidden Chronicles*, players could buy clues to help them find more objects.

89. Zynga's virtual goods also allowed players to personalize their game environments. For example, players could purchase Big Ben while creating virtual cities in *CityVille,* a catapult while creating a virtual castle in *CastleVille*, or "Amazing 80s Chair" to accent their restaurant with an 80s theme in *Café World*. The in-game sales of these sorts of virtual goods represented Zynga's primary revenue source.

90. Zynga allowed its players to purchase two distinguishable types of virtual goods: "durable" and "consumable" virtual goods. Players could buy durable goods and use them as long as they continued to play. On the other hand, players could buy consumable goods and use them right away. For example, a *Farmville* tractor was a durable virtual good while gas to make that tractor run was a consumable good.

### 2. Zynga's Relationship with Facebook

91. At all relevant times, Zynga conducted most of its sales of virtual goods on the Facebook platform. As Zynga explained in both its December 15, 2011 IPO Prospectus and March 29, 2012 Secondary Offering Prospectus, "substantially all of [the Company's] revenue [was] generated from players accessing [its] games via the Facebook platform." In its IPO Prospectus, Zynga explained that its users pay for services using "Facebook Credits," subject to an agreement with Facebook that expires in May 2015. Zynga players could either purchase Facebook Credits directly from Facebook or could redeem Zynga Game Cards for Facebook Credits. Facebook Credits could then be used to acquire in-game credits. Facebook remitted to Zynga 70% of the face value of the Facebook Credits used to play Zynga games.

92. Given the importance of the Facebook platform to Zynga, any changes to the way Facebook users interacted with Zynga's social games would have a significant impact on the Company. Prior to the second quarter of 2012, unbeknownst to investors, Facebook was changing its gaming platform and the way it displayed and promoted its games. Specifically, Facebook changed the surfacing of its content (including tweaks to the News Feed algorithm that promoted newer games) and also opened an App Center to increase awareness of other games.

93. The changes to Facebook's platform resulted in newer games from other developers being promoted more than those of Zynga's and, thus, Zynga lost users and its bookings decreased, none of which was revealed to investors until the end of the Class Period.

### 3. Zynga's Key Financial and Operating Metrics

94. Prior to and during the Class Period, Zynga operated as a data-driven company that carefully tracked both financial metrics and operating metrics, as discussed herein. According to Zynga, it measured its business by using key financial metrics, bookings and adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"), and key operating metrics, DAU and average bookings per user ("ABPU").

95.     Throughout the Class Period, defendants stressed to investors that bookings was the most significant, meaningful monetization metric in assessing the Company's operating performance, financial health, and growth potential.   According to Zynga, "[b]ookings, as opposed to revenue, [was] the fundamental top-line metric we use[d] to manage our business, as we believe it is a better indicator of the sales activity in a given period."   During Zynga's fourth quarter 2011 earnings call, defendant Wehner stated that "[w]e managed our business on bookings, which is revenue plus the change in deferred revenue for any period. I will focus on bookings as the best indicator of the top line performance of our business."   As Zynga further stated in its 2011 Form 10-K, the Company used bookings to "evaluate the results of [its] operations, generate future operating plans and assess the performance of [the] company."

96.     Bookings represented the total amount of funds the Company received net of amounts paid for use on platforms such as Facebook.   Zynga defined bookings as being "equal to revenue recognized during the period in addition to the change in deferred revenue during the period."   Put another way, Zynga defined bookings as "the total amount of revenue from the sale of virtual goods in our online games and advertising that would have been recognized in a period if we recognized all revenue immediately at the time of the sale."   Bookings is a more meaningful measure of Zynga's performance in a given period than revenue because bookings represents the dollar-amount of virtual goods actually sold to game players in the period, whereas revenue takes into account that durable goods were amortized over the expected life of virtual goods and, thus, the revenue received for such goods was recognized over time, as discussed below.   A July 31, 2012 article by *The Business of Social Media* entitled "A look inside Zynga's numbers" described bookings as "an alternative measurement of revenue that is more accurate for social game companies than GAAP revenue."

97.     Zynga also used "key operating metrics" to measure its business.   As the Company reported in its March 29, 2012 Prospectus, Zynga recorded the metrics using an "internal analytics system."

98.    Zynga's internally-recorded metrics included DAU, monthly unique users of Zynga's games, and ABPUs.  Zynga defined DAU as "the number of individuals who played one of [the Company's] games during a particular day."  The Company defined ABPUs as "(i) [the Company's] total bookings in a given period, divided by (ii) the number of days in that period, divided by, (iii) the average [daily active users] during the period."

99.    According to Zynga, its reported "ABPU provide[d] useful information to investors and others in understanding and evaluating our results in the same manner as our management and board of directors."  Zynga stated that it used ABPU "as a measure of overall monetization across all of our players through the sale of virtual goods and advertising."

100.    As with its bookings, Zynga focused investor attention on its DAU and ABPUs.  According to Zynga, the Company "primarily focus[ed] on bookings, DAU and ABPU, which together [Zynga] believe[d] best reflect[ed] the economic value of all of [the Company's] players."

101.    Although bookings and ABPU numbers were closely tracked in real-time by Zynga, these numbers were not publicly available until Zynga announced its earnings results for a given period.  Instead, investors only had access to DAU and monthly active users as measured and published by AppData, an independent service that publicly reported traffic data for games and other applications on Facebook only.  But Zynga's own measure of DAU and monthly active user information was based on its internal analytics system which included users across all platforms on which its games were played.

### 4.    Overview of Zynga's Revenue Recognition Practices

102.    Zynga's revenue recognition policies and practices, which were based on accounting rules for social gaming developed by Zynga's auditor, Ernst & Young, were susceptible to manipulation.  Under Zynga's revenue recognition practices, funds received for consumable goods were recognized immediately and funds received for durable goods were recognized over time based on the WAL of the durable good.  Specifically, in its March 29, 2012 Prospectus, Zynga stated, "We record the sale of virtual goods as deferred revenue and

then recognize that revenue over the estimated average life of the purchased virtual goods or as the virtual goods are consumed."  Thus, the shorter the WAL that Zynga assigned to a virtual durable good, the larger the amount of revenue it could recognize in the present and upcoming periods.  According to Zynga, on a quarterly basis, Zynga calculated the WAL by estimating the average playing period for paying players by game beginning at the time of a payer's first purchase in that game and ending on a date when that paying player is no longer playing the game.

103.    Sales of durable virtual goods accounted for the majority of Zynga's online game revenue.  According to Zynga's March 29, 2012 Prospectus for its Secondary Offering, "[d]urable virtual goods accounted for 63% and 71% of online game revenue in 2010 and 2011, respectively. Revenue from durable virtual goods accounted for 81% of the increase in online game revenue in 2011."  Zynga's reliance on durable goods to generate the majority of its revenue continued into 2012.  According to Zynga's March 31, 2012 Form 10-Q, "[d]urable virtual goods accounted for 71% and 65% of online game revenue in the three months ended March 31, 2012 and 2011, respectively.  Revenue from durable virtual goods accounted for 91% of the increase in online game revenue in the first quarter of 2012."

104.    The Exchange Act Defendants were able to manipulate the WAL applied to funds received in order to increase the Company's reported revenue and bottom line leading up to the IPO and the Secondary Offering.  For example, Zynga reduced its WAL for durable goods from 18 months at the end of 2010 to 15 months during the six months ended June 30, 2011, which led to an increase in revenue of $27.3 million and turning turned a loss for the six months ended June 30, 2011 into a net profit of $18.1 million.  Overall, in 2011, the cumulative changes in Zynga's WAL for durable virtual goods resulted in a net increase in revenue of $53.9 million.  Further, for the first quarter of 2012, Zynga reduced its WAL for durable goods yet again from 15 months to 13 months, which led to a $10 million increase in revenue for the first quarter of 2012.

105.    The following chart show changes in Zynga's WAL and the effect on revenue:

| (number in millions) | (FY) 2010 | Q1 2011 | Q2 2011 | Q3 2011 | Q4 2011 | Q1 2012 | Q2 2012 |
|---|---|---|---|---|---|---|---|
| **WAL** (months) | 18 | 17 | 14 | 14 | 14[i] | 13 | 12 |
| **Increase to Revenue** | N/A | $27.3[ii] | | $21.2[iii] | $5.4[iv] | $10.0 | $5.7 |
| **Net Income** (loss) | $ 90.6 | $16.8 | $1.4 | $12.5 | ($435.0 ) | ($85.4 ) | ($22.8 ) |
| Net Income (Loss) Without WAL Changes | N/A | ($9.1)[v] | | ($8.7) | ($440.4) | ($95.4) | ($28.5) |

[i.] Estimated.

[ii.] This information for Q1 2011 and Q2 2011 is only available for the full six month period.

[iii.] Calculated from 2012 10Qs (Q2 and Q3).

[iv.] Calculated from 2012 10Qs and 2011 10K.

[v.] This information for Q1 2011 and Q2 2011 is only available for the full six month period.

## C.    THE IPO

106.    Taking advantage of its inflated reported revenue and net income, on December 15, 2011, Zynga filed an Amendment No. 9 to Form S-1 Registration Statement and Prospectus with the SEC in connection with Zynga's offering of 100,000,000 shares of Class A common stock at an IPO price of $10.00 per share for an aggregate offering price of $1.0 billion.  That day, the Registration Statement received a Notice of Effectiveness from the SEC.

107.    The Underwriter Defendants served as underwriters in connection with Zynga's IPO.  Morgan Stanley and Goldman Sachs served as the joint book running managers and representatives of the underwriters for the IPO.  In connection with the IPO, Zynga granted the Underwriter Defendants the right to pursuant up to an additional 15 million shares of Class A common stock at the $10.00 per share offering price.

108.    Pursuant to the IPO, all of Zynga's officers and directors and the holders of substantially all of Zynga's capital stock, including the Individual Defendants, agreed to certain lock-up provisions, restricting their sale of Zynga common stock, as follows:

All of our officers and directors and the holders of substantially all of our capital stock have entered into lock-up agreements with us which provide that they will not offer, sell or transfer any shares of our common stock beneficially owned by them for 165 days, subject in certain cases to extension under certain circumstances, following the date of this prospectus. We have agreed with Morgan Stanley & Co. LLC and Goldman, Sachs & Co. not to waive these lock-up restrictions without their prior consent.

109. Those insiders agreed that, without the prior written consent of Morgan Stanley & Co. LLC and Goldman, Sachs & Co. on behalf of the underwriters, for a period ending 165 days after the date of the prospectus, they would not do the following (subject to certain exceptions):

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase lend or otherwise transfer or dispose of, directly or indirectly, any shares of common stock or any securities convertible into or exercisable or exchangeable for shares of common stock;

- file any registration statement with the SEC relating to the offering of any shares of common stock or any securities convertible into or exercisable or exchangeable for common stock; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the common stock.

110. The lock-up period was scheduled to expire on May 28, 2012.

111. The IPO Registration statement was signed by all of the Individual Defendants.

112. On December 16, 2011, Zynga completed its IPO and issued 100 million shares of Class A common stock in the IPO at an offering price of $10.00 per share. The IPO raised $1 billion and netted $961.4 million after deducting underwriting discounts and commissions and other offering expenses. Valued at $7 billion, Zynga was the biggest initial public offering in gaming history and at the time, was the largest initial public offering by a U.S. Internet company since Google Inc. raised $1.9 billion in its 2004 initial public offering.

113. Upon closing of the IPO, Zynga had 100 million shares of Class A common stock, 578,855,599 shares of Class B common stock, and 20,517,472 shares of Class C common stock outstanding.

114. On December 16, 2011, the market valued Zynga at approximately $10 billion, and Zynga common stock opened trading on December 16, 2011, at an initial price of $11.00

per share, 10% above the $10 per share offering price.  Upon completion of its IPO, Zynga had a market capitalization of approximately $6.8 billion and approximately $2 billion of cash on its balance sheet.

### D.     THE SECONDARY OFFERING

115.     During the Class Period, and taking advantage of Zynga's artificially inflated stock price, and on the heels of its 2012 guidance and the acquisition of OMGPOP, defendants Pincus, Wehner, Schappert, Vranesh, Van Natta and Hoffman (the "Selling Defendants") and other insiders sold 49.4 million of their personally-held shares of stock at $11.64 per share, reaping approximately $593 million in proceeds, of which more than 20.2 million shares and proceeds in excess of $235.75 million were sales by the Selling Defendants and other Zynga officers.  None of these proceeds went to the Company.

116.     Specifically, on March 14, 2012, Zynga filed a Form S-1 Registration Statement and Prospectus with the SEC in connection with a Secondary Offering of 42,969,153 shares of Zynga's Class A common stock for certain insider shareholders, which included the Selling Defendants.  In the March 14, 2012 Form S-1 Registration and Prospectus, Zynga re-affirmed that lock-up restrictions had been placed on shares issued to officers and directors and the holders of substantially all of Zynga's capital stock pursuant to the IPO.

117.     Then, on March 23, 2012, Zynga filed an Amendment to its March 14, 2012 Form S-1 Registration and Prospectus announcing that the Underwriter Defendants had granted a waiver to a select group of Zynga insiders, including the Selling Defendants, releasing them from the IPO's lock-up restrictions.

118.     On March 28, 2012, the Registration Statement used for the Secondary Offering received a Notice of Effectiveness from the SEC and on the following day, the Prospectus used in connection with the Secondary Offering was filed with the SEC.  As a result, shares of Zynga stock held by a select group of insiders, including the Selling Defendants and other Zynga officers, were unlocked for sale two months before the lock-up was set to expire under the IPO's lock-up agreement.  Taking advantage of the premature lock-up release, this select group

of Zynga insiders was prematurely permitted to sell up to 49,414,526 shares of Zynga common stock.

119.    The Underwriter Defendants served as underwriters in connection with Zynga's Secondary Offering.  In connection with the March 23, 2012 amendment to the Secondary Offering releasing the Selling Defendants and other officers from the May 28, 2012 lock-up period, the Underwriter Defendants were paid approximately $18 million in discounts and commissions.

120.    As detailed below, the Selling Defendants and other officers promptly sold the shares released from the lock-up as soon as the Secondary Offering was completed on April 3, 2012, at $11.64 per share for proceeds of over $235 million.  Thus, Zynga insiders were able to sell their holdings much sooner than the original lock-up expiration date, knowing the true financial condition of the Company and just months before the house of cards fell apart when Zynga revealed its dismal performance, causing the stock price to plummet to plummet to $2.97 per share and causing colossal losses to Plaintiffs and the Class.

## VI.    THE EXCHANGE ACT DEFENDANTS' ACTIONABLE CONDUCT

### A.    THE EXCHANGE ACT DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD

121.    The Exchange Act Defendants engaged in a scheme to defraud Zynga's investors and artificially inflating the price of Zynga stock so that they and other defendants and insiders could reap millions of dollars in personal proceeds from the sale of their personally held shares before the inevitable implosion of the stock price which caused substantial losses to Plaintiffs and the Class.  As disclosed herein, to carry out their scheme, the Exchange Act Defendants: (a) manipulated Zynga's recognition of revenue and bookings; (b) falsely assured investors not to worry about declining DAU, stating that there was not a direct correlation between DAU and monetization because as DAU go down, monetization goes up when, in fact, monetization was rapidly declining; (c) failed to disclose delays in product launches; (d) issued aggressive and unsupportable full-year guidance for 2012; and (e) repeatedly assured investors

that Zynga's bookings and growth would be more heavily weighted in the second half of 2012. Further, the Exchange Act Defendants concealed material, adverse information regarding Zynga's real-time game and user data and game pipeline available for 2012. While Zynga's stock was trading at artificially inflated prices, the Exchange Act Defendants and other defendants and insiders obtained an early release on a lock-up of their personally held shares of Zynga common stock which allowed them to sell 49.4 million personally-held shares for approximately $593 million in proceeds, less than four months before, and for the same quarter that, Zynga finally disclosed that its business was collapsing and drastically revised its guidance for the second half of 2012.

**B.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

**1.    IPO Materials**

122.    On December 16, 2011, Zynga filed its prospectus dated December 15, 2011 for the IPO. The IPO was conducted pursuant to a registration statement filed on July 1, 2011 and a prospectus supplement Form 424B4 filed December 16, 2011 and dated December 15, 2011 preliminary versions of which were filed on July 1, 2011, July 18, 2011, August 11, 2011, September 21, 2011, October 13, 2011, November 4, 2011, November 17, 2011, December 2, 20011, December 9, 2011 and, December 15, 2011, and which supplemented and included a prospectus dated July 1, 2011 (together, the "IPO Registration Statement").

123.    The "IPO Materials" are as follows:

        a.    the IPO Registration Statement;

        b.    the Underwriting Agreement;

        c.    the road show presentation; and

        d.    the filings incorporated by reference.

124.    The IPO Materials contained a series of materially false and misleading statements and failed to disclose material information.

125.    According to the IPO Registration Statement:

We have achieved significant growth in our business in a short period of time. From 2008 to 2010, our revenue increased from $19.4 million to $597.5 million, our bookings increased from $35.9 million to $838.9 million, we went from a net loss of $22.1 million to net income of $90.6 million and our adjusted EBITDA increased from $4.5 million to $392.7 million. For the nine months ended September 30, 2011, our revenue was $828.9 million, our bookings were $849.0 million, our net income was $30.7 million and our adjusted EBITDA was $235.5 million.

126. The IPO Registration Statement further announced that, for the nine months ended September 30, 2011, Zynga reported that bookings had increased by $253.6 million from the nine months ended September 30, 2010, and ABPU had increased from $0.038 to $0.053, reflecting improved overall monetization of players.

127. Under "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained in the IPO Prospectus, Zynga reported that:

In 2010, [Zynga's] revenue and bookings were $597.5 million and $838.9 million, respectively, which represented increases from 2009 of $476.0 million and $510.8 million, respectively.

128. And in a section of the IPO Registration Statement titled, "Letter From Our Founder," Zynga focused investor attention on growth and not on earnings results. In the letter, Pincus stated: "We will prioritize innovation and long-term growth over quarterly earnings."

129. In conjunction with Zynga's IPO Offering, the Company issued an IPO Road Show Presentation. As noted by a December 2, 2011 *BusinessInsider.com* article, the Company used the slide presentation to "pitch investors on the company's fundamentals." According to a December 2, 2011 *VentureBeat.com* article, Zynga delivered the 30-minute road show pitch to investors over the course of nine days.

130. Using the Company's franchise title *Farmville* as an example, Zynga used the Road Show Presentation to divert investor attention away from the falling number of DAU. Zynga focused investor attention instead on the Company's measurement of bookings, as demonstrated through a slide titled, "Longevity of Bookings from Enduring Game Franchises":



131. Through this slide, and in conjunction with other statements made by its officers, Zynga represented to investors that the number of DAU and the Company's monetization were not directly related. Schappert expanded on this representation during the 2012 Q1 conference call, while responding to a question posed by analyst Richard Greenfield:

> I just wanted to circle back and remind on that slide that we had in the road show that you are speaking to, ***one of the key points on that slide was that daily active users and monetization are not directly related*** in fact what we talked about was DAU rise at the launch of the game, they trail off over time ***while revenues and monetization frankly does the opposite.*** So *FarmVille* is nearing in on celebrating its three-year anniversary and it's a strong contributor and we expect continued good things from *FarmVille* for the remainder of the year.

132. Further focusing investor attention on bookings growth after the launch games during the Road Show Presentation, Schappert stated "[o]ur games live on for years, and bookings continue to grow long after launch," as noted in the December 2, 2011 *VentureBeat.com* article.

133.    In its Road Show Presentation, Zynga further stated that it used both bookings and revenue to gauge its performance.  The Company pointed investors to its "Robust Bookings Growth," as noted in the slide below:



134.    In its July 1, 2011 Form S-1, Zynga continued to direct investors towards its "long-term growth."   In his letter to shareholders, Pincus again noted:   "We will prioritize innovation and long-term growth over quarterly earnings."

135.    In its December 15, 2011 Amendment No. 9 to its Form S-1, Zynga made additional misstatements and omissions.  The Amendment again included the December 2, 2011 "Letter From Our Founder" section, through which Pincus emphasized that Zynga would prioritize "long-term growth over quarterly earnings."

136.    Pursuant to the IPO Materials, on December 16, 2011, Zynga completed its IPO and issued 100 million shares of Class A common stock in the IPO at an offering price of

$10.00 per share. The IPO raised $1 billion and netted $961.4 million after deducting underwriting discounts and commissions and other offering expenses.

137. The Exchange Act Defendants' statements above were false and misleading when made and omitted material facts. The Exchange Act Defendants' statements regarding Zynga's reported revenue and bookings and growth were false and misleading because, as relayed by CWs, Zynga had been experiencing a decline in bookings and an inability to monetize its games, and because, as discussed in Section VI.B.4. below, Zynga had manipulated its revenue reporting by improperly shortening the WAL of its games, thereby inflating the revenue Zynga reported leading up to the IPO. Further, the Exchange Act Defendants' statements that there was not a direct correlation between DAU and monetization because as DAU go down, monetization goes up, were false and misleading because bookings/monetization, which were tracked internally by Zynga and which were non-public, were, in fact, declining, as relayed by CWs and as discussed in Sections V.A. and VI.D.2. herein.

## 2. Fourth Quarter 2011 ("Q4 2011") Results and 2012 Guidance

138. On February 14, 2012, Zynga issued a press release on Form 8-K announcing its financial results for the fourth quarter and full year 2011, Zynga's first earnings release as a public company. For the fourth quarter of 2011, Zynga reported record bookings of $306.5 million, up 26% year-over-year and up 7% from the prior quarter. Zynga reported that full year 2011 bookings were at a "record level" of $1.16 billion, up 38% year-over-year, and revenue of $1.14 billion, up 91% year-over-year. In addition, Zynga reported an increase in ABPU from $0.055 in the fourth quarter of 2010 to $0.061 in the fourth quarter of 2011, up 11%.

139. In addition, Zynga reported:

- Daily active users (DAU) increased from 48 million in the fourth quarter of 2010 to 54 million in the fourth quarter of 2011, up 13%.

- Monthly active users (MAUs) increased from 195 million in the fourth quarter of 2010 to 240 million in the fourth quarter of 2011, up 23%.

- Monthly unique users (MUUs) increased from 111 million in the fourth quarter of 2010 to 153 million in the fourth quarter of 2011, up 38%.

- Average daily bookings per average DAU (ABPU) increased from $0.055 in the fourth quarter of 2010 to $0.061 in the fourth quarter of 2011, up 11%.

- Monthly Unique Payers (MUPs) increased from 2.6 million in the third quarter of 2011 to 2.9 million in the fourth quarter of 2011, up 13%.

140. In announcing its outlook for 2012, Zynga was extremely positive:

- Bookings are projected to be in the range of $1.35 billion to $1.45 billion. ***We expect that growth will be weighted towards the back-half of the year with slower sequential growth in the first half of the year***.

- Adjusted EBITDA is projected to be in the range of $390 million to $440 million.

- We project non-GAAP weighted-average diluted shares outstanding to be approximately 865 million shares in Q1 2012 and approximately 890 million shares in Q4 2012. Full year 2012 non-GAAP EPS is projected to be in the range of $0.24 to $0.28.

141. At an earnings call the same day, February 14, 2012, commenting on Zynga's "record" results, Pincus stated:

> 2011 was another milestone year for Zynga on our mission of connecting the world through games. The world is starting to embrace play, which is quickly emerging as one of the most popular pastimes on the web and mobile. … ***Zynga set new records in 2011 in terms of the audience size, revenues and bookings on web and mobile.***
>
> * * *
>
> Looking forward to 2012, we're excited about the opportunities in front of us. In the last few months, we've launched three breakout games with CastleVille, Hidden Chronicles and Scramble With Friends. ***We have a strong pipeline for the rest of the year*** and we've seen great momentum in mobile and advertising businesses, which we expect to continue throughout 2012.

142. Also during Zynga's fourth quarter earnings call, defendant Wehner announced that "[w]***e also continue to make progress in monetizing non-payers***." He further stated that "[o]ur overall monetization is measured by bookings per DAU or ABPU grew 11%, driven by increases in payer conversion and advertising. During the fourth quarter, we grew our monthly unique payers to 2.9 million, up 13% from the third quarter. This number, which we plan to report on going forward, represents the average number of unique people in each month of the quarter who pay in both our web and mobile games."

143.    Defendant Wehner further stated, **"[l]ooking at 2011 bookings, we saw that our older games continued to deliver solid performance and provided a stable base on which to grow**."  Wehner concluded by stating that, "[i]n closing, our first public quarter showed positive trends across our key operating and financial metrics.  We grew our audience and monetization to their highest levels and delivered a record quarter in terms of bookings.  We delivered solid growth in both bookings and adjusted EBITDA.  We are pleased with the results in the fourth quarter and full year 2011, and continue to be excited about the long-term opportunity for the business."

144.    Defendant Schappert also fostered positive guidance for 2012, stating:

Now let me talk about Q4.  Q4 marked the start of a very busy launch period for Zynga.

* * *

Looking to this year, even though it's still early in 2012, we are off to a good start.  In January, we launched Hidden Chronicles on Facebook, our first entry into the hidden objects genre. Hidden Chronicles has grown to over 7 million.

DAU and was the third most played game on Facebook in January.  We also released Scramble With Friends for mobile in January, and it quickly became one of the top five paid apps in the Apple Apps Store, demonstrating the strength of our "With Friends" brand.  It also illustrates the power of Zynga's network and cross-promotion engine for mobile platforms.

***So far this quarter, our network of players continues to increase, with daily active users, monthly active users and monthly unique users all showing growth.***  Zynga has a lot of opportunities for growth, and we are aggressively executing in three key growth areas.  First, ***we have a repeatable, scaleable model for going after every major category and play***, as we've recently done so with CastleVille and Hidden Chronicles.

* * *

Zynga has invested more in the social and free-to-play space than any other company, and ***we will continue to build upon our key competitive advantages to drive growth and long-term shareholder value.***

145.    During the Q&A portion of the call, analyst Arvind Bhatia inquired into the trajectory of *CityVille*, specifically regarding trends in DAU versus monetization, asking, "I was wondering if you could talk about the trajectory of *CityVille*, I know you mentioned that one as doing well, and how that compares to *FarmVille*, for which I know you mentioned that in your

slide presentation during the road show. Just wondering, because we noted that the DAU trends are a little different from a trajectory standpoint, so just wondering how that translates into monetization? Are you monetizing that sooner or you think that it's going to follow the same pattern?"

146. In response, Defendant Schappert stated, "I'll give you a little bit of color. *I would first say that I think it's – do not draw the same conclusion when you look at DAU and think you can kind of – they're directly related to the monetization. Obviously, as we've said before, when games launch DAU go up and then we find the DAU go down over time and monetization increases over time.*"

147. Later on the call, Defendant Wehner stated, "*we're excited about the pipeline of games that we have launching in 2012. As we've seen in the past that bookings and DAU, bookings can pick up after DAU picks up. So, you won't necessarily get the best bookings performance in the quarters that you launch a game*."

148. On this news, Zynga common stock price closed at $14.35 on February 14, 2012, an increase of almost 7% from the previous day's closing price. Describing these fourth quarter 2011 results, Robert W. Baird & Co. analyst Colin Sebastian stated, "[i]n terms of Zynga coming out of the gate, they exceeded consensus and they're guiding to a pretty good growth number."

149. On February 28, 2012, Zynga filed its Annual Report on Form 10-K with the SEC for the 2011 fiscal year, which included the same false and misleading financial results previously reported to investors on February 14, 2012. Further, with respect to Zynga's future with Facebook, the Form 10-K stated that "[w]e expect to continue to derive a substantial portion of our revenue and to acquire a substantial portion of our players from the Facebook platform for the foreseeable future."

150. In connection with the Form 10-K, Defendant Pincus and Wehner filed identical certifications with the SEC certifying that:

1. I have reviewed this annual report on Form 10-K of Zynga Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

151.    Defendants Pincus and Wehner also filed an additional certification pursuant to 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE

SARBANES-OXLEY ACT OF 2002, certifying that, in connection with the Annual Report on Form 10-K filed by Zynga with the SEC on February 28, 2012:

1.    The Company's Annual Report on Form 10-K for the period ended December 31, 2011, to which this Certification is attached as Exhibit 32.1 (the "Annual Report") fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2.    The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

152.    The Exchange Act Defendants' statements to the market detailed above were false and misleading when made and omitted material facts. The Exchange Act Defendants' statements regarding Zynga's revenue, bookings and growth being weighted more heavily in the second half of 2012 were false and misleading because, as relayed by CWs, beginning in mid to late 2011 Zynga had been experiencing a rapid decline in user numbers, user spending, revenue and bookings, and because, as discussed in Section VI.B.4. below, Zynga manipulated its revenue reporting by improperly shortening the WAL of its games and thus increasing the revenue Zynga reported leading up to the IPO and in Q4 2011. Further, the Exchange Act Defendants' statements that there was not a direct correlation between DAU and monetization because as DAU go down, monetization goes up, were false and misleading because bookings/monetization, which was tracked internally by Zynga and was non-public, were, in fact, rapidly declining, as relayed by CWs and as discussed in Section VI.D.2. herein. Additionally, the Exchange Act Defendants' statements regarding Zynga's new games in the pipeline for 2012 were false and misleading because Zynga had been facing substantial delays in developing and launching new games and its pipeline of games for 2012 was materially weaker than reported, as relayed by CWs and as discussed in Section VI.D.2. herein. The Exchange Act Defendants also failed to disclose the material fact that Facebook's online gaming platform was changing in a way that would have material adverse effects on Zynga's immediate and long-term revenue and bookings beginning in the second quarter of 2012, as relayed by CWs and as discussed in Section VI.D.3.herein.

**3.**     **Secondary Offering Materials**

153.     On March 14, 2012, Zynga filed a Form S-1 Registration Statement and Prospectus with the SEC in connection with a secondary offering of 42,969,153 shares of Zynga's Class A common stock, amended version of which were filed on March 23, 2012 and on March 29, 2012, (together, the "Secondary Offering Registration Statement") for certain insider shareholders, which included the Selling Defendants.

154.     The "Secondary Offering Materials" are as follows:

       a.      the Secondary Offering Registration Statement;

       b.      the March 23, 2012 Underwriting Agreement;

       c.      the Annual Report on Form 10-K filed on February 28, 2012, which Zynga incorporated by reference in the Prospectus;

       d.      the Report on Form 8-K filed on March 5, 2012, which Zynga incorporated by reference in the Prospectus; and

       e.      other filings incorporated by reference.

155.     The Secondary Offering Materials contained a series of materially false and misleading statements and failed to disclose material information.

156.     The Secondary Offering Registration Statement stated that "[t]he principal purposes of this offering are to facilitate an orderly distribution of shares and to increase our public float."

157.     The Secondary Offering Registration Statement reported that "[w]e have achieved significant growth in our business in a short period of time. From 2009 to 2011, our revenue increased from $121.5 million to $1.14 billion and our bookings increased from $328.1 million to $1.16 billion."

158.     According to "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained within the Secondary Offering Registration Statement, "[i]n 2011, our revenue and bookings were $1.14 billion and $1.16 billion, respectively, which represented increases from 2010 of $542.6 million and $316.6 million, respectively."

159.    The Secondary Offering Registration Statement also reported "***Rapid Game Growth.*** Our games have achieved rapid and widespread adoption. *FarmVille* grew to 43 million MAUs in its first 100 days and *CityVille* grew to 61 million MAUs in its first 50 days. *CastleVille*, which launched in November 2011, reached 30 million MAUs in its first 25 days." (Emphasis in original).

160.    In the section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations," Zynga stated:  "Revenue growth will depend largely on our ability to attract and retain players and more effectively monetize our player base through the sale of virtual goods and advertising. ***We intend to do this through the launch of new games***, enhancements to current games and expansion into new markets, distribution platforms and Zynga.com."

161.    In a section discussing the Company's user metrics, Zynga stated:  "Our user metrics are impacted by several factors that cause them to fluctuate on a quarterly basis. Beginning in early 2010, Facebook changed its policies for application developers regarding use of its communication channels.  These changes limited the level of communication among users about applications on the Facebook platform, which we believe contributed to a decline in our number of players throughout 2010."

162.    On March 21, 2012, Zynga announced its acquisition of OMGPOP and, thus *Draw Something*.  The March 21, 2012, press release boasted how, in the six weeks since *Draw Something* launched, it had been downloaded over 35 million times.  The press release further touted *Draw Something*'s "eye-popping stats" including that more than 1 billion drawings had been created in the past week.

163.    In the March 21, 2012, press release, Zynga also touted its pipeline of new games.  Specifically, Zynga stated:  "With 15 game launches in the past two quarters, Zynga Mobile is bringing a variety of genres and games to reflect its players' lifestyles and provide them with the social experiences they want, at any time and on any device, regardless of platform."

164.    Then, on March 23, 2012, Zynga filed an Amended Secondary Offering Prospectus stating that the selling stockholders were being released "from these lock-up[] [agreements] to permit them to sell up to 49,414,526 shares (including the underwriters' option to purchase additional shares)" in the Secondary Offering.  The Amended Secondary Offering Prospectus reiterated that "[t]he principal purposes of this offering are to facilitate an orderly distribution of shares and to increase our public float."  The Prospectus stated that "[t]he selling stockholders will receive all of the net proceeds from this offering" and "[Zynga] will not receive any proceeds from the sale of shares in this offering."

165.    On March 26, 2012, Zynga issued a press release entitled "ZYNGA ANNOUNCES PARTIAL RELEASE OF LOCK-UP AGREEMENTS WITH CERTAIN OFFICERS AND DIRECTORS IN CONNECTION WITH PROPOSED SECONDARY OFFERING," announcing that the Underwriter Defendants Morgan Stanley & Co. LLC and Goldman, Sachs & Co. "have consented to the release of lock-up restrictions with respect to certain shares of the Company's Class A common stock held by certain officers and directors of the Company to facilitate sales by such officers and directors in connection with the Company's recently-announced secondary offering.  The release will take effect concurrently with the secondary offering, and the shares may be sold only in connection with such offering." Zynga's March 26, 2012, press release stated again that "[t]he principal purposes of the [Secondary Offering] are to facilitate an orderly distribution of shares and increase the company's public float."

166.    Zynga also issued a press release on March 28, 2012, entitled "Zynga Announces Pricing of Secondary offering," claiming that "[t]he principal purposes of the offering are to facilitate an orderly distribution of shares and to increase the company's public float.  Zynga will not receive any proceeds from the sale of shares in this offering."

167.    On April 3, 2012, Zynga issued a press release entitled "Zynga Announces Closing of Secondary Offering," announcing the completion of the Secondary Offering and reporting that the selling stockholders, who had been released from the IPO's lock-up

restrictions, including the Selling Defendants and other Zynga officers, had sold their shares pursuant to the Secondary Offering. The press release further reiterated Zynga's claim that "[t]he principal purposes of the offering were to facilitate an orderly distribution of shares and to increase the company's public float. Zynga did not receive any proceeds from the sale of shares in the offering."

168. The Exchange Act Defendants' statements were false and misleading when made and omitted material facts. The Exchange Act Defendants' statements regarding the purpose of the secondary offering were false and misleading because the purpose was, in fact, to enable the Selling Defendants and other insiders to sell stock and reap millions prior to the disclosure of Zynga's true financial condition and its dismal Q2 2012 results and revised guidance and, thus, the inevitable crash in Zynga's stock price. Further, the Exchange Act Defendants' statements regarding Zynga's revenue, bookings and growth were false and misleading because, as relayed by CWs, beginning in mid to late 2011 Zynga had been experiencing a rapid decline in bookings, and because, as discussed below, Zynga manipulated its revenue reporting by improperly shortening the WAL of its games and thus increasing the revenue Zynga reported leading up to the IPO and in Q4 2011. Additionally, the Exchange Act Defendants' statements regarding Zynga's game launches were false and misleading because Zynga had been facing substantial delays in developing and launching new games and its pipeline of games for 2012 was materially weaker than reported, as relayed by CWs and as discussed in Section VI.D.2. herein. The Exchange Act Defendants' statements regarding Facebook were false and misleading as they failed to disclose that Facebook's online gaming platform was changing in a way that would have material adverse effects on Zynga's immediate and long-term revenue and bookings beginning in the second quarter of 2012, as relayed by CWs and as discussed in Section VI.D.3. herein.

### 4. First Quarter 2012 ("Q1 2012") Results and Revised 2012 Guidance

169. On April 26, 2012, Zynga issued a press release on Form 8-K with the SEC announcing its financial results for the first quarter of 2012. Zynga's press release touted Zynga's growth in both web and mobile bookings, reporting "highest ever" bookings of $329 million for the quarter, up 15% year-over-year and up 7% from the fourth quarter 2011. The press release announced that "[w]e're pleased with the progress that Zynga has made in the first quarter growing our audience reach 25% year over year and nearly 20% quarter over quarter."

170. For Q1 2012, Zynga disclosed several business highlights, including:

- Daily active users (DAU) increased from 62 million in the first quarter of 2011 to 65 million in the first quarter of 2012, up 6% year-over-year.

- Monthly active users (MAUs) increased from 236 million in the first quarter of 2011 to 292 million in the first quarter of 2012, up 24% year-over-year.

- Monthly unique users (MUUs) increased from 146 million in the first quarter of 2011 to 182 million in the first quarter of 2012, up 25% year-over-year.

- Average daily bookings per average DAU (ABPU) increased from $0.051 in the first quarter of 2011 to $0.055 in the first quarter of 2012, up 8% year-over-year.

- Monthly Unique Payers (MUPs) increased from 2.9 million in the fourth quarter of 2011 to 3.5 million in the first quarter of 2012, up 21% sequentially.

171. In announcing these Q1 2012 financial results, Zynga further raised its already positive guidance that had been issued on February 14, 2012, in connection with Zynga's fourth quarter and full year 2011 financial results, to $1.425 billion to $1.5 billion in bookings, up from $1.35 to $1.45 billion, Zynga's April 26, 2012 press release proclaimed that "[w]e expect that growth will be *weighted towards the second half of the year*." Zynga also reported that adjusted EBITDA is projected to be in the range of $400 million to $450 million and full year 2012 non-GAAP EPS is projected to be in the range of $0.23 to $0.29.

172. Zynga also touted the transparency of its financial metrics, including its reported bookings and adjusted EBITDA, stating: "We believe these non-GAAP financial measures are

useful to investors because they allow for ***greater transparency*** with respect to key financial metrics we use in making operations decisions and because our investors and analysts use them to help them to help assess the health of our business."

173.    In Zynga's Q1 2012 earnings call held on April 26, 2012, Zynga's executive officers conveyed very positive financial results for the first quarter, making statements, such as "Q1 was a great start to 2012" and "Q1 was a strong quarter across all our key operating and financial metrics."

174.    With respect to Zynga's OMGPOP acquisition, defendant Pincus announced that, "[t]owards the end of the quarter, we also acquired Draw Something, which further extends our leadership position. With 11 million DAU per AppData, this game dramatically increases the size of our mobile network, allowing us to distribute our games to an even larger audience.  We expect the purchase of OMGPOP, the makers of Draw Something to be accretive on many fronts."  Defendant Schappert also commented on OMGPOP that "Draw Something passed 50 million total installs within 50 days, making it one of the fastest growing games ever.  We're thrilled to have the OMGPOP team as part of our mobile group.  Our teams are already working well together, and we just released an update last week that brought new social features to the game, including messaging and the ability to easily post your drawings to Facebook and Twitter."

175.    During the call, defendant Schappert reported a record performance for Zynga, saying "[w]e delivered a strong first quarter with ***record bookings*** and strong audience growth, ***and we're raising bookings and EBITDA guidance for the year***."

176.    In reporting increases in monetization, defendant Wehner stated that, "[t]urning to monetization, average bookings per DAU or ABPU was $0.055, up 8% year-over-year, but down 10% quarter-over-quarter. On a year-over-year basis, ABPU growth was driven by improved conversion and increased advertising."

177.    Defendant Wehner provided the following update on Zynga's record bookings for the quarter:

***We manage our business on bookings, which is a key indicator of top line performance.*** Q1 bookings were strong, reaching $329 million, up 15% year-over-year and 7% quarter-over-quarter. ***This was our third quarter of accelerating bookings growth on a sequential basis, and both web and mobile bookings were up year-over-year.***

The primary drivers of total bookings growth were successful launches of new games, including CastleVille and Hidden Chronicles, and growth in our mobile and advertising businesses, all on top of solid performance from our existing games, which provided a stable base on which to grow.

First, let me talk about bookings growth in terms of both existing and new games. ***We wanted to provide you with a one-time snapshot to illustrate the bookings stability we're seeing from our existing base of games***. Please note that we do not plan to disclose this metric on an ongoing basis.

In the first quarter the total bookings from games that are more than a year old was approximately 80% of what those games delivered in the first quarter of 2011. The key takeaways here are twofold. ***One, we had a stable base of bookings from existing games. And two, there's not always a direct correlation between bookings growth and publicly available DAU data which showed a steeper decline year-over-year.***

On top of the stable base of bookings, we saw growth from new web games like CastleVille and Hidden Chronicles. There continues to be strong demand for our core social games like CastleVille. In the first full quarter after launch, CastleVille delivered comparable bookings to CityVille in its first full quarter and more than FarmVille in its full quarter.

178. With respect to the performance of Zynga's games, defendant Schappert stated:

***Our coreportfolio of games, which includes FarmVille, CityVille, CastleVille and Zynga Poker, continues to generate solid bookings***. . . I'm happy to report that ***our core portfolio of games remains healthy and continues to provide solid bookings***. We're pleased with the performance of CastleVille, the latest game in our popular Ville franchise, which we launched in last November. Both CastleVille and Zynga Poker delivered record bookings in Q1. And two of our largest games, FarmVille and CityVille, remain at the top of the charts on Facebook as we continue to launch expansions, including Hawaiian Paradise in FarmVille, airports and islands in CityVille and parties and alliances in CastleVille.

179. Moreover, during the first quarter earnings call, defendant Schappert announced, "***[l]ooking ahead, we're excited about our game pipeline for the rest of the year.***"

180. In further conveying a positive guidance for 2012, including an emphasis on bookings being more heavily weighted towards the second half of 2012, defendant Wehner said:

***We're well positioned for growth in 2012. Our business continues to track well against the original guidance we gave in February. And we're increasing bookings guidance today to reflect the recent acquisition of OMGPOP. Note,***

*however, that we continue to expect growth to be weighted towards the second half of the year.*

*For the full year 2012, we expect to deliver bookings between $1.425 billion and $1.5 billion, with adjusted EBITDA between $400 million and $450 million. We've increased adjusted EBITDA to reflect stronger bookings, partially offset by increases in both sales and marketing and R&D.*

*In summary, **Q1** was a great quarter with strong organic performance across our key operating and financial metrics. We grew our audience 25% year-over-year, and delivered record bookings with significant margin expansion quarter-over-quarter. We're pleased with our results and excited about the future of play and the long-term opportunity for our business.*

181.    In response to a request by Robert Baird analyst Colin Sebastian to clarify Zynga's statements on full year guidance, expecting growth to be more heavily weighted in the second half of 2012, defendant Wehner responded, "*we're just saying that the sequential growth rates will be higher in the back two quarters than in the second quarter.*"

182.    During the Q&A portion of the first quarter earnings call, regarding upcoming game launches, defendant Schappert stated, "We have a nice pipeline of games beyond that and a strong pipeline of mobile titles too.  So, we feel good about the remainder of the year" and "we have a very healthy pipeline of new games coming on both mobile and on web."

183.    During that call, there was a detailed exchange regarding 2012 growth, specifically related to declines in DAU in relation to bookings.  Arvind Bhatia of Sterne Agee inquired, "I just have one quick question and that is essentially on FarmVille. With the DAU now under 5 million, I wonder if you could maybe update that slide that you had provided on the road show, where you talked about the trajectory of FarmVille.  And again, I know you gave a general idea of your top games from last year and this year, but could you hone in a little bit more on FarmVille."

184.    In response, defendants Wehner and Schappert stressed that DAU were not the full picture on monetization, specifically referencing defendants' comments in connection with the IPO:

[Wehner]  We're not providing specifics on individual title-by-title performance. We provided that snapshot on overall, which I think gives a good indication of the stability of the games. ***We continue to see FarmVille performing well and we see good prospects for FarmVille and our existing games and new games for the***

*remainder of the year, which is why we're excited and comfortable raising guidance for the year*….

[Schappert] *I just wanted to circle back and remind on that slide that we had in the road show that you are speaking to. One of the key points on that slide was that daily active users and monetization are not directly related. In fact, what we talked about was DAU rise at the launch of the game they trail off over time, while revenues and monetization frankly does the opposite. So FarmVille is nearing in on celebrating its three-year anniversary and it's a strong contributor and we expect continued good things from FarmVille for the remainder of the year*.

185. On May 8, 2012, Zynga filed its Quarterly Report on Form 10-Q for Q1 2012 with the SEC, which included the same false and misleading financial results previously reported to investors on April 26, 2012.

186. In the Form 10-Q, Zynga again reiterated the purported purpose of the offering, stating that "[t]he principal purpose of the offering was to facilitate an orderly distribution of shares and to increase our public float."

187. In discussing how the Company generated revenue, Zynga likewise boasted that it expected to enjoy growth in the future. The Company stated "[w]e generate substantially all of our revenue and players through the Facebook platform and **expect to continue to do so for the foreseeable future.**"

188. In a discussion of the Company's financial measures, Zynga directed investors to its financial measures as accurate representations of its business and operations, stating, "[w]e believe that adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of directors."

189. And in a discussion of the Company's operational measures, including the number of DAU, Zynga again directed investors towards bookings and away from the "short term" reported number of daily or monthly users. Specifically, Zynga stated: "Our operating metrics may not correlate directly to quarterly bookings or revenue trends in the short term. For instance, revenue has grown every quarter since our inception, including in quarters where DAU, MAU and MUU did not grow."

190.    In a section titled "Factors Affecting Our Performance," Zynga focused on game monetization and stated "[o]ur bookings, revenue and overall financial performance are affected by the number of players and the effectiveness of our monetization of players through the sale of virtual goods and advertising."

191.    And in a section discussing the Company's revenue results, Zynga stated that "[t]otal revenue increased $78.1 million in the first quarter of 2012, as a result of growth in both online game and advertising revenue.  Bookings increased by $42.6 million in the first quarter of 2012.  ABPU increased from $0.051 to $0.055, reflecting improved overall monetization of our players, while average DAU increased from 62 million to 65 million."

192.    The Exchange Act Defendants' statements to the market detailed above were false and misleading when made and omitted material facts.  The Exchange Act Defendants' statements regarding Zynga's revenue, bookings—including in its core portfolio, its revised 2012 guidance and the representation that 2012 would be weighted more heavily in the second half of 2012—were false and misleading.  As relayed by CWs, beginning in mid to late 2011 Zynga had been experiencing a rapid decline in bookings.  And as discussed in Section V.B.4. herein, Zynga manipulated its revenue reporting by improperly shortening the WAL of its games and thus increasing the revenue Zynga reported for Q1 2012.  Further, the Exchange Act Defendants' statements that there was not a direct correlation between DAU and monetization because as DAU go down, monetization goes up were false and misleading because bookings/monetization, which was tracked internally and was non-public, were, in fact, rapidly declining, as relayed by CWs and as discussed in Section VI.D.2 herein.  Additionally, the Exchange Act Defendants' statements regarding Zynga's new games in the pipeline, were false and misleading because Zynga had been facing substantial delays in developing and launching new games and its pipeline of games for 2012 was materially weaker than reported, as relayed by CWs and as discussed in Section VI.D.2. herein.  The Exchange Act Defendants also failed to disclose the material facts that Facebook's online gaming platform was changing in a way that would have material adverse effects on Zynga's immediate and long-term revenue and

bookings beginning in the second quarter of 2012 as relayed by CWs and as discussed in Section VI.D.3. herein.  Moreover, the Exchange Act Defendants' statements regarding the purpose of the secondary offering were false and misleading because the purpose was, in fact, to enable the Selling Defendants and other insiders to sell stock and reap millions prior to the disclosure of Zynga's true financial condition and its dismal Q2 2012 results and revised guidance, and thus, the inevitable crash in Zynga's stock price.

193.    Tellingly, an October 9, 2012 Business Insider article entitled "Rumors Of Layoffs And A Sale Rip Through Zynga As Employees Revolt Or Flee" disclosed that "[o]ne Zynga executive emailed us yesterday to accuse CEO Mark Pincus of misleading investors about the real root of the company's problems."

194.    Indeed, an October 9, 2012 Business Insider article entitled "Rumors Of Layoffs And A Sale Rip Through Zynga As Employees Revolt Or Flee" noted that "[o]ne Zynga executive emailed us yesterday to accuse CEO Mark Pincus of misleading investors about the real root of the company's problems."

### 5.    J.P. Morgan Global Technology, Media and Telecom Conference

195.    On May 16, 2012, defendant Wehner spoke at the J.P. Morgan Global Technology, Media and Telecom Conference.

196.    At the conference, in regard to upcoming launches, Wehner stated, "*we have a robust pipeline that we're excited about in terms of launching games that are not only new categories like I mentioned, but also in existing categories to keep those categories fresh and to keep delivering the content that our users want*."  He further stated, "[w]e launched Bubble Safari last week, Bingo is something that we're going to be cross – in cross promo shortly. *So we've got – we've already launched a pretty substantial number of titles relative to where we were last year, and we've got a robust pipeline going forward*. We haven't said much about our going-forward pipeline. We did mention that we'll be having a Zynga Unleashed product event during the summer where we'll talk about our forward product pipeline."

197.    Wehner also stressed that Zynga was able to ramp up bookings:

*What we're seeing with our cross promo ability is an ability to get DAU and bookings ramped up relatively quickly*. And so we've seen success, for instance, with CastleVille in its first quarter after a launch, even on a smaller DAU base than CityVille had, delivered approximately the same level of bookings in its first quarter out that CityVille did.  *So we are seeing good performance in terms of being able to ramp bookings up quickly.*  I would say FarmVille is a good example in the past, that game ramped up fairly slowly in terms of DAU and ramped up bookings fairly slowly. *We're clearly seeing these games being able to ramp up more quickly with our – with our cross promotion.*

198.    Defendant Wehner's above statement about ramping up bookings prompted a question from the moderator, J.P. Morgan analyst, Douglas Anmuth, regarding defendants' oft-repeated mantra that bookings go up after DAU go down.  Specifically, Wehner was asked, "in thinking about that bookings sort of trajectory, you've typically shown in some of these games that your DAU can go down, your bookings can continue to actually go up as you're hitting perhaps a more core base of users?"  Wehner responded, "*correct.*"

199.    Wehner was then asked, "How do you think about that trajectory, now it feels like things are maybe happening a little bit quicker out of the gate, what do we know about the next period?"  In response, Wehner stated:

*Yeah, and we still see that same trajectory* as we bring in DAU of people who are trying the game early on, they may or may not stick with the game.  You're going to get a lower percentage of those users paying than you will when the game gets older, and the people who are just trying but not as committed to the game are now not playing it anymore.  *So you do see over time the same sort of trends. You'll see ARPU increases in games as they get longer in their life cycle because you're retaining that committed payer base and we're continuing to see that trend repeat*.

200.    Wehner was subsequently questioned by Anmuth regarding *Draw Something*, which was seeing a dramatic decrease in DAU.  Specifically, the exchange was as follows:

**Douglas Anmuth**

Let's talk about Draw Something, so DAU here have declined from nearly 15 million in late March to, I was looking at yesterday, just over 8 million basically in recent days.  So you released some updates on April 18 with user sharing and commenting, but what's the plan here to get Draw Something to stabilize?  Where can we see it settle out?

**David M. Wehner**

Yeah, I don't think we know exactly where it's gonna settle out, at least we're not making any predictions on that publicly. ***But we do expect that we're going to see a stable base set in DAU on Draw Something.*** Whenever you have a game that has a large ramp of installs just like all of our games, you're going to find that some people are committed long-term players and stick with that game and become recurring users that have a high retention and others are using it for a while and then stop playing. So that's very consistent with what we see in our everyday business. ***So it's not surprising to find that with Draw Something.*** So it's an expected pattern of any big social game launch.

**Douglas Anmuth**

And so the trend here you obviously saw – I mean it's been going on for a little while sort of since late March. Just trying to get a sense for what's baked in, how you are thinking about it relative to your three quarter assumption on the $50 million to $75 million?

**David M. Wehner**

Sure. So we look at it in terms of what our expected retention rates are, what our expected install rates are and we forecast forward what we expect DAU to be over the next several quarters and actually into 2013, and apply a rev per DAU to it. So that's how we do the modeling.

**Douglas Anmuth**

I don't suppose you want to share that DAU?

**David M. Wehner**

No. Not – ***and also just to note, that DAU that you're seeing on app data is not the – that's only part of the DAU relative to Draw Something. Draw Something has a whole set of DAU that are not Facebook connected as well***.

201. Analysts focused on The Exchange Act Defendants' statements stressing that DAU did not reflect monetization/bookings. For example, in a June 13, 2012, *MarketWatch* article, analyst Atul Bagga of Lazard was quoted as saying "investors should key in on 'monetization growth' at Zynga, rather than user growth." Likewise, a June 13, 2012 Forbes article noted that "Lazard's view is that Zynga is more focused on monetization growth than usage growth and that the slide in the share price provides a good entry point."

202. The Exchange Act Defendants' statements to the market detailed above were false and misleading. The Exchange Act Defendants' statements regarding Zynga's revenue, bookings, including in its core portfolio, and revised guidance 2012 and that 2012 would be weighted more heavily in the second half of 2012 were false and misleading because, as relayed by CWs, beginning in mid to late 2011 Zynga had been experiencing a rapid decline in

bookings and Zynga manipulated its revenue reporting by improperly shortening the WAL of its games and thus increasing the revenue Zynga reported leading up to the IPO and in Q4 2011, as relayed by CWs and as discussed in Section V.B.4. herein. Further, the Exchange Act Defendants' statements that there is not a direct correlation between DAU and monetization, including specifically as to *Draw Something*, because as DAU go down, monetization goes up, were false and misleading because bookings/monetization, which was tracked internally by Zynga and was non-public, were, in fact, significantly declining, as relayed by CWs and as discussed in Section VI.D.2. herein. Additionally, the Exchange Act Defendants' statements regarding Zynga's new games in the pipeline were false and misleading because Zynga had been facing substantial delays in developing and launching new games and its pipeline of games for 2012 was materially weaker than reported, as relayed by CWs and as discussed in Section VI.D.2. herein. The Exchange Act Defendants also failed to disclose the material fact that Facebook's online gaming platform was changing in a way that would have material adverse effects on Zynga's immediate and long-term revenue and bookings beginning in the second quarter of 2012, as relayed by CWs and as discussed in Section VI.D.3. herein.

## C. THE TRUTH IS REVEALED

203. On July 25, 2012, Zynga shocked the market when it announced its financial results for the second quarter of 2012, reporting substantially lower than expected earnings and issuing a dismal forecast for the rest of the year, sharply lowering its 2012 guidance.[3] Zynga reported a net loss of $22.8 million in the second quarter compared to a net income gain of $1.4 million for the same quarter of 2011. Zynga's gross bookings for the second quarter decreased 8.3% to $301.6 million, compared to $329 million for the first quarter.[4] In addition, Zynga's sales

---

[3] These results were subsequently reported on July 30, 2012 in the Form 10-Q filed by Zynga with the SEC.

[4] The July 30, 2012 10-Q reported that, "[f]or the three months ended June 30, 2012 and 2011, we estimate that 80% and 93% of our quarterly bookings, respectively, was generated through the Facebook platform. For the three months ended June 30, 2012 and 2011, we estimate that 87% and 93% of our quarterly revenue, respectively, was generated through the Facebook platform."

for the quarter were $332.5 million, compared to the $344 million that analysts had projected. Zynga also reported a profit of 1-cent per share, 84% less than the expected 6-cents per share. On the monetization front, ABPU also declined from $0.051 in the second quarter of 2011 to $0.046, down 10% year-over-year, and 16% compared to the first quarter of 2012.

204.    In short, Zynga not only missed its financial targets and previously increased guidance, it did not even come close to meeting these targets.  As Sterne Agee & Leach Inc. analyst Arvind Bhatia asserted, "*[a] slight reduction in guidance would've been understandable, but this kind of reduction is mind-boggling*."

205.    In addition to reporting a dismal second quarter, Zynga announced that it was drastically lowering its full-year outlook for the rest of 2012, after having just raised its guidance on February 14, 2012, and then again on April 26, 2012.  Zynga lowered its projected 2012 gross bookings to a range of $1.15 billion to $1.23 billion, down from an April projection of $1.43 billion to $1.5 billion, which had been revised upward from the February projection of $1.35 billion to $1.45 billion.  Zynga also severely lowered its earnings projections to a range of 4-cents to 9-cents a share, compared to its prior expected range of 23-cents to 29-cents a share.  Moreover, Zynga slashed its full-year adjusted EBITDA guidance in half from $400-450 million to $180-250 million.

206.    In its July 25, 2012 press release, Zynga attributed its reporting of revenue of only $332 million versus the analyst-projected $344 million and earnings of 1-cent per share instead of the projected 6-cents per share, and Zynga's need to slash guidance for 2012 "to reflect delays in launching new games, a faster decline in existing web games due in part to a more challenging environment on the Facebook web platform, and reduced expectations for *Draw Something*."

207.    During Zynga's Q2 2012 earnings call held on July 25, 2012, defendant Pincus reiterated that "[t]hree factors impacted our Q2 results.  First, we saw declines in engagement and bookings for our web games due in part to changes Facebook made to their platform. Second, we launched The Ville later than expected in the quarter.  And third, Draw Something

underperformed versus our early expectations." During the call, when asked to clarify the order of magnitude of these three negative effects relative to 2012 guidance cited by Zynga management, Wehner responded that "[w]e laid out the impacts in the order of their size; we're not giving specificity around that in terms of the quarter, but the existing games were the largest impact followed by The Ville and then followed by Draw Something."

208. Moreover, during that July 25, 2012 call, defendant Wehner acknowledged that:

> We are lowering our outlook to reflect delays in launching new games, a faster decline in existing web games gains due in part to a more challenging environment on the Facebook web platform, and reduced expectations for Draw Something. I want to note that our cost base is largely fixed, so reduced bookings will have a significant impact on adjusted EBITDA. As a result, we now expect to deliver bookings in 2012 between $1.15 billion and $1.225 billion, adjusted EBITDA between $180 million and $250 million, and non-GAAP EPS between $0.04 and $0.09 per share[.]

209. Defendant Wehner further stated that "I want to clarify that the largest reason for us decreasing our guidance has to do with the performance of our existing games."

210. With respect to Zynga's drastic reduction in expected 2012 EBITDA, Wehner disclosed that, "[i]n terms of the year, the big impact is the decrease in the bookings. There's no increase in spend in the year, it's really the decrease in the bookings that's driving the EBITDA outlook."

211. Notably, during the second quarter earnings call, analyst Richard Greenfield of BTIG pointed out the fallacy in Zynga management's previous statements, continuously representing that bookings and growth would be weighted in the second half of 2012 and then suddenly revealing that guidance for the full year of 2012 was being drastically lowered:

> **Q - Richard Greenfield**:
>
> Hi, I've actually got a few questions. Mark, I wanted to explore, you talked about the fact that I think you missed EBITDA, at least in terms of our expectations or Street expectations, by $25 million to $30 million, ***but you're lowering the full-year guidance by somewhere around $200 million. You mentioned that you are excited about your prospects for the second half, but trying to just walk through how do you put those two statements, given the significant reduction in the back half relative to what happened during the second quarter and even what would happen during the third quarter?*** . . .

**A - David M. Wehner**:

In terms of the full-year guidance and how it relates to what we experienced in the second quarter, we are factoring in the experience that we had in the second quarter on the impact that the weakness that we saw in existing games as well as delays in new game launches and the underperformance of Draw Something. So all of those things are factoring into the outlook that we're providing for the full year. *The full-year outlook in terms of bookings has obviously been reduced and that has a dramatic impact on EBITDA*, given the relatively fixed cost structure of the business, given that we're continuing to invest for long-term growth. *So that's what's leading to the change in guidance on EBITDA that is obviously significant.* . . .

**Q - Richard Greenfield**:

But I think just before you go to Mark on the last question, *you specifically said that you were excited about your second half prospects. Given the magnitude of the decline in EBITDA in the back half of the year in the guidance, it just, I guess the question is you've always said the year is very back half weighted, it seems that you were always excited about the back half of the year and all the things that were going on in the back half of the year. Yet, almost the entire majority of the downgrade to guidance, is due to the back half of the year and it's just, it's very hard to foot those two statements.*

**A - David M. Wehner**:

Well, Rich, the reason is the trends that we're seeing on existing games that we experienced in the second quarter we believe will persist into the back half of the year. That's the largest impact, the existing game performance, that's the largest impact on our guidance in the back half of the year. We did not expect those trends going into Q2; we expect those trends will persist into the back half of the year. So that's the biggest impact on guidance.

212. Upon announcement of Zynga's dreadful second-quarter results and drastically lowered outlook for the remainder of 2012, shares of Zynga common stock plummeted over 37% in one day down to a July 26, 2012 trading low of $2.97 per share. This drop represented a loss of 70% of Zynga's stock value from its December 2011 IPO price and a loss of over 81% compared to the March 2, 2012, Class Period trading high of $15.91 per share.[5]

213. These drastic changes in 2012 guidance offered a conspicuously different assessment from Zynga's management only three months after Zynga had raised its 2012 guidance in its first quarter 2012 earnings announcement, consistently stressing that bookings and game monetization would be weighted more heavily in the second half of 2012. In turn,

---

[5] Zynga's stock plunge was so abrupt and steep that it triggered the SEC's so-called alternative uptick rule, which aims to limit the impact of short sellers on a stock price.

investors and analysts alike expressed their shock at Zynga's lower than expected earnings and lowered 2012 guidance, as Zynga's July 25, 2012, announcement directly contradicted the statements previously made by Zynga's management.

214. According to an August 1, 2012 article by *GameZebo*, an editorial and discovery site for games across the most popular devises and platforms, entitled "The Dog Days of Summer for Zynga":

> Zynga blamed its earnings weakness on the delay of the game launch of The Ville, weakness in revenue numbers for Draw Something (the game it just bought with OMGPOP), and an algorithmic change by Facebook that sent less users to Zynga games than before.
>
> This last comment raised the flag for its competitors, as Wooga, Crowdstar, and every social game company with a PR firm, posted press releases that they were not impacted by any change by Facebook and that their numbers are doing fine. Electronic Arts released better than expected earnings signaling this could be more an issue with Zynga and not social gaming as a whole.

215. A July 31, 2012, article by *The Business of Social Media* entitled "A look inside Zynga's numbers" noted that "[t]he most important numbers are that Zynga generated $302 million in bookings (an alternative measurement of revenue that is more accurate for social game companies than GAAP revenue) and a loss of $22.8 million for the quarter." The article further observed that those numbers "are all below analysts and investors expectations and prompted Zynga's stock to drop almost 40 percent."

216. A July 26, 2012, *Tech Trader Daily* article entitled "ZNGA Zapped: Six Downgrades; 'Disaster,' Gruesome"; Broken?" stated that "[t]he main focus of concern this morning is the 16% quarter-over-quarter drop in what the company calls 'average daily bookings per daily active user,' or 'ABPU,' which seemed to point to weaker 'monetization' of its games." The article further noted that analysts' "[p]rice targets and estimates are going down across the board, and the stock was cut to Hold or lower by about six different analysts this morning." Several of the analysts who cut their price targets included:

- Ken Sena of Evercore cut the stock to a sell rating with a $2 price target wrote in a note to investors that "[s]omething smells in 'FarmVille.'"

- Canaccord Genuity reduced its price target from $13 to $6, citing bookings coming in "very weak at $301 million, missing our $351 million estimate and consensus of $342 million."

- In cutting his price target for Zynga stock from $12 to $5 per share, Scott Devitt of Morgan Stanley sounded chastened, as he downgraded Zynga stock, declaring that "[w]e were wrong about the current state of Zynga's business."

- BMO Captial Markets analysts cut their price target for Zynga to $5 from $10, noting that Zynga's ABPU for the second quarter "was $0.046 versus $0.051 a year ago, below our expectations – and driving the shortfall in bookings, relative to our estimates."

- Citigroup cut its price target to $4 from $12, Barclays lowered its price target to $3 from $8.

- Colin Sebastian of Robert W. Baird slashed his price target from $13 to $6.

- Goldman Sachs downgraded its rating on Zynga, removing Zynga from its "Americas Buy List."

- JPMorgan tech analyst Doug Anmuth wrote flatly in a note to clients that "Zynga's [second quarter] results and outlook for 2012 were extremely disappointing across the board."

217.    Analyst Richard Greenfield of BTIG LLC went as far as to take the rare and extreme step to issue a public apology for recommending that investors buy Zynga stock, issuing a note titled "We Are Sorry and Embarrassed by Our Mistake."  The note apologized to investors for having placed a buy rating on Zynga stock since the IPO, saying that he was "really caught by surprise" by Zynga's failure to monetize its games because based on what had been publicly reported before Zynga's second quarter announcement, "we firmly believed that the small fraction of Zynga users who pay was increasing and that monetization per user was improving."

218.    In the research note, Greenfield further explained that:

We firmly believed that the small fraction of Zynga users who pay was increasing and that monetization per user was improving from both virtual currency and advertising.  *Over the past several months, Zynga management indicated that while investors see DAU via Appdata on a daily basis, they do not know the actual number of paying users, nor do they see the monetization from those paying users – the implication being that we only see "part" of the picture.*

While Zynga's Q2 2012 results illustrate that monthly unique payers (MUPs) continued to increase, up 17% sequentially, monetization, and in turn profitability, fell, the opposite of what we expected to occur[.]

* * *

We apologize for our poor decision to have had a BUY rating on this stock since the IPO and are downgrading its shares to NEUTRAL.

219.    Consequently, Richard Greenfield concluded that "[o]ur confidence in Zynga management diminished."  With respect to the outlook for Zynga for the rest of 2012, he stated, "[o]bviously with Zynga's numbers in such collapse in the back half of the year, I'd be surprised if there was any new companies that could quickly make up that revenue. So it clearly looks like on the credit side of the business there's going to be increased weakess over the course of the - the back half of 2012."

220.    In an interview with CNBC conducted on July 26, 2102, Greenfield further stated:

> ***The thing that management, you know, repeatedly pointed to was that monetization is something the market doesn't see every day.***  There's publicly available web sites that show daily usage and they really tried to focus people on the monetization side which is not as visible. ***The reality is, not only did monetization not improve, what shocked us was that monetization is actually falling and so you have kind of the double negative of falling usage and falling monetization.***

221.    Detailing how the market had been misled by Zynga management's previous representations regarding bookings and user monetization growth being weighted more heavily in the second quarter of 2012, Richard Greenfield said the following during a July 26, 2012 interview broadcasted by Bloomberg Surveillance:

> ***[One]*** *of the things that management kept reiterating and that we were really focused on them being able to achieve was that you only see daily usage. You don't see monetization.*  And given their robust data center and their understandings of the game mechanics, they really believed that they could improve monetization of their games. ***Obviously not only was usage falling, but monetization wasn't flat, wasn't up, was actually down as well.***  And that was really what really caught us by surprise.

222.    During the same July 26, 2012 interview, Greenfield was asked, "Do they play by a different playbook within the corporations and managements of Silicon Valley, whether it's Facebook or Zynga? Do they feel like they get a different set of rules?"  Richard Greenfield responded "I don't really know how to answer that. I think, look, every company should be taking their approach to investors in a similar way.  Obviously [Zynga] stock is at $3 in the premarket trading.  I think that pretty much speaks for itself, Tom."

223.    Likewise, Jeff Clavier, a venture capitalist and managing partner of SoftTech VC, an early-stage venture firm that has invested in the social gaming industry, observed that "[t]here was a perception that there would be a constant supply of new gamers and potential gaming hours and that you could monetize all those platforms. It's just not the case."

224.    Arvind Bhatia of Sterne Agee agreed about the long term adverse effects of Zynga's second quarter results, saying that, "[w]hile we have been bearish on the story since the beginning, these results and the current trends appear to be much worse than even we had anticipated. We do not share management's belief that these trends are temporary."

225.    Arvind Bhatia of Sterne Agree also noted how Zynga's second quarter earnings announcement "was a big about-face. It was revealing to us that the communication from management was not very clear - or straight." Like Greenfield, Bhatia pointed out how "[t]he company has been saying for some time that declining traffic doesn't matter and clearly it does."

226.    Wedbush Securities analysts further detailed how Zynga's revised full year outlook for 2012 was "in direct contrast to previous comments from management" and "it also changes our thinking on the company's long-term growth potential." A Wedbush analyst report dated July 26, 2012 explained that Zynga's lowered 2012 guidance implies that:

> *2H will not be the stronger half, in direct contrast to management's comments earlier this year.* While management previously stated that bookings growth would be weighted towards the second half of the year, implied 2H bookings of $519 – 594 million are actually below 1H bookings of $631 million. Also, 1H adjusted EBITDA of $152 million is greater than the high-end of the 2H implied range, as is 1H EPS of $0.06.

227.    Tech analyst Ben Schachter at Macquarie wrote "Zynga's shocking results and guidance (EBITDA [earnings before interest, taxes, depreciation, and amortization] guidance for FY' 12 down by ~50%) *raise our worst fears about the stability of the company's business model* and competitive positioning." By July 2012, only a few months after reporting positive financial results for the first quarter of 2012 and raising its guidance for 2012 in February and then again in April, and removing **lock-up provisions allowing only certain insiders to sell**

*approximately* **$593 million** in shares at a price of $11.64 per share, Zynga's business had effectively become valued at "nothing" by the market.

228.    Despite having $2.5 billion in net cash, investments, receivables and plants and equipment, Zynga's stock was trading at $2.80 per share on August 1, 2012, valuing Zynga at only $2.14 billion.  As such, an August 1, 2012, article by *GameZebo*, an editorial and discovery site for games across the most popular devises and platforms, entitled "The Dog Days of Summer for Zynga," concluded, "[h]ence, Wall Street values Zynga as nothing."

229.    An August 1, 2012, *Forbes* article entitled "Zynga: Is The Business Really Worth Nothing At all?" likewise found that:

> For Zynga, it has come down to this: ***the market seems to have concluded that the company's ongoing business is worth absolutely nothing***.
>
> This morning, with the stock down another 14 cents, or 4.8%, to $2.81 – a new all-time low – the social gaming company's market cap has shriveled to $2.14 billion. (Recall that just over a year ago, there was talk that the company might be worth as much as $20 billion).
>
> Zynga had about $1.54 billion in net cash and investments as of the end of the June quarter; throw in $115 million in receivables, and $499 million in plant and equipment, and you get $2.15 billion. Ergo, the market is basically saying it simply does not see any long-term value in the company's ongoing business. ***Zero.  That's startling.***

**D.      ADDITIONAL SCIENTER ALLEGATIONS REGARDING THE EXCHANGE ACT DEFENDANTS**

230.    The Exchange Act Defendants acted with scienter with respect to the materially false and misleading statements discussed herein.  The Exchange Act Defendants had actual knowledge that the statements were false or misleading or acted with deliberate and reckless disregard for the truth or falsity of those statements.  In addition to the allegations set forth above, the Exchange Act Defendants' scienter is established by: (1) their massive insider trading pursuant to the waiver of the post-IPO lock-up restrictions; (2) the Exchange Act Defendants were aware or ignored that Zynga's key metrics, including bookings and DAU, were declining and game launches were being delayed; (3) the Exchange Act Defendants' prior knowledge of the changes to Facebook; (4) the temporal proximity of defendants' false

statements and Zynga's collapse; (5) the fact that the misconduct related to Zynga's core business; (6) the fact that defendants Pincus and Wehner signed SOX certifications attesting to knowledge of the issues here; (7) the WAL was decreased throughout the Class Period in order to increase reported revenue; and (8) contemporaneous executive departures and undisclosed management restructuring.

### 1. The Fact That The Exchange Act Defendants Prematurely Removed Lock-Up Restrictions On Their Shares In Order To Engage In Massive Insider Trading On Zynga's Artificially Inflated Stock Price Supports A Strong Inference Of Scienter

231.    Beginning in connection with the IPO and continuing into the Class Period, the Exchange Act Defendants repeatedly issued false and misleading statements regarding Zynga's financial health, including its revenues, bookings and growth for FY 2012, while knowing internally that Zynga's business was failing fast, in order to increase Zynga's stock price so they could cash out just before the house of cards collapsed.

232.    Indeed, in the midst of Zynga's business issues, the Selling Defendants and other insiders obtained the removal of the IPO's lock-up restrictions on their shares of Zynga stock on March 23, 2012, through an amendment to the Secondary Offering, in order to unloaded approximately 49.4 million of their personally-held shares of stock at $11.64 per share, generating approximately $593 million in proceeds, of which more than 20.2 million shares and proceeds in excess of $235.76 million were sales by the Selling Defendants and other Zynga officers collectively.

233.    Moreover, this was in the *same* quarter in which Zynga later shocked the market by announcing its terrible Q2 2012 results and lowered its guidance for the rest of 2012, driving Zynga stock down over 37% in one day to a price of $2.97 per share and causing Plaintiffs and the Class to suffer significant losses.

234.    Attached as Exhibit B is a chart evidencing the Selling Defendants' and other Zynga officers' trading during the Class Period.[6] As the chart indicates, at a time when Zynga

---

[6]    The figures in Exhibit B do not include any shares sold in the IPO by a Selling

was touting positive growth and increased revenues in 2012, the Selling Defendants dumped large amounts of their holdings and reaped millions from the sales.

235. Specifically, as to the Exchange Act Defendants:

    a) Defendant Pincus sold 16.5 million shares of Zynga common stock for proceeds of approximately $192 million. These shares represented about 16% of his holdings in the Company.

    b) Defendant Wehner sold 386,865 shares of Zynga common stock for proceeds of over $4.5 million. These shares represented about 67% of his holdings in the Company.

    c) Defendant Schappert sold 322,350 shares of Zynga common stock for proceeds of over $3.75 million. These shares represented about 84% of his holdings in the Company.

    d) Defendant Vranesh sold more than 366,216 shares for proceeds of over $4.26 million. These shares represented about 17% of his holdings in the Company.

Further, as to the other Selling Defendants:

    e) Defendant Hoffman sold 687,626 shares of Zynga common stock for proceeds of over $8 million. These shares represented about 15% of his holdings in the Company.

    f) Defendant Van Natta sold 505,267 shares of Zynga common stock for proceeds of over $5.88 million. These shares represented about 88% of his holdings in the Company.

Further, the following Zynga officers also sold substantial stock in the holdings:

    g) Cadir B. Lee, who has served as Zynga's Chief Technology Officer and Executive Vice President since November 2008, sold 1,171,7644 shares of Zynga common stock for proceeds of over $13.6 million. These shares represented about 92% of his holdings in the Company.

    h) Reginald D. Davis, who has served as Zynga's Senior Vice President and General Counsel since May 2009 and as Zynga's Secretary since August 2009, sold 314,643 shares of Zynga common stock for proceeds of over $3.6 million. These shares represented about 86% his holdings in the Company.

236. Additionally, the Selling Defendants and other Zynga officers disposed of an additional 1,505,569 shares in the Class Period outside of the Secondary Offering for proceeds

Shareholder with whom the defendants may have had a relationship.

of over $16.14 million. For example, Exchange Act Defendant Wehner disposed of 551,393 shares for proceeds of over $5.7 million; Exchange Act Defendant Schappert disposed of 330,846 for proceeds of over $4.28 million; and Exchange Act Defendant Vranesh disposed of 41,960 shares for proceeds of over $397,700. Additionally, defendant Van Natta disposed of 427,391shares for proceeds of over $4.27 million. Finally, non-defendant officers Davis and Lee disposed of 150,818 shares for proceeds of over $1.44 million and 3,161 shares for proceeds of over $31,500, respectively.

237.    The Selling Defendants' trading is unusually large and also suspiciously timed. Given that the Class Period starts with the IPO, no comparison can or should be done with the Selling Defendants' pre-Class Period trading for several reasons, including that, (i) there was no liquid market for their shares prior to the IPO; (ii) they did not need to publicly report their trading prior to the IPO; and (iii) a large portion of their options only vested upon the satisfaction of a liquidity condition which was only satisfied once Zynga raised approximately $1 billion in the IPO. Moreover, the sheer volume and percentages of holdings sold is unusually large. Further, the sales are highly suspicious and unusual as the Secondary Offering sales were only possible because of the lock-up release. Further, although the Selling Defendants did not sell the entirety of their stakes (some came quite close to it), this was a result of the fact that the amendment to the lock-up agreement capped the amount of shares that could be sold in the Secondary Offering. These sales are also highly suspicious because they occurred less than four months before the fraud was revealed and Zynga announced its dismal and shocking earnings results for Q2 2012 (the very same quarter in which these sales occurred) and revised 2012 guidance that slashed the prior guidance by approximately 50% and which sent Zynga's stock plummeting to $2.97 per share, an astounding 75% decrease from the price at which The Exchange Act Defendants took advantage of in the Secondary Offering.

238.    As BTIG analyst Richard Greenfield stated in an interview, "[t]hey [Zynga executives] were released out of a lock-up that underwriters normally wouldn't have allowed,

… They raised guidance and reorganized management without telling anyone. Then they cut guidance by 50 percent. It's a very shocking chain of events."

239. As noted by a July 26, 2012 *Yahoo Finance* article entitled "Zynga Insiders Who Cashed Out Before The Stock Crashed," "Zynga insiders cashed out at *exactly* the right time." (Emphasis in original).

240. As a July 26, 2012 news article by *Gamasutra*, an online version of Game Developer magazine, entitled "Zynga CEO cashed out for $200M before stock implosion" pointed out, the "fortunate timing of [Zynga insiders] cashouts – conducted in the same quarter when Zynga's business appeared to deteriorate to the point that its share prices collapsed once investors were updated on its status – has raised a few eyebrows."

241. In a post on *Business Insider*, Henry Blodget also cited the suspicious timing of the insider sales, saying it "doesn't look very good" considering the insider sales occurred in the same quarter that Zynga's business "imploded."

242. Likewise, Sterne Agee analyst Arvind Bhatia stated in a July 26, 2012, report, "[g]iven [that] the company completed a secondary offering in early April at $12 a share, based on significantly higher projections, management will likely be in the penalty box with investors for quite some time." Further, on July 25, 2012, *MSN Money* reported that the insider selling in April, 2012, "now seems especially well-timed."

243. Even around the time of the Secondary Offering, reports noted that the release from the lock-up was unusual. An April 23, 2012 *The Wall Street Journal* report entitled "Zynga insider activity is all selling" reported that:

> With its recently completed secondary offering, Zynga found an innovative way to allow its top executives, early investors and other insiders to sell off their stakes – despite IPO restrictions designed to prevent it.

244. In fact, during Zynga's July 25, 2012 earnings call discussing the shocking results and revised guidance, defendants declined to address the timing of their sales. BTIG analyst Greenfield questioned defendant Pincus about the timing of his sales of his personally held shares. In his response, defendant Pincus ignored the question.

245.    Greenfield then issued a report with "an interesting timeline showing how management sold stock with guidance increasing in April before radically reducing full-year guidance in July."  The next day he stated, "what I think is so shocking, as an analyst, but, I think, more broadly, for investors who are involved in this stock is that you have the company, you know, management including the founder was selling stock back in March at $12 a share in a secondary offering, they raise guidance at the end of April, and in just the span of three months, in three months, guidance cut in half from where they raised it back at the end of April."

2.    **Given Zynga's Internal Monitoring, The Exchange Act Defendants Were Either Aware Of Or Deliberately Ignored That Key Metrics, Such As Bookings, Were Falling And That Game Launches Were Delayed**

246.    The Exchange Act Defendants' scienter is also established by the internal reporting mechanisms Zynga used to measure its financial and user metrics.  The Exchange Act Defendants were directly provided with or had access to numerous internal reports that closely tracked the Company's bookings for its games.  As the reports that were provided to the Officer Defendants' tracked all of the Company's bookings, the reports clearly revealed the decrease in bookings during the Class Period which directly impacted its current and future revenue and earrings.

247.    As demonstrated by the accounts of CWs, defendant Schappert's own admission and other reports, Zynga was a data-driven company.  The Company measured the activity and purchases of every user.  As described by CW1, Zynga was "crazy, analytically insane."

248.    A Zynga employee quoted in a *The Verge* article stated, "Zynga is a company very focused on data. Mark (Pincus) wants this business to be driven by numbers, not by hits…They analyze every action in the game and try to optimize the business."  As an August 1, 2012, *Gamezebo* article states, "Zynga is such a data-driven company, its tough to believe that the people on top did not see something dropping."  As noted in the December 2, 2011 *VentureBeat.com* article, Schappert stated during the IPO Road Show Presentation that Zynga used data to determine everything in its games.  Indeed, defendant Schappert expressly admitted

during that Presentation that Zynga operated as a "metrics-driven company," and used its "data and analytics" as an advantage in the social gaming industry.

249. As described by several CWs, Zynga used an in-house computer system to generate DAU and revenue results: Subsets of these reports were prepared and provided to Pincus as well as to Zynga's other management.

250. CW1 and CW2 both worked in the same Quality Control Center as QA analysts. CW1 held several positions at Zynga from May 2009 to December 2012, including as a QA analyst, QA Security Analyst and as Lead QA and the point of contact person on three additional games. CW2 worked as a Quality Assurance analyst for Zynga in the Quality Control Center from March 2011 until March 2012. According to CW1, the QA Department in which CW1 and CW2 worked was part of Zynga's "Global Operations."

251. According to CW1, DAU is tracked on a real-time basis and that information was accessible to Zynga employees on their desktop computers and on monitors located throughout the office. CW1 said that beginning in mid-2011, Zynga became aware of declines in user numbers and in revenue companywide, stating that revenue and users numbers were down "across the board" and "it was the same story" for the thirty to forty games Zynga had released in mid-2011. CW1 stated that its knowledge of this came from its discussions with other Lead QAs on other games.

252. CW1 described two types of "scrum" meetings held within the QA Department. One was held every day and was attended by QAs. The purpose of those meetings was to go over the day's activities and determine what was needed to be done for that day. A Second "scrum" meeting was at the "studio level." The purpose of the studio meeting was to coordinate activities weeks in advance for production, program management and development. These meetings were held every other week and attended only by QA leads, typically approximately 12-30 QA leads per meeting. According to CW1, there was "always" discussion about revenue and DAU at these meetings. CW1 says that beginning in mid-2011, the QA leads would share information about decreasing DAU and revenues for their games at these meetings and that QAs had said that such declines were "across the board" rather than isolated within a few games. Further, CW8 stated that

revenue per DAU, which CW8 defined as "revenue that comes in daily from the players," was the metric that was used in CW8's arena. CW8 relayed that bookings and revenue results would be "bubbl[ed] up" to E-Staff by studio general managers and head product managers and that a "weekly report was sent to higher ups" regarding these numbers. According to CW8, "Mark Pincus and John Schappert were aware of what was going on" in bookings, revenue and financial results.

253. CW2 worked on the release of certain games on Facebook and tested games to make sure that they complied with all of the "terms and services" that were part of Zynga's contract with Facebook. In addition, as part of CW2's job duties, CW2 participated in the daily "scrum" meetings run by QA managers as well as "POC" meetings run by project managers. During these meetings, CW2 would be provided with detailed reports from project managers showing the number of game users and the amount of money users were spending on each game. In fact, CW2 said that Zynga issued internal daily reports each morning updating this information. Zynga maintained a computer system, to which Zynga employees of every office had access, which show exactly how well each game was performing. According to CW2, "[t]hey all knew the metrics of how many users were playing and how many of them were spending money. They had flat screens in the office that showed exactly how many users were playing." Thus, employees could "ping the computer" whenever they wanted to "see how many active users were on and how many were spending money."

254. In addition, before periodic "scrum" meetings held with project managers, CW2 and the QA team would receive reports from project managers providing a detailed breakdown by game of all the money game users were spending on Zynga's games. These reports showed exactly how many active users were playing the games and how much money they were spending. CW2 stated that the reports were generated for all games showing that revenue for all games was decreasing during Q3 2011 and Q4 2011; the decrease in revenue occurred "across the board" for Zynga's games. CW2 further stated that "we knew the Company was not doing well before the IPO launch." According to CW4, Pincus and Zynga's other senior management "got subsets of all reports" that were prepared.

255.     CW2 stated that, with respect to Zynga's ability to monetize its games, by the fourth quarter of 2011, Zynga was aware that users were not spending as much on games and that this decreased spending "was across the board."  CW2 offered firsthand knowledge of Zynga's advanced notice of decreased monetization from daily users because CW2 saw the reports that were generated for each game, which showed the number of game users and the amount of money users were spending on each game. CW2 recalled at one scrum meeting, hearing CW1 announce to the team that "the numbers show we are losing users every day."

256.     CW2 was "fairly certain" that the daily user and spending reports came straight out of Zynga's headquarters in San Francisco and had attended POC meetings during which the information contained in these reports was shared and discussed by project managers.  With respect to knowledge of the information put in the reports and how each game was doing by Zynga management, CW2 believed that "Pincus had access to everything – it was his company."

257.     CW7 also worked in Quality Assurance for Zynga's Mobile Division and worked on the expansion of the game *Mafia Wars*.  The head director of that Mobile Division during CW7's tenure was David Ko, current Chief Operating Officer.  CW7 said all game revenue was tracked by Zynga and easily available to Zynga's management through processing systems on platforms.  This information was displayed on "monitors" and accessible to Zynga management at any time.

258.     Similarly, CW5, stated that Zynga used an analytics system to calculate its revenue from the sale of virtual goods.

259.     According to CW6, Zynga's product managers conducted weekly reviews with Zynga's senior managers, including Pincus, to discuss the Company's operations and results.  Other management-level employees who attended the meeting included the Chief Operating Officer, VP of Product, the Chief Creative Officer, Product Manager and the Studio VP.

260.     As further explained by CW3, Zynga's sales of virtual goods were processed at the Company's San Francisco location.  Zynga recorded its sales numbers, or "input data," which were then delivered to the Company's accounting department through daily reports.

Eventually, the sales numbers were sent to accounting by an Oracle system that the Company developed. And according to CW4, Zynga monitored outputs and could determine the impact of those outputs. CW4 stated that Zynga had an analytics department made up of approximately 150 people.

261. Further evidence of Zynga's access to and knowledge of real-time updates on all game user and spending data was provided by CW9, a Senior Producer at Zynga. CW9 explained that Zynga embedded a code referred to as a "program code, D++ language code" into each of its games which Zynga's headquarters distributed to each studio to implant into each of that studio's games. This code automatically recorded a game's "output," such as how many times the game was played, how many users played the game, and other metrics. CW9 stated that Zynga's servers also tracked revenue and Zynga "kept track of revenue on a per user basis." Zynga "collected metrics on everything users did in a game, including what they bought and clicked on." These statistics were automatically reported to Zynga on a real-time basis and were used by Zynga to calculate revenue. Anyone with "credentials" could access a game and view that game's output on a real-time basis at any time. According to CW9, all studio managers and Zynga's senior management had such credentials to access a game's output.

262. Zynga also recorded other statistics for all of its games, including the average life of durable goods and the sales of virtual goods. According to CW3, the Company recorded the average life of durable goods—a measure pertinent to the Company's revenue recognition—in all of its games.

263. CW10 reported plainly that "Management was always aware of delays." According to CW10, whether a game was in "design mode, beta testing or pre-launch," each game's status was provided to Zynga's executive management in the weekly Executive Summary. In addition to the Executive Summary provided to Zynga's management, CW10 stated that Zynga's Central Product Management Team, referred to also as the "Central Product Office," projected when each new game would be launched and how much money it was likely to earn. The Central Product Office made revenue projections for games with information provided to it by general managers, senior

Product Managers, Product Managers and team leads. Thus, CW10 asserted that "there was no reason for the executive team not to be fully aware" of any game delays. CW10 was specifically aware of delays experienced by the games *CityVille 2*, *FarmVille 2*, *ChefVille* and *Mafia Wars 2*.

264. According to CW7, Zynga's management knew of game delays prior to 2012. CW7 personally sent production teams to executive producers with information about the status of game developments and delays who would then inform division directors of these meetings, and those division directors would report to Zynga management. CW7 recalled David Ko "constantly asking why hasn't this game been released? Why is this taking so long?" CW7 believed that Ko was in constant contact with Zynga's top executives about the status of game developments and delays. According to CW7, there was "no way" top executives could not know about all the game delays.

265. In addition, with respect to the strength of Zynga's pipeline for the rest of 2012, and beyond, during a J.P. Morgan Global Technology, Media and Telecom Conference held on May 16, 2012, analyst Douglas Anmuth asked defendant Wehner "[a]nd how far out do you think about the gaming pipeline? I mean do you know what you're doing in 2013 and 2014 at this point." Defendant Wehner answered "2013 we've got a pretty idea of what the pipeline looks like."

266. Thus, while Zynga was, as discussed below, accelerating WAL to push forward revenue reporting for the current period, thereby inflating Zynga's financial results for the fourth quarter 2011 and first quarter 2012, the Exchange Act Defendants knew there was much less in the pipeline for the second half of 2012 than what had been reported and that the reported revenue and booking were unsustainable for the second half of 2012.

267. Even industry people confirmed that Zynga senior executives had to know about Zynga's problems with declining users, declining sales and problems with new game releases. For example, a July 31, 2012 article by the *Verge* entitled "First insider trading lawsuit filed against Zynga after executives cash out" reported that Zynga employees were doubtful that the company's executives did not foresee Zynga's current woes, quoting an anonymous employee

as stating that "Zynga is a company very focused on data. Mark (Pincus) wants this business to be driven by numbers, not by hits. They analyze every action in the game and try to optimize the business."

268. An August 1, 2012 article by *GameZebo*, an editorial and discovery site for games across the most popular devises and platforms, entitled "The Dog Days of Summer for Zynga" concluded "Zynga is such a data-driven company, it's tough to believe that the people on top did not see something dropping."

269. An August 9, 2012, *Inc.com* article entitled "Insider Zynga's Fun House, Workers Say Games Are Over" reported that, according to one "former employee," the way Zynga was run "was extremely short-term-focused."

### 3. Prior To Its Second Quarter Earnings Release, Zynga Had Knowledge Of Facebook's Platform Changes That Would Adversely Affect Zynga's Business

270. As detailed above, Zynga attributed its shocking and dreadful second quarter 2012 financial results and slashed guidance for 2012 on "declines in engagement and bookings for our web games due in part to changes Facebook made to their platform." During Zynga's second quarter 2012 earnings call held July 25, 2012, defendant Wehner confirmed that Facebook's changes to its platform had the "largest impact" on Zynga's decrease in bookings and inability to monetize its games in the second quarter of 2012 and on Zynga's need to substantially cut its guidance for the rest of 2012.

271. However, during the Class Period, the Exchange Act Defendants knew, but failed to disclose, material non-public information regarding Facebook's plans to implement changes to its platform that promised to have and ultimately did have a materially adverse effect on Zynga's business.

272. Regarding the changes that the Exchange Act Defendants stated on July 25, 2012 were a substantial factor for its disastrous Q2 2012 results, CW10, who acted as Senior Product Manager for three of Zynga's games and who met with two Zynga executives to determine quarterly estimates, said that CW10 was first informed that Facebook was planning

to launch a platform change that would impact Zynga's games in April 2012, but that even before Zynga employees were informed, Zynga's executives "knew a few months earlier." CW10 stated that executives "had lots of early information and access into the Facebook change." According to CW10, Zynga's Central Product Management Team produced a weekly report on any developments relating to the Facebook platform and any potential Facebook platform changes was also written into the weekly Executive Summary that went directly to Zynga's upper management. In fact, CW10 disclosed that Zynga was even "beta testing one game on the new Facebook" platform before the platform changes were announced. According to CW10, two Zynga executives served on the Facebook Relationship Team.

273. This advance notice was consistent with past practice regarding changes to Facebook. According to CW7, with respect to changes to Facebook that occurred in late 2011, Zynga was given "5-6 months" advanced notice of the changes before Facebook implemented the platform changes and that "[w]e were informed very early on because we were having to prepare and test that." CW7 further revealed that "Zynga was aware of [that] upcoming change, but they didn't do much. They knew it was coming and how they had to make change, but it didn't happen."

274. Despite Zynga's management, including the Exchange Act Defendants, having knowledge of Facebook's planned platform changes in Q2 2012 months before Zynga's second quarter earnings announcement, Zynga concealed that information from the market, while engaging in the insider trading detailed above.

**4.    The Timing Of The Collapse Of Zynga's Business Shortly After The Exchange Act Defendants Issued False Statements Further Supports Scienter**

275. The temporal proximity between the Exchange Act Defendants' positive statements and the revelation of the truth further supports scienter. Indeed, Zynga's collapse on July 25, 2012 was just seven months after its IPO. Even more significantly, Zynga's collapse was announced just three months after the Exchange Act Defendants increased Zynga's already aggressive 2012 guidance, stressed that as DAU decline, bookings increase, and touted Zynga's

pipeline of new games for the second half of 2012. Further, the dismal results announced on July 25, 2012, related to the very same quarter in which those statements were made. Moreover, Zynga's collapse came just two months after defendant Wehner again stressed that as DAU declines, bookings increase, including as to *Draw Something*, and repeatedly stated that bookings were "ramping up," and also touted Zynga's robust new games in the pipeline. And, again, the dismal results announced on July 25, 2012 related to the very same quarter in which those statements were made. Given their access to information, it is inconceivable that the Exchange Act Defendants would not be aware that Zynga's business was rapidly declining at the time the statements were made.

276. As stated in an August 17, 2012 *San Francisco Chronicle* article entitled "Free-falling Zynga needs fast turnaround," Zynga's "revised 2012 forecast was particularly troubling to analysts because it came after the company had raised annual expectations in its first-quarter announcement. In fact, Zynga had emphasized in the first quarter of 2012 that most of its growth would happen in the second half of the year. The wildly different assessment in a three-month period revealed a stunning lack of insight into the state of the business - or something worse."

### 5. The Misconduct Related To Zynga's Core Business

277. A strong inference of the Exchange Act Defendants' scienter is also supported by the fact that the misconduct relates to Zynga's core business. Zynga is a provider of social games and, as its primary source of revenue throughout the Class Period was the bookings received by users who purchased virtual goods, such bookings are of critical importance to its operations. In its IPO Registration Statement, Zynga stated that the Company's "primary revenue source [was] the sale of virtual currency that players use[d] to buy in-game virtual goods." Additionally, the Company stated that bookings was "the fundamental top-line metric [the Company] use[d] to manage [its] business." Accordingly, these bookings constituted the Company's core operations and formed the heart of its business.

278.     Facts that are critical to Zynga's business, operations, financial reporting and management are presumably known by its executive officers, including the Exchange Act Defendants.  The Exchange Act Defendants, directly participated in the management of Zynga, were directly involved in the day-to-day operations of Zynga at the highest levels and were privy to confidential proprietary information concerning Zynga and its business, operations, financial statements and financial outlook, as alleged herein.

279.     Moreover, the Exchange Act Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements, information and omissions alleged herein, knew or recklessly disregarded the fact that the false and misleading statements and omissions were being issued by Zynga, and approved or ratified these statements, in violation of the federal securities laws.

280.     Further, as has been widely reported and attested to by CWs as described herein, Defendant Pincus, Zynga's founder, was highly involved in how revenue was generated, tracked and reported.  For example, a November 6, 2009, *TechCrunch.com* article entitled "Zynga CEO Mark Pincus: 'I Did Every Horrible Thing In The Book Just To Get Revenues'" quotes Pincus from a speech he gave during the spring of 2009 at the University of California, Berkeley during which he said:

> I knew that I wanted to control my destiny, so I knew I needed revenues, right, f---ing, now.  Like I needed revenues now.  So I funded the company myself but I did every horrible thing in the book to, just to get revenues right away. …We did anything possible just to get revenues so that we could grow and be a real business… So control your destiny. So that was a big lesson, controlling your business. So by the time we raised money we were profitable.

### 6.     Defendants Pincus And Wehner's Sox Certifications Further Evidence Their Scienter

281.     In connection with Zynga's Form 10-K for FY 2011 filed on February 28, 2012, Form 10-Q for Q1 2012 on filed May 8, 2012 and Form 10-Q for Q2 2012 on filed July 30, 2012, Defendants Pincus and Wehner signed virtually identical SOX certifications attesting to accuracy and reliability of the Company's reported financial results for FY 2011, Q1 2012 and

Q2 2012. These reports included Zynga's bookings, revenue, EBITDA and WAL used in a given period, which was used to calculate revenue.

282. The certifications provided that the reports "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the] report[.]"

283. The certifications also provided that "the financial statements, and other financial information included in [the] report[s], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

284. Additionally, the certifications provided that Pincus and Wehner were "responsible for establishing and maintaining disclosure controls and procedures" for Zynga and that Pincus and Wehner:

> (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting

285. And the certifications provided that, "based on [their] most recent evaluation of internal control over financial reporting," Pincus and Wehner also disclosed to Zynga's auditors and the audit committee of Zynga's board of directors:

> (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

286.     Given that the Company's financial statements did not fairly present in all material respects the financial condition, and the revenue reported therein was the result of the manipulation of the applicable WAL, the SOX certifications signed by Defendants Pincus and Wehner further support scienter.

### 7.     The Confluence Of These Factors Evidence That Zynga's Reduction In WAL Was Designed To Manipulate Its Revenue Figures In Order To Artificially Inflate The Current Condition Of Its Business

287.     As detailed above, Zynga insiders were able to obtain removal of the IPO's lock-up provisions in order to sell personally held shares of Zynga stock at "*exactly* the right time." The facts indicate that this was more than luck. Indeed, the facts indicate that the Exchange Act Defendants artificially inflated Zynga's stock price by inflating revenues while simultaneously concealing the true condition of Zynga's business and dismal outlook for the second half of 2012.

288.     Because of how Zynga recognized revenue for durable goods, the Exchange Act Defendants were able to take creative accounting measures to manipulate its recognition of revenue. Specifically, the Exchange Act Defendants were able to, and did, shorten the WAL of its virtual goods. The facts support a strong inference that the shortening of the WAL was designed to and done in order to pull revenue forward leading up to the IPO and in Q1 2012 and, thereby recognize revenue sooner and inflate Zynga's net income. The effect of this was to make Zynga's business appear to be better than it was short-term leading up to the IPO and for Q4 2011 and Q1 2012, while also raising 2012 guidance and emphasizing that Zynga would experience most of its growth in the second half of 2012.

289.     The impact of reduction in WAL is clear. As noted above, by reducing WAL, the Exchange Act Defendants were able to increase the Company's reported revenue and bottom line leading up to the IPO and the Secondary Offering. For example, Zynga reduced its WAL for

durable goods from 18 months at the end of 2010 to 15 months during the six months ended June 30, 2011, which led to an increase in revenue of $27.3 million and turning turned a loss for the six months ended June 30, 2011 into a net profit of $18.1 million. Overall, in 2011, the cumulative changes in Zynga's WAL for durable virtual goods resulted in a net increase in revenue of $53.9 million. Further, for the first quarter of 2012, Zynga reduced its WAL for durable goods yet again from 15 months to 13 months, which led to a $10 million increase in revenue for the second quarter of 2012.

290. Given the confluence of evidence here, there is a strong inference that these reductions were made solely for the purpose of pulling of revenue forward. Zynga's management knew that the numbers they would report for the second quarter and second half of 2012 would be drastically lower than the numbers previously issued in Zynga's 2012 guidance. As Sam Hamadeh at finance analysts PrivCo cautioned, "[i]t's a red flag when a company wants to suddenly start recognizing revenue faster."

291. In sum, with access to real-time data showing game and user data, the Exchange Act Defendants took creative accounting measures to manipulate Zynga's recognition of revenue in order to artificially inflate Zynga's reported revenue prior to Zynga's announcement of its second quarter of 2012 earnings disaster. This scheme was described in a July 31, 2012, article by *The Business of Social Media*, entitled "A look inside Zynga's numbers," which discussed the reasons it believed Zynga underperformed in the second quarter of 2012. The author of the article, Lloyd Melnick, managing director of Verus Entertainment Group, co-founder of Merscom, and previously employed by Disney and Playdom, to whom he sold the company Merscom, described one of those reasons, "[w]hen you burn the furniture, you have nothing to sit on," as follows:

> I have worked at several ventures that were nearing an exit event in all my experiences ***extraordinary efforts were made to move revenue and profits into the period that would most impact valuation, even if it hurt future business. In one case, I was asked to "burn the furniture" so more revenue could be recognized in the month we were hoping to close a deal, even at the expense of negatively impacting revenue for quarters to come.*** Although I have no direct knowledge of how Zynga operated just before its IPO, given the mentality I have seen frequently, it is not a big stretch to think a lot of furniture was burned pre-IPO that now has to be replaced (and thus dragging on revenue and profitability).

292.   An August 10, 2012, *Seeking Alpha* news article entitled "Zynga's Real Game Could Be Fraudville" described this timing as follows:

> ***Zynga used a combination of GAAP and Non-GAAP accounting to offset losses and inflate their stock price*** before issuing a waiver so select insiders could offload their stock at $12.00 a share and then posted those offset losses to Q2 after the insiders sold millions of shares.

* * *

> Zynga went public in December of 2011 with a stock price of $10 a share.  A Positive 1Q helped raise the stock price to above $12 a share.  Early investors and company employees had a lock-up period and were unable to sell their shares until May 28th of 2012.  Zynga filed an amendment to the form S-1 which *waived* the lockup restriction allowing a select group of insiders to dump shares.  Using Underwriters Morgan Stanley and Goldman Sachs, those insiders offloaded $515 million worth of shares on April 3rd at $12 a share.  ***Because of Zynga's creative Non-GAAP accounting they were able to shift previous losses from Q1 to Q2 and the insiders dumped shares before the dismal Q2 report.  Coincidence?"***

**8.    Contemporaneous Departures Of Zynga's Top Executives And Undisclosed Management Restructuring Supports A Strong Inference Of Scienter**

293.   On November 16, 2011, defendant Van Natta resigned from his positions as Zynga's Executive Vice President and Chief Business Officer, only 15-months after being hired for those positions.  According to an August 9, 2012, article by *The Street* entitled "Zynga COO Departure Is Red Flag," defendant Van Natta "resigned last November, just a few weeks before the company's December IPO … [T]o leave just weeks before an IPO looks suspicious.  With all the drama surrounding the company since its IPO, it now looks even more suspicious."

294.   In addition, on August 8, 2012, defendant Schappert resigned from his positions as Zynga's Chief Operating Officer and as a director, only 18-months after being hired for those positions.

295.   As reported in an August 17, 2012 *San Francisco Chronicle* article entitled "Free-falling Zynga needs fast turnaround," a few days after analyst Richard Greenfield of BTIG responded to Zynga's second quarter earnings announcement by apologizing to investors for having recommended Zynga stock, Greenfield took Zynga to task for failing to disclose the restructuring of its senior management team in the days ahead of the quarterly announcement.

In fact, Zynga had stripped Chief Operating Officer John Schappert of his game development duties and handed them to two other executives. However, those developments came to light only through reporting by Bloomberg. Defendant Schappert resigned only a few weeks after Zynga's disastrous announcement of its second quarter earnings and reduced guidance for 2012.

### E. LOSS CAUSATION/ECONOMIC LOSS

296. Throughout the Class Period, as detailed herein, the Exchange Act Defendants engaged in a focused and deliberate scheme to deceive the market that artificially inflated Zynga's common stock price and operated as a fraud on acquirers of the Zynga's common stock. The Exchange Act Defendants publicly issued materially false and misleading statements and omitted material facts which directly caused Zynga's common stock price to be artificially inflated. The statements were materially false and misleading because they failed to disclose a true and accurate picture of Zynga's business, operations and growth prospects including, *inter alia*, that Zynga had been experiencing a rapid decline in bookings and Zynga had faced substantial delays in launching new web games. Moreover, as a result of these undisclosed issues, Zynga's Q2 2012 and FY 2012 financial projections were materially overstated. Lead Plaintiff and other Class members purchased Zynga's common stock at those artificially inflated prices. When truth about Zynga's financial situation was revealed to the market on July 25, 2012, Zynga's common stock declined as the prior artificial inflation came out of its common stock price, causing Lead Plaintiffs and the Class to suffer the damages.

297. After the close of market on July 25, 2012, Zynga issued its earnings release for the Q2 2012, reporting significantly lower than expected earnings and issuing a dismal forecast for the rest of the year, sharply lowering its 2012 guidance.

298. During Zynga's earnings call later that day, defendants Pincus and Wehner stated that the most significant reason for Zynga's dismal Q2 2012 results was declines in engagement and bookings for Zynga's web games with the second biggest factor being the delayed launch of *The Ville*. Likewise, in the earnings release and during the earnings call, Zynga attributed the need to slash guidance for 2012 to declines in bookings in existing web

games and delays in launching new games. During the call, defendant Wehner stated that the dramatic forecast reduction reflected the ongoing trends in Zynga's business, with the largest impact being the dismal performance of its existing games in the second quarter, an issue they expected would persist into the back half of the year. Defendant Wehner further stated on that call that this decline in bookings began no later than early in the second quarter.

299. In response to Zynga's July 25, 2012 disclosures, Zynga's common stock plummeted over 37% from a July 25, 2012 close of $5.08 to a July 26, 2012 close of $3.18 per share on extremely high volume, eliminating the artificial inflation in the price of those securities and causing Plaintiffs and the Class economic harm. The decline on July 26, 2012 represented a loss in value of over 81% compared to the March 2, 2012 Class Period trading high of $15.91 per share. Zynga's stock plunge was so swift and severe that it triggered the SEC's so-called alternative uptick rule, which aims to limit the impact of short sellers on a stock price. To put Zynga's freefall into perspective, several analysts reported that Zynga's market value had plummeted down to "nothing."

300. That decline in Zynga common stock price was a direct result of the nature and extent of the Exchange Act Defendants' fraud being revealed to the market. The adverse consequences of the July 25, 2012 disclosures were entirely foreseeable to the Exchange Act Defendants at all relevant times. There was no other direct intervening or independent cause of the stock price decline. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct. The economic loss, *i.e.,* damages, suffered by the Plaintiffs and other Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the Zynga's common stock price and the subsequent significant decline in the value of the Zynga's common stock when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct was revealed.

301. As set forth above, Zynga's disastrous Q2 2012 results and slashed outlook for the second half of 2012, directly contradicted management's prior comments, including in regard to expected growth, that its core portfolio continued to provide solid bookings, and that Zynga's bookings and growth would be weighted more heavily towards the second half of 2012. Prior to its July 25, 2012 announcement, Zynga had misrepresented and/or failed to disclose the true extent to which it had been experiencing sharp declines in user spending and bookings that was taking place "across the board." The undisclosed issues Zynga was experiencing directly impacted Zynga's financial position and rendered Zynga's projections unsupportable and false and misleading when made.

302. Loss causation is further evidenced by the market analysts' reactions. As detailed above, a myriad of analysts expressed their shock at Zynga's lower than expected results and slashed guidance, sparking a flurry of analyst downgrades. A July 26, 2012 article from *The Wall Street Journal* entitled "Zynga Shares Tank: Analysts Take Out Scalpel" observed that "Zynga's earnings disaster has prompted analysts to come out swinging" and that "at least eight Wall Street analysts have slashed their investment ratings" of the Company following the disclosures.

303. Analyst shock at the results and the contradictions to recent statements, particularly in light of the April insider sales, was expressed during the second quarter earnings call. Richard Greenfield, Co-Head of Research at BTIG stated:

> I think you missed EBITDA, at least in terms of our expectations, or the Street expectations, by $25 million to $30 million, but you're lowering the full-year guidance by somewhere around $200 million... I'd also love to get your sense, you sold stock, I think, on March 28 at $12 a share. The company raised guidance in late April when you reported the first quarter, and now you've cut guidance by a pretty large amount. Just – you didn't pre-announce; is there any reason for not pre-announcing and just how do you react or how should we react to this? And then lastly, you [Defendant Pincus] spoke at PandoDaily last week and said it wasn't your place, I think, to comment on how the market was valuing your stock. That was when it was trading at $5. It's now sub-$3 or right around $3 in the aftermarket.

304. The next day, in an interview on CNBC, Greenfield further explained his shock and concerns:

It's been obviously quite clear for some time now that overall usage of their games—especially some of their games on the Facebook platform—were getting less usage. However, the thing that management, you know, repeatedly pointed to was that monetization is something the market doesn't see every day. There's publicly available web sites that show daily usage and they really tried to focus people on the monetization side which is not as visible. The reality is, not only did monetization not improve, what shocked us was that monetization is actually falling and so you have kind of the double negative of falling usage and falling monetization. And management just seems totally unprepared to deal with the fact that the mobile transition, you know, on the internet broadly on a global basis is happening much, much faster than was expected. And what I think is so shocking, as an analyst, but, I think, more broadly, for investors who are involved in this stock is that you have the company, you know, management including the founder was selling stock back in March at $12 a share in a secondary offering, they raise guidance at the end of April, and in just the span of three months, in three months, guidance cut in half from where they raised it back at the end of April.

305.    Likewise, in an interview with Bloomberg, he stated that "one of the things that management kept reiterating and that we were really focused on them being able to achieve was that you only see daily usage. You don't see monetization. And given their robust data center and their understandings of the game mechanics, they really believed that they could improve monetization of their games. Obviously not only was usage falling, but monetization wasn't flat, wasn't up, was actually down as well. And that was really what really caught us by surprise." Greenfield was then asked if he thought Zynga played by a different set of rules and Greenfield responded, "I think, look, every company should be taking their approach to investors in a similar way. Obviously this stock is at $3 in the premarket trading. I think that pretty much speaks for itself."

306.    Many other analysts expressed similar sentiments. For example:

- As Sterne Agee Arvind Bhatia stated in a July 26, 2012 report, "Zynga reported a very disappointing quarter and lowered 2012 adjusted EBITDA guidance by 50%" and highlighted the close proximity of the April Offering, stating, "[g]iven [that] the company completed a secondary offering in early April at $12 a share, based on significantly higher projections, management will likely be in the penalty box with investors for quite some time." In a July 25, 2012 Reuters article, he also stated that the "quarter is a disaster" and "the company has been saying for some time that declining traffic doesn't matter and clearly it does."

- In a note to investors, Evercore analyst, Ken Sena, who cut the stock to a sell rating with a $2 price target, wrote "Something smells in 'Farmville.'"

- As reported by Reuters on the evening of July 25, 2012, "Game provider *Zynga* Inc. slashed its 2012 outlook and quarterly results badly missed

Wall Street targets, sending its stock plunging 35 percent" and stating that the insider selling in April, 2012, "now seems especially well-timed."

307. Likewise, a July 26, 2012 *Seeking Alpha* article entitled "Zynga – A 40% Sell-Off Is Warranted By The Bad Underlying Results" stated that "Zynga is lowering its full year outlook on the back of these terrible results," noting that "[a]s recent as April of this year Zynga anticipated bookings between $1.43 billion and $1.5 billion." The article further reports that:

> [a]round February/March all red flags were raised. CEO and Founder Pincus sold shares near the peak in March of this year. At the same time the company was acquiring the company behind the game 'Draw Something' at the day the user base of the drawing game peaked. Then came the news reports about declining user growth at Facebook, which platform generated 92% of Zynga's revenues in the first quarter. Wednesday's results show that user numbers at Zynga's games are fading quickly and successful games are not lasting very long. Add to that some runaway expenses, stock-based compensation and expensive acquisitions and you will find the perfect storm that Zynga is witnessing . . . . Finances are not the biggest problem, credibility and corporate governance is.

## F. PRESUMPTION OF RELIANCE

308. Plaintiffs are entitled to a presumption of reliance under the fraud on the market doctrine. The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

    (a)    Zynga common stock was actively traded on the NASDAQ;

    (b)    The market price of Zynga common stock reacted promptly to the dissemination of public information regarding the Company;

    (c)    The Company's stock was followed by numerous financial analysts, including those cited herein. Thus, the Company's stock reflected the effect of information disseminated into the market;

    (d)    The average weekly trading volume for Zynga stock during the Class Period was approximately 79.6 million shares; and

    (e)    The Company's market capitalization was in excess of 9.6 billion on March 31, 2012 and the Company had over 732 million shares outstanding as of March 31, 2012.

309. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts as well as the business press. The market relies upon the

Company's financial results and management to accurately present the Company's financial results. During this period, Zynga and defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's securities.

310. As a result of the misconduct alleged herein (including defendants' misstatements and omissions), the market for Zynga common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which defendants are each responsible.

311. Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Zynga common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

312. Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted herein against defendants are predicated upon omissions of material fact which there was a duty to disclose.

313. Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by defendants or been aware of the truth behind defendants' material misstatements, they would not have purchased Zynga common stock at artificially inflated prices.

**VII. THE UNTRUE STATEMENTS CONTAINED IN THE OFFERING MATERIALS ARE ACTIONABLE UNDER THE SECURITIES ACT**

**A. THE OFFERING MATERIALS CONTAINED UNTRUE STATEMENTS**

**1. Untrue Statements in the IPO Offering Materials**

314. As discussed above, the IPO Registration Statement contained materially untrue statements. For example, as stated in the IPO Registration Statement, Zynga represented as follows:

We have achieved significant growth in our business in a short period of time. From 2008 to 2010, our revenue increased from $19.4 million to $597.5 million, our bookings increased from $35.9 million to $838.9 million, we went from a net loss of $22.1 million to net income of $90.6 million and our adjusted EBITDA increased from $4.5 million to $392.7 million. For the nine months ended September 30, 2011, our revenue was $828.9 million, our bookings were $849.0 million, our net income was $30.7 million and our adjusted EBITDA was $235.5 million.

315.    The IPO Registration Statement further announced that, for the nine months ended September 30, 2011, Zynga reported that bookings had increased by $253.6 million from the nine months ended September 30, 2010, and ABPU had increased from $0.038 to $0.053, reflecting improved overall monetization of our players.

316.    Under "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained in the IPO Registration Statement s, Zynga reported that:

In 2010, [Zynga's] revenue and bookings were $597.5 million and $838.9 million, respectively, which represented increases from 2009 of $476.0 million and $510.8 million, respectively.

317.    And in a section of the IPO Registration Statement titled, "Letter From Our Founder," Zynga focused investor attention on growth and not on earnings results.  In the Letter, Pincus stated:  "We will prioritize innovation and long-term growth over quarterly earnings."

318.    In its July 1, 2011 Form S-1, Zynga continued to direct investors towards its "long-term growth."  In his letter to shareholders, Pincus again noted:  "We will prioritize innovation and long-term growth over quarterly earnings."

319.    And as noted above, in Zynga's Road Show Presentation for the IPO, in a slide entitled, "Longevity of Bookings from Enduring Game Franchises," and in conjunction with other statements, Zynga diverted investor attention away from the falling number of DAU and represented that the number of DAU and the Company's monetization were not directly related.

320.    As alleged in detail in Section VI.B. above, these statements were materially untrue.  With respect to Zynga's bookings, the Company had begun experiencing a rapid decline in bookings and could not sustain the growth to sustain the growth and revenue

projected for 2012. And with regard to Zynga's game growth, the Company was in fact experiencing substantial delays in both developing and launching new games.

321. The IPO Registration Statement was signed by all of the Individual Defendants.

322. The Underwriter Defendants served as underwriters in connection with Zynga's IPO. Morgan Stanley and Goldman Sachs served as the joint book running managers and representatives of the underwriters for the IPO.

## 2. Untrue Statements in the Secondary Offering Materials

323. As discussed above, the Secondary Offering Materials also contained untrue statements.

324. For example, the Secondary Offering Registration Statement stated that "[t]he principal purposes of this offering are to facilitate an orderly distribution of shares and to increase our public float."

325. The Secondary Offering Registration Statement also falsely reported that "[w]e have achieved significant growth in our business in a short period of time. From 2009 to 2011, our revenue increased from $121.5 million to $1.14 billion and our bookings increased from $328.1 million to $1.16 billion."

326. According to "Management's Discussion and Analysis of Financial Condition and Results of Operations" contained within the Secondary Offering Registration Statement "[i]n 2011, our revenue and bookings were $1.14 billion and $1.16 billion, respectively, which represented increases from 2010 of $542.6 million and $316.6 million, respectively."

327. In addition, the Secondary Offering Registration Statement also reported "***Rapid Game Growth.*** Our games have achieved rapid and widespread adoption. *FarmVille* grew to 43 million MAUs in its first 100 days and *CityVille* grew to 61 million MAUs in its first 50 days. *CastleVille*, which launched in November 2011, reached 30 million MAUs in its first 25 days." (Emphasis in original).

328. In the section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations," Zynga stated: "Revenue growth will depend largely on

our ability to attract and retain players and more effectively monetize our player base through the sale of virtual goods and advertising. ***We intend to do this through the launch of new games***, enhancements to current games and expansion into new markets, distribution platforms and Zynga.com."

329.     As alleged in detail in Section VI.B. above, these statements were materially untrue.  The purpose of the Secondary Offering, in fact, was to allow the Individual Defendants to sell personally-held shares before the disclosure of Zynga's true financial condition. Moreover, with respect to Zynga's bookings, the Company had begun experiencing a rapid decline in bookings and could not sustain the growth to sustain the growth and revenue projected for 2012.  And with regard to Zynga's game growth, the Company was in fact experiencing substantial delays in both developing and launching new games.

330.     The Underwriter Defendants served as underwriters in connection with Zynga's Secondary Offering and created and distributed the accompanying Prospectus.

**B.     ADDITIONAL FACTS REGARDING THE FAILURE OF THE UNDERWRITER DEFENDANTS TO CONDUCT ADEQUATE DUE DILIGENCE**

331.     In connection with the registration and sale of securities alleged in Sections V.C. and V.D., the Underwriter Defendants had the obligation to perform a reasonable due diligence investigation of Zynga's business and operations to independently verify that the statements in the relevant Registration Statements were not untrue, including those representations concerning Zynga's monetization, omissions concerning changes to the Facebook platform and omissions concerning Zynga's game delays.

332.     However, the Underwriter Defendants did not properly conduct their due diligence reviews and did not properly disclose risks in the subject Registration Statements and Prospectuses, despite having full access to Zynga's non-public records.  Thus, the Underwriter Defendants are liable for the untrue statements in the subject Registration Statements and Prospectuses for the sale of the subject securities offered to Plaintiffs.

333.    In per forming their due diligence procedures and investigations, the Underwriter Defendants ignored the following "red flags" that required further investigation:

a.  The Selling Defendants sought an early release of the lock-up restrictions;

b.  Zynga's revenue recognition policy allowed for easy manipulation through changes to the WAL. The Underwriters Defendants should have initiated further investigations into whether or not the Company's shortening of the WAL in order to accelerate revenue recognition were appropriate prior to the IPO;

c.  Management's emphasis on bookings should have been further investigated due to the nature of the underlying number not being in compliance with GAAP. The Company emphasized the growth of its bookings through monetization of its current players and also new game launches. The Underwriter Defendants should have  investigated the Company's game launch pipeline and the Company's ability to monetize players;

d.  The Underwriter Defendants, given their unique position of having access into the Company's operations, should have been aware of the decrease in monetization rates;

e.  Delays with new game launch would have a severe impacted on future revenue, income, and bookings. Given the importance of new game launches, the Underwriter Defendants should have been aware of the delays in the new game launch and should have properly disclosed such information to potential investors; and

f.  Due to the Company's heavy reliance on Facebook for the majority of its revenue, the Underwriter Defendants should have been aware of and further investigated any changes to Facebook that could materially impact bookings.

## VIII.   NO SAFE HARBOR

334.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. None of the specific statements alleged herein are forward looking.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made.

335.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual result to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement, these statements are actionable because, at the time any forward-looking statement was made, the

particular speaker knew that the particular forward-looking statement was false or the forward-looking statement was authorized or approved by an executive officer of Zynga who knew that those statements were false when made.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of Section 11 of the Securities Act**
**(Against the Exchange Act Defendants, the Director Defendants and the Underwriter Defendants)**

336. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent. For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability or negligence under the Securities Act.

337. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Exchange Act Defendants, the Director Defendants and the Underwriter Defendants (the "Section 11 Defendants"), in connection with the Offerings with which the defendants were involved as set forth above.

338. The IPO Offering Materials and Secondary Offering Materials, including the registration statements, issued in connection with Zynga's IPO and the Secondary Offering contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading. The IPO Offering Materials and Secondary Offering Materials, including the registration statements, further omitted to state material facts required to be stated therein as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Offering Materials and Secondary Offering Materials, including the registration statements.

339. Defendants' liability under this Count is predicated on the participation of each defendant in conducting the Offerings pursuant to the IPO Offering Materials and Secondary Offering Materials, including the registration statements at issue, which contained untrue

statements and omissions of material fact. This Count does not sound in fraud. Any allegations or claims of fraud, fraudulent conduct, intentional misconduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Section 11 Defendants acted with scienter or fraudulent intent. Plaintiffs assert only strict liability and negligence claims.

340. Zynga is the registrant and, as such, is strictly liable to Plaintiffs and the Class for untrue statements and omissions contained in the IPO Offering Materials and Secondary Offering Materials, including the registration statements.

341. Each of the individual defendants named in this Count is liable as they each signed or authorized the signing of one or both of the IPO Offering Materials and Secondary Offering Materials, including the registration statements. By virtue of signing one or more of the IPO Offering Materials and Secondary Offering Materials, including the registration statements, they issued, caused to be issued and participated in the issuance of the IPO Offering Materials and Secondary Offering Materials, including the registration statements, which contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading and omitted to state material facts required to be stated therein. These defendants failed to conduct a reasonable investigation of the statements in one or more of the IPO Offering Materials and Secondary Offering Materials, including the registration statements, and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

342. The Underwriter Defendants each acted as an underwriter with respect to one or more of the Offerings pursuant to the IPO Offering Materials and Secondary Offering Materials, including the registration statements. The IPO Offering Materials and Secondary Offering Materials, including the registration statements, specifically named the Underwriter Defendants as underwriters for their respective offerings. The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference into the IPO Offering Materials and Secondary Offering Materials, including the registration

statements, for which they acted as underwriters and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

343. None of the defendants named herein possessed reasonable grounds for the belief that the statements and omissions contained in the IPO Offering Materials and Secondary Offering Materials, including the registration statements, were true and without omissions of any material facts.

344. By reason of the conduct herein alleged, the Section 11 Defendants named herein violated or controlled a person who violated Section 11 of the Securities Act.

345. Plaintiffs purchased or otherwise acquired Zynga stock pursuant to or traceable to the IPO Offering Materials and Secondary Offering Materials, including the registration statements, and were damaged thereby.

346. Plaintiffs and the Class have sustained damages. Plaintiffs and the other members of the Class likewise did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material facts in the IPO Offering Materials and Secondary Offering Materials, including the registration statements, when they purchased or acquired shares of Zynga's common stock.

347. Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed. Less than three years elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the Class.

**COUNT II**
**Violations of Section 12(a)(2) of the Securities Act**
**(Against Zynga and the Underwriter Defendants)**

348. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent. For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging

fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

349. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, by Plaintiffs and other members of the class who purchased or otherwise acquired common stock in one or more of the Offerings against Zynga and the Underwriter Defendants.

350. Zynga and the Underwriter Defendants offered, solicited, promoted and/or sold Zynga's common stock to Plaintiffs by the use of means or instrumentalities of interstate commerce by means of defective IPO Offering Materials and Secondary Offering Materials, including the prospectuses, for their own financial gain. By means of the defective IPO Offering Materials and Secondary Offering Materials, including the prospectuses, created and disseminated by Zynga and the Underwriter Defendants in connection with Zynga's IPO and Secondary Offering, Zynga and the Underwriter Defendants assisted in the offering of shares of Zynga stock to Plaintiffs and other members of the Class.

351. The IPO Offering Materials and Secondary Offering Materials, including the prospectuses, contained untrue statements of material fact and omitted to disclose material facts, as detailed above. The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Offering Materials and Secondary Offering Materials, including the prospectuses.

352. Zynga and the Underwriter Defendants owed Plaintiffs and the other members of the Class who acquired Zynga stock pursuant to the IPO Offering Materials and Secondary Offering Materials, including the prospectuses, the duty to make a reasonable and diligent investigation of the statements contained in the IPO Offering Materials and Secondary Offering Materials, including the prospectuses, to ensure that such statements were true and that there were no omissions to state a material fact required to be stated in order to make the statements contained therein not misleading.

353. Zynga and the Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained in the IPO Offering Materials and Secondary Offering

Materials, including the prospectuses, in connection with the Offerings and did not possess reasonable grounds for believing that the IPO Offering Materials and Secondary Offering Materials, including the prospectuses, in connection with the Offerings did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Zynga and the Underwriter Defendants, in the exercise of reasonable care, should have known of the untrue statements and omissions contained in the IPO Offering Materials and Secondary Offering Materials, including the prospectuses, as set forth above and/or should have updated investors regarding material information about the IPO and the Secondary Offering. Accordingly, Zynga and the Underwriter Defendants are liable to Plaintiffs who purchased Zynga's common stock in the Offerings.

354. Plaintiffs purchased or otherwise acquired Zynga securities pursuant to the defective IPO Offering Materials and Secondary Offering Materials, including the prospectuses. Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the IPO Offering Materials and Secondary Offering Materials, including the prospectuses, at the times Plaintiffs acquired Zynga stock during the Class Period.

355. By reason of the conduct alleged herein, Zynga and the Underwriter Defendants violated §12(a)(2) of the Securities Act, and are liable to Plaintiffs who purchased Zynga's common stock pursuant to the defective IPO Offering Materials and Secondary Offering Materials, including the prospectuses. As a direct and proximate result of such violations, Plaintiffs and the other Class members who acquired Zynga stock pursuant to and/or traceable to the IPO Offering Materials and Secondary Offering Materials, including the prospectuses, sustained substantial damages.

356. Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was

filed. Less than three years elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the Class.

## COUNT III
### Violations of Section 15 of the Securities Act
**(Against the Officer Defendants and the Director Defendants)**

357. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent. For the purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

358. This Count is brought pursuant to Section 15 of the Securities Act against the Officer Defendants and the Director Defendants.

359. At all relevant times, the defendants named herein were controlling persons of the Company within the meaning of Section 15 of the Securities Act. Each of these defendants served as an executive officer or director of Zynga prior to and at the time of the offerings. At all relevant times, these defendants had the power, influence and control over the operation and management of the Company and the conduct alleged herein. Each conducted and participated, directly and indirectly, in the conduct of Zynga's business affairs. As officers of a publicly owned company, the Officer Defendants, had a duty to disseminate accurate and truthful information with respect to Zynga's financial condition and results of operations.

360. By reason of the aforementioned conduct, each of the defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class who purchased securities in the Offerings or traceable to the offerings. As a direct and proximate result of the conduct of these defendants, Plaintiffs and other members of the Class suffered damages in connection with their purchase or acquisition of Zynga common stock.

361.    Less than one year has elapsed from the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed.  Less than three years elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiffs and the Class.

**COUNT IV**
**Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**(Against Zynga and the Officer Defendants)**

362.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

363.    During the Class Period, Zynga and the Officer Defendants individually and in concert, directly and indirectly, by the use of and means of instrumentalities of commerce and/or of the U.S. mail, engaged in and participated in a common plan, scheme, and unlawful course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (b) artificially inflate the prices of Zynga's securities; and (c) cause Plaintiffs and other members of the Class to purchase Zynga's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Zynga and the Officer Defendants, both collectively and individually, took the actions set forth herein.  Zynga and the Officer Defendants:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Zynga's securities in an effort to maintain artificially high market prices for Zynga's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Each of the Officer Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

364.    Zynga and the Officer Defendants, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Zynga as specified herein.

365.    Zynga and the Officer Defendants:  (a) employed devices, schemes and artifices to defraud; (b) made or participated in the making of untrue statements of material fact and/or omitted to state material facts necessary to make the statements made about Zynga and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein; (c) sold shares while in possession of material adverse non-public information; and (d) engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Zynga's value and performance and continued substantial growth and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Zynga's securities during the Class Period.

366.    The Officer Defendants knew or, but for their deliberate recklessness, should have known, that Zynga's reported financial results during the Class Period, as filed with the SEC and disseminated to the investing public, were materially overstated.  Further, these defendants knew of existing adverse facts which undermined their representations about Zynga's existing business, internal controls and prospects during the Class Period.

367.    Throughout the Class Period, Zynga acted through the Officer Defendants, whom it portrayed and represented to the financial press and public as its valid representatives. The willfulness, motive, knowledge and recklessness of the Officer Defendants are therefore imputed to Zynga, which is primarily liable for the securities law violations of the Officer Defendants.

368.    Zynga and the Officer Defendants, the top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of these individual defendants was able to and did control the control the content of the public statements disseminated by Zynga. Zynga and the Officer Defendants had actual knowledge of the misrepresentations and

omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available. These defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein. Such material misrepresentations and/or omissions were done knowingly and/or recklessly and for the purpose and effect of concealing Zynga's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

369. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Zynga's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices for Zynga's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the defendants, or upon the integrity of the market in which the common stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the defendants, but not disclosed in public statements by the defendants during the Class Period, Plaintiffs and the other members of the Class acquired Zynga common stock during the Class Period at artificially high prices, and were, or will be, damaged thereby.

370. At the time of the above-noted misrepresentations and omissions, Plaintiffs and other Class members were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other Class members and the marketplace known the truth regarding Zynga's financial results, which was not disclosed by the defendants, Plaintiffs and other Class members would not have purchased or otherwise acquired their Zynga securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially-inflated prices that they paid.

371. As a direct and proximate result of Zynga and the Officer Defendants' wrongful conduct, Plaintiffs and other Class members suffered substantial damages in connection with their purchases of Zynga's securities during the Class Period.

372. In addition to the duties of full disclosure imposed on the Officer Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's financial condition, earnings and expenses so that the market price of the Company's securities would be based on truthful, complete and accurate information.

373. By reason of the foregoing, Zynga and the Officer Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

**COUNT V**
**<u>Violations of Section 20(a) of the Exchange Act</u>**
**(Against the Officer Defendants)**

374. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

375. The Officer Defendants acted as controlling persons of Zynga within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency and their ownership and contractual rights, participation in and/or awareness of Zynga's operations and/or intimate knowledge of the false financial statements filed by Zynga with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Zynga, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of Zynga's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

376. In particular, each Officer Defendant had direct and supervisory involvement in the day-to-day operations of Zynga and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

377. As set forth above, the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

378. By reason of the conduct of Zynga as alleged in this Complaint, and by virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their purchases of Zynga common stock during the Class Period.

## COUNT VI
## Violation of Section 20A of the Exchange Act
### (Against the Officer Defendants)

379. Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

380. This Claim is brought pursuant to Section 20A of the Exchange Act against the Officer Defendants on behalf of all members of the Class damaged by the insider trading by these defendants during the Class Period.

381. Plaintiffs purchased at least one Zynga stock contemporaneously with sales of Zynga stock by defendants named in this Count.

382. By virtue of their positions at Zynga and the specific facts alleged herein, these defendants were in possession of material, adverse, non-public information about Zynga contemporaneously with when they sold their Zynga stock to Plaintiffs and members of the Class at artificially inflated prices.

383. As alleged above, each of the defendants violated Sections 10(b) and/or 20(a) of the Exchange Act.

384.    These defendants violated Section 20A of the Exchange Act and applicable rules and regulations thereto by selling Zynga stock while in possession of material, non-public information about the adverse information detailed herein.

385.    Plaintiffs and other members of the Class who traded in Zynga securities contemporaneously with the sales of Zynga stock by defendants named in this Count have suffered substantial damages in that they paid artificially inflated prices for Zynga stock as a result of the violations of Sections 10(b) and 20(a) herein described.  Moreover, these Class members would not have traded Zynga securities at the prices they paid or received, or at all, if they had been aware that the market prices had been artificially inflated by defendants' false and misleading statements and scheme to defraud.

386.    The defendants named in this Count are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs' Counsel as Class Counsel;

B.    Awarding compensatory and/or rescissionary damages in favor of Plaintiffs and the other members of the Class against defendants for all damages sustained as a result of defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.    Awarding disgorgement of all insider trading profits in favor of Plaintiffs and the other members of the Class who purchased contemporaneously with defendants;

D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Awarding such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues that may be so tried.

DATED:  April 3, 2013

BERMAN DeVALERIO

By: _/s/ Nicole Lavallee_
          Nicole Lavallee

Joseph J. Tabacco, Jr.
Nicole Lavallee
Victor S. Elias
One California Street, Suite 900
San Francisco, CA 94111
Telephone:  (415) 433-3200
Facsimile: (415) 433-6282
Email: jtabacco@bermandevalerio.com
       nlavallee@bermandevalerio.com
       velias@bermandevalerio.com

Jeffrey M. Norton
Roy Shimon
NEWMAN FERRARA LLP
1250 Broadway, 27th Floor
New York, NY 10001
Telephone:  (212) 619-5400
Facsimile:  (212) 619-3090
Email: jnorton@nfllp.com
       rshimon@nfllp.com

**Co-Lead Counsel and Attorneys for
Lead Plaintiff David Fee and Named Plaintiff
Joy Arjoon-Singh**

U. Seth Ottensoser
Joseph R. Seidman, Jr.
BERNSTEIN LIEBHARD LLP
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile:  (212) 779-3218
Email: ottensoser@bernlieb.com
       seidman@bernlieb.com

**Additional Counsel for Named Plaintiff Joy
Arjoon-Singh**