1
2
3
4
5
6
7
8
9
10
11
12
13
14

Joseph J. Tabacco, Jr. (SBN 75484)
Nicole Lavallee (SBN 165755)
Victor Elias (SBN 262269)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone:  (415) 433-3200
Facsimile: (415) 433-6282
Email: jtabacco@bermandevalerio.com
        nlavallee@bermandevalerio.com
        velias@bermandevalerio.com

Jeffrey M. Norton (Admitted *Pro Hac Vice*)
Roy Shimon (Admitted *Pro Hac Vice*)
Ramzi Abadou, *Of Counsel* (SBN 222567)
**NEWMAN FERRARA LLP**
1250 Broadway, 27th Floor
New York, NY 10001
Telephone:  (212) 619-5400
Facsimile:  (212) 619-3090
Email: jnorton@nfllp.com
        rshimon@nfllp.com

Lead Counsel for Lead Plaintiff David Fee

15
16

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| IN RE ZYNGA INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| This Document Relates To: All Actions. | |

Lead Case No. 3:12-cv-04007-JSW

Consolidated with Case Nos.
12-CV-4048-JSW
12-CV-4059-JSW
12-CV-4064-JSW
12-CV-4066-JSW
12-CV-4133-JSW
12-CV-4250-JSW

**FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

**CLASS ACTION**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF ALLEGATIONS ...................................................................... 1

      A.    Company Background and Overview of Defendants' Motives ............................ 1

      B.    Defendants' Misleading Class Period Statements and Material Omissions .......... 5

            1.    Defendants' Statements About Zynga's Strong Bookings Are
                  Actionable ............................................................................................ 6

            2.    Defendants' Statements About Zynga's Robust New Game Pipeline
                  Are Actionable ...................................................................................... 6

            3.    Defendants' Statements and Omissions Concerning Facebook Are
                  Actionable ............................................................................................ 7

            4.    Defendants' Statements Regarding Zynga's 2012 Guidance Are
                  Actionable ............................................................................................ 7

      C.    The Class Period Ends ................................................................................... 8

III.  JURISDICTION AND VENUE ........................................................................ 10

IV.   THE PARTIES ................................................................................................ 10

      A.    Plaintiff ...................................................................................................... 10

      B.    Defendants .................................................................................................. 10

            1.    The Company ........................................................................................ 10

            2.    The Officer Defendants .......................................................................... 10

V.    BACKGROUND .............................................................................................. 12

      A.    Zynga's Business Model ............................................................................... 12

            1.    Zynga's Free-to-Play Model Relies on Sales of Virtual Goods to a
                  Small Percentage of Users ...................................................................... 13

            2.    Zynga's Relationship with Facebook ........................................................ 15

            3.    Zynga's Key Financial and Operating Metrics ........................................... 15

      B.    Zynga Goes Public and then Quickly Consummates a Secondary Offering ....... 17

            1.    The IPO ................................................................................................ 17

            2.    The Secondary Offering .......................................................................... 20

      C.    Confidential Witnesses ................................................................................. 20

VI.    EXCHANGE ACT VIOLATIONS ................................................................. 26

    A.    Defendants' False And Misleading Class Period Statements And Omissions .... 27

        1.    Defendants Misled Investors in Connection with Zynga's Fourth Quarter 2011 Results and 2012 Guidance .................................................. 27

        2.    Zynga's Annual Report on 2011 Form 10-K Contained False and Misleading Statement and Material Omissions ....................................... 30

        3.    The Secondary Offering Materials Contained False and Misleading Statements ......................................................................................... 31

        4.    Defendants Misled Investors in Connection with Zynga's First Quarter 2012 Results and Revised 2012 Guidance................................... 32

        5.    Defendant Wehner's Statements at the J.P. Morgan Global Technology, Media and Telecom Conference Were Materially False and Misleading ........................................................................................ 36

    B.    Additional Allegations Regarding Defendants' Scienter ..................................... 37

        1.    The Officer Defendants Were Either Aware Of Or Recklessly Ignored That Bookings Were Falling, that Game Launches Were Delayed, and that Facebook was Making Platform Changes that Would Adversely Impact Zynga ............................................................. 37

        2.    The Officer Defendants Sought and Obtained a "Lock-Up" Waiver to Engage in Massive Insider Trading ...................................................... 39

        3.    Zynga Reduced the WALs Applied to Virtual Goods To Manipulate Its Revenue Figures In Order To Artificially Inflate The Then-Current Condition Of Its Business .......................................................... 43

VII.    LOSS CAUSATION.................................................................................. 45

VIII.    POST CLASS PERIOD EVENTS ............................................................ 50

IX.    *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ......................... 52

X.    NO SAFE HARBOR ............................................................................... 53

XI.    CLASS ACTION ALLEGATIONS ........................................................... 54

CLAIMS FOR RELIEF ................................................................................ 56

COUNT I ..................................................................................................... 56

COUNT II .................................................................................................... 57

PRAYER FOR RELIEF ................................................................................ 58

1   I.      INTRODUCTION

2          1.      David Fee ("Plaintiff") alleges the following based upon personal knowledge

3   with respect to himself and, for all other matters, the investigation of Lead Counsel which

4   included, *inter alia*, a review and analysis of: (i) Zynga Inc.'s ("Zynga" or the "Company")

5   filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and

6   other public statements; (iii) securities analyst reports and media reports about the Company;

7   and (iv) interviews with former Zynga employees who were employed at Zynga before and/or

8   during the Class Period, defined below.  Plaintiff believes that substantial evidentiary support

9   will exist for the allegations set forth herein after a reasonable opportunity for discovery.

10         2.      This is a class action for violation of the federal securities laws.  Plaintiff brings

11  this action on behalf of all persons who purchased or otherwise acquired the publicly-traded

12  securities of Zynga between February 14, 2012 and July 25, 2012, inclusive (the "Class

13  Period"), and were damaged thereby (the "Class").  Plaintiff asserts claims for violations of

14  §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule

15  10b-5 promulgated thereunder.  The defendants are Zynga and its Class Period Chief Executive

16  Officer ("CEO") (Mark Pincus), Chief Financial Officer ("CFO") (David M. Wehner), and

17  Chief Operating Officer ("COO") (John Schappert) (the "Officer Defendants") (collectively

18  "Defendants").

19  II.     SUMMARY OF ALLEGATIONS

20         A.      Company Background and Overview of Defendants' Motives

21         3.      Zynga describes itself as a leading provider of social game services.   The

22  Company develops, markets and operates online social games as live services played over the

23  Internet and on social networking sites and mobile platforms, such as Facebook, Inc.

24  ("Facebook").  In connection with its free-to-play business model, Zynga generates revenue

25  primarily through the in-game sale of virtual currency to users, which is used to buy virtual

26  goods to enhance their game playing experience by, among other things, extending their play

27  sessions, personalizing their game environments, accelerating their progress through the game

28

and sending unique gifts to their friends.  To evaluate the performance of the Company's business and the strength of its results of operations, Zynga utilizes a key financial metric known as "bookings."  Bookings is a non-GAAP financial measure that represents the total dollar amount received in a given period from the sale of virtual goods.  Reported revenue, on the other hand, takes into account that bookings for durable virtual goods are amortized over time using a weighted average life ("WAL") of the good.[1]  According to Zynga, "[b]ookings, as opposed to revenue, is the fundamental top-line metric we use to manage our business, as we believe it is a better indicator of the sales activity in a given period."  "Monetization" refers to Zynga's ability to turn users of its games into paying users who purchase virtual goods – which sales are referred to as bookings.

4.     Given the importance of bookings to the Company's core operations, the Officer Defendants tracked bookings obsessively for its games and user and game-operating metrics on a real-time basis, and, thus, had up-to-the-minute updates on the activity and purchases of every user of every game.  Indeed, CW5 revealed that Zynga tracked "metrics on everything users did in a game, including what they bought and clicked on" which was used to calculate revenue.[2]  As a Company driven by daily bookings generated from the amount of virtual goods purchased by users in each game, tracking this data on a real-time basis enabled Zynga to evaluate the results of its operations, generate future operating plans and assess the performance of every game and the Company as a whole.

5.     As described by former Zynga employees in §V(C), *infra*, in the lead up to its December 15, 2011 initial public offering (the "IPO"), the Officer Defendants had access to real-time data showing declines in user numbers, user spending and bookings.  By the time Zynga consummated the IPO, the Officer Defendants knew that Zynga's bookings and overall growth

---

[1]   Thus, not all bookings received for virtual goods are recognized in the period they are received, but instead are recognized over multiple reporting periods depending on the WAL for such goods.

[2]   Confidential Witness ("CW") No. 5 ("CW5") worked in software production and as a Senior Producer at Zynga Game Network from the spring of 2011 to the fall of 2011.

1   were showing significant signs of strain.  Indeed, CW2 explained that *"we knew the Company*

2   *was not doing well before the IPO launch*."[3]  With particular respect to Zynga's ability to

3   monetize its games, by the fourth quarter of 2011, CW2 reported how Zynga was aware that

4   users were not spending as much on its games and that this decreased spending "was across the

5   board."

6        6.    While in possession of these and other negative non-public facts in early 2012,

7   the Officer Defendants were subject to a 165 day "lock-up" of their personally held Zynga

8   shares (*i.e.*, until May 28, 2012).  The lock-up of their IPO shares was designed to restrict

9   Zynga's highest ranking insiders from trading on non-public, material information and diluting

10  the Company's nascent share price.  The lock-up was heavily promoted to investors in the IPO

11  materials but, given the Company's poor financial condition and prospects, the Officer

12  Defendants became eager to cash out soon after the IPO.

13       7.    Thus, the Officer Defendants and other insiders obtained an early release of their

14  lock-up in order to sell 49.4 million shares of Zynga stock for proceeds of approximately $593

15  million, none of which went to the Company.  Specifically, on March 14, 2012, only three

16  months after the IPO, Zynga filed a Registration Statement and Prospectus announcing that

17  Zynga senior executives, including the Officer Defendants, and other insiders had sought and

18  obtained a waiver releasing them from the IPO's lock-up period in order to sell their personally

19  held shares in a secondary offering  (the "Secondary Offering").  A week later, on March 23,

20  2012, Zynga filed an Amendment to its Secondary Offering Registration Statement announcing

21  that these insiders would be selling up to 49.4 million shares in the Secondary Offering. The

22  release enabled them to sell their shares *fifty-five days* before the lock-up was set to expire on

23  May 28, 2012.

24

25

26  _____

27  [3]  Confidential Witness No. 2 ("CW2") worked at Zynga's Austin Quality Control Center
    ("AQC") as a QA Analyst from before the start of the Class Period until the spring of 2012 and

28  participated in various meetings where bookings and revenue were discussed.

8.      On April 3, 2012, the day the Secondary Offering was completed, Zynga's insiders immediately sold 49.4 million of their personally-held shares of stock at $12 per share to generate approximately ***$593 million*** in illicit proceeds, of which the insiders reaped $11.64 per share, or a total of over $575 million, after underwriter discounts and commissions.  None of these proceeds went to the Company.  Defendant Pincus alone pocketed nearly $200 million in personal profits.  Despite his prior bullish representations earlier in the Class Period about the Company and its prospects, defendant Wehner (Zynga's CFO) sold 386,865 shares of Zynga common stock in the Secondary Offering for proceeds of over $4.5 million which represented about ***67%*** of his holdings in the Company, and defendant Schappert (Zynga's COO and director) sold 322,350 shares for proceeds of over $3.75 million which represented about ***84%*** of his holdings.

9.      Reporting on these developments, on April 23, 2012, a *Wall Street Journal* report entitled "Zynga Insider Activity is All Selling" described how:

> With its recently completed secondary offering, Zynga found an ***innovative way to allow its top executives, early investors and other insiders to sell off their stakes – despite IPO restrictions designed to prevent it***.[4]

10.     Incredibly, the Officer Defendants cashed out in the ***same*** quarter Zynga was suffering disastrous financial results, which were only disclosed to the public at the end of the Class Period on July 25, 2012.  Commenting on the lock-up waiver at the end of the Class Period, BTIG analyst Richard Greenfield noted that:

> They [Zynga executives] were released out of a lock-up that underwriters normally wouldn't have allowed … They raised guidance and reorganized management without telling anyone.  Then they cut guidance by 50 percent.  ***It's a very shocking chain of events***.

11.     Furthermore, because of how Zynga recognized revenue for durable virtual goods, the Officer Defendants were able to take creative accounting measures to manipulate the Company's recognition of revenue which allowed them to keep Zynga's stock price artificially

---

[4]   Emphasis added herein unless otherwise noted.

1    inflated long enough to for them to dump their personally-held shares.  Specifically, Defendants

2    shortened the WALs for Zynga's durable virtual goods in order to pull revenue forward leading

3    up to the IPO and in the first quarter of 2012 ("Q1 2012") leading up to the Secondary Offering.

4    This allowed Zynga to recognize revenue sooner and inflate the Company's net income at the

5    expense of recognizable revenue for the remainder of 2012.

6        12.    By recognizing revenue more quickly and deferring losses into future periods,

7    the Officer Defendants had shifted losses from Q1 2012 to the second quarter of 2012 ("Q2

8    2012") – perfect timing for the Officer Defendants to sell their shares and maximize the return

9    on their illicit stock sales before the Company's negative Q2 2012 announcement decimated

10   Zynga's stock price.

11           **B.    Defendants' Misleading Class Period Statements and Material Omissions**

12       13.    During the short five-month Class Period alleged herein, Zynga and the Officer

13   Defendants misled investors by: (i) repeatedly assuring them that Zynga's bookings were robust

14   and assuring them not to worry about declining daily active user ("DAU") figures when

15   bookings were, in fact, declining and Zynga was having trouble monetizing users;

16   (ii) repeatedly assuring them that Zynga's new game pipeline growth was robust when it was, in

17   fact, already suffering from delays; (iii) acknowledging that a change to Facebook's platform

18   would have adverse consequences for Zynga, but failing to disclose that Facebook had notified

19   Zynga by the Class Period that it already *was* changing its platform in a way that would

20   materially harm Zynga's business beginning in Q2 2012; and (iv) issuing full-year 2012 guidance

21   that was unsupportable given Zynga's knowledge that bookings were declining, games were

22   being delayed and Facebook was implementing platform changes that would have a materially

23   negative impact on bookings.

24       14.    The positive reports issued by Zynga in connection with its IPO, fourth quarter

25   2011 ("Q4 2011"), and Q1 2012 financial results and full year 2012 guidance had the intended

26   effect of inflating the value of the Company's common stock from an IPO price of $10.00 per

27   share to a trading high of $15.91 per share on March 2, 2012.  The Company's trading high

28

came less than two weeks before the Officer Defendants obtained the share lock-up waiver described in detail in §§V(B)(2); VI(B)(2), *infra*.

### 1. Defendants' Statements About Zynga's Strong Bookings Are Actionable

15.     As set forth in detail in §VI(A), *infra*, beginning on February 14, 2012, Zynga touted its robust and growing bookings and deflected investor concern about declining DAUs. In truth, as explained by former Zynga employees described in §V(C), *infra*, the Company's booking were suffering serious declines even before Zynga's highly touted IPO.  For example, Confidential Witness No. 6 ("CW6"), who worked for Zynga as a Senior Product Manager from spring 2011 to fall 2012, said he/she **became aware of bookings declines in late 2011 and into 2012** due to the failure of the Company's games to monetize well.

16.     The Officer Defendants either knew or were deliberately reckless in not knowing about these problems because, as described by CWs 1-6, the Officer Defendants were provided with or had access to numerous internal reports that closely tracked the Company's bookings for its games on a real-time basis.  As the reports and data that were provided to the Officer Defendants tracked all of the Company's bookings, they clearly revealed the decrease in bookings during the Class Period that directly impacted its current and future revenue and earnings.

### 2. Defendants' Statements About Zynga's Robust New Game Pipeline Are Actionable

17.     As set forth in detail in §VI(A), *infra*, the Officer Defendants misleadingly assured investors that there was a growing supply of new games in the pipeline.  These pipeline statements were false and misleading because, as the CWs explained, Zynga had been facing substantial delays in developing and launching new games and its pipeline of games for 2012 was materially weaker than reported.  Moreover, Confidential Witness No. 3 ("CW3"), an employee in Zynga's Mobile Quality Assurance Division, stated that there was no way Zynga's top executives could not know about all the game delays.  CW6, who was specifically aware of delays with respect to games *CityVille 2*, *FarmVille 2*, *ChefVille* and *Mafia Wars 2*, also stated that

Zynga's "management was always aware of delays." Indeed, CW6 further stated that "there was no reason for the executive team not to be fully aware" of any game delays, as the status of all games was provided to Zynga's executive management in a weekly Executive Summary, whether the games were in "design mode, beta testing or pre-launch."

### 3. Defendants' Statements and Omissions Concerning Facebook Are Actionable

18.    As set forth in §VI(A), *infra*, while Zynga disclosed that it was deeply dependent on Facebook to generate revenue and that a material change by Facebook could materially adversely impact its business, Zynga failed to disclose that Facebook ***was*** actually changing its platform in a way that would materially harm Zynga's business. Specifically, Facebook changed the surfacing of its content (including tweaks to the News Feed algorithm that promoted newer games) and also opened an App Center to increase awareness of games by Zynga's competitors. The changes to Facebook's platform resulted in newer games from other developers being promoted over Zynga's games, causing Zynga to lose users. In turn, the Company's bookings decreased. None of these material developments were disclosed to investors by Zynga until the end of the Class Period.

19.    According to CW6, a Senior Product Manager, while he/she was first informed that Facebook was planning to launch a platform change that would impact Zynga's games in April 2012, the Company's executives "knew a few months earlier" – *i.e.*, at the start of the Class Period. Stating that executives "had lots of early information and access into the Facebook change," CW6 further explained that Zynga was provided with advanced notice of the platform change so that Zynga could conduct beta testing on the new platform.

### 4. Defendants' Statements Regarding Zynga's 2012 Guidance Are Actionable

20.    As set forth in §VI(A), *infra*, Defendants also issued unsupportable guidance for the second half of 2012 and *repeated* assurances that Zynga's bookings and growth would be weighed in the back half of the year. On February 14, 2012, Zynga issued guidance for 2012,

1   including that "[b]ookings are projected to be in the range of $1.35 billion to $1.45 billion.  We

2   expect that growth will be weighted towards the back-half of the year with slower sequential

3   growth in the first half of the year."  Then, on April 26, 2012, during the same quarter in which

4   Zynga reported dismal results and slashed guidance, Zynga raised its already aggressive

5   guidance further.

6   21.    These statements were false and misleading when made because, as relayed by

7   numerous CWs, Zynga had been experiencing a rapid decline in bookings beginning even prior

8   to 2012 and Zynga's current and future growth were further negatively impacted by game

9   delays, and because of the import of Facebook's undisclosed upcoming platform change

10   beginning in the second quarter of 2012.

11          **C.      The Class Period Ends**

12   22.    On July 25, 2012, Zynga disclosed substantially lower than expected earnings for

13   Q2 2012 and sharply lowered its 2012 guidance.  Zynga revealed that the Company's poor

14   results and reduced outlook were due to declines in bookings and delays in launching new

15   games – the same metrics the Officer Defendants had touted as late as May 2012 (*see*

16   §V(A)(4)-(5), *infra*), including declines in bookings due to changes to the Facebook platform.

17   23.    In response to this news, Zynga's stock price ***plummeted over 37% in one day***

18   ***on massive trading volume*** to a low of $2.97 per share.  This drop represented a loss of 70% of

19   Zynga's stock value from its $10.00 per share IPO price and a loss of over 81% compared to its

20   March 2, 2012 Class Period trading high of $15.91 per share.  The negative results announced

21   on July 25, 2012, related to the ***very same quarter*** in which the Officer Defendants touted

22   Zynga's bookings and growth while at the same time unloading their own holdings at a price of

23   $12.00 per share.  Zynga's stock plunge was so swift and severe that it triggered the SEC's so-

24   called alternative uptick rule, which aims to limit the impact of short sellers on a stock price.

25   24.    On the evening of July 25, 2012, *Reuters* reported that "Zynga Inc. slashed its

26   2012 outlook and quarterly results badly missed Wall Street targets, sending its stock plunging

27   35 percent," noting that the insider selling in April 2012 "now seems ***especially well-timed***."

28

Richard Greenfield, an analyst at BTIG LLC, went so far as to issue a public apology for recommending that his investors buy Zynga stock in a research note titled "We Are Sorry and Embarrassed by Our Mistake." The note highlighted how he was "really caught by surprise" by Zynga's failure to monetize its games because, based on what had been publicly reported before Zynga's second quarter announcement, "we firmly believed that the small fraction of Zynga users who pay was increasing and that monetization per user was improving."

25. By August 1, 2012, numerous analysts had reported that Zynga's market value had reached the point where Zynga's business was being valued at "nothing." Unlike shareholders who bore the brunt of the Company's share price declines, Zynga's insiders had cashed out at *exactly* the right time in the Secondary Offering based on their access to non-public real-time data and access to non-public material information. An August 10, 2012 *Seeking Alpha* report aptly entitled "Zynga's Real Game Could Be Fraudville" described the Officer Defendants' impeccably timed sales as follows:

> Zynga went public in December of 2011 with a stock price of $10 a share. A Positive 1Q helped raise the stock price to above $12 a share. Early investors and company employees had a lock-up period and were unable to sell their shares until May 28th of 2012. Zynga filed an amendment to the form S-1 which **waived** the lockup restriction allowing a select group of insiders to dump shares. Using Underwriters Morgan Stanley and Goldman Sachs, those insiders offloaded $515 million worth of shares on April 3rd at $12 a share. ***Because of Zynga's creative Non-GAAP accounting they were able to shift previous losses from Q1 to Q2 and the insiders dumped shares before the dismal Q2 report. Coincidence?***

26. As reported by *GameZebo* on August 1, 2012, because "Zynga is such a data-driven company, it's tough to believe that the people on top did not see something dropping." An August 2012 *San Francisco Chronicle* article entitled "Free-falling Zynga needs fast turnaround," noted that Zynga's:

> [R]evised 2012 forecast was particularly troubling to analysts because it came after the company had raised annual expectations in its first-quarter announcement. In fact, Zynga [had] emphasized that most of its growth would happen in the second half of the year. The wildly different assessment in a three-month period revealed a stunning lack of insight into the state of the business - ***or something worse***.

1    **III.   JURISDICTION AND VENUE**

2        27.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act,

3    (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-

4    5)).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

5    §1331 and Section 27 of the Exchange Act.

6        28.    Venue is proper in this District pursuant to Section 27 of the Exchange Act.

7    Zynga's headquarters are located within this District, the Company conducts substantial

8    business in this District, and many of Defendants' acts and practices complained of herein

9    occurred in substantial part in this District.

10       29.    In connection with the acts, conduct and other wrongs alleged herein,

11   Defendants, directly and indirectly, used the means and instrumentalities of interstate

12   commerce, including but not limited to the United States mails, interstate telephone

13   communications and national securities markets.

14   **IV.   THE PARTIES**

15       **A.    Plaintiff**

16       30.    As set forth in his Certification attached here as Exhibit 1, Lead Plaintiff

17   David Fee purchased Zynga common stock during the Class Period, and was damaged thereby.

18       **B.    Defendants**

19           **1.    The Company**

20       31.    Zynga is a Delaware corporation headquartered at 699 Eighth Street, San

21   Francisco, California 94103.  Zynga completed its IPO in December 2011 and its Class A

22   common stock is traded in the NASDAQ Global Select Market, which is an efficient market,

23   under the symbol "ZNGA."

24           **2.    The Officer Defendants**

25       32.    Mark Pincus ("Pincus") founded Zynga in 2007.  At all relevant times, he served

26   as Zynga's CEO, Chief Product Officer and Chairman of Zynga's Board of Directors.  Pincus

27   signed the Registration Statements for Zynga's IPO and Secondary Offering.  After obtaining a

28

1  waiver from the IPO's lock-up period for himself and other key officers and directors, Pincus

2  sold 16.5 million shares of Zynga stock in the Secondary Offering for proceeds of over $192

3  million.  At the time of the IPO, Pincus owned 100% of Zynga's Class C shares and 16% of

4  Zynga's Class B shares and controlled approximately 36.2% of the total voting power of

5  Zynga's outstanding capital stock.  Pincus has since taken control of Zynga increasing his total

6  voting stake to a majority of the voting power of Zynga's outstanding stock. Pincus also signed

7  the Annual Report on Form 10-K filed with the SEC on February 28, 2012.

8        33.    David M. Wehner ("Wehner") served as Zynga's CFO from August 2, 2010 to

9  November 13, 2012.  Wehner signed the Registration Statements for Zynga's IPO and

10  Secondary Offering.  After obtaining a waiver from the IPO's lock-up period, Wehner, sold

11  386,865 shares of Zynga stock in the Secondary Offering for proceeds of over $4.5 million.

12  Wehner also signed the Annual Report on Form 10-K filed with the SEC on February 28, 2012,

13  and the Form 10-Q for Q1 2012 filed on May 8, 2012.

14        34.    John Schappert ("Schappert") served as Zynga's COO from May 2011 to

15  August 8, 2012 and as a director of Zynga from July 2011 to August 8, 2012.  Schappert signed

16  the Registration Statements for Zynga's IPO and Secondary Offering.  After obtaining a waiver

17  from the IPO's lock-up period, Schappert sold 322,350 shares of Zynga stock in the Secondary

18  Offering for proceeds of over $3.75 million.  Schappert also signed the Annual Report on Form

19  10-K filed with the SEC on February 28, 2012.

20        35.    Defendants Pincus, Wehner, and Schappert are collectively referred to as the

21  "Officer Defendants."

22        36.    Because of the Officer Defendants' positions, they had access to the adverse

23  undisclosed information about Zynga's financial results, business, operations and practices, *via*

24  access to internal corporate documents, conversations and contact with other corporate officers

25  and employees, attendance at meetings and *via* reports and other information provided to them.

26  Each of the Officer Defendants, by virtue of his high-level position, was directly involved in the

27  day-to-day operations of Zynga at the highest levels and was privy to confidential information

28

concerning the Company and its business, operations and practices, including the accounting
misstatements alleged herein.  Their positions of control and authority as officers or directors
enabled the Officer Defendants to control the content of the SEC filings, press releases, and
other public statements of Zynga during the Class Period.  Furthermore, Defendants Pincus and
Wehner signed SOX certifications attesting to the accuracy of the Company's financial reports.

37.     Accordingly, each of the Officer Defendants bears responsibility for the
accuracy of the public reports and press releases detailed herein and are primarily liable for the
misrepresentations and omissions contained therein.  Moreover, they had continuous and
systematic contacts with the United States and California through Zynga's conduct of its
business and its San Francisco corporate headquarters.  During the Class Period, each of the
Officer Defendants personally made, signed and substantially participated in the preparation of
Zynga's false statements or engaged in conduct that made it necessary or inevitable that
material misrepresentations would be made to investors on the basis of that conduct.

## V.     BACKGROUND

### A.     Zynga's Business Model

38.     As a provider of social game services, Zynga develops, markets and operates
online social games played on Facebook and other social networks, mobile platforms, and
Zynga.com.   The games offered by Zynga include, among others, *Farmville*, *CastleVille,*
*CityVille*, *The  Ville*, *Draw  Something*, *Words  With  Friends*, *Mafia Wars*, *Matching With
Friends, Scramble With Friends*, *Zynga Poker*, *Zynga Bingo* and *Zynga Slots*.  Zynga initially
emerged as a leading social game developer by identifying successful games made by other
companies, copying those games, and polishing the underlying mechanic and theme.

39.     An August 2012 *Seeking Alpha* article highlighted how Zynga's game *The Ville*
copied Electronic Arts' game *The Sims Social* down to the color palate used for avatar skin
tones.  A September 2010, *SF Weekly* article entitled "FarmVillains: Steal someone else's game.
Change its name.   Make millions.   Repeat," quoted Defendant Pincus as having told Zynga
employees, "I don't f--king want innovation.  You're not smarter than your competitor.  Just copy

1    what they do and do it until you get their numbers."  The article further quoted a "former senior

2    employee" as describing "Zynga's motto is 'Do Evil.'  I would venture to say it is one of the most

3    evil places I've run into, from a culture perspective and in its business approach.  I've tried my best

4    to make sure that friends don't let friends work at Zynga."

5
          **1.     Zynga's Free-to-Play Model Relies on Sales of Virtual Goods
6                   to a Small Percentage of Users**

7          40.    At all relevant times, Zynga employed a free-to-play business model.  Zynga

8    touted its free-to-play model in comparison to pay-to-play business models, stating that the

9    free-to-play approach attracted a wider audience of players and increased the number of players

10   who had the potential to become paying users.  While Zynga's games were free to play, Zynga

11   generated revenue through the in-game sale of virtual currency that was used to buy virtual

12   goods for players to enhance their game playing experience.  Zynga also generates a small

13   portion of its revenue through in-game advertising.

14         41.    Zynga's December 15, 2011 IPO Prospectus represented that one of the "key

15   elements" of Zynga's strategy is to:

16         ***Increase Monetization of Our Games.***  We strive to offer increased selection,
           better merchandising and more payment options to increase the sales of our
17         virtual goods.  Our players purchase these virtual goods to extend their play
           sessions, personalize their game environments, accelerate their progress and send
18         unique gifts to their friends.  We will also continue to pursue additional revenue
           opportunities from advertising, including branded virtual goods and sponsorships.
19
20   (Emphasis in original).  The IPO Prospectus further elaborated that:

21         We generate most of our bookings and revenue from the sale of virtual goods in
           our games.  The degree to which our players choose to pay for virtual goods in our
22         games is driven by our ability to create content and virtual goods that enhance the
           game-play experience.  ***Our bookings, revenue and overall financial performance
23         are affected by the number of players and the effectiveness of our monetization
           of players through the sale of virtual goods and advertising***.

24   (Emphasis in original).

25         42.    By buying virtual goods, users accelerate their progress in games.  For example,

26   in Zynga's *Farmville* game, Zynga's users act as digital farmers and purchase virtual goods,

27   such as tractors, seeders and harvesters.  Whereas non-paying digital farmers could plow just

28

1    one plot at a time until they earned enough currency through successful game play to afford

2    farm equipment, paying digital farmers could speed up the process by buying a virtual tractor to

3    plow four plots at a time.  Although Zynga designed many of its games to have short-playing

4    sessions, players could also buy virtual goods to play games for longer periods.  The Company

5    limited game durations by replenishable "energy" or "coins" available to players for each

6    session.   To play longer sessions, players could buy virtual "energy boost" goods such as

7    batteries in *CityVille*, energy potions in *CastleVille*, or poker chips to play additional hands in

8    *Zynga Poker*.

9          43.    Virtual goods also allowed players to compete more effectively with friends and

10   increase their capabilities.  For example, in *Zynga Poker*, players could buy poker chips to play

11   with better players at higher stakes tables.   Zynga's virtual goods also allowed players to

12   personalize their game environments.   For example, players could purchase Big Ben while

13   creating virtual cities in *CityVille*.  The in-game sales of these sorts of virtual goods represented

14   Zynga's primary revenue source.

15         44.    Zynga allows its players to purchase two distinguishable types of virtual goods:

16   "durable" and "consumable" virtual goods.  Players could buy durable goods and use them as

17   long as they continued to play.  On the other hand, players could buy consumable goods and use

18   them right away.  For example, a *Farmville* tractor was a durable virtual good while gas to

19   make that tractor run was a consumable good.

20         45.    Despite its emphasis and financial dependence on being able to monetize its

21   free-to-play games and generate daily revenue from its users, Zynga only monetized a small

22   portion of its users and it relied on these funds for nearly all of its revenue.  For example, in

23   Q1 2012, paying users represented just 1.9% of the Company's monthly active users.  As Zynga

24   indicated in its December 15, 2011 IPO Prospectus and March 29, 2012 Prospectus, the

25   Company "rel[ied] on a small portion of [its] total players for nearly all of [its] revenue" and

26   "that the number of players who choose to purchase virtual goods will continue to constitute a

27   small portion of our overall players as our business grows."

28

### 2.    Zynga's Relationship with Facebook

46.    At all relevant times, Zynga conducted most of its sales of virtual goods on the Facebook platform.  As Zynga explained in both its December 15, 2011 IPO Prospectus and March 29, 2012 Secondary Offering Prospectus, "substantially all of [the Company's] revenue [was] generated from players accessing [its] games via the Facebook platform."

47.    Underscoring the great importance of the Facebook platform to Zynga's strategy, the Company's December 15, 2011 IPO Prospectus and March 29, 2012 Secondary Offering Prospectus, stated specifically that *if* Facebook were to implement changes to its platform that altered Zynga's access to that platform, such changes "*would* harm our business" and "[a]ny deterioration in our relationship with Facebook *would* harm our business and adversely affect the value of our Class A common stock."

### 3.    Zynga's Key Financial and Operating Metrics

48.    Prior to and during the Class Period, Zynga operated as a data-driven company that carefully tracked both financial metrics and operating metrics.  According to Zynga, it measured its business by using key financial metrics, bookings and adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"), and key operating metrics, DAU (daily average user) and average bookings per user ("ABPU").

49.    Throughout the Class Period, Zynga stressed that bookings was the most significant, meaningful monetization metric in assessing the Company's operating performance, financial health and growth potential.  According to Zynga, "[b]ookings, as opposed to revenue, [was] the fundamental top-line metric we use[d] to manage our business, as we believe it is a better indicator of the sales activity in a given period."  During Zynga's Q4 2011 earnings call, defendant Wehner stated that "[w]e managed our business on bookings, which is revenue plus the change in deferred revenue for any period.  I will focus on bookings as the best indicator of the top line performance of our business."  The Company's 2011 Annual Report on Form 10-K added that the Company used bookings to "evaluate the results of [its] operations, generate future operating plans and assess the performance of [the] company."

50.     Bookings represented the total amount of funds the Company received net of amounts paid for use on platforms such as Facebook.  Zynga defines bookings as being "equal to revenue recognized during the period in addition to the change in deferred revenue during the period."  Stated differently, Zynga defines bookings as "the total amount of revenue from the sale of virtual goods in our online games and advertising that would have been recognized in a period if we recognized all revenue immediately at the time of the sale."  A July 31, 2012 article by *The Business of Social Media* entitled "A look inside Zynga's numbers" described bookings as "an alternative measurement of revenue that is more accurate for social game companies than GAAP revenue."

51.     Zynga also used "key operating metrics" to measure its business.  Zynga's internally-recorded metrics included DAU, monthly unique users of Zynga's games, and ABPUs.  Zynga defined DAU as "the number of individuals who played one of [the Company's] games during a particular day."  The Company defined ABPUs as "(i) [the Company's] *total bookings in a given* period, divided by (ii) the number of days in that period, divided by, (iii) the average [daily active users] during the period."  As the Company reported in its March 29, 2012 Prospectus, Zynga recorded the metrics using an "internal analytics system."

52.     According to Zynga, its reported "ABPU provide[d] useful information to investors and others in understanding and evaluating our results in the same manner as our management and board of directors."  Zynga stated that it used ABPU "as a measure of overall monetization across all of our players through the sale of virtual goods and advertising."  As with its bookings, Zynga focused investor attention on ABPUs.

53.     Zynga carefully tracked all these metrics internally.  A Zynga employee quoted in a *The Verge* article stated, "Zynga is a company very focused on data.  Mark (Pincus) wants this business to be driven by numbers, not by hits…  They analyze every action in the game and try to optimize the business."  As an August 1, 2012, *Gamezebo* article states, "Zynga is such a data-driven company, its tough to believe that the people on top did not see something dropping."  As noted in the December 2, 2011 *VentureBeat.com* article, Schappert stated during

the IPO Road Show Presentation that Zynga used data to determine everything in its games. Indeed, defendant Schappert expressly admitted during that Presentation that Zynga operated as a "metrics-driven company," and used its "data and analytics" as an advantage in the social gaming industry.

54.     Although bookings and ABPU numbers were closely tracked in real-time by Zynga, these numbers were not publicly available until Zynga announced its earnings results for a given period.   Instead, investors only had access to DAU and monthly active users as measured and published by AppData, an independent service that publicly reported traffic data for games and other applications on Facebook only.   Thus, investors only had access to user numbers, not bookings numbers.

55.     Zynga also closely tracked its game pipeline.   As defendant Wehner stated during a J.P. Morgan Global Technology, Media and Telecom Conference held on May 16, 2012, in response to question from analyst Douglas Anmuth asking "how far out do you think about the gaming pipeline?   I mean do you know what you're doing in 2013 and 2014 at this point?" Defendant Wehner answered "2013 we've got a pretty good idea of what the pipeline looks like."

**B.     Zynga Goes Public and then Quickly Consummates a Secondary Offering**

**1.     The IPO**

56.     On December 15, 2011, Zynga filed an Amendment No. 9 to Form S-1 Registration Statement and Prospectus with the SEC in connection with Zynga's offering of 100,000,000 shares of Class A common stock at an IPO price of between $8.50 and $10.00 per share for an aggregate offering price of $1.0 billion.   Morgan Stanley and Goldman Sachs served as the joint book running managers for the IPO.

57.     In conjunction with Zynga's IPO, the Company issued an IPO Road Show Presentation.   As noted by a December 2, 2011 *BusinessInsider.com* article, the Company used the slide presentation to "pitch investors on the company's fundamentals."   According to a December 2, 2011 *VentureBeat.com* article, Zynga delivered the 30-minute road show pitch to investors over the course of nine days.   Using the Company's franchise title *Farmville* as an

example, Zynga used the Road Show Presentation to divert investor attention away from declining DAU figures.   Zynga focused investor attention instead on the Company's measurement of bookings, as demonstrated through a slide titled, "Longevity of Bookings from Enduring Game Franchises":



58.   Schappert later expanded on this representation during the Class Period at the 2012 Q1 earnings call, while responding to a question posed by analyst Richard Greenfield:

> I just wanted to circle back and remind on that slide that we had in the road show that you are speaking to, ***one of the key points on that slide was that daily active users and monetization are not directly related***.   In fact, what we talked about was DAU rise at the launch of the game, they trail off over time ***while revenues and monetization frankly does the opposite.***   So *FarmVille* is nearing in on celebrating its three-year anniversary and it's a strong contributor and we expect continued good things from *FarmVille* for the remainder of the year.

59.   Defendants made these representations in order to deflect investor attention away from declining DAU.

60.     Pursuant to the IPO, all of Zynga's officers and directors and the holders of substantially all of Zynga's capital stock, including the Officer Defendants, agreed to certain lock-up provisions, restricting their sale of Zynga common stock, as follows:

> *All of our officers and directors and the holders of substantially all of our capital stock have entered into lock-up agreements with us which provide that they will not offer, sell or transfer any shares of our common stock beneficially owned by them for 165 days*, subject in certain cases to extension under certain circumstances, following the date of this prospectus. We have agreed with Morgan Stanley & Co. LLC and Goldman, Sachs & Co. *not to waive* these lock-up restrictions without their prior consent.

61.     Those insiders agreed that, without the prior written consent of Morgan Stanley & Co. LLC and Goldman, Sachs & Co., they would not do the following (subject to certain exceptions) for a period ending 165 days after the date of the Prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase lend or otherwise transfer or dispose of, directly or indirectly, any shares of common stock or any securities convertible into or exercisable or exchangeable for shares of common stock;

- file any registration statement with the SEC relating to the offering of any shares of common stock or any securities convertible into or exercisable or exchangeable for common stock; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the common stock.

62.     The lock-up period was scheduled to expire on May 28, 2012.  On December 16, 2011, Zynga completed its IPO and issued 100 million shares of Class A common stock in the IPO at an offering price of $10 per share.  The IPO raised $1 billion and netted $961.4 million after deducting underwriting discounts and commissions and other offering expenses.  Valued at $7 billion, Zynga was the biggest initial public offering in gaming history and, at the time, was the largest initial public offering by an American Internet company since Google Inc. raised $1.9 billion in its 2004 initial public offering.  Upon closing of the IPO, Zynga had 100 million shares of Class A common stock, 578,855,599 shares of Class B common stock, and 20,517,472 shares of Class C common stock outstanding.

63.     Zynga common stock opened trading on December 16, 2011, at an initial price of $11.00 per share, 10% above the $10 per share offering price.

## 2.     The Secondary Offering

64.     On March 14, 2012, Zynga filed a Form S-1 Registration Statement and Prospectus with the SEC in connection with a Secondary Offering of personally held ZyngaClass A common stock for certain insider shareholders, which included the Officer Defendants, releasing them from the IPO lock-up restrictions.

65.     Then, on March 23, 2012, Zynga filed an Amendment to its March 14, 2012 Form S-1 Registration and Prospectus announcing that these insiders would be selling up to 42,969,153 personally held shares in the Secondary Offering.  As a result, shares of Zynga stock held by a select group of insiders, including the Officer Defendants and other Zynga officers, were unlocked for sale **two months** before the lock-up was set to expire under the IPO's lock-up agreement.

66.     The underwriters were paid approximately $18 million in discounts and commissions for their role in the Secondary Offering.  As detailed below, the Officer Defendants and other Zynga officers promptly sold the shares released from the lock-up as soon as the Secondary Offering was completed on April 3, 2012, at $12.00 per share, reaping $11.64 per share after under underwriter discounts and commissions.

## C.     Confidential Witnesses

**Confidential Witness No. 1**

67.     Confidential Witness No. 1 ("CW1") worked as a Zynga employee throughout the Class Period, from 2009 through late 2012.  CW1 held several positions with the Company's Quality Assurance ("QA") Department, which monitored errors reported in Zynga's games and was part of Zynga's Global Operations.  CW1 worked on QA issues, serving as a QA "Lead" for one of Zynga's games for two years and as the QA Point of Contact ("POC") for three games.  In addition, CW1 held the positions of QA Analyst, QA Security Analyst, and Back-End QA Lead.

68.     According to CW1, Zynga was detailed in collecting and monitoring user and revenue data for its games.  The Company tracked DAU for its games on a real-time basis. This data was available to Zynga employees on their desktop computers and monitors located through the office.  CW1 stated that, beginning in mid-2011 user numbers and revenue were declining in Zynga games "across the broad" and "it was the same story" for the thirty to forty games Zynga had released in mid-2011."  CW1 became aware of this through meetings and discussions with other Lead QAs on other games.

69.     CW1 further explained that Zynga's QA Department held two types of "scrum meetings."  The Department held the first type every day to go over the day's activities and determine what needed to be done for that day.  This meeting was attended by QA employees. As for the second type of scrum meeting, the QA Department held a meeting once every other week at the "studio level" to coordinate activities weeks in advance for production, program management and development.  These "studio level" meetings were attended only by QA leads, with typically approximately 12-30 QA leads attending per meeting.  As CW1 noted, revenue and DAU were "always" discussed at these meetings.  Beginning in mid-2011, QA leads shared information about decreasing DAU and revenue for their games at the meeting and it was said at the meetings the declines were "across the board" rather than isolated within a few games.

**Confidential Witness No. 2**

70.     Confidential Witness No. 2 ("CW2") worked at Zynga's Austin Quality Control Center ("AQC") as a QA Analyst from before the start of the Class Period until the spring of 2012.  CW2 worked on a Zynga game available on the Facebook platform.  CW2 also worked on the release of certain games on the Facebook platform and tested games to ensure that they complied with all of the "terms and services" that were part of Zynga's contract with Facebook. CW2 participated in the daily "scrum meetings" described in further detail by CW1.  According to CW2, the daily scrum meetings were run by QA managers.  CW2 also attended Point of Contact ("POC") meetings run by project managers.  Before these meetings, project managers provided CW2 and others with detailed reports showing the number of game users and amount

of money users were spending on each game. As CW2 stated, Zynga issued internal daily reports with updated numbers of daily users and user spending which were generated by Zynga's headquarters in San Francisco. At the meetings attended by CW2, project managers shared and discussed the information contained in the reports. These reports showed that *revenue for all games was decreasing during Q3 2011 and Q4 2011, and that these decreases were "across the board" for Zynga's games*.

71. CW2 described that Zynga also maintained a computer system that showed exactly how well each game was performing. Zynga employees at every office had access to the data provided by this system. Further corroborating CW1's statements, CW2 stated that "[they] all knew the metrics of how many users were playing and how many of them were spending money. They had flat screens and monitors in the office that showed exactly how many users were playing." Indeed, any of Zynga's employees could "ping the computer" whenever they wanted to "see how many active users were on and how many were spending money."

72. Given their knowledge of Zynga's user and revenue data for all of the Company's games, CW2 explained that "*we knew the Company was not doing well before the IPO launch*." With particular respect to Zynga's ability to monetize its games, by Q4 2011, Zynga was aware that users were not spending as much on its games and that this decreased spending was "significant" and "across the board." With respect to knowledge of the information put in the reports and how each game was doing by Zynga management, CW2 believed that "Pincus had access to everything – it was his company."

**Confidential Witness No. 3**

73. Confidential Witness No. 3 ("CW3") worked for Zynga's Mobile Division from the spring of 2011 to the spring of 2012. CW3 worked as part of the Mobile Division's QA Department. The head director of the Mobile Division during CW3's tenure was David Ko, who currently serves as Zynga's COO. CW3's duties included sending production teams to executive producers to provide updates about the status of game developments and delays.

74.     Corroborating the statements provided by other CWs, CW3 stated that Zynga tracked game revenue.  According to CW3, Zynga used a measure of the average revenue per daily user to understand how much money all players were spending daily for Zynga's games. Further, CW3 indicated that revenue information was tracked and easily available to Zynga's management through processing systems on platforms.  CW3 further also indicated that Zynga displayed this information on "monitors" and that the information was accessible to Zynga's management at any time.

75.     According to CW3, Zynga's management knew of game delays prior to 2012. CW3 personally sent production teams to executive producers with information about the status of game developments and delays.  In turn, the executive producers informed division directors of the meetings.   And the division directors reported the same information to Zynga's management.  CW3 further recalled that David Ko constantly asked "why hasn't this game been released?  Why is this taking so long?"  CW3 believed that Ko was in constant contact with Zynga's top executives about the status of game developments and delays.  CW3 thought there was "no way" top executives could not know about the game delays.

76.     Indeed, in regard to a prior change Facebook made in 2011 to its platform, CW3 explained that Facebook provided the changed platform to Zynga "5-6 months" prior to its launch so that Zynga's engineers and QA could conduct beta testing.

**Confidential Witness No. 4**

77.     Confidential Witness No. 4 ("CW4") worked for Zynga as a Senior Product Marketing Manager from the spring of 2011 to June 2012.  CW4 worked on three games, and used the metric "revenue per daily average user," which CW4 defined as "revenue that comes in daily from the players."  CW4 relayed that bookings and revenue results would be "bubbl[ed] up" to e-staff by studio general managers and head product managers and that a "weekly report was sent to higher ups" regarding these numbers.  According to CW4, "Mark Pincus and John Schappert were aware of what was going on" in bookings, revenue and financial results.

**Confidential Witness No. 5**

78.     Confidential Witness No. 5 ("CW5") worked for Zynga as a Senior Producer at Zynga Game Network from the spring of 2011 to the fall of 2011 and worked in software production.  According to CW5, Zynga embedded a code, known as a "program code, D++ language code," into each of its games which allowed Zynga's management to track the "output" of each game on a real-time basis.  CW5 stated that Zynga's headquarters distributed this code to each studio to implant into all of that studio's games.  This code automatically recorded a game's "output" for each user of that game, meaning that the code recorded how many times games were played and how many users played the game.

79.     CW5 further explained that Zynga "kept track of revenue on a per user basis." The Company "collected metrics on everything users did in a game, including what they bought and clicked on."

80.     CW5 corroborated statements from other confidential witnesses that real-time updates on game user and spending data was readily accessible to Zynga's management.  CW5 stated that these real-time statistics were automatically reported to Zynga on a real-time basis, which the Company used in turn to calculate revenue.  As stated by CW5, anyone with "credentials" could access a game and view that game's output on a real-time basis at any time. According to CW5, all studio managers and Zynga's senior management had such credentials to access a game's output.

**Confidential Witness No. 6**

81.     Confidential Witness No. 6 ("CW6") worked for Zynga as a Senior Product Manager from the spring of 2011 to the fall of 2012.  CW6 served as a Project Manager for at least three of Zynga's titles.  As a Product Manager, CW6 was responsible for weekly, monthly and quarterly projections and for reporting findings.  Before each quarter, like other product managers, CW6 put together estimated revenue expectations for each game for the upcoming quarter.  And like other product managers, CW6 reported the revenue expectations to and worked in conjunction with the studio general manager.  CW6 attended meetings with Zynga's

1    COO before each quarter to estimate quarterly revenue for games that CW6 worked on.  And

2    like other product managers, CW6 was responsible for providing management with a "daily

3    report" regarding the average revenue per user.  Like other product managers, CW6 contributed

4    to a so-called "Executive Summary," which was a weekly report sent to Zynga's upper

5    management "by game, by studio."

6           82.    ***CW6 became aware of bookings declines in late 2011 and into 2012***, due to the

7    failure of games to monetize well.  Indeed, CW6 participated in regular meetings with Zynga's

8    COO, who at that time was defendant Schappert, and various executive vice presidents to

9    determine and discuss Zynga's actual and expected revenues for games and upcoming quarter

10   estimates.  According to CW6, every product managers was responsible for providing certain

11   members of Zynga's executive-level management (known as "E-Staff") with weekly, monthly

12   and quarterly projections of expected revenues for each game.

13          83.    For every game that was launched, CW6 stated that product managers would

14   report actual and expected revenue for their games to the studio general manager on a weekly

15   basis.  The general manager, who was responsible for managing multiple games at his or her

16   studio, would then write a cumulative report on all games, an Executive Summary that would

17   go directly to both Zynga's finance department and Zynga's executives.

18          84.    According to CW6, the Executive Summaries and game revenue projects

19   provided to upper management were collaborations between product managers, studio general

20   managers and certain members of Zynga's E-Staff.  According to CW6, Zynga's "***management***

21   ***was always aware of delays***."   Further, the status of all games was provided to Zynga's

22   executive management in a weekly Executive Summary, whether the games were in "design

23   mode, beta testing or pre-launch."  CW6 also stated that "there was no reason for the executive

24   team not to be fully aware" of any game delays.  CW6 was specifically aware of delays with

25   respect to the games *CityVille 2*, *FarmVille 2*, *ChefVille* and *Mafia Wars 2*.   CW6 further stated

26   that Zynga's Central Product Management Team projected when all new games would be

27   launched.  The Project Management Team also projected how much money the games were all

28

1    likely to earn.  But as CW6 stated, "[e]very game has to get signed off on" by Zynga's top

2    management before the estimates were finalized."

3        85.    Regarding changes to the Facebook platform, CW6 stated that Zynga was first

4    informed that Facebook was planning to launch a platform change that would impact Zynga's

5    games in April 2012.  CW6 also explained that Zynga's executives knew of the change even "a

6    few months earlier," having "lots of early information and access into the Facebook change."

7    CW6 also stated that Zynga's Central Product Management Team also produced a weekly

8    report on any developments relating to the Facebook platform.  CW6 explained that any

9    potential Facebook platform changes were also written into the weekly Executive Summary that

10   went directly to Zynga's upper management.  Indeed, according to CW6, Zynga was even "beta

11   testing one game on the new Facebook" platform before the platform changes were announced.

12   CW6 further explained that two Zynga executives served on the Facebook Relationship Team.

13   **Confidential Witness No. 7**

14       86.    Confidential Witness No. 7 ("CW7") worked at Zynga as a QA Engineer and

15   Lead QA Engineer from summer 2011 until then end of 2012.  CW7 described becoming aware

16   of "significant" bookings declines in January 2012.  CW7 further witnessed teams being "shut

17   down and games not supported" and stated "it was pretty drastic."  CW7 also described delays

18   with *The Ville* and *Kingdoms* based on his work as a lead engineer on those games.

19   **VI.    EXCHANGE ACT VIOLATIONS**

20       87.    Throughout the Class Period, Defendants: (i) repeatedly assured investors that

21   Zynga's bookings were robust, despite declining DAU, when bookings were, in fact, declining;

22   (ii) represented that Zynga's new game pipeline growth was robust when it was suffering from

23   substantial delays; (iii) failed to disclose that Facebook was changing its platform in a way that

24   would materially harm Zynga's business beginning in Q2 2012; and (iv) issued positive full-

25   year 2012 guidance that was unsupportable given that bookings were declining, games were

26   being delayed and the Facebook changes would have a materially negative impact on bookings.

27

28

88.     While Zynga's stock was trading at artificially inflated prices, the Officer Defendants and other insiders obtained an early release on a lock-up of their personally held shares of Zynga common stock which allowed them to sell 49.4 million personally-held shares for approximately $593 million in proceeds less than four months before, and for the same quarter that, Zynga finally disclosed that its business had deteriorated and drastically revised its guidance for the second half of 2012.

A.      **Defendants' False And Misleading Class Period Statements And Omissions**

1.      **Defendants Misled Investors in Connection with Zynga's Fourth Quarter 2011 Results and 2012 Guidance**

89.     On February 14, 2012, the first day of the Class Period, Zynga announced its financial results for the fourth quarter and full year ended December 31, 2011 and 2012 guidance, which included the following false and misleading statements regarding bookings, game pipeline and guidance.

90.     During the February 14, 2012 earnings call, Defendant Wehner stated, "our first public quarter showed ***positive trends*** across our key operating and financial metrics.  We grew our audience and monetization to their highest levels and delivered a record quarter in terms of bookings.  We delivered solid growth in both bookings and adjusted EBITDA.  We are pleased with the results in the fourth quarter and full year 2011, ***and continue to be excited about the long-term opportunity for the business***."

91.     During the Q&A portion of the call, analyst Arvind Bhatia inquired into the trajectory of *CityVille*, specifically regarding trends in DAU versus monetization, asking, "I was wondering if you could talk about the trajectory of *CityVille*, I know you mentioned that one as doing well, and how that compares to *FarmVille*, for which I know you mentioned that in your slide presentation during the road show.  Just wondering, because we noted that the DAU trends are a little different from a trajectory standpoint, so just wondering how that translates into monetization?  Are you monetizing that sooner or you think that it's going to follow the same pattern?"  In response, defendant Schappert stated, "I'll give you a little bit of color.  ***I would***

*first say that I think it's – do not draw the same conclusion when you look at DAUs and think that you can kind of – they're directly related to the monetization.  Obviously, as we've said before, when games launch DAUs go up and then we find the DAUs go down over time and monetization increases over time.*"

92.     These statements regarding growing and record bookings (despite declining DAU) were misleading because they failed to state that bookings were actually declining for all of Zynga's games and that the declining trend had started even before the IPO.  As CW1 stated, as discussed in ¶¶67-69, *supra,* declines in bookings occurred "across the broad" in all Zynga's games and "it was the same story" for the thirty to forty games Zynga had released in mid-2011."   Confirming this, CW2 stated, as discussed in ¶¶70-72, *supra,* that "we knew the Company was not doing well before the IPO launch," as evidenced by reports showing that bookings for all games was decreasing during Q3 2011 and Q4 2011, and, by the fourth quarter of 2011, users were not spending as much on games "across the board."  Likewise, CW6 stated, as discussed in ¶¶81-84, *supra,* that the failure of games to monetize well led to bookings declines in late 2011 and into 2012, as discussed during regular meetings with Zynga's COO and various executive vice presidents to discuss Zynga's actual and expected revenues for games and upcoming quarter estimates.  CW7 also described, as discussed in ¶86, *supra,* becoming aware of "significant" bookings declines in January 2012.

93.     During the earnings call on February 14, 2012, Defendants also issued false and misleading statements regarding Zynga's pipeline of new games,  defendant Pincus stated:

> Looking forward to 2012, we're excited about the opportunities in front of us.  In the last few months, we've launched three breakout games with CastleVille, Hidden Chronicles and Scramble With Friends.  **We have a strong pipeline** [of games] **for the rest of the year** and we've seen great momentum in mobile and advertising businesses, which we expect to continue throughout 2012.

94.     Later on the call, defendant Wehner stated, "**we're excited about the pipeline of games that we have launching in 2012**.  As we've seen in the past that bookings and DAU, bookings can pick up after DAU picks up.  So, you won't necessarily get the best bookings performance in the quarters that you launch a game."

95.     These statements regarding Zynga's strong pipeline of games were false and misleading because, in fact, beginning even prior to 2012, Zynga was experiencing substantial delays of its games across the board, thus, its pipeline of games that could be released in 2012 was materially weaker than represented.  According to CW3, as discussed in ¶¶73-75, *supra* Zynga was experiencing game delays prior to 2012 and CW3 personally sent production teams to executive producers with information about the status of game delays.  CW6 also described, as discussed in ¶¶81-84, *supra*, delays including with respect to the games *CityVille 2*, *FarmVille 2*, *ChefVille*, and *Mafia Wars 2*.  CW7 reported delays with respect to the games *The Ville* and *Kingdoms*, as discussed in ¶86, *supra*.

96.     Further, in its February 14, 2012 press release on Form 8-K, Zynga announced a strong outlook for 2012, representing that: ***"[b]ookings are projected to be in the range of $1.35 billion to $1.45 billion. We expect that growth will be weighted towards the back-half of the year with slower sequential growth in the first half of the year***."

97.     These statements regarding Zynga's full-year 2012 guidance, including that growth would be more heavily weighted in the second half of 2012, were false and misleading as such guidance was unsupportable given that bookings and new game growth were significantly declining, as discussed in ¶¶92, 95, *supra*.   This guidance was further unsupportable because Facebook's online gaming platform was changing in a way that would have material adverse effects on Zynga's immediate and long-term revenue and bookings beginning in Q2 2012 due to changes with surfacing of its content (including tweaks to the News Feed algorithm that promoted newer games) and also opened an App Center to increase awareness of games by Zynga's competitors.  As relayed by CW6, as discussed in ¶85, *supra*, by this time Defendants were informed that Facebook was making these changes and had even beta tested the changes.

98.     Based on this news, Zynga common stock price closed at $14.35 on February 14, 2012, an increase of almost 7% from the previous day's closing price.  Describing these Q4 2011 results, Robert W. Baird & Co. analyst Colin Sebastian stated, "[i]n terms of Zynga

1    coming out of the gate, they exceeded consensus and they're guiding to a pretty good growth

2    number."

3

### 2.   Zynga's Annual Report on 2011 Form 10-K Contained False and Misleading Statement and Material Omissions

4

5    99.    On February 28, 2012, Zynga filed its Annual Report on Form 10-K ("2011

6    Annual Report") with the SEC for the 2011 fiscal year.  With respect to Facebook, the 2011

7    Annual Report stated that "[w]e expect to continue to derive a substantial portion of our

8    revenue and to acquire a substantial portion of our players from the Facebook platform for the

9    foreseeable future."  The 2011 Annual Report further stated:

10   **Factors Affecting Our Performance -** *Changes in Facebook or other platforms.*
     Facebook is the primary distribution, marketing, promotion and payment platform

11   for our social games. We generate substantially all of our bookings, revenue and
     players through the Facebook platform and expect to continue to do so for the

12   foreseeable future.  ***Facebook and other platforms have broad discretion to
     change their platforms, terms of service and other policies with respect to us or***

13   ***other developers, and those changes may be unfavorable to us***.

14                              *        *        *

15   **Risks Related to Our Business and Industry –** ***If we are unable to maintain a
     good relationship with Facebook, our business will suffer. -*** Facebook is the

16   primary distribution, marketing, promotion and payment platform for our games.
     We generate substantially all of our revenue and players through the Facebook

17   platform and expect to continue to do so for the foreseeable future.  ***Any
     deterioration in our relationship with Facebook would harm our business and***

18   ***adversely affect our operating results.***

19                              *        *        *

20   ***Our business would be harmed if***:

21   • ***Facebook discontinues or limits access to its platform by us and other game
     developers…***

22   • Facebook modifies its terms of service or other policies, including fees charged
     to, or other restrictions on, us or other application developers, or ***Facebook***

23   ***changes how the personal information of its users is made available to
     application developers on the Facebook platform or shared by users;***

24   • ***Facebook establishes more favorable relationships with one or more of our***

25   ***competitors***…

26   100.    These statements were false and misleading because they failed to disclose that

27   Facebook's online gaming platform ***was*** changing in a way that would have material adverse

28

---

effects on Zynga's immediate and long-term revenue and bookings beginning in Q2 2012 as set forth in ¶97, *supra*.

### 3.  The Secondary Offering Materials Contained False and Misleading Statements

101.   On March 14, 2012, Zynga filed a Form S-1 Registration Statement and Prospectus with the SEC in connection with a secondary offering of 42,969,153 shares of Zynga's Class A common stock, amended versions of which were filed on March 23, 2012 and on March 29, 2012, (together, the "Secondary Offering Materials") for certain insider shareholders, which included the Officer Defendants.

102.   Regarding Facebook, the Secondary Offering Materials stated that "[c]urrently, substantially all of our revenue is generated from players accessing our games via the Facebook platform." The Secondary Offering Materials further stated:

> **Factors Affecting Our Performance -** *Changes in Facebook or other platforms.* Facebook is the primary distribution, marketing, promotion and payment platform for our social games. We generate substantially all of our bookings, revenue and players through the Facebook platform and expect to continue to do so for the foreseeable future. ***Facebook and other platforms have broad discretion to change their platforms, terms of service and other policies with respect to us or other developers, and those changes may be unfavorable to us***.
>
> *       *       *
>
> **Risks Related to Our Business and Industry –** ***If we are unable to maintain a good relationship with Facebook, our business will suffer. -*** Facebook is the primary distribution, marketing, promotion and payment platform for our games. We generate substantially all of our revenue and players through the Facebook platform and expect to continue to do so for the foreseeable future. ***Any deterioration in our relationship with Facebook would harm our business and adversely affect the value of our Class A common stock.***
>
> *       *       *
>
> ***Our business would be harmed if***:
> • ***Facebook discontinues or limits access to its platform by us and other game developers…***
> • Facebook modifies its terms of service or other policies, including fees charged to, or other restrictions on, us or other application developers, or ***Facebook changes how the personal information of its users is made available to application developers on the Facebook platform or shared by users;***

**•** ***Facebook establishes more favorable relationships with one or more of our*** ***competitors***…

103.   These statements regarding Facebook were false and misleading because they failed to disclose that Facebook's online gaming platform ***was*** changing in a way that would have material adverse effects on Zynga's immediate and long-term revenue and bookings beginning in Q2 2012 as set forth in ¶97, *supra*.

### 4.   Defendants Misled Investors in Connection with Zynga's First Quarter 2012 Results and Revised 2012 Guidance

104.   On April 26, 2012, Zynga announced its financial results for Q1 2012 and revised 2012 guidance, which announcements included the following false and misleading statements regarding bookings and guidance.

105.   In Zynga's April 26, 2012 press release on Form 8-K with the SEC announcing its financial results for Q1 2012, Zynga touted its growth in both web and mobile bookings, ***reporting "highest ever" bookings*** of $329 million for the quarter, up 15% year-over-year and up 7% from the fourth quarter 2011.

106.   During the earnings call the same day, defendant Wehner provided the following update on Zynga's record bookings for the quarter:

> We manage our business on bookings, which is a key indicator of top line performance. ***Q1 bookings were strong***, reaching $329 million, up 15% year-over-year and 7% quarter-over-quarter. ***This was our third quarter of*** ***accelerating bookings growth on a sequential basis, and both web and mobile*** ***bookings were up year-over-year.***
>
> *          *          *
>
> In the first quarter the total bookings from games that are more than a year old was approximately 80% of what those games delivered in the first quarter of 2011. The key takeaways here are twofold. ***One, we had a stable base of*** ***bookings from existing games.***   And two, there's not always a direct correlation between bookings growth and publicly available DAU data which showed a steeper decline year-over-year.
>
> *          *          *
>
> Q1 was a great quarter with strong organic performance across our key operating and financial metrics. We grew our audience 25% year-over-year, and delivered ***record bookings*** with significant margin expansion quarter-over-quarter. We're

1    pleased with our results and excited about the future of play and the long-term
opportunity for our business.

2    107.    Defendant Schappert stated:

3    ***Our core portfolio of games, which includes FarmVille, CityVille, CastleVille
and Zynga Poker, continues to generate solid bookings*** . . . I'm happy to report
4    that ***our core portfolio of games remains healthy and continues to provide solid
bookings***.

5

6    108.    During the Q&A portion of the first quarter earnings call, there was also a detailed

7    exchange related to declines in DAU in relation to bookings.  Arvind Bhatia of Sterne Agee

8    inquired, "I just have one quick question and that is essentially on FarmVille. With the DAU

9    now under 5 million, I wonder if you could maybe update that slide that you had provided on

10   the road show, where you talked about the trajectory of FarmVille.  And again, I know you

11   gave a general idea of your top games from last year and this year, but could you hone in a little

12   bit more on FarmVille."  In response, defendants Wehner and Schappert stressed that DAU

13   were not the full picture on monetization, specifically referencing Defendants' comments in

14   connection with the IPO:

15   [Wehner]  We continue to see FarmVille performing well and we see good
prospects for FarmVille and our existing games and new games for the remainder
16   of the year, ***which is why we're excited and comfortable raising guidance for the
year***….

17
[Schappert]  I just wanted to circle back and remind on that slide that we had in
18   the road show that you are speaking to. ***One of the key points on that slide was
that daily active users and monetization are not directly related.  In fact, what
19   we talked about was DAU rise at the launch of the game they trail off over time,
while revenues and monetization frankly does the opposite.***  So FarmVille is
20   nearing in on celebrating its three-year anniversary and it's a strong contributor
and we expect continued good things from FarmVille for the remainder of the
21   year.

22   109.    Likewise, in its May 8, 2012 Quarterly Report on Form 10-Q for Q1 2012 with

23   the SEC, in describing the Company's operations, including the number of DAU, Zynga again

24   directed investors towards bookings and away from the "short term" reported number of daily

25   or monthly users.  Specifically, Zynga stated:  "***Our operating metrics may not correlate

26   directly to quarterly bookings or revenue trends in the short term***.  For instance, revenue has

27

28

grown every quarter since our inception, including in quarters where DAU, MAU and MUU did not grow."

110.    These statements regarding growing and record bookings (despite declining DAU) were misleading because they failed to disclose that, as confirmed by CWs 1, 2, 6 and 7, bookings were significantly declining for all of Zynga's games, as set forth in ¶92, *supra*.

111.    During the first quarter earnings call, defendant Schappert made false and misleading statements regarding Zynga's pipeline of new games.  Schappert stated, "***[l]ooking ahead, we're excited about our game pipeline for the rest of the year.***"  Further, during the Q&A portion of the first quarter earnings call, regarding upcoming game launches, Schappert stated, "We have ***a nice pipeline*** of games beyond that and ***a strong pipeline*** of mobile titles ***too***.  So, we feel good about the remainder of the year" and "we have ***a very healthy pipeline*** of new games coming on both mobile and on web."

112.    These statements regarding Zynga's strong pipeline of games were false and misleading because, in fact, as relayed by CWs 3, 6, and 7, Zynga was experiencing substantial delays of its games across the board, thus, its pipeline of games that could be released in 2012 was materially weaker than represented, as set forth in ¶95, *supra*.

113.    In its May 8, 2012 Quarterly Report on Form 10-Q for Q1 2012 with the SEC, Zynga boasted that it expected to enjoy growth in the future, stating "[w]e generate substantially all of our revenue and players through the Facebook platform and ***expect to continue to do so for the foreseeable future***."  The 10-Q for Q1 2012 further stated:

> **Factors Affecting Our Performance -** *Changes in Facebook or other platforms.* Facebook is the primary distribution, marketing, promotion and payment platform for our social games.  We generate substantially all of our bookings, revenue and players through the Facebook platform and expect to continue to do so for the foreseeable future.  ***Facebook and other platforms have broad discretion to change their platforms, terms of service and other policies with respect to us or other developers, and those changes may be unfavorable to us***.
>
> *       *       *
>
> **Risks Related to Our Business and Industry –** ***If we are unable to maintain a good relationship with Facebook, our business will suffer. -*** Facebook is the primary distribution, marketing, promotion and payment platform for our games. We generate substantially all of our revenue and players through the Facebook

platform and expect to continue to do so for the foreseeable future. *Any deterioration in our relationship with Facebook would harm our business and adversely affect the value of our Class A common stock.*

\*       \*       \*

*Our business would be harmed if*:
• *Facebook discontinues or limits access to its platform by us and other game developers*…
• Facebook modifies its terms of service or other policies, including fees charged to, or other restrictions on, us or other application developers, or *Facebook changes how the personal information of its users is made available to application developers on the Facebook platform or shared by users;*
• *Facebook establishes more favorable relationships with one or more of our competitors*…

114.    These statements regarding Facebook were false and misleading because they failed to disclose that Facebook's online gaming platform *was* changing in a way that would have material adverse effects on Zynga's immediate and long-term revenue and bookings beginning in Q2 2012, as set forth in ¶97, *supra*.

115.    In its Q1 2012 announcements, Zynga also raised its already positive February 14, 2012 guidance for its fourth quarter and full year 2011 financial results *from $1.35 to $1.45 billion to $1.425 billion to $1.5 billion in bookings*.  Zynga's April 26, 2012 press release proclaimed that "[w]e expect that *growth will be weighted towards the second half of the year*."

116.    In further conveying a positive guidance for 2012, including an emphasis on bookings being more heavily weighted towards the second half of 2012, during the earnings call, Defendant Wehner said:

Our business continues to track well against the original guidance we gave in February.  And we're increasing bookings guidance today to reflect the recent acquisition of OMGPOP.  Note, however, that *we continue to expect growth to be weighted towards the second half of the year*.

117.    Likewise, defendant Schappert stated "[w]e delivered a strong first quarter with *record bookings* and strong audience growth, and *we're raising bookings and EBITDA guidance for the year*."

118.    These statements regarding Zynga's full-year 2012 guidance, including that growth would be more heavily weighted in the second half of 2012, were false and misleading as such guidance was unsupportable given that bookings and new game growth were significantly declining and the changes Facebook was making to its platform for games would have a significant negative impact on bookings for Zynga's games going forward, as set forth in ¶97, *supra*.

### 5.    Defendant Wehner's Statements at the J.P. Morgan Global Technology, Media and Telecom Conference Were Materially False and Misleading

119.    On May 16, 2012, only two months before Zynga's July 2012 negative announcement, Defendant Wehner spoke at the J.P. Morgan Global Technology, Media and Telecom Conference.  At the conference, Wehner stressed that Zynga was able to ramp up bookings:

> *What we're seeing with our cross promo ability is an ability to get DAUs and bookings ramped up relatively quickly*. And so we've seen success, for instance, with CastleVille in its first quarter after a launch, even on a smaller DAU base than CityVille had, delivered approximately the same level of bookings in its first quarter out that CityVille did.  *So we are seeing good performance in terms of being able to ramp bookings up quickly.*  I would say FarmVille is a good example in the past, that game ramped up fairly slowly in terms of DAU and ramped up bookings fairly slowly. *We're clearly seeing these games being able to ramp up more quickly with our – with our cross promotion.*

120.    Defendant Wehner's statement about ramping up bookings prompted a question from the moderator, J.P. Morgan analyst, Douglas Anmuth, regarding Defendants' oft-repeated mantra that bookings go up after DAU go down.  Specifically, Wehner was asked, "in thinking about that bookings sort of trajectory, you've typically shown in some of these games that your DAUs can go down, your bookings can continue to actually go up as you're hitting perhaps a more core base of users?"  Wehner responded, "*Correct.*"  Wehner was then asked, "How do you think about that trajectory, now it feels like things are maybe happening a little bit quicker out of the gate, what do we know about the next period?"  In response, Wehner stated:

> *Yeah, and we still see that same trajectory* as we bring in DAUs of people who are trying the game early on, they may or may not stick with the game.  You're going to get a lower percentage of those users paying than you will when the game gets older, and the people who are just trying but not as committed to the

game are now not playing it anymore. *So you do see over time the same sort of trends. You'll see ARPU increases in games as they get longer in their life cycle because you're retaining that committed payer base and we're continuing to see that trend repeat*.

121.   These statements regarding ramping up bookings (despite declining DAU) were misleading because they failed to disclose that, as confirmed by CWs 1, 2, 6 and 7 bookings were significantly declining for all of Zynga's games, as set forth in ¶92, *supra*.

122.   In addition, with respect to the strength of Zynga's pipeline for the rest of 2012, and beyond, during the May 16, 2012 J.P. Morgan Global Technology, Media and Telecom Conference, analyst Douglas Anmuth asked defendant Wehner "[a]nd how far out do you think about the gaming pipeline?  I mean do you know what you're doing in 2013 and 2014 at this point?"  Defendant Wehner answered "2013 *we've got a pretty idea of what the pipeline looks like*."

123.   These statements regarding Zynga's strong pipeline of games were false and misleading because, in fact, as relayed by CWs 3, 6, and 7, Zynga was experiencing substantial delays of its games across the board, thus, its pipeline of games that could be released in 2012 was materially weaker than represented, as set forth in ¶95, *supra*.

**B.   Additional Allegations Regarding Defendants' Scienter**

124.   The Officer Defendants' scienter is established by: (1) their knowledge and/or recklessly disregard that Zynga's bookings were declining, game launches were being delayed, and that Facebook was implementing a change to its platform which would adversely impact Zynga; (2) their successful efforts to obtain a waiver of the post-IPO lock-up restrictions so that they could sell *over 17.2 million shares* at inflated prices; and (3) their manipulation of applicable WALs for virtual goods in order to increase reported revenue leading up to the IPO and Secondary Offering.

**1.   The Officer Defendants Were Either Aware Of Or Recklessly Ignored That Bookings Were Falling, that Game Launches Were Delayed, and that Facebook was Making Platform Changes that Would Adversely Impact Zynga**

125.   The Officer Defendants were directly provided with and/or had access to numerous internal reports and data that closely tracked the Company's bookings for its games.

1   As the reports and data tracked all of the Company's bookings, they clearly revealed the

2   decrease in bookings described by the CWs that directly impacted its current and future

3   reported revenue and earnings.

4          126.    Indeed, as described by CWs 1-6, as discussed in ¶¶67-84, *supra*, Zynga used an

5   in-house computer system to track bookings in each game on a real-time basis.   Thus, the

6   Officer Defendants had constant access to real-time bookings numbers.

7          127.    Further, CW4 relayed, as discussed in ¶77, that bookings and revenue results would

8   be "bubbl[ed] up" to E-Staff by studio general managers and head product managers and that a

9   "weekly report was sent to higher ups" regarding these numbers.  According to CW4, "Mark Pincus

10  and John Schappert were aware of what was going on" in bookings, revenue and financial results.

11         128.    CW2 described, as discussed in ¶¶70-72, reports which provided a detailed

12  breakdown by game of all the money game users were spending on Zynga's games which showed

13  that bookings for all games was decreasing by Q3 2011 and Q4 2011.   CW2 also described daily

14  user and spending reports that were generated in Zynga's headquarters.    With respect to

15  management's knowledge of the information put in the reports and how each game was doing, CW2

16  believed that "Pincus had access to everything – it was his company."

17         129.    The Officer Defendants also were directly provided with and/or had access to

18  information regarding the substantial delays of Zynga's games.  As CW6 plainly reported, as

19  discussed in ¶84, "Management was always aware of delays."  According to CW6, whether a game

20  was in "design mode, beta testing or pre-launch," each game's status was provided to Zynga's

21  executive management in the weekly Executive Summary.  In addition to an Executive Summary

22  provided to Zynga's management, CW6 stated that Zynga's Central Product Management Team,

23  referred to also as the "Central Product Office," projected when each new game would be launched

24  and how much money it was likely to earn.  The Central Product Office made revenue projections

25  for games with information provided to it by general managers, senior Product Managers, Product

26  Managers and team leads.  Thus, CW6 asserted that "there was no reason for the executive team not

27  to be fully aware" of any game delays.

28

1    130.    According to CW3, as discussed in ¶75, Zynga's management knew of game

2    delays prior to 2012.   CW3 personally sent production teams to executive producers with

3    information about the status of game developments and delays who would then inform division

4    directors of these meetings, and those division directors would report to Zynga management.   CW3

5    recalled David Ko "constantly asking why hasn't this game been released? Why is this taking so

6    long?"   CW3 believed that Ko was in constant contact with Zynga's top executives about the status

7    of game developments and delays.   According to CW3, there was "no way" top executives could

8    not know about all the game delays.

9    131.    Finally, regarding the changes to the Facebook platform which were a

10   substantial factor for Zynga's disastrous Q2 2012 results, as of the beginning of the Class

11   Period, the Officer Defendants were informed of, or recklessly disregarded, that the changes

12   would be occurring.   CW6 said, as discussed in ¶85, that he/she was first informed that

13   Facebook was planning to launch a platform change that would impact Zynga's games in April

14   2012, but that even before Zynga employees were informed, Zynga's executives "knew a few

15   months earlier" – *i.e.*, at the start of the Class Period.   CW6 stated that executives "had lots of

16   early information and access into the Facebook change."   According to CW6, Zynga's Central

17   Product Management Team   produced a weekly report on any developments relating to the

18   Facebook platform and any potential Facebook platform changes was also written into the

19   weekly Executive Summary that went directly to Zynga's upper management.   In fact, CW6

20   disclosed that Zynga was even "beta testing one game on the new Facebook" platform before

21   the changes were announced.    According to CW6, two Zynga executives served on the

22   Facebook Relationship Team.

23

24   **2.     The Officer Defendants Sought and Obtained a "Lock-Up"
            Waiver to Engage in Massive Insider Trading**

25   132.    On March 14, 2012 and March 23, 2012, Zynga filed its Secondary Offering

26   Registration Statements and Prospectuses stating that the Officer Defendants and other insiders

27   were being released "from these lock-up[] [agreements] to permit them to sell up to

28

1    49,414,526 shares (including the underwriters' option to purchase additional shares)" in the

2    Secondary Offering. The Registration Statements and Prospectuses stated that "[t]he selling

3    stockholders will receive all of the net proceeds from this offering" and "[Zynga] will not

4    receive any proceeds from the sale of shares in this offering."

5    133.   On April 3, 2012, Zynga issued a press release entitled "Zynga Announces

6    Closing of Secondary Offering," announcing the completion of the Secondary Offering and

7    reporting that the Officer Defendants and other insiders had sold their shares pursuant to the

8    Secondary Offering at **$12.00 per share**.  This was done in the **same** quarter for which Zynga

9    later announced its disastrous results, driving Zynga stock down over 37% in one day to a price

10   of **$2.97 per share**.[5]

11   134.   Specifically, as to the Officer Defendants:  (i) defendant Pincus sold 16.5 million

12   shares of Zynga common stock for proceeds of approximately $192 million, these shares

13   represented about 16% of his holdings in the Company; (ii) defendant Wehner sold 386,865

14   shares of Zynga common stock for proceeds of over $4.5 million, these shares represented

15   about 67% of his holdings in the Company; and (iii) defendant Schappert sold 322,350 shares

16   of Zynga common stock for proceeds of over $3.75 million, these shares represented about 84%

17   of his holdings in the Company.

18   135.   Other Zynga officers and directors also profited from unloading shares in the

19   Secondary Offering: (i) Reid Hoffman, who served as a director of Zynga since January 2008 sold

20   687,626 shares of Zynga common stock for proceeds of over $8 million, these shares

21   represented about 15% of his holdings in the Company; (ii) Owen Van Natta, who served as a

22   director of Zynga since August 2010 and Zynga's Executive Vice President and Chief Business

23   Officer from August 2010 to November 16, 2011 sold 505,267 shares of Zynga common stock

24   for proceeds of over $5.88 million, these shares represented about 88% of his holdings in the

25

26   [5]  Attached as Exhibit 2 is a chart evidencing the Officer Defendants' and other Zynga officers'
     trading during the Class Period.  As the chart indicates, at a time when Zynga was touting
27   positive growth and increased revenues in 2012, the Officer Defendants dumped large amounts
     of their holdings and reaped millions from the sales.
28

1   Company; (iii) Mark Vranesh, who has served as Zynga's Chief Accounting Officer since August

2   2010 and as Zynga's CFO since November 13, 2012, sold more than 366,216 shares for proceeds

3   of over $4.26 million, these shares represented about 17% of his holdings in the Company;

4   (iv) Cadir B. Lee, who has served as Zynga's Chief Technology Officer and Executive Vice

5   President since November 2008, sold 1,171,644 shares of Zynga common stock for proceeds of

6   over $13.6 million, these shares represented about 92% of his holdings in the Company; and

7   (v) Reginald D. Davis, who has served as Zynga's Senior Vice President and General Counsel

8   since May 2009 and as Zynga's Secretary since August 2009, sold 314,643 shares of Zynga

9   common stock for proceeds of over $3.6 million, these shares represented about 86% his

10  holdings in the Company.

11      136.    The Officer Defendants and other Zynga officers disposed of additional holdings

12  in the Class Period outside of the Secondary Offering: (i) defendant Schappert sold 330,846 for

13  proceeds of over $4.28 million; (ii) defendant Wehner sold 130,491 shares for proceeds of over

14  $1.3 million; (iii) Davis sold 29,999 shares for proceeds of over $247,900; and (iv) Vranesh

15  sold 9,294 shares for proceeds of over $76,800.

16      137.    The Officer Defendants' trading was unusually large and also suspiciously

17  timed.  Given that the Class Period starts while the Officer Defendants' shares were still locked-

18  up and just two months after the IPO, no comparison can or should be done with their pre-Class

19  Period trading for several reasons, including that: (i) there was no liquid market for their shares

20  prior to the IPO; (ii) they did not need to publicly report their trading prior to the IPO; (iii) a

21  large portion of their options only vested upon the satisfaction of a liquidity condition which

22  was only satisfied once Zynga raised approximately $1 billion in the IPO; and (iv) their shares

23  were locked-up until they were able to obtain an early release to engage in the Secondary

24  Offering.

25      138.    The sheer volume and percentages of holdings sold is unusually large.

26  Moreover, although the Officer Defendants did not sell the entirety of their stakes (while some

27

28

came quite close), this appears only to be because of the fact that the amendment to the lock-up agreement capped the amount of shares that could be sold in the Secondary Offering.

139.    Further, the sales are highly suspicious and unusual as the Secondary Offering sales were only possible because of the lock-up release.  These sales are also highly suspicious because they occurred less than four months before the fraud was revealed and Zynga announced its dismal and shocking earnings results for Q2 2012 (the very same quarter in which these sales occurred) and revised 2012 guidance that slashed the prior guidance by approximately 50% and which sent Zynga's stock plummeting to $2.97 per share, an astounding 75% decrease from the price at which the Officer Defendants took advantage of in the Secondary Offering.

140.    As noted by a July 26, 2012 *Yahoo Finance* article entitled "Zynga Insiders Who Cashed Out Before The Stock Crashed," "Zynga insiders cashed out at **exactly** the right time." (Emphasis in original).  A July 26, 2012 news article by *Gamasutra*, an online version of Game Developer magazine, entitled "Zynga CEO cashed out for $200M before stock implosion" pointed out, the "fortunate timing of [Zynga insiders] cashouts – conducted in the same quarter when Zynga's business appeared to deteriorate to the point that its share prices collapsed once investors were updated on its status – has raised a few eyebrows."

141.    In a post on *Business Insider*, Henry Blodget also cited the suspicious timing of the insider sales, saying it "doesn't look very good" considering the insider sales occurred in the same quarter that Zynga's business "imploded."  Likewise, Sterne Agee analyst Arvind Bhatia stated in a July 26, 2012, report, "[g]iven [that] the company completed a secondary offering in early April at $12 a share, based on significantly higher projections, management will likely be in the penalty box with investors for quite some time."  Further, on July 25, 2012, *Reuters* reported that the insider selling in April, 2012, "now seems especially well-timed."

142.    In fact, during Zynga's July 25, 2012 earnings call, the Officer Defendants declined to address the timing of their sales.  BTIG analyst Greenfield questioned defendant Pincus about the timing of his sales of his personally held shares.  In his response, defendant

1    Pincus flatly ignored the question.  Greenfield then issued a report with "an interesting timeline

2    showing how management sold stock with guidance increasing in April before radically reducing

3    full-year guidance in July."  The next day he stated, "what I think is so shocking, as an analyst

4    and more broadly, for investors who are involved [in] this stock is that you have the company,

5    you know, management including the founder was selling stock back in March at $12 a share in

6    a secondary offering.  They raised guidance at the end of April, right, and in just a span of three

7    months, in three months, guidance cut in half from where they raised it back at the end of

8    April."

9            3.      **Zynga Reduced the WALs Applied to Virtual Goods To**
                     **Manipulate Its Revenue Figures In Order To Artificially**
10                   **Inflate The Then-Current Condition Of Its Business**

11   143.    In an article entitled "Zynga CEO Mark Pincus: 'I Did Every Horrible Thing in the

12   Book Just to Get Revenues,'" defendant Pincus is quoted from a speech he gave during the spring

13   of 2009 stating:

14           I knew I needed revenues, right, f--king, now.  Like I needed revenues now.  So I
             funded the company myself but ***I did every horrible thing in the book to, just to***
15           ***get revenues right away***. …We did anything possible just to get revenues …

16   144.    Unfortunately for investors, defendant Pincus' misconduct persisted after the

17   Company went public.  Because of how Zynga recognized revenue for durable goods, the

18   Officer Defendants were able to take creative accounting measures to manipulate its recognition

19   of revenue.  Specifically, the Officer Defendants were able to, and did, shorten the WAL of its

20   virtual goods in order to pull revenue forward leading up to the IPO and in Q1 2012 leading up

21   to the Secondary Offering and thereby recognize revenue sooner and inflate Zynga's net

22   income.  The shorter the WAL that Zynga assigned to a virtual durable good, the larger the

23   amount of revenue it could recognize in the immediate, short-term period.

24   145.    The effect of this was to make Zynga's business appear to be better than it was

25   short-term leading up to the IPO and for Q4 2011 and Q1 2012, while also raising 2012

26   guidance and emphasizing that Zynga would experience most of its growth in the second half of

27   2012. Zynga reduced its WAL for durable goods from 18 months at the end of 2010 to 15

28

1    months during the six months ended June 30, 2011, which led to an increase in revenue of

2    $27.3 million and turned a loss for the six months ended June 30, 2011 into a net profit of $18.1

3    million.  Overall, in 2011, the cumulative changes in Zynga's WAL for durable virtual goods

4    resulted in a net increase in revenue of $53.9 million.  Further, for Q1 2012, Zynga reduced its

5    WAL for durable goods yet again from 15 months to 13 months, which led to a $10 million

6    increase in revenue for Q1 2012.

7           146.   By recognizing revenue more quickly and deferring losses into future periods,

8    the Officer Defendants had shifted losses from Q1 2012 to Q2 2012 to sell their shares before the

9    Company's negative Q2 2012 announcement hammered the Company's stock price.  Indeed,

10   buried deep in the Secondary Offering Registration Statement (in the index 150 pages into the

11   Registration Statement), Zynga vaguely described how "[c]umulative changes in estimated

12   average playing period for paying players in 2011 resulted in an increase in revenue of $53.9

13   million and will result in an offsetting reduction of 2012 revenue in the same amount."  By

14   burying this vague statement in the Registration Statement after reducing its WAL for durable

15   goods yet again from 15 months to 13 months in Q1 2012, the Officer Defendants kept the price

16   of Zynga's stock artificially inflated just long enough to maximize the return on their illicit

17   stock sales on April 3, 2012.

18          147.   In sum, with access to real-time bookings data, the Officer Defendants took

19   creative accounting measures to manipulate Zynga's recognition of revenue in order to artificially

20   inflate Zynga's reported revenue prior to Zynga's announcement of its Q2 2012 earnings disaster.

21          148.   An August 10, 2012, *Seeking Alpha* news article entitled "Zynga's Real Game

22   Could Be Fraudville" described this timing as follows:

> ***Zynga used a combination of GAAP and Non-GAAP accounting to offset losses
> and inflate their stock price*** before issuing a waiver so select insiders could offload
> their stock at $12.00 a share and then posted those offset losses to Q2 after the
> insiders sold millions of shares.
>
>                                    * * *
>
> Zynga went public in December of 2011 with a stock price of $10 a share.  A Positive
> 1Q helped raise the stock price to above $12 a share.  Early investors and company
> employees had a lock-up period and were unable to sell their shares until May 28th of

2012.  Zynga filed an amendment to the form S-1 which *waived* the lockup restriction allowing a select group of insiders to dump shares.  Using Underwriters Morgan Stanley and Goldman Sachs, those insiders offloaded $515 million worth of shares on April 3rd at $12 a share.  ***Because of Zynga's creative Non-GAAP accounting they were able to shift previous losses from Q1 to Q2 and the insiders dumped shares before the dismal Q2 report.  Coincidence?"***

## VII.    LOSS CAUSATION

149.    On July 25, 2012, Zynga announced its financial results for Q2 2012, reporting substantially lower than expected earnings and issuing a dismal forecast for the rest of the year, sharply lowering its 2012 guidance.[6]  Zynga reported a net loss of $22.8 million in the second quarter compared to a net income gain of $1.4 million for the same quarter of 2011.  ***Zynga's gross bookings for the second quarter decreased*** 8.3% to $301.6 million, compared to $329 million for the first quarter.

150.    During Zynga's earnings call later that day, defendants Pincus and Wehner stated that the most significant reason for Zynga's poor Q2 2012 results was declines in engagement and bookings for Zynga's web games with the second biggest factor being the delayed launch of *The Ville*.  Likewise, Zynga attributed the need to slash guidance for 2012 to ***declines in bookings in existing web games and delays in launching new games***.  During the call, defendant Wehner stated that the dramatic forecast reduction reflected the ongoing trends in Zynga's business, with the largest impact being the poor performance of its existing games in the second quarter, an issue they expected would persist into the back half of the year.  ***Defendant Wehner further stated on that call that this decline in bookings began no later than early in the second quarter.***

151.    Defendant Pincus reiterated that "[t]hree factors impacted our Q2 results.  First, we saw ***declines in engagement and bookings*** for our web games due in part to changes Facebook made to their platform. Second, we launched The Ville later than expected in the quarter.  And third, *Draw Something* underperformed versus our early expectations."  During the call, when asked to clarify the order of magnitude of these three negative effects relative to

---

[6]  These results were subsequently reported on July 30, 2012 in the Form 10-Q filed by Zynga with the SEC.

2012 guidance cited by Zynga management, Wehner responded that "[w]e laid out the impacts in the order of their size; we're not giving specificity around that in terms of the quarter, but the existing games were the largest impact followed by The Ville and then followed by Draw Something."

152.     Moreover, during that July 25, 2012 call, defendant Wehner acknowledged that:

We are lowering our outlook to reflect *delays in launching new games, a faster decline in existing web games gains due in part to a more challenging environment on the Facebook web platform*, and reduced expectations for Draw Something.  I want to note that our cost base is largely fixed, so reduced bookings will have a significant impact on adjusted EBITDA. As a result, we now expect to deliver bookings in 2012 between $1.15 billion and $1.225 billion, adjusted EBITDA between $180 million and $250 million, and non-GAAP EPS between $0.04 and $0.09 per share[.]

153.     Defendant Wehner further stated that "I want to clarify that the largest reason for us decreasing our guidance has to do with the performance of our existing games."  With respect to Zynga's drastic reduction in expected 2012 EBITDA, Wehner disclosed that, "[i]n terms of the year, the big impact is the decrease in the bookings.  There's no increase in spend in the year, it's really the decrease in the bookings that's driving the EBITDA outlook."

154.     Notably, during the second quarter earnings call, analyst Richard Greenfield of BTIG pointed out the fallacy in Zynga management's previous statements, continuously representing that bookings and growth would be weighted in the second half of 2012 and then suddenly revealing that guidance for the full year of 2012 was being drastically lowered:

**Q - Richard Greenfield**:

Hi, I've actually got a few questions.  Mark, I wanted to explore, you talked about the fact that I think you missed EBITDA, at least in terms of our expectations or Street expectations, by $25 million to $30 million, *but you're lowering the full-year guidance by somewhere around $200 million.  You mentioned that you are excited about your prospects for the second half, but trying to just walk through how do you put those two statements, given the significant reduction in the back half relative to what happened during the second quarter and even what would happen during the third quarter?*  . . .

**A - David M. Wehner**:

In terms of the full-year guidance and how it relates to what we experienced in the second quarter, we are factoring in the experience that we had in the second quarter on the impact that the weakness that we saw in existing games as well as

delays in new game launches and the underperformance of Draw Something.  So all of those things are factoring into the outlook that we're providing for the full year. ***The full-year outlook in terms of bookings has obviously been reduced and that has a dramatic impact on EBITDA***, given the relatively fixed cost structure of the business, given that we're continuing to invest for long-term growth.  ***So that's what's leading to the change in guidance on EBITDA that is obviously significant.***  . . .

**Q - Richard Greenfield**:

But I think just before you go to Mark on the last question, you specifically said that you were excited about your second half prospects. Given the magnitude of the decline in EBITDA in the back half of the year in the guidance, it just, I guess the question is you've always said the year is very back half weighted, it seems that you were always excited about the back half of the year and all the things that were going on in the back half of the year. Yet, almost the entire majority of the downgrade to guidance, is due to the back half of the year and it's just, ***it's very hard to foot those two statements.***

155.    Zynga also severely lowered its earnings projections to a range of 4-cents to 9-cents a share, compared to its prior expected range of 23-cents to 29-cents a share.  Moreover, Zynga slashed its full-year adjusted EBITDA guidance in half from $400-450 million to $180-250 million.  In its July 25, 2012 press release, Zynga attributed its reporting of revenue of only $332 million versus the analyst-projected $344 million and earnings of 1-cent per share instead of the projected 6-cents per share, and Zynga's need to slash guidance for 2012 "to reflect delays in launching new games, a faster decline in existing web games due in part to a more challenging environment on the Facebook web platform, and reduced expectations for *Draw Something*."

156.    These drastic changes in 2012 guidance offered a conspicuously different assessment from Zynga's management only three months after Zynga had raised its 2012 guidance in Q1 2012 earnings announcement, consistently stressing that bookings and game monetization would be weighted more heavily in the second half of 2012.  In turn, investors and analysts alike expressed their shock at Zynga's lower than expected earnings and lowered 2012 guidance, as Zynga's July 25, 2012, announcement directly contradicted the statements previously made by Zynga's management.

157.    Upon announcement of Zynga's Q2 2012 results and drastically lowered outlook for the remainder of 2012, shares of Zynga common stock plummeted over 37% in one day

1  down from a July 25, 2012 close of $5.08 to a July 26, 2012 close of $3.18 per share on

2  extremely high volume.   This drop represented a loss of 70% of Zynga's stock value from its

3  December 2011 IPO price and a loss of over 81% compared to the March 2, 2012 Class Period

4  trading high of $15.91 per share.[7]  To put Zynga's freefall into perspective, several analysts

5  reported that Zynga's market value had plummeted down to "nothing."

6          158.    The decline in Zynga common stock price was a direct result of the nature and

7  extent of Defendants' false and misleading statements and omissions being revealed to the

8  market.   The adverse consequences of the July 25, 2012 disclosures were entirely foreseeable to

9  Defendants at all relevant times.   There was no other direct intervening or independent cause of

10  the stock price decline.   The timing and magnitude of the common stock price decline negates

11  any inference that the loss suffered by Plaintiff and other members of the Class was caused by

12  changed market conditions, macroeconomic or industry factors or Company-specific facts

13  unrelated to Defendants' reckless conduct.   The economic loss, *i.e.,* damages, suffered by the

14  Plaintiff and other Class members was a direct result of Defendants' artificial inflation of

15  Zynga's common stock price and the subsequent significant decline in the value of the Zynga's

16  common stock when the Defendants' prior misrepresentations and other fraudulent conduct was

17  revealed.

18          159.    On July 26, 2012, a *Tech Trader Daily* article entitled "ZNGA Zapped: Six

19  Downgrades; 'Disaster,' 'Gruesome'; Broken?" reported that "[t]he main focus of concern this

20  morning is the 16% quarter-over-quarter drop in what the company calls 'average daily

21  bookings per daily active user,' or 'ABPU,' which seemed to point to weaker 'monetization' of

22  its games."   The article further noted that analysts' "[p]rice targets and estimates are going

23  down across the board, and the stock was cut to Hold or lower by about six different analysts

24  this morning."   In a published research note, analyst Greenfield added that:

25

26

27  [7]  Zynga's stock plunge was so abrupt and steep that it triggered the SEC's so-called alternative
    uptick rule, which aims to limit the impact of short sellers on a stock price.

28

1

we firmly believed that the small fraction of Zynga users who pay was increasing and that monetization per user was improving from both virtual currency and advertising. *Over the past several months, Zynga management indicated that while investors see DAUs via Appdata on a daily basis, they do not know the actual number of paying users, nor do they see the monetization from those paying users – the implication being that we only see "part" of the picture.*

2

3

4

While Zynga's Q2 2012 results illustrate that monthly unique payers (MUPs) continued to increase, up 17% sequentially, monetization, and in turn profitability, fell, the opposite of what we expected to occur[.]

5

6

* * *

We apologize for our poor decision to have had a BUY rating on this stock since the IPO and are downgrading its shares to NEUTRAL.

7

8      160.    With respect to the outlook for Zynga for the rest of 2012, he stated,

9  "[o]bviously with Zynga's numbers in such collapse in the back half of the year, I'd be

10  surprised if there was any new companies that could quickly make up that revenue.  So it

11  clearly looks like on the credit side of the business there's going to be increased weakness over

12  the course of the – the back half of 2012."  In an interview with CNBC on July 26, 2102,

13  Greenfield further stated:

14

*The thing that management, you know, repeatedly pointed to was that monetization is something the market doesn't see every day.* There's publicly available web sites that show daily usage and they really tried to focus people on the monetization side which is not as visible. *The reality is, not only did monetization not improve, what shocked us was that monetization is actually falling and so you have kind of the double negative of falling usage and falling monetization.*

15

16

17

18      161.    Detailing how the market had been misled by Zynga prior representations

19  regarding bookings and user monetization growth being weighted more heavily in Q2 2012, on

20  July 26, 2012 interview broadcasted by Bloomberg Surveillance, Greenfield detailed how:

21

*one of the things that management kept reiterating and that we were really focused on them being able to achieve was that you only see daily usage. You don't see monetization.* And given their robust data center and their understandings of the game mechanics, they really believed that they could improve monetization of their games. *Obviously not only was usage falling, but monetization wasn't flat, wasn't up, was actually down as well.* And that was really what really caught us by surprise.

22

23

24

25      162.    During the same July 26, 2012 interview, Greenfield was asked, "Do they play

26  by a different playbook within the corporations and managements of Silicon Valley, whether

27  it's Facebook or Zynga? *Do they feel like they get a different set of rules*?"  Richard Greenfield

28

1    responded "I don't really know how to answer that. I think, look, every company should be
2    taking their approach to investors in a similar way.  Obviously [Zynga] stock is at $3 in the
3    premarket trading. ***I think that pretty much speaks for itself, Tom.***"

4         163.   Arvind Bhatia of Sterne Agree noted how Zynga's second quarter earnings
5    announcement "was a big about-face.  It was revealing to us that the communication from
6    management was not very clear – ***or straight***."  Like Greenfield, Bhatia pointed out how "[t]he
7    company has been saying for some time that declining traffic doesn't matter and clearly it
8    does."  Wedbush Securities analysts further detailed how Zynga's revised full year outlook for
9    2012 was "in direct contrast to previous comments from management" and "it also changes our
10   thinking on the company's long-term growth potential."  A Wedbush analyst report dated July
11   26, 2012 explained that Zynga's lowered 2012 guidance implies that:

12        ***2H will not be the stronger half, in direct contrast to management's comments***
     ***earlier this year.***  While management previously stated that bookings growth
13        would be weighted towards the second half of the year, implied 2H bookings of
     $519 – 594 million are actually below 1H bookings of $631 million.  Also, 1H
14        adjusted EBITDA of $152 million is greater than the high-end of the 2H implied
     range, as is 1H EPS of $0.06.
15

16        164.   Tech analyst Ben Schachter at Macquarie wrote "Zynga's shocking results and
17   guidance (EBITDA [earnings before interest, taxes, depreciation, and amortization] guidance
18   for FY' 12 down by ~50%) ***raise our worst fears about the stability of the company's business***
19   ***model*** and competitive positioning."

20   **VIII.   POST CLASS PERIOD EVENTS**

21        165.   Zynga's performance and stock price continued to deteriorate after its second
22   quarter earnings results had shocked the market.  Despite having $2.5 billion in net cash,
23   investments, receivables and plants and equipment, Zynga's stock was trading at $2.80 per share on
24   August 1, 2012, valuing Zynga at only $2.14 billion.  As such, an August 1, 2012, article by
25   *GameZebo*, an editorial and discovery site for games across the most popular devises and
26   platforms, entitled "The Dog Days of Summer for Zynga," concluded, "[h]ence, Wall Street
27   values Zynga as nothing."

28

166.     Similarly, an August 1, 2012, *Forbes* article entitled "Zynga: Is The Business Really Worth Nothing At all?" likewise found that:

> For Zynga, it has come down to this: ***the market seems to have concluded that the company's ongoing business is worth absolutely nothing***.
>
> This morning, with the stock down another 14 cents, or 4.8%, to $2.81 – a new all-time low – the social gaming company's market cap has shriveled to $2.14 billion. (Recall that just over a year ago, there was talk that the company might be worth as much as $20 billion).
>
> Zynga had about $1.54 billion in net cash and investments as of the end of the June quarter; throw in $115 million in receivables, and $499 million in plant and equipment, and you get $2.15 billion. Ergo, the market is basically saying it simply does not see any long-term value in the company's ongoing business. ***Zero.  That's startling.***

167.     Moreover, on August 8, 2012, only a few weeks after Zynga's announcement of its second quarter earnings, defendant Schappert resigned from his positions as Zynga's COO and as a director, only 18-months after being hired for those positions.  In August 2012, alone, six other Zynga executives quit their positions with the Company, including:

- Mike Verdu Chief Creative Officer left on August 28, 2012.

- Brian Birtwistle resigned as Vice President of Marketing on August 30, 2012.

- Bill Mooney resigned as Vice President of Studios and General Manager of the popular game "FarmVille" on August 30, 2012.

- Erik Bethke resigned as a General Manager who oversaw the game "Mafia Wars 2" in August 2012.

- Jeremy Stauser, resigned as a General Manager who oversaw development studios responsible for Zynga slots and bingo games, such as "Zynga Bingo," in August 2012.

- Ya-Bing Chu resigned as a Vice President in Zynga's mobile division in August 2012.

168.     In addition, on November 7, 2012, defendant Wehner resigned as Zynga's CFO.

169.     Further, Zynga's financial condition continued to deteriorate after the Class Period demonstrating the magnitude of the financial problems that Zynga had concealed from the market until releasing its second quarter earnings.  On October 4, 2012, Zynga announced preliminary results for the third quarter and full year of 2012, warning that it experienced

1   another terrible quarter for the third quarter of 2012 and would be lowering its guidance for the

2   full year 2012 even further than it during its second quarter earnings release.

3        170.   Upon news of Zynga's preliminary report of terrible third quarter results and

4   further reduced 2012 guidance, Zynga common stock dropped an additional 12% from its prior

5   day trading, down to an October 5, 2012 closing price of $2.48 per share, its lowest price since

6   the IPO.   An October 5, 2012 *Seeking Alpha* news article entitled "Zynga – Shares Hit Yet

7   Another Record Low, Valued At Merely Its Cash Balances" pointed out that Zynga's "operational

8   performance is an absolute disaster" and "management has severe credibility issues."

9        171.   On October 5, 2012, J.P.Morgan analyst Doug Anmuth pointed out that Zynga's

10  cash on hand, the securities it owns, and the amount it paid for its San Francisco headquarters,

11  combined were worth $2.46 per share.   However, on October 5, 2012, Zynga was trading at

12  prices as low as $2.21 per share, which, according to Doug Anmuth, meant that "Wall Street is

13  valuing the social and mobile game company's business at, essentially, ***nothing***."

14  **IX.   *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE**

15       172.   Plaintiffs are entitled to a presumption of reliance under the fraud on the market

16  doctrine.   The market for the Company's securities was, at all times, an efficient market that

17  promptly digested current information with respect to the Company from all publicly-available

18  sources and reflected such information in the prices of the Company's securities.   Throughout

19  the Class Period:

20       (a)   Zynga common stock was actively traded on the NASDAQ;

21       (b)   The market price of Zynga common stock reacted promptly to the
22             dissemination of public information regarding the Company;

23       (c)   The Company's stock was followed by numerous financial analysts,
             including those cited herein.   Thus, the Company's stock reflected the
24             effect of information disseminated into the market;

25       (d)   The average weekly trading volume for Zynga stock during the Class
             Period was approximately 89.175 million shares; and

26       (e)   The Company's market capitalization was in excess of 9.6 billion on
27             March 31, 2012 and the Company had over 732 million shares outstanding
             as of March 31, 2012.

28

173.     Throughout the Class Period, the Company was consistently followed by the market, including securities analysts as well as the business press.  The market relies upon the Company's financial results and management to accurately present the Company's financial results.  During this period, Zynga and the Officer Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company.  This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's securities.

174.     As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for Zynga common stock was artificially inflated.  Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.  Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are each responsible.

175.     Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Zynga common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

176.     Plaintiff and the other Class Members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted herein against defendants are predicated upon omissions of material fact which there was a duty to disclose.

177.     Had Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, he would not have purchased Zynga common stock at artificially inflated prices.

## X.     NO SAFE HARBOR

178.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint.

1    None of the specific statements alleged herein are forward looking.  Many of the specific

2    statements alleged herein were not identified as "forward-looking statements" when made.

3         179.    To the extent there were any forward-looking statements, there were no

4    meaningful cautionary statements identifying important factors that could cause actual result to

5    differ materially from those in the purportedly forward-looking statements.  Moreover, to the

6    extent that the statutory safe harbor does apply to any forward-looking statement, these

7    statements are actionable because, at the time any forward-looking statement was made, the

8    particular speaker knew that the particular forward-looking statement was false or the forward-

9    looking statement was authorized or approved by an executive officer of Zynga who knew that

10   those statements were false when made.

11   **XI.    CLASS ACTION ALLEGATIONS**

12        180.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of

13   the Federal Rules of Civil procedure on behalf of a class consisting of all persons and entities

14   who purchased or otherwise acquired Zynga common stock during the Class Period and were

15   damaged thereby (the "Class").  Excluded from the Class are: (a) Defendants; (b) members of

16   the immediate families of the Defendants; (c) the subsidiaries and affiliates of Defendants;

17   (d) any person who is an officer, director or controlling person of Zynga; (e) any entity in which

18   any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability

19   insurance carries, and any affiliates or subsidiaries thereof; and (g) the legal representatives,

20   heirs, successors or assigns of any such excluded party.

21        181.    The members of the Class are so numerous that joinder of all members is

22   impracticable.  While the exact number of Class members is unknown to Plaintiff at this time

23   and can only be ascertained through appropriate discovery, Plaintiff believe there are thousands

24   of members of the Class at a minimum.

25        182.    As of February 15, 2013, Zynga had 598,057,857 shares of Class A common

26   stock outstanding and 38 record holders of Class A common stock.  However, according to

27   Zynga, the actual number of Class A stockholders is greater than the number of record holders

28

1    because the number of record holders does not include the voluminous stockholders who are

2    beneficial owners whose shares are held in street name by brokers and other nominees.

3    According to Zynga, it is unable to estimate the number of stockholders represented by these

4    record holders, because many of its shares of Class common stock are held by brokers and other

5    institutions on behalf of stockholders.

6        183.    Members of the Class may be identified from records maintained by Zynga or its

7    transfer agent, and may be notified of the pendency of this action by mail using a form of notice

8    customarily used in securities class actions.

9        184.    Common questions of law and fact exist as to all members of the Class and

10   predominate over any questions affecting solely individual members of the Class.

11       185.    Plaintiff's claims are typical of the claims of other members of the Class and the

12   other members of the Class sustained damages arising out of Defendants' wrongful conduct in

13   violation of federal law as complained of herein.

14       186.    Plaintiff will fairly and adequately protect the interests of the members of the

15   Class and has retained counsel competent and experienced in class actions and securities

16   litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

17       187.    A class action is superior to other available methods for the fair and efficient

18   adjudication of the controversy since joinder of all members of the Class is impracticable.

19   Furthermore, because the damages suffered by the individual Class members may be relatively

20   small, the expense and burden of individual litigation makes it impracticable for the Class

21   members individually to redress the wrongs done to them.  There will be no difficulty in the

22   management of this action as a class action.

23       188.    Plaintiff will rely, at least in part, on the presumption of reliance established by

24   the fraud-on-the-market doctrine.  All purchasers of Zynga securities during the Class Period

25   suffered similar injuries, including injury through their purchase of the securities at artificially

26   inflated prices.  A presumption of reliance therefore applies.

27

28

189.     Lead Plaintiff and the putative Class are also entitled to the *Affiliated Ute* presumption of reliance due to Defendants' material omission as alleged in §VI(A), which information Lead Plaintiff would have wanted to know and which would have caused investors to have avoided purchasing shares of Zynga common stock at the prices they traded at during the Class Period.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Section 10(b) of the Exchange Act
And Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

190.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

191.     Throughout the Class Period, Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class in connection with their purchases of the common stock of Zynga during the Class Period, all in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

192.     The Company and the Officer Defendants, as the most senior officers of Zynga during the Class Period, are liable as direct participants in all of the wrongs complained of herein through the date they left the Company.  As detailed above, the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

193.    Lead Plaintiff and the other members of the Class relied upon the Defendants' statements and/or on the integrity of the market in purchasing shares of Zynga's common stock during the Class Period.

194.    As a direct and proximate cause of the wrongful conduct described herein, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Zynga common stock at artificially inflated prices during the Class Period.  Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by the Defendants, or been aware of the truth behind the Defendants' material misstatements, they would not have purchased Zynga common stock at artificially inflated prices during the Class Period.

195.    In addition to the duties of full disclosure imposed on the Officer Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's financial condition, earnings and expenses so that the market price of the Company's securities would be based on truthful, complete and accurate information.

196.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the members of the Class who have been damaged as a result of such violations.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**(Against the Officer Defendants)**

197.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

198.    The Officer Defendants acted as controlling persons of Zynga within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency and their ownership and contractual rights, participation in and/or awareness

of Zynga's operations and/or intimate knowledge of the false financial statements filed by Zynga with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Zynga, including the content and dissemination of the various statements that Plaintiff contend are false and misleading.  The Officer Defendants were provided with or had unlimited access to copies of Zynga's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

199.    In particular, each Officer Defendant had direct and supervisory involvement in the day-to-day operations of Zynga and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

200.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

201.    By reason of the conduct of Zynga as alleged in this Complaint, and by virtue of their positions as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their purchases of Zynga common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's Counsel as Class Counsel;

B.    Awarding compensatory and/or rescissionary damages in favor of Plaintiff and the other members of the Class against Defendants for all damages sustained as a result of

1   Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-

2   judgment interest thereon;

3         C.        Awarding disgorgement of all insider trading profits in favor of Plaintiff and the

4   other members of the Class who purchased contemporaneously with Defendants;

5         D.        Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

6   this action, including counsel fees and expert fees; and

7         E.        Awarding such other and further relief as the Court may deem just and proper.

8                                **DEMAND FOR TRIAL BY JURY**

9         Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby

10  demands a trial by jury.

11  DATED:  March 31, 2014                    **BERMAN DEVALERIO**

12

13                                           By:  ___/s/ Nicole Lavallee_____
                                                      Nicole Lavallee

14                                           Joseph J. Tabacco, Jr.
15                                           Nicole Lavallee
                                             Victor S. Elias
16                                           One California Street, Suite 900
                                             San Francisco, CA 94111
17                                           Telephone:  (415) 433-3200
                                             Facsimile: (415) 433-6282
18                                           Email: jtabacco@bermandevalerio.com
                                                    nlavallee@bermandevalerio.com
19                                                  velias@bermandevalerio.com

20                                           Jeffrey M. Norton
                                             Roy Shimon
21                                           Ramzi Abadou, *Of Counsel*
                                             **NEWMAN FERRARA LLP**
22                                           1250 Broadway, 27th Floor
                                             New York, NY 10001
23                                           Telephone:  (212) 619-5400
                                             Facsimile:  (212) 619-3090
24                                           Email: jnorton@nfllp.com
                                                    rshimon@nfllp.com
25
                                             **Lead Counsel and Attorneys for**
26                                           **Lead Plaintiff David Fee**

27

28

---

[3:12-cv-04007-JSW] FIRST AMENDED COMPLAINT                                          59