JORDAN ETH (Bar No. 121617)
Email:  JEth@mofo.com
ANNA ERICKSON WHITE (Bar No. 161385)
Email:  AWhite@mofo.com
KEVIN A. CALIA (Bar No. 227406)
Email:  KCalia@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:    415.268.7000
Facsimile:    415.268.7522

Attorneys for Defendants
ZYNGA INC., MARK PINCUS, DAVID M. WEHNER, and
JOHN SCHAPPERT

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ZYNGA INC. SECURITIES LITIGATION | **CLASS ACTION** |
| | Lead Case No. C 12-04007 JSW |
| | Consolidated with Case Nos. |
| This Document Relates To: <br> All Actions. | C 12-04048 JSW, C 12-04059 JSW, <br> C 12-04064 JSW, C 12-04066 JSW, <br> C 12-04133 JSW, C 12-04250 JSW |
| | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| | Hearing:      July 25, 2014 <br> Time:          9:00 a.m. <br> Courtroom:   5, 2nd Floor <br> Judge:         Hon. Jeffrey S. White |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 25, 2014, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Jeffrey S. White, located at 1301 Clay Street, Oakland, California, Courtroom 5, 2nd Floor, Zynga Inc. ("Zynga" or the "Company"), together with Mark Pincus, David M. Wehner, and John Schappert (collectively, the "Individual Defendants," and together with Zynga, the "Defendants"), will, and hereby do, move pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (Dec. 22, 1995) (the "Reform Act"), codified in relevant part at 15 U.S.C. § 78u-4 *et seq.*, to dismiss without further leave to amend Plaintiff's First Amended Complaint (the "Amended Complaint"), filed on March 31, 2014.

This Motion is based on this Notice; the accompanying Memorandum of Points and Authorities; the Defendants' Request for Judicial Notice in Support of Their Motion to Dismiss Plaintiff's First Amended Complaint; the Declaration of Kevin A. Calia in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint and the exhibits attached thereto; the papers and pleadings on file with the Court; and such other written or oral argument and other materials as may be presented before the Court takes this Motion under submission.

1

# TABLE OF CONTENTS

2

Page

3    TABLE OF AUTHORITIES ...................................................................................... iv

4    ISSUES TO BE DECIDED ....................................................................................... vii

5    SUMMARY OF ARGUMENT ................................................................................ viii

6    INTRODUCTION ........................................................................................................1

7    BACKGROUND ...........................................................................................................2

8           A.    December 15, 2011 Initial Public Offering.................................................2

9           B.    February 14, 2012 Announcement of Q4 2011 Results and 2012
                 Guidance .......................................................................................................3

10          C.    March 28, 2012 Secondary Offering............................................................3

11          D.    April 26, 2012 Announcement of Q1 2012 Results and 2012 Guidance...........4

            E.    July 25, 2012 Announcement of Q2 2012 Results and 2012 Guidance............4

12          F.    This Lawsuit.................................................................................................5

13   ARGUMENT .................................................................................................................5

14   I.     PLAINTIFF MUST SATISFY HEIGHTENED PLEADING REQUIREMENTS...........5

15   II.    THE AMENDED COMPLAINT FAILS TO PLEAD A MATERIAL
            MISREPRESENTATION.......................................................................................6

16          A.    Zynga's Statements About Bookings Were Not False or Misleading. .................6

17          B.    Statements About Zynga's Game Pipeline Were Not False or
                 Misleading.....................................................................................................9

18          C.    Zynga's Warnings About the Risks Related to Possible Facebook
19               Changes Are Not Actionable. .....................................................................9

            D.    Plaintiff Fails to Plead an Actionable Forward-Looking Statement. ...................11

20                1.    Plaintiff fails to plead that Zynga's 2012 guidance lacked a
21                      reasonable basis when made. .....................................................................11

22                2.    The forward-looking statements are also protected by the
                        Reform Act's safe harbor and the "bespeaks caution"
23                      doctrine. .............................................................................................13

     III.   THE AMENDED COMPLAINT FAILS TO PLEAD A STRONG INFERENCE
24          OF SCIENTER. ..................................................................................................14

25          A.    The Confidential-Witness Statements Do Not Show That Defendants
                 Made Statements Knowing That They Were False............................................14

26          B.    The Core-Operations Inference Does Not Support Scienter............................15

27          C.    Stock-Sale Allegations Do Not Create A Strong Inference That
                 Defendants Made False or Misleading Statements. ...........................................16

28

D.    Viewed Holistically, Plaintiff's Theory of Fraud Is Neither Cogent Nor Compelling. ..................................................................................18

IV.    PLAINTIFF ALSO FAILS TO PLEAD LOSS CAUSATION. .....................................19

V.    PLAINTIFF'S 20(a) CLAIM SHOULD BE DISMISSED. ...........................................20

CONCLUSION ...........................................................................................................................20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4
*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008)..................................................................... 16

5
*Brodsky v. Yahoo! Inc.*,
6
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...................................................... 7

7
*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................... 18
8

9
*Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
    353 F.3d 1125 (9th Cir. 2004)................................................................... 13

10
*In re Accuray, Inc. Sec. Litig.*,
11
    757 F. Supp. 2d 936 (N.D. Cal. 2010) ...................................................... 15

12
*In re Bare Escentuals, Inc. Sec. Litig.*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) .................................................... 15
13

14
*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991)..................................................................... 13

15
*In re Cutera Sec. Litig.*,
16
    610 F.3d 1103 (9th Cir. 2010)..................................................... viii, 6, 9, 13

17
*In re Daou Sys., Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005)................................................................... 17
18

19
*In re Ditech Commc'ns Corp. Sec. Litig.*,
    No. C 05-02406 JSW, 2007 WL 2990532 (N.D. Cal. Oct. 11, 2007) ............................. 6, 7, 9

20
*In re Foundry Networks, Inc. Sec. Litig.*,
21
    No. C 00-4823 MMC, 2003 WL 23211577 (N.D. Cal. Feb. 14, 2003).................................. 7

22
*In re FVC.COM Sec. Litig.*,
    136 F. Supp. 2d 1031 (N.D. Cal. 2000) .................................................... 17
23

24
*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994)..................................................................... 6, 9

25
*In re Harmonic Inc. Sec. Litig.*,
26
    163 F. Supp. 2d 1079 (N.D. Cal. 2001) ...................................................... 8

27
*In re Harmonic Inc. Sec. Litig.*,
    No. C-00-2287 PJH, 2002 WL 31974384 (N.D. Cal. Nov. 13, 2002)................................. 7

28

*In re Juniper Networks, Inc. Sec. Litig.*,
   Nos. 3:02-CV-01221, C 02-0749 SI, 2004 WL 547607 (N.D. Cal. Mar. 11, 2004)............... 12

*In re LeapFrog Enters. Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) ............................................................................ 10

*In re Pixar Sec. Litig.*,
   450 F. Supp. 2d 1096 (N.D. Cal. 2006) ............................................................................ 18

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012).................................................................................*passim*

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999)............................................................................... 14, 18

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996)...........................................................................10, 11, 12

*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996)........................................................................................ 12

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
   No. 12-CV-4677 YGR, 2014 WL 1254149 (N.D. Cal. Mar. 26, 2014) ................................ 10

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002).......................................................viii, 16, 17, 18, 20

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993).......................................................................................... 11

*Kuehbeck v. Genesis Microchip Inc.*,
   No. C 02-05344 JSW, 2005 WL 1787426 (N.D. Cal. July 27, 2005) ................................... 11

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007)...................................................................................viii, 20

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)........................................................................................ 20

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002)................................................................................. 16, 17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008)......................................................................viii, 14, 18, 20

*Osher v. JNI Corp.*,
   256 F. Supp. 2d 1144 (S.D. Cal. 2003) ......................................................................... 18

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001)..................................................................viii, 7, 11, 12, 18

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ................................................................................. 15

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) .................................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................ 6, 14

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ...................................................................... 17

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................. 14, 15, 16, 18

**STATUTES**

15 U.S.C.
    § 78u-4(b)(2) ...................................................................................................... 14
    § 78u-5(c)(1)(A) .................................................................................................. 13

1

**ISSUES TO BE DECIDED**

2      **Falsity**

3      1.      Whether Plaintiff's claim under Section 10(b) of the Securities Exchange Act of

4 1934 (the "Exchange Act") should be dismissed on the ground that Plaintiff has failed to plead

5 that Defendants' public statements were materially false or misleading when made.

6      **Safe Harbor and "Bespeaks Caution" Doctrine**

7      2.      Whether Plaintiff's claims based on Zynga's forward-looking statements should

8 also be dismissed on the ground that these forward-looking statements are protected by the

9 Reform Act's safe harbor and/or the "bespeaks caution" doctrine.

10      **Scienter**

11      3.      Whether Plaintiff's claims should also be dismissed on the ground that Plaintiff

12 has failed to plead facts giving rise to a strong inference that the Individual Defendants made the

13 challenged public statements with scienter—the intent to deceive, manipulate, or defraud.

14      **Loss Causation**

15      4.      Whether Plaintiff's claims should also be dismissed on the ground that Plaintiff

16 has failed to plead loss causation.

17      **Control-Person Liability**

18      5.      Whether Plaintiff's claim against the Individual Defendants for control-person

19 liability under Section 20(a) of the Exchange Act, should be dismissed on the ground that the

20 Amended Complaint does not plead a primary violation of the Exchange Act.

21      **Leave to Amend**

22      6.      Whether Plaintiff's claims should be dismissed without leave to amend because

23 further amendment would be futile.

24

25

26

27

28

**SUMMARY OF ARGUMENT**

The Amended Complaint, which alleges that statements Zynga made between February 14 and July 25, 2012, violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, is just a shorter version of the complaint the Court dismissed on February 25, 2014. It should be dismissed with prejudice for multiple, independent reasons.

First, Plaintiff fails to plead with particularity that Zynga issued misleading statements. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876–77, 885–86 (9th Cir. 2012). None of Plaintiff's "Confidential Witnesses" ("CWs") even suggests that any challenged public statement was false. A few CWs recount "declines" or "delays" regarding Zynga's games, but do so only in the vaguest terms. *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). Zynga's forward-looking statements are also protected under the Reform Act's safe harbor and/or the "bespeaks caution" doctrine. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

Second, Plaintiff's claims should also be dismissed because Plaintiff fails to plead facts raising a "strong inference" of scienter. *Rigel*, 697 F.3d at 882–83. The CW allegations are not reliable and do not evidence scienter in any event, and the stock sales are not suspicious.

Third, Plaintiff's claims should also be dismissed because Plaintiff fails to plead loss causation. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). Plaintiff does not allege that Zynga ever revealed to the market that any of its prior statements were false. Any losses that occurred were caused by the materialization of risks that were known and that Zynga previously disclosed. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

Fourth, the Section 20(a) claim should be dismissed because Plaintiff fails to plead an underlying violation of Section 10(b). *Rigel*, 697 F.3d at 886.

Lastly, the Amended Complaint should be dismissed without leave to amend because further amendment would be futile. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097–98 (9th Cir. 2002).

1

**INTRODUCTION**

2        In February, this Court dismissed the prior version of the complaint in this securities class

3    action.  In doing so, the Court ruled that Plaintiffs had "fail[ed] to include the relevant, basic

4    factual details in support of their claims."  (Dkt. No. 152 at 4.)  In addition, "the statements

5    alleged to be misleading and reasons for their alleged falsity [were not pled] with the requisite

6    level of specificity."  (*Id.*)  Finally, the Court "exhort[ed] Plaintiffs to redraft their complaint with

7    simplicity[.]"

8        In response, Plaintiff dropped defendants, shortened the Class Period, abandoned all

9    claims under the Securities Act of 1933, and discarded all references to five of his eleven

10   "confidential witnesses."  Other than shortening the complaint, however, Plaintiff did nothing to

11   improve it.  He did not add any "basic factual details in support of" his remaining claims that

12   bookings were "declining," that Zynga's pipeline of games was not robust, and that a Facebook

13   platform change was harming Zynga.  Rather, Plaintiff added only a few references to after-the-

14   fact media reports and one new CW who repeats the same vague allegations as before about

15   unspecified "declines" in bookings and "delays" in games.  Like the prior complaint, the

16   Amended Complaint also identifies no internal documents or data supporting Plaintiff's claim

17   that Zynga was "deteriorating."

18       In addition, Plaintiff's theory of fraud—that Defendants sought to sell stock in advance of

19   bad news—still makes no sense.  Defendants sold in the Secondary Offering, which was finalized

20   during Q1 2012.  But those sales occurred several weeks before Zynga reported record-setting

21   financial results for Q1.  Plaintiff does not dispute the accuracy of those results.  Moreover, the

22   Secondary Offering's staggered release reduced, rather than increased, the number of shares

23   Defendants could sell before Zynga announced its disappointing results for Q2 2012.

24       What does make sense is the very thing Zynga disclosed—that it was a new company in a

25   new industry.  More specifically, Zynga cautioned investors about the rapidly changing social

26   gaming industry, the Company's short operating history, and its dependence on Facebook.  When

27   those risks materialized, Zynga's business was, not surprisingly, negatively affected.  Plaintiff's

28   Amended Complaint does no more than allege "fraud by hindsight," which is exactly what the

1   pleading standards were designed to prevent.  The Amended Complaint should be dismissed, this

2   time with prejudice.

3                                        **BACKGROUND**

4          Founded in 2007, Zynga Inc. ("Zynga" or the "Company") develops, markets, and

5   operates online social games played on social networking sites like Facebook and on mobile

6   devices.  (¶¶ 32, 38.)[1]  From its inception, Zynga achieved significant growth.  (Ex. 1 at 77.)

7   From 2008 to 2010, for example, Zynga's revenue increased from $19.4 million to $597.5

8   million.  (*Id.*)  By September 2011, more people played Zynga's games than those from the next

9   14 game companies combined.  (*Id.* at 1.)  Zynga offers many popular social games, including

10  *FarmVille*, *Words with Friends*, and *Zynga Poker*.  (*Id.*)

11         Zynga makes money, in part, by selling virtual goods to players who want to enhance their

12  experience by, for example, buying tractors to plow their fields in the game *FarmVille*.  (¶¶ 40–

13  42.)  Zynga publicly reports a financial metric called "bookings" that reflects "the total amount of

14  revenue from the sale of virtual goods in [Zynga's] online games and advertising that would have

15  been recognized in a period if [Zynga] recognized all revenue immediately at the time of the

16  sale."  (¶¶ 3, 50.)  As Plaintiff alleges, bookings is Zynga's most significant metric in assessing

17  the Company's performance.  (¶ 49.)  In addition to bookings, Zynga also reports other operating

18  metrics to the public, including daily active users ("DAUs"), which mean "the number of

19  individuals who played one of [Zynga's] games during a particular day."  (¶ 51.)

20         A.      **December 15, 2011 Initial Public Offering**

21         On December 15, 2011, the SEC declared effective a registration statement and

22  prospectus ("Prospectus") filed by Zynga for its initial public offering ("IPO") of 100 million

23  shares of common stock at $10 per share.  (¶ 56.)  Zynga's Prospectus contained 17 pages of risk

24  factors detailing the "high degree of risk" involved in investing in Zynga common stock.  (Ex. 1

25

26         [1]  All references to "¶ __" are to the paragraphs of the Amended Complaint
    ("Complaint").  All references to "Ex. __" are to numbered exhibits attached to the Declaration of
27  Kevin A. Calia ("Calia Decl.").  All references to "Dkt. No. __" are to docket numbers assigned
    by PACER to the documents filed in this action.

28

at 14–31.)  For example, Zynga cautioned investors about the following:

- Zynga operated in a "new and rapidly changing industry" and had a "short operating history" and "new business model," which made it difficult to effectively evaluate its business and prospects.  (*Id.* at 15.)

- Zynga relied on Facebook to generate "substantially all of [Zynga's] revenue and players," and Facebook had "broad discretion to change its terms of service and other policies with respect to [Zynga]," had previously made changes that negatively impacted Zynga's business, and could do so again in the future.  (*Id.* at 14.)

- Zynga's "growth depend[ed] on [its] ability to consistently launch new games that achieve significant popularity."  (*Id.* at 15.)

- If Zynga did "not successfully launch games that attract and retain a significant number of players and extend the life of [its] existing games, [its] market share, reputation and financial results will be harmed."  (*Id.* at 15–16.)

- Zynga's "bookings, revenue, traffic and operating results could vary significantly from quarter-to-quarter and year-to-year and may fail to match [its] past performance," and "quarterly operating results are volatile and difficult to predict."  (*Id.* at 22.)

Plaintiff does not challenge any statement in the IPO Prospectus.

**B.     February 14, 2012 Announcement of Q4 2011 Results and 2012 Guidance**

On February 14, 2012 (the first day of the Class Period), Zynga announced its financial results for Q4 and full year 2011.  (¶ 89.)  For Q4 2011, Zynga reported record bookings of $306.5 million, up 7% from the prior quarter.  (Ex. 9 at 1.)  Zynga issued guidance for 2012, including projected bookings of $1.35–1.45 billion.  (¶ 96.)  At the same time, Zynga continued to caution investors about the rapidly changing social gaming industry, the Company's short operating history, its dependence on Facebook, and the need to launch new hit games and extend the life of existing games.  (*See* Ex. 9 at 3; Ex. 13 at 1–2; *see also* Ex. 1 at 14–16, 22.)

**C.     March 28, 2012 Secondary Offering**

On March 28, 2012, the SEC declared effective a registration statement and prospectus filed by Zynga for an underwritten public offering of 49,414,526 shares of common stock (the "Secondary Offering"), which was completed on April 3, 2012.  (Ex. 10; ¶ 133.)  Zynga again included detailed risk disclosures in its registration statement and prospectus for the Secondary Offering.  (¶¶ 46, 47, 102; Ex. 3 at 13–15, 21; Ex. 5 at 13–15, 21.)

As part of the IPO, Zynga stockholders had entered into lock-up agreements that prevented them from selling shares until May 29, 2012, without the underwriters' prior consent.

(¶¶ 60–62; Ex. 1 at 144.)  The lock-up covered approximately 688 million shares compared to the less than 150 million shares that were trading in the public market before the Secondary Offering. (Ex. 2 at 23; Ex. 5 at 7.)  To avoid having 688 million shares become available for sale on one day, Zynga sought agreement from its directors, officers, and early investors to stagger the release of their lock-ups over a period of five months.  (Ex. 5 at 29, 125–26.)

As shown in Appendix A, under this staggered release, Zynga's officers and directors and selling stockholders could sell a limited number of shares, up to approximately 20% of their collective holdings, in the Secondary Offering (eight weeks before the original release date), but agreed to extend the lock-up restrictions on approximately 20% to July 6, 2012 (five weeks after the original release date), and on approximately another 60% to August 16, 2012 (11 weeks after the original release date).  (Ex. 5 at 125.)  In addition, all non-executive employees could sell approximately 115 million shares on April 30, 2012 (four weeks before the original release date). (*Id.*)  Zynga disclosed that "[t]he principal purposes of the offering [were] to facilitate an orderly distribution of shares and to increase [the company's] public float."  (Ex. 5 at 34.)

### D.    April 26, 2012 Announcement of Q1 2012 Results and 2012 Guidance

On April 26, 2012, Zynga announced its financial results for Q1 2012, again reporting record results, including bookings of $329 million, up 7% from Q4 2011.  (¶ 105.)  Zynga raised its guidance for 2012, projecting bookings of $1.425–1.5 billion for 2012  to reflect its recent acquisition of OMGPOP, the developer of *Draw Something*.  (¶¶ 115–16; Ex. 11 at 1–2.)  Once again, Zynga cautioned investors about its prospects.  (Ex. 11 at 3; Ex. 14 at 1–2; Ex. 4 at 13–21.)

### E.    July 25, 2012 Announcement of Q2 2012 Results and 2012 Guidance

On July 25, 2012, Zynga announced results for Q2 2012 that did not meet analyst expectations.  (¶ 149.)  Zynga explained that three factors affected its Q2 results:  (1) "declines in engagement and bookings for our web games due in part to changes Facebook made to their platform"; (2) the launch of a new game, *The Ville*, "later than expected in the quarter"; and (3) "*Draw Something* underperformed versus [Zynga's] early expectations."  (¶ 151.)  Zynga had warned investors about these very risks.  (Ex. 1 at 14–16, 22.)  Because Zynga believed that the rest of 2012 would not live up to previous expectations, it reduced its guidance.  (¶¶ 152, 155; Ex.

12 at 2.)  The next day, Zynga's stock fell $1.90 to close at $3.18 per share.  (¶ 157.)

**F.     This Lawsuit**

Three business days after Zynga's July 25, 2012 announcement, the first securities fraud class action was filed in this Court.  (Dkt. No. 1.)  After consolidating the various actions, the Court appointed David Fee as Lead Plaintiff.  (Dkt. No. 110.)  On April 3, 2013, Fee and Joy Arjoon-Singh filed the Consolidated Complaint.  (Dkt. No. 125.)  On February 25, 2014, the Court granted the Defendants' motion to dismiss the Consolidated Complaint, finding that "despite the length of the complaint, Plaintiffs fail to include the relevant, basic factual details in support of their claims."  (Dkt. No. 152 at 4.)

Plaintiff David Fee filed the Amended Complaint on March 31, 2014.  (Dkt. No. 155.) The Amended Complaint drops thirteen defendants, shortens the Class Period, drops all claims under the Securities Act of 1933, and no longer includes Joy Arjoon-Singh as a named plaintiff. (*Id.*)  Plaintiff now purports to represent a class of investors who acquired Zynga stock between February 14 and July 25, 2012.  (¶ 2.)  In the Amended Complaint, Plaintiff names as Defendants Zynga and three former officers of Zynga:  Mark Pincus, Founder and Chairman of the Board of Directors, and former Chief Executive Officer and Chief Product Officer; David M. Wehner, former Chief Financial Officer; and John Schappert, former Chief Operating Officer (collectively, the "Individual Defendants" and, together with Zynga, the "Defendants").  (¶¶ 31–34.)  Plaintiff alleges that the Defendants' public statements violated the Securities Exchange Act of 1934 (the "Exchange Act"), and asserts claims under Section 10(b) and Rule 10b-5 against Zynga and the Individual Defendants, and Section 20(a) against the Individual Defendants.  (¶¶ 190–201.)

**ARGUMENT**

**I.     PLAINTIFF MUST SATISFY HEIGHTENED PLEADING REQUIREMENTS.**

To state a claim under Section 10(b) of the Exchange Act, Plaintiff must plead facts showing, among other things, that Defendants made a material misrepresentation with scienter. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  To survive a motion to dismiss, Plaintiff must satisfy both Rule 9(b) and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (the "Reform Act" or "PSLRA").

Rule 9(b) requires particularity as to the circumstances of the fraud, including "identifying the statements at issue and setting forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." *Rigel*, 697 F.3d at 876, 885–86 (citation omitted). The "time, place, persons, statements made, [and] explanation of why or how such statements are false or misleading" all must be plead with particularity. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 n.7 (9th Cir. 1994) (en banc).

"The heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead 'fraud by hindsight.'" *In re Ditech Commc'ns Corp. Sec. Litig.*, No. C 05-02406 JSW, 2007 WL 2990532, at *6 (N.D. Cal. Oct. 11, 2007) (quoting *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999)). To that end, the Reform Act requires a complaint to plead with particularity facts showing both falsity and scienter. *Rigel*, 697 F.3d at 876–77; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (Reform Act imposes "[e]xacting pleading requirements").

## II.     THE AMENDED COMPLAINT FAILS TO PLEAD A MATERIAL MISREPRESENTATION.

In his Amended Complaint, Plaintiff alleges that Zynga made misleading statements regarding: (1) Zynga's bookings during the Class Period, (2) Zynga's pipeline of games to be released in 2012, (3) the risk that Facebook could make changes to Facebook's platform, and (4) Zynga's 2012 guidance. As set forth below, Plaintiff fails to plead sufficient facts to show that any of these statements were false.

### A.     Zynga's Statements About Bookings Were Not False or Misleading.

Plaintiff challenges statements describing Zynga's bookings as "strong," "record," and "growing." (¶¶ 90, 105–07.)[2] He alleges that these statements were misleading because they failed "to state that bookings were actually declining for all of Zynga's games and that the declining trend had started even before the IPO." (¶ 92; *see also* ¶ 110.) He also alleges that

---

[2] These "mildly optimistic, subjective assessment[s]" are also not actionable as a matter of law because investors "'know how to devalue the optimism of corporate executives.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (citation omitted).

1  Zynga "deflected investor concern about declining DAUs" by telling investors that "bookings go

2  up after DAU go down."  (¶¶ 15, 120; *see also* ¶¶ 92, 110, 121.)  Plaintiff is wrong for four

3  reasons.

4       First, Plaintiff's allegations directly conflict with Zynga's reported financial results—the

5  accuracy of which Plaintiff does not challenge.  From Q3 2011 to Q1 2012, Zynga's bookings

6  grew each quarter.  (Ex. 2 at 37; Ex. 6 at 19.)  In fact, in Q1 2012, Zynga's bookings were the

7  highest in its history.  (Ex. 2 at 37; Ex. 6 at 19.)  Courts regularly dismiss claims as a matter of

8  law where, as here, a plaintiff does not dispute that the company accurately reported its financial

9  results.  *In re Foundry Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL 23211577, at

10  *3 (N.D. Cal. Feb. 14, 2003) (dismissing claim that company misstated its demand "since

11  plaintiffs did not dispute that [the company] achieved 'record revenues' during that quarter"); *In

12  re Harmonic Inc. Sec. Litig.*, No. C-00-2287 PJH, 2002 WL 31974384, at *9 (N.D. Cal. Nov. 13,

13  2002) (dismissing claim about "strong" demand where "Plaintiffs do not contend that the

14  financial results reported by Harmonic for 1999 were inaccurate") *aff'd in part, rev'd in part and

15  remanded sub nom. Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674 (9th Cir. 2005).

16       Second, none of Plaintiff's CWs claims that bookings were declining *during the Class

17  Period*.  Rather, CWs 1 and 2 discuss bookings declines in mid-to-late 2011, CW6 claims that this

18  decline ran "into 2012," and CW7 describes "becoming aware of" declines in January 2012.

19  (¶¶ 68–70, 82, 86.)

20       Third, even if the CWs alleged declining bookings during the Class Period, their

21  allegations would lack the particularity necessary to show that Zynga's statements were false

22  when made.  The CWs all refer to vague "declines," but do not state what those declines were,

23  which games were involved, or how long the declines lasted.  *Ronconi v. Larkin*, 253 F.3d 423,

24  434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people.  That they

25  exist does not make a lie out of any of the alleged false statements."); *Ditech*, 2007 WL 2990532,

26  at *9 (same).  In addition, the allegations attributed to CWs 1, 6, and 7 are based, at best, on

27  vague hearsay from other anonymous company personnel.  (¶¶ 68–69, 82, 86.)  *See, e.g.,*

28  *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115–16 (N.D. Cal. 2009) (allegations attributed to

1   CWs without personal knowledge or that failed to provide particular facts did not support claims

2   that statements about revenue were false).  And the only CW who references daily reports, CW2,

3   says nothing about the specific contents of these reports.  *See, e.g.*, *In re Harmonic Inc. Sec.*

4   *Litig.*, 163 F. Supp. 2d 1079, 1094 (N.D. Cal. 2001) (allegations about weekly forecasts that did

5   not include details about content, preparation, and use of reports were insufficient to plead

6   falsity).  This lack of detail is not surprising given that none of the CWs worked in finance or

7   accounting.

8        Fourth, contrary to Plaintiff's allegations, Zynga did not deflect concerns about declining

9   DAUs by telling investors that "bookings go up after DAU go down."[3]  (¶ 120.)  What Zynga

10  actually said is that "there's not always a direct correlation between bookings growth and publicly

11  available DAU data," (¶ 106), and "daily active users and monetization are not directly related,"

12  (¶¶ 58, 108; *see also* ¶¶ 91, 109, 120).  But Plaintiff has alleged no facts, let alone specific ones,

13  that even suggest that these statements were false when made.  That is because he cannot.  In five

14  of the six quarters before the Class Period where DAU declined or stayed flat, bookings

15  increased.  (Ex. 1 at 50–51; Ex. 2 at 36–37; Ex. 6 at 19, 21; Ex. 7 at 18, 20.)  In other words, there

16  was not a direct correlation between bookings growth and DAU.  Plaintiff has not contested the

17  accuracy of these publicly reported metrics.

18       In fact, the only data Plaintiff points to in his Amended Complaint is consistent with

19  Defendants' statements or undermine his allegations.  The Amended Complaint includes a chart

20  about *FarmVille* from Zynga's road show that illustrates how DAUs and bookings can move in

21  opposite directions.  (¶ 57.)  When a new game launches, DAUs are high because many users

22  "try[] the game early on" but "may not stick with the game."  (¶ 120.)  Over time, the committed

23  users that remain are more willing to spend money on game add-ons, which increases bookings.

24  (*Id.*)  This makes sense given Zynga's "free-to-play" business model.  (¶ 40.)

25

26       [3] In fact, DAUs did not decline during the Class Period—DAUs went up.  Zynga's
    financial statements, unchallenged by Plaintiff, show average DAUs increased from 54 million in
27   Q4 2011 to 65 million in Q1 2012 and then to 72 million in Q2 2012.  (Ex. 2 at 36; Ex. 6 at 21;
    Ex. 7 at 20.)

28

1    What Plaintiff's claim boils down to is that, because bookings came in lower than

2    expected in Q2 2012, Zynga must have known months earlier that bookings would decline.  But

3    "it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier,

4    cheerier statement a falsehood."  *GlenFed*, 42 F.3d at 1548.

5    ### B.    Statements About Zynga's Game Pipeline Were Not False or Misleading.

6    Plaintiff also challenges statements expressing enthusiasm about Zynga's pipeline of new

7    games for release in 2012.  (¶¶ 17, 93–94, 111, 122.)  Statements that Zynga's pipeline of new

8    games was "strong," "nice," and "robust" are not actionable as a matter of law.  *Cutera*, 610 F.3d

9    at 1111 (citation omitted).  Moreover, Plaintiff does not and cannot dispute that Zynga had a

10   strong pipeline of games—it launched 22 games in 2012, compared to nine in 2011.  (Ex. 1 at 82–

11   84; Ex. 5 at 39, 69–72; Ex. 8 at 44.)

12   Instead, citing to conclusory allegations by CWs 3, 6, and 7, Plaintiff alleges that there

13   were unspecified "delays" in the development of some games.  (¶¶ 95, 112, 123.)  As for *The

14   Ville* specifically—the only game Zynga identified on July 25, 2012 as having been delayed—all

15   the Amended Complaint says is that CW7 "described delays with *The Ville*."  (¶ 86.)  But the

16   existence of unspecified "delays" in the development of some games does not mean that Zynga's

17   pipeline was weak or that Defendants were not genuinely enthusiastic about the pipeline.  *See

18   Ditech*, 2007 WL 2990532, at *7–8 (alleged problems that caused delays in shipping products did

19   not demonstrate falsity of defendant's statements because company did not disclose dates that

20   orders would ship and complaint did not specify how long it would take to fix problems).

21   Further, CWs 3, 6, and 7 offer no details about the alleged delays and their impact on the pipeline,

22   such as what the delays were, when they occurred, whether they had any financial impact, or

23   whether Zynga was able to overcome them.  (¶¶ 75, 84, 86.)

24   ### C.    Zynga's Warnings About the Risks Related to Possible Facebook Changes
         Are Not Actionable.

25

26   Zynga warned investors extensively about the risks associated with its Facebook

27   relationship.  (Ex. 1 at 14.)  It disclosed that "Facebook and other platforms have broad discretion

28   to change their platforms . . .  and those changes may be unfavorable to us."  (¶¶ 99, 102, 113.)  It

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. C 12-04007 JSW
sf-3407214

9

1   further listed examples of changes that "may" occur, pointed to detailed examples of past changes

2   that had harmed Zynga's business, and cautioned that "[a]ny such changes in the future could

3   significantly alter how players experience our games or interact within our games, which may

4   harm our business."  (Ex. 2 at 7–8.)  Nonetheless, Plaintiff claims that these risk factors were

5   misleading because Zynga "failed to disclose that Facebook **was** actually changing its platform in

6   a way that would materially harm Zynga's business."  (¶ 18.)

7       Courts regularly reject similar challenges to risk factors.  In *Stac Electronics*, for example,

8   the company warned "[t]here can be no assurance" that Microsoft would not launch a competing

9   product.  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1407 (9th Cir. 1996).  The plaintiffs claimed

10  that this risk factor was misleading because the company was already in licensing negotiations

11  with Microsoft and "*knew* that Microsoft was going to come out with a competitive product."  *Id.*

12  at 1405–06.  The Ninth Circuit affirmed the dismissal of the complaint on the ground that

13  "[a]nalyzing the quoted statements in context leads to the inexorable conclusion that investors

14  were specifically and adequately warned about the relevant risks."  *Id.* at 1409; *see also In re*

15  *LeapFrog Enters. Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1049 (N.D. Cal. 2007) ("plaintiffs'

16  allegations do not support that the risk factors themselves are false").

17      Likewise, in *Ubiquiti Networks*, the court rejected a claim that a risk factor was

18  misleading because it described counterfeiting as "a contingency rather than an actuality."  *In re*

19  *Ubiquiti Networks, Inc. Sec. Litig.*, No. 12-CV-4677 YGR, 2014 WL 1254149, at *11 (N.D. Cal.

20  Mar. 26, 2014).  Ubiquiti had disclosed that:  "Unauthorized use of our intellectual property has

21  occurred in the past and may occur in the future without our knowledge."  *Id.* at *8.  Zynga's

22  disclosures are even more specific than those in *Ubiquiti Networks*.  Zynga described specific past

23  changes that led to a decline in "the number of our players on Facebook" and further explained

24  that future Facebook changes "could significantly alter how players experience our game or

25  interact within our games, which may harm our business."  (Ex. 1 at 14.)

26      In any event, none of Plaintiff's allegations shows that Zynga knew that Facebook was

27  changing its platform in 2012 in a way that would harm Zynga's business during the Class Period.

28  Only one CW—CW6, a Senior Product Manager for "at least three of Zynga's titles"—has

anything to say about a 2012 platform change.[4]  All that CW6 says is that Zynga was first informed of a Facebook platform change in April 2012, that unnamed Zynga executives knew of a change a few months earlier, and that any Facebook platform changes would have been included in two types of weekly reports.  (¶ 85.)  To begin with, CW6 does not say what the platform change was or even that it was the same one that was referenced in the July 25 earnings call as having a negative impact on Zynga's business.  Nor does CW6 allege any details about these reports, such as what Facebook changes they discussed or who received them.  Nor does he allege that Zynga was informed that this Facebook change would have a negative "impact" on Zynga's games, just that it would have an "impact."  And, most importantly, CW6 does not say that anyone, let alone any of the Defendants, knew that this platform change would actually occur or harm Zynga's business.  *See Ronconi*, 253 F.3d at 434; *see also Stac Elecs.*, 89 F.3d at 1407 ("another company's plans cannot be known to a certainty").  Plaintiff's vague allegations do not come close to satisfying the Reform Act's requirements.

### D.    Plaintiff Fails to Plead an Actionable Forward-Looking Statement.

Plaintiff challenges Zynga's 2012 projections and Zynga's statements that it expected growth to be weighted towards the second half of 2012.  (¶¶ 20, 96, 115–17.)  Plaintiff, however, does not plead facts to show that these statements lacked a reasonable basis when they were made.  In addition, the statements are protected by the Reform Act's safe harbor.

### 1.    Plaintiff fails to plead that Zynga's 2012 guidance lacked a reasonable basis when made.

Plaintiff fails to allege facts to support his assertion that Zynga provided false guidance for 2012.  (¶¶ 20–21, 96–97, 115–18.)  "The mere fact that stated expectations fail to come to pass does not make a statement concerning expectations or plans false."  *Rigel*, 697 F.3d at 882 n.12; *see also In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993).  To plead that a

---

[4] CW3 alleges that in 2011, "Facebook provided [a] changed platform to Zynga '5–6 months' prior to its launch so that Zynga's engineers and QA could conduct beta testing.'" (¶ 76.)  CW3 is silent about any Facebook platform changes that occurred in 2012.  *See Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW, 2005 WL 1787426, at *11 (N.D. Cal. July 27, 2005) ("this silence is telling").

1   forward-looking statement is false, Plaintiff must plead facts showing that at the time the

2   prediction was made (1) the prediction was not genuinely believed, (2) there was not a reasonable

3   basis for the prediction, or (3) the speaker was aware of undisclosed facts tending to seriously

4   undermine the accuracy of the prediction. *Rigel*, 697 F.3d at 870; *Stac Elecs.*, 89 F.3d at 1409.

5          Plaintiff does not cite a single internal document or CW even suggesting that Zynga did

6   not have a reasonable basis for its February or April statements about its 2012 guidance.  Rather,

7   Plaintiff recycles the same allegations underlying his other claims—vague "declines" in

8   bookings, game delays, and Facebook changes.  (¶¶ 97, 118, referring to ¶¶ 92, 95.)  The only

9   CW alleged to have had any role in preparing projections at Zynga—CW6 (¶ 81–84)—says

10  nothing about whether the alleged "declines" would have any effect on Zynga's guidance, the size

11  of any such effect, or whether Zynga's guidance already took account of the alleged "declines" or

12  "delays."  *See Ronconi*, 253 F.3d at 434 (plaintiff did not allege specific facts showing how

13  "'problems' and 'difficulties' translated into decreasing revenues"); *In re Juniper Networks, Inc.*

14  *Sec. Litig.*, No. 3:02-CV-01221, 2004 WL 547607, at *3 (N.D. Cal. Mar. 11, 2004) (allegations

15  from CWs failed to show how "problems being experienced translated into the need for [the

16  company] to alter or reduce its publicly issued projections").  In addition, no CW points to any

17  reports or data that would contradict Zynga's public statements, even though Plaintiff claims that

18  "revenue information was tracked and easily available" and displayed on "monitors" to

19  employees throughout the Company.  (¶ 74.)

20         Plaintiff also challenges Zynga's statements that it "expect[ed] to continue" to generate a

21  substantial portion of its revenue and players through the Facebook platform "for the foreseeable

22  future."  (¶¶ 99, 113.)  According to Plaintiff, these statements were false and misleading because

23  Zynga did not disclose a Facebook platform change that would have material adverse effects

24  beginning in Q2 2012.  (¶¶ 100, 103, 114.)  There is a fatal flaw in Plaintiff's contention—

25  Zynga's prediction came true, and Plaintiff does not and cannot claim otherwise.  In 2012, Zynga

26  derived 81% of its bookings, earned 86% of its revenue, and acquired substantially all of its

27  players from games played on Facebook.  (Ex. 8 at 6.)  Predictions that come true are not

28  actionable.  *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 930–31 (9th Cir. 1996).

**2.      The forward-looking statements are also protected by the Reform Act's safe harbor and the "bespeaks caution" doctrine.**

A statement is protected by the safe harbor when it is identified as forward looking and is either (1) accompanied by meaningful cautionary language; or (2) not made with actual knowledge of its falsity.  15 U.S.C. § 78u-5(c)(1)(A)–(B); *Cutera*, 610 F.3d at 1112.  Under the companion "bespeaks caution" doctrine, forward-looking statements that contain meaningful cautionary language are not actionable.  *Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004).

Here, Plaintiff challenges various forward-looking statements, including statements about Zynga's financial guidance for 2012 (¶¶ 90, 96, 108, 115–17, 120), game pipeline and portfolio (¶¶ 93–94, 107, 111, 122), and Facebook expectations (¶¶ 99, 113).  Zynga identified each as a "forward-looking statement," including its "outlook for full year 2012," "higher growth rate in the back-half of 2012," "ability to sustain bookings from existing games and increase payer conversion," and "launch of successful new games."  (Ex. 9 at 3; Ex. 13 at 1–2; Ex. 11 at 3; Ex. 14 at 1–2; Ex. 15 at 1.)

The cautionary language that accompanied these statements was sufficient because it disclosed the very risks that Plaintiff challenges now.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) ("meaningful cautionary statements" should "identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]").  Zynga warned that its "actual results could differ materially from those predicted or implied" based on factors such as "our ability to launch new games in a timely manner and monetize these games," "changing interests of players," and "changes in the Facebook platform or our relationship with Facebook."  (Ex. 9 at 3.)  Zynga also referred investors to its recent SEC filings, which, as set forth above in Background §§ A–E, "virtually overflow[ed]" with risk factors.  *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515-16 (9th Cir. 1991).  Detailed warnings such as these end the inquiry.  *Cutera*, 610 F.3d at 1112-13; *Clorox*, 353 F.3d at 1132.

### III.    THE AMENDED COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER.

Plaintiff's failure to meet the requirements for pleading falsity means that he has also not adequately alleged scienter.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996).  Even apart from this failure, Plaintiff has failed to plead facts that would give rise to a strong inference of scienter.

Under the Reform Act, Plaintiff is required to "state with particularity facts giving rise to a strong inference" that the person who made the false statements acted with scienter.  *Tellabs*, 551 U.S. at 314; 15 U.S.C. § 78u-4(b)(2).  This means that Plaintiff must plead in "great detail," *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), facts demonstrating that "defendants believed that they were making false or misleading statements."  *Rigel*, 697 F.3d at 876, 885–86.  Plaintiff's allegations must give rise to an inference of scienter that is both (1) "cogent" and (2) "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

The Court first must determine if any of Plaintiff's allegations, standing alone, create a strong inference of scienter and, if not, it should then conduct a "holistic" review.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009).  Plaintiff's allegations do not create an inference of scienter under either analysis.

### A.    The Confidential-Witness Statements Do Not Show that Defendants Made Statements Knowing that They Were False.

"[A] complaint relying on statements from confidential witnesses must pass two hurdles": (1) it must establish that the CWs are reliable—i.e., it "must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report"; and (2) the CW statements "must themselves be indicative of scienter."  *Zucco*, 552 F.3d at 995; *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1069 n.13 (9th Cir. 2008).  The Amended Complaint fails to clear either hurdle.

The CWs are not reliable.  The Amended Complaint fails to provide an adequate basis showing that the CWs have personal knowledge about what the Defendants knew when they

1    made the alleged misstatements.  Allegations attributed to CWs do not support an inference of

2    scienter where a majority of defendants had no interaction with them.[5]  *See In re Accuray, Inc.*

3    *Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010); *In re Bare Escentuals, Inc. Sec. Litig.*, 745

4    F. Supp. 2d 1052, 1079 (N.D. Cal. 2010) (no scienter where no allegation that CWs spoke with

5    any defendants or heard any statement by defendants that contradicted their public statements).

6    Here, the only CW Plaintiff alleges had contact with any Individual Defendant, CW6, claims to

7    have attended an unspecified number of meetings with one defendant, Schappert.  (¶¶ 81–82, 92.)

8    But there are no allegations that CW6 personally spoke to Schappert or knew that Schappert did

9    not believe that Zynga's games provided "solid bookings."  (¶ 107.)  And "[n]one of the CWs

10   held finance or accounting positions, so none was in a position to" know about Zynga's quarterly

11   bookings, or guidance.  *Accuray*, 757 F. Supp. 2d at 945; (*see, e.g.*, ¶¶ 67, 70, 73, 77, 78, 81, 86.)

12        Further, as discussed below, Plaintiff's CW allegations also fail the second hurdle—the

13   allegations themselves do not create a strong inference of scienter, regardless of their reliability.

14        **B.    The Core-Operations Inference Does Not Support Scienter.**

15        Generally, allegations that officers "must have known" a statement was false because it

16   related to the business's "core operations," do not create a strong inference that Defendants had

17   contemporaneous knowledge contradicting their statements.  *Zucco*, 552 F.3d at 1000–01.  The

18   Ninth Circuit has identified two "exceedingly rare" exceptions to this rule, but neither is present

19   here.  *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008).

20        The first exception applies where the complaint pleads "detailed and specific allegations

21   about management's exposure to factual information."  *Id.* at 785; *Zucco*, 552 F.3d at 1000.  As

22   set forth above, Plaintiff has failed to plead the existence of any data, report, conversation,

23   meeting, or other information that contradicts any of the challenged public statements, much less

24   any facts to show that any of the Defendants was aware of such information.

25        Plaintiff's generalized and recycled allegations from CWs 3, 4, and 6 that the Individual

26   ─────────────────────
         [5] CWs 1 and 2 allegedly attended meetings, but none of the Defendants is alleged to have

27   been present at those meetings.  (¶¶ 68–70.)  CW5 did not even work at Zynga during the Class
     Period.  (¶ 78.)

28

1    Defendants "were aware," or that there was "no way" they were unaware, of unspecified game

2    delays or financial metrics[6] cannot substitute for the specific facts that the Reform Act requires.

3    *Zucco*, 552 F.3d at 998 (rejecting allegation that defendant "had to have known what was going

4    on"). Similarly, conclusory allegations that Defendants had access to information or were

5    provided internal reports (*see, e.g.*, ¶¶ 17, 68, 72, 75, 77, 80–84, 127–30) are not adequate to

6    create an inference of scienter. *See Zucco*, 552 F.3d at 1000–01 (allegations that management

7    "had access to" purportedly manipulated quarterly accounting numbers or "analyzed the

8    inventory numbers closely" do not support inference of scienter); *Lipton v. Pathogenesis Corp.*,

9    284 F.3d 1027, 1035–36 (9th Cir. 2002).

10          The second exception applies only where "the falsity is patently obvious—where the facts

11   [are] prominent enough that it would be absurd to suggest that top management was unaware of

12   them." *Zucco*, 552 F.3d at 1001 (citation omitted). This "absurd to suggest" standard is strict.

13   The misrepresented information must be so "obvious" that the falsity is "readily apparent to the

14   defendant corporation's senior management." *Id*. at 1000–01; *cf. Berson v. Applied Signal Tech.,*

15   *Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008) ("absurd to suggest" executives did not know about

16   four stop-work orders that halted tens of millions of dollars of work, led to reassignment of 50–75

17   employees, and left one company facility a "ghost town"). Nothing like that is alleged here.

18   None of Plaintiff's vague allegations regarding declines, delays, and changes to Facebook's

19   platform shows that conditions at Zynga differed so fundamentally—or at all—from Zynga's

20   public statements that Defendants must have known their statements were false.

21          **C.    Stock-Sale Allegations Do Not Create a Strong Inference that Defendants
22                   Made False or Misleading Statements.**

23          Plaintiff's allegations regarding the Individual Defendants' stock sales also do not support

24   an inference of scienter. (¶¶ 132–42.) "Insider stock sales are not inherently suspicious." *In re*

25   *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (citation omitted). At a minimum,

26   ─────────────────
         [6] (*See* ¶¶ 17, 75, 130 (CW3:  there was "no way" defendants were unaware of game
27   delays); ¶¶ 77, 127 (CW4:  defendants "were aware" of financial metrics); ¶¶ 17, 84, 129 (CW6:
     management had "no reason" to be unaware of game delays).)

28

1    "the trading must be . . . well beyond the normal patterns of trading by [the] defendants." *In re*

2    *Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1022–23 (9th Cir. 2005) (citation omitted).  Here, the

3    trading was not unusual, the timing and amounts were not suspicious, and Plaintiff does not

4    provide any relevant trading history.

5          First, as the Ninth Circuit has observed, "insufficient allegations of fraud" elsewhere in

6    the Complaint have a "spillover effect" on the analysis of stock sales.  *Vantive*, 283 F.3d at 1093.

7    As here, where a plaintiff recycles "virtually identical allegations" throughout the complaint, "it

8    becomes difficult to see how particular stock sales would strengthen allegations that particular

9    statements were uttered with deliberate recklessness at the times they were made."  *Id.*

10         Second, the timing was not suspicious.  Zynga went public in December 2011, and

11   reported record results in February 2012.  (¶ 56; Ex. 9 at 1.)  "One would expect shareholders of a

12   company which only recently went public to sell significant sums of stock shortly after the

13   company announced its most profitable quarter in its history."  *In re FVC.COM Sec. Litig.*, 136 F.

14   Supp. 2d 1031, 1040 (N.D. Cal. 2000), *aff'd*, 32 F. App'x 338 (9th Cir. 2002).  Moreover, the

15   Secondary Offering was finalized during Q1 2012, and the sales in that offering occurred on April

16   3, weeks before Zynga reported record-setting bookings for Q1.  (Ex. 10; Ex. 11 at 1.)  And, even

17   if Defendants had sold stock after optimistic projections, the timing still would not be suspicious.

18   *Lipton*, 284 F.3d at 1037 (officers commonly sell stock after quarterly financial disclosures that

19   provide investors with detailed information about company performance).

20         Third, the staggered lock-up release undermines any inference of scienter.  There is

21   nothing inherently wrong about a lock-up release.  *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d

22   1231, 1238, 1251 (N.D. Cal. 1998) (allegations that defendants obtained an early lock-up release

23   failed to raise a strong inference of scienter).  Without the staggered release, 100% of the shares

24   would have been released on May 29, 2012, nearly two months *before* the alleged "truth" was

25   revealed on July 25, 2012.  (Ex. 1 at 144.)  Instead, all officers and directors—most of whom are

26   not defendants and did not sell in the Secondary Offering—agreed to restrict 20% of their

27   collective shares to July 6, 2012, and another 60% of their collective shares to August 16, 2012.

28   (Appendix A; Ex. 5 at 125.)  Plaintiff does not explain why, if the Individual Defendants were

1   "eager to cash out" (¶ 6), they would have extended the lock-up agreements covering many of

2   their shares until after the disclosure of Zynga's Q2 results. *See Osher v. JNI Corp.*, 256 F. Supp.

3   2d 1144, 1165 (S.D. Cal. 2003) (finding stock sales were not suspicious where plaintiff did not

4   explain how lock-up agreements supported inference of scienter).

5        Fourth, the percentages and amounts of Defendants' sales in the Secondary Offering do

6   not raise a strong inference of scienter.  (Calia Decl. ¶¶ 22-24; Exs. 16–18.)  Pincus sold

7   approximately 15% of his shares.  (Calia Decl. ¶ 22); *see Ronconi*, 253 F.3d at 435–36 (sales of

8   10% and 17% of holdings not suspicious); *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1105

9   (N.D. Cal. 2006) (sales of 15% and 25% of holdings not suspicious).  And although Pincus's

10  sales were large in dollar terms ($192 million), "large numbers do not necessarily create a strong

11  inference of scienter."  *Vantive*, 283 F.3d at 1093; *see also City of Royal Oak Ret. Sys. v. Juniper

12  Networks, Inc.*, 880 F. Supp. 2d 1045 (N.D. Cal. 2012) (no scienter where defendant sold

13  $142 million of stock).  Nor do stock sales by Wehner and Schappert raise a strong inference of

14  scienter simply because the sales were of 67% and 84% of their respective vested shares.[7]  (¶

15  134.)  Indeed, in *Metzler*, the court held that there was no scienter even though the defendant had

16  sold 100% of his shares.  *See Metzler*, 540 F.3d at 1067; *see also Ronconi*, 253 F.3d at 435–36

17  (no inference of scienter where seven insiders sold 69% or more of their stock and one sold 98%);

18  *Vantive*, 283 F.3d at 1093 (no inference of scienter where Chairman sold 74% of his stock).

19       Finally, Plaintiff does not provide any relevant trading history to determine whether

20  Defendants' trades were, in fact, suspicious.  Plaintiff must do so, "*[e]ven if the defendant's

21  trading history is simply not available*."  *Zucco*, 552 F.3d at 1005 (emphasis added).

22       **D.    Viewed Holistically, Plaintiff's Theory of Fraud Is Neither Cogent Nor
              Compelling.**

23

24       Viewed holistically, Plaintiff's theory of fraud makes no sense.  Plaintiff contends that

25

26       [7] Additionally, Schappert only joined Zynga in May 2011, and thus did not have any
vested options to sell before the Class Period. *Silicon Graphics*, 183 F.3d at 987 (no scienter
27  where defendant had only been employed for a year and had no trading history for comparison);
*Pixar*, 450 F. Supp. 2d at 1105.

28

1   Defendants lied to investors so that a few Zynga insiders could sell a portion of their shares in

2   early April instead of late May.  Plaintiff alleges that to perpetrate this fraud, Defendants made

3   false and misleading statements, such as releasing optimistic financial projections on April 26,

4   2012 (after the challenged stock sales), before "revealing the truth" on July 25, 2012.

5        Neither the facts alleged nor the documents referenced in the Amended Complaint support

6   Plaintiff's theory.  Although the CWs say that Zynga paid close attention to data, they do not

7   identify any data even suggesting that anyone at Zynga—let alone the Individual Defendants—

8   had information that was inconsistent with what was disclosed.

9        Moreover, pursuant to the original lockup agreements, *none* of the Individual Defendants'

10  shares would have been locked up after May 29, 2012.  Thus, the Secondary Offering's staggered

11  release reduced, rather than increased, the number of shares the Individual Defendants could sell

12  before Zynga reported disappointing news on July 25, 2012.  Plaintiff's theory that Individual

13  Defendants' stock sales show they were "eager to cash out" in advance of bad news about a

14  "disastrous" Q2 (¶¶ 6–10) is thus neither cogent nor compelling.

15       The stronger and more compelling inference is that Zynga was a new, rapidly growing

16  company in a new, rapidly growing industry.  Zynga's games depended on a third-party's

17  platform and needed to continually produce and maintain hit games to succeed—all risks which

18  Zynga repeatedly disclosed.  When those risks materialized, Zynga's business was, not

19  surprisingly, negatively affected.  Viewed holistically, therefore, the allegations in the Complaint

20  do not support the required strong inference of scienter.[8]

21  **IV.   PLAINTIFF ALSO FAILS TO PLEAD LOSS CAUSATION.**

22       To plead loss causation, it is not enough to allege a stock drop following disappointing

23

24       _____

        [8] Plaintiff's previous complaint alleged that Zynga manipulated its reported revenue by
        changing the weighted average life ("WAL") of its virtual durable goods, like tractors.  Plaintiff
25  has dropped this claim, but nevertheless says that Zynga's shortening of WAL supports scienter.
        It does not.  Zynga fully and completely disclosed precisely what it was doing in terms of WAL
26  for its virtual durable goods.  (Ex. 1 at 67–68.)  And Zynga disclosed precisely the estimated
        WAL for each quarter and precisely how much it affected revenue.  (*See id.*; Ex. 6 at 24; ¶ 145.)
27  Full disclosure does not support a claim of fraud.  And, in any event, as Plaintiff acknowledges, it
        is bookings, not revenue, that Zynga told investors was its "key financial metric."  (¶ 3.)

28

1    news.  Rather, a complaint must "allege that the practices that the plaintiff contends are fraudulent

2    were revealed to the market" and that such revelation, rather than "reports of the defendant's poor

3    financial health generally," caused the plaintiff's losses.  *Metzler*, 540 F.3d at 1063.

4         Here, Plaintiff does not allege that the market ever learned that any of Zynga's prior

5    public statements had been false.  Neither Zynga, nor any analyst, or any news article has ever

6    said that Zynga's bookings had been declining since before the IPO.  Nor were there any public

7    reports that Zynga's pipeline of games scheduled for release in 2012 had been weak in early

8    2012, that Zynga knew of harmful Facebook changes before they happened, or that Zynga's

9    guidance given in February and April had been unsupportable at the time.  Thus, Plaintiff has not

10   pled that the market was reacting to revelations of falsity, as opposed to reports of Zynga's worse-

11   than-anticipated financial performance.  *Metzler*, 540 F.3d at 1063.

12        In addition, the reasons Zynga gave on July 25 as to why it was lowering its guidance—

13   declines in existing games due in part to Facebook platform changes and the delay in the launch

14   of *The Ville*—were risks that Zynga had repeatedly disclosed.  *See supra* Background §§ A–E.  A

15   complaint does not show loss causation where, as here, a stock drop follows the materialization of

16   a previously disclosed and known risk.  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158

17   (2d Cir. 2007); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).

18   **V.    PLAINTIFF'S 20(a) CLAIM SHOULD BE DISMISSED.**

19        The Section 20(a) claim should be dismissed because Plaintiff has failed to plead a

20   primary violation of the federal securities laws.  *Rigel*, 697 F.3d at 886.

21                                    **CONCLUSION**

22        The Amended Complaint should be dismissed with prejudice because further amendment

23   would be futile.  *See Vantive*, 283 F.3d at 1097–98.

24   Dated: May 2, 2014                    MORRISON & FOERSTER LLP

25                                    By:    /s/   *Jordan Eth*
                                         _____
26                                         Jordan Eth

27                                    Attorneys for Defendants

28

1

**ECF ATTESTATION**

2

I, Kevin A. Calia, am the ECF User whose ID and Password are being used to file this:

3

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO
DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT;
SUPPORTING MEMORANDUM OF POINTS AND
AUTHORITIES**

4

5

6

In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Jordan Eth has

7

concurred in this filing.

8

9

Dated: May 2, 2014

MORRISON & FOERSTER LLP

10

By:   /s/ *Kevin A. Calia*

11

Kevin A. Calia

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28