UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ZYNGA INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>All Actions. | Case No.  12-cv-04007-JSC<br>Consolidated with Case Nos.<br>12-CV-4048-JSC; 12-CV-4059-JSC;<br>12-CV-4064-JSC; 12-CV-4066-JSC;<br>12-CV-4133-JSC; 12-CV-4250-JSC<br><br>**ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Re: Dkt. No. 205 |

Lead Plaintiff David Fee ("Lead Plaintiff") brings this pre-certification securities class action against Defendants Zynga Inc. ("Zynga" or the "Company"), Mark Pincus, David M. Wehner, and John Schappert (the "Individual Defendants," and collectively, "Defendants"), alleging that Defendants artificially inflated Zynga's stock price by misleading investors about Zynga's core business metrics and engaging in insider trading in violation of the federal securities laws.  Now pending before the Court is Lead Plaintiff's motion for preliminary approval of a class action settlement.  (Dkt. No. 205.)[1]  Defendants consent to the motion.  (*Id.* at 31.)  After reviewing the proposed settlement, and with the benefit of oral argument on October 8, 2015 and post-hearing briefing, the Court GRANTS the motion as outlined below.

## BACKGROUND

### A.    Factual Background

This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Zynga during the relevant class period, defined below.  Zynga

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

develops, markets and operates online social game services that generate revenue primarily through in-game sale of virtual currency and goods to users, monitored mainly through a financial metric called "bookings." (Dkt. No. 155 ¶ 3.) In the lead up to its December 15, 2011 initial public offering ("IPO"), the Individual Defendants and other corporate insiders had access to real-time data showing declines in user numbers, user spending, and bookings. Just three months after the IPO, and despite an IPO restriction that barred them from selling for a certain time period, aware of the Company's poor financial condition the Individual Defendants and some officers sold their shares for hundreds of millions of dollars in a Secondary Offering on April 3, 2012. (*Id.* ¶¶ 7-8.) Just three months later, on July 25, 2012, Zynga disclosed its poor financial results to the public. (*Id.* ¶ 10.) The officers' actions allowed them to shift the Company's revenue losses from the first quarter to the second quarter of 2012, thereby artificially inflating the price of Zynga shares during the first quarter. (*Id.* ¶¶ 11-12.) As part of their effort to artificially inflate the price of Zynga stock, Defendants issued a series of false and misleading statements regarding Zynga's bookings, game pipeline, Facebook changes, and 2012 guidance, all while the Company's finances were actually deteriorating. (*See id.* ¶¶ 13-21.) By the time the truth about the Company's financial status was actually disclosed, Zynga's stock price had fallen 37% in a single day. (*Id.* ¶ 23.)

**B.      Procedural History**

Beginning on June 30, 2012, twelve class actions were filed in this Court against Zynga and certain of its directors and officers, as well as certain underwriters that served in connection with the Company's IPO and secondary offering of personally held shares (Secondary Offering").[2] By Stipulation and Order of September 26, 2012, the district court consolidated seven related class actions then pending in this District into this single class action entitled *In re Zynga Inc. Securities*

---

[2] These cases include *DeStefano v. Zynga Inc.*, Case No. 12-cv-4007-JSW; *Campus v. Zynga Inc.*, No. 12-cv-4048-JSW; *Diemand v. Zynga Inc.*, No. 12-cv-4059-JSW; *Phillips v. Zynga Inc.*, No. 12-cv-4064-JSC; *Walker v. Zynga Inc.*, No. 12-cv-4066-JSW; *Gaines v. Zynga Inc.*, No. 12-cv-4133-SBA; *Moayyad v. Zynga Inc.*, No. 12-cv-4250-JSW; *Draper v. Zynga Inc.*, No. 12-v-4017-RS; *Yan v. Zynga Inc.*, No. 12-cv-4360-LHK; *Choukri v. Zynga Inc.*, No. 12-cv-4629-CRB; *Westley v. Zynga Inc.*, No. 12-cv-4833-LHK; *Reyes v. Zynga Inc.*, No. 12-cv-5065-CRB.

United States District Court
Northern District of California

1   *Litigation*, Lead Case No. 12-cv-4007-JSW.[3]  (Dkt. No. 30; *see also* Dkt. No. 206 ¶ 2.)  On

2   October 23, 2012, the Court related an additional five actions into this class action.[4]  (Dkt. No. 92;

3   *see also* Dkt. No. 206 ¶ 2.)  On January 23, 2013, the district court appointed David Fee as Lead

4   Plaintiff for the putative class pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of

5   1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act ("PSLRA"),

6   15 U.S.C. § 78u-4(a)(3)(B),and Section 27D(a)(3)(B) of the Securities Act of 1933 ("Securities

7   Act"), 15 U.S.C. § 77z-1(a)(3)(B), and approved the law firms of Berman DeValerio and Newman

8   Ferrara LLP as Lead Counsel in this class action.

9          On April 3, 2013, after extensive investigation by Lead Counsel, Lead Plaintiff and named

10   plaintiff Joy Arjoon-Singh filed a Consolidated Complaint alleging claims under the Exchange

11   Act and the Securities Act on behalf of all persons who purchased Zynga common stock between

12   December 15, 2011 and July 25, 2012, inclusive.  (Dkt. No. 125; *see also* Dkt. No. 206 ¶ 3.)  The

13   Consolidated Complaint asserted (1) claims under Section 20 of the Exchange Act against the

14   Officer Defendants; (2) claims under Section 11 of the Securities Act against the Director

15   Defendants and Underwriter Defendants; (3) claims under Section 12(a)(2) of the Securities Act

16   against Zynga and the Underwriter Defendants; and (4) claims under Section 15 of the Securities

17   Act against the Officer Defendants and Director Defendants.   (*See generally* Dkt. No. 125.)  The

18   district court granted Defendants' motion to dismiss the entire Consolidated Complaint with leave

19   to amend.  (Dkt. No. 152; *see also* Dkt. No. 206 ¶ 3.)

20          After further investigation, Lead Plaintiff filed the First Amended Complaint ("FAC"),

21   which is the operative pleading in this action.  (Dkt. No. 155; *see also* Dkt. No. 206 ¶ 4.)  The two-

22   count FAC brings causes of action only under the Exchange Act.  Plaintiff no longer brings claims

23   against the Underwriter Defendants; instead, only Zynga and certain officers and directors are

24   named as defendants.  The first cause of action alleges that Defendants violated Section 10(b) of

25   the Exchange Act and Rule 10b-5 by making materially false statements that operated as a fraud

26

27   [3] Specifically, the Court consolidated civil actions numbered 12-cv-4007-JSW, 12-cv-4048-JSW, 12-cv-4059-JSW, 12-cv-4064-JSW, 12-cv-4066-JSW, 12-cv-4133-SBA, and 12-cv-4250-JSW.

28   [4] These cases related civil actions numbered 12-cv-4017-RS, 12-cv-4360-LHK, 12-cv-4629-CRB, 12-cv-4833-LHK, and 12-cv-5065-CRB with the consolidated action.

United States District Court
Northern District of California

and deceit upon Lead Plaintiff and the other class members in connection with their purchases of Zynga common stock.  The second cause of action is a control-person liability claim against the Individual Defendants under Section 10(a) of the Exchange Act.  In the FAC, Lead Plaintiff elected not to replead claims for shares purchased between December 14, 2011 and July 25, 2012 (the "Earlier Period") and instead shortened the relevant time period to only five months, running from February 14, 2012 to July 25, 2012 (the "FAC Class Period").  (*See* Dkt. No. 210; *Compare* Dkt. No. 125 at 5, *with* Dkt. No. 155 ¶ 2.)  Lead Plaintiff made this tactical decision for three reasons: (1) Zynga's first statement about its 2012 guidance was not made until February 14, 2012, so there were no claims based on that guidance until that date; (2) the allegations about the changes to Facebook games solely pertain to the later period; and (3) the allegations regarding statements about bookings declines are more compelling later in 2012, since trends in declining sales would be more defined later in the quarter.  (Dkt. No. 210 at 3; *see also* Dkt. No. 155 ¶¶ 85, 131.)

Defendants moved to dismiss the FAC, and the Court determined that Lead Plaintiff had adequately alleged all claims—including those based on declining bookings, the Facebook issue, and the 2012 guidance—except those as to Defendants' statements regarding Zynga's game pipeline, which the Court concluded were inactionable business puffery.  (Dkt. No. 176; *see also* Dkt. No. 206 ¶ 5.)  The Court then denied Defendants' motion for reconsideration of their motion to dismiss.  (Dkt. No. 183; *see also* Dkt. No. 206 ¶ 5.)  Thus, the FAC is the operative pleading in this action.

The district court held a case management conference on June 12, 2015.  (Dkt. No. 187; *see also* Dkt. No. 206 ¶ 8.)  Prior to the conference, the parties had agreed to participate in a mediation session.  (Dkt. No. 186.)  By the parties' consent, the action was then reassigned to the undersigned magistrate judge for all further proceedings.  (Dkt. Nos. 190, 193.)  In August 2015, the parties reached a settlement.  Lead Plaintiff filed the instant motion for preliminary approval of the parties' agreement, and the Court held a hearing on the motion on October 8, 2015.  Lead Plaintiff subsequently submitted a supplemental brief addressing concerns the Court raised at the

hearing, along with an Amended Stipulation of Settlement and Revised Class Notice.[5]  (Dkt. Nos. 210, 212-1.)

<div align="center">

**SETTLEMENT PROPOSAL**

</div>

On August 4, 2015, the parties participated in intensive, arm's-length settlement negotiations under the supervision of experienced mediator, Hon. Edward A. Infante (Ret.) of JAMS.  (Dkt. No. 206 ¶¶ 9-10.)  At the negotiations, the parties had the benefit of having already exchanged extensive analyses of the legal and factual issues—including the falsity of Defendants' statements, scienter, and loss causation—in connection with their briefing on the motions to dismiss.  (*Id.* ¶ 12.)  The parties had already served discovery requests and exchanged initial disclosures, and Lead Plaintiff had responded to Defendants' Requests for Admission and Interrogatories.  (Dkt. No 206 ¶ 7.)  At the conclusion of the August 4 mediation, the parties reached an agreement on all materials, including the amount of the settlement.  (*Id.* ¶ 13.)  Thereafter, the parties engaged in further negotiations and ultimately agreed to the Settlement Agreement before the Court, as amended following the hearing.  (*See* Dkt. No. 212-1.)  The key provisions are as follows.

**A.     Estimated Class Size**

The parties define "Settlement Class" as "all Persons who purchased or otherwise acquired Zynga's common stock during the Class Settlement Period[,]" except those who opt out of the class in accordance with the requirements set forth in the agreed-upon notice.[6]  (Dkt. No. 212-1 ¶ 1.34.)  The agreement, in turn, defines "Settlement Class Period" as December 15, 2011 to July 25, 2012, inclusive.  (Dkt. No. 206-1 ¶ 1.36.)  The parties' Settlement Agreement does not contain an estimated number of class members, but Lead Plaintiff notes that there were millions of Zynga common stock shares sold, so there are "likely thousands" of class members.  (Dkt. No. 205 at

---

[5] In this Order, the Court refers to the Amended Stipulation of Settlement and Revised Class Notice as the Settlement Agreement and Class Notice, respectively.

[6] Excluded from the Settlement Class are "Defendants, the Officer Defendants, the Director Defendants, the Underwriter Defendants, the officers and directors of Zynga during the Settlement Class period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity which Defendants have or had a controlling interest."  (Dkt. No. 206-1 ¶ 1.34.)

<div style="writing-mode: vertical">United States District Court  
Northern District of California</div>

United States District Court
Northern District of California

21.)  Lead Plaintiff expects to receive 100,000 claim forms.  (Dkt. No. 212-1 at 61.)  Notably, the proposed Settlement Class includes class members whose claims are no longer part of the operative complaint.

**B.     Settlement Fund**

The parties' Settlement Agreement provides a Settlement Fund of $23,000,000 plus interest earned until entry of final approval.  (Dkt. No. 212-1 ¶¶ 4.1, 4.3)  Deducted from that fund are (1) taxes; (2) attorneys' fees; (2) actual litigation costs; (3) notice and claims administration expenses; and (4) all other costs, fees and expenses associated with the settlement or approved by the Court.  (*Id.* ¶ 5.2.)

The parties' Settlement Agreement itself does not set maximum amounts for any of these categories of costs.  (*See* Dkt. No. 212-1 ¶¶ 7.1—7.5.)  However, the Notice indicates that Lead Counsel will ask the Court to approve payment of up to 25% of the Settlement Fund, or approximately $5,750,000 in attorneys' fees and up to $276,000 for reimbursement of litigation expenses.  (Dkt. No. 212-1 at 61; *see also* Dkt. No. 206 ¶ 16.)  Likewise, the Notice indicates that Lead Plaintiff will seek $900,000 in claims administrator's expenses.  (Dkt. No. 212-1 at 61; *see also* Dkt. No. 206 ¶ 19.)  Before the effective date of final approval, Lead Counsel may use up to $500,000 of the Settlement Fund to pay notice and administration costs, such as the actual costs of publication, printing and mailing the Notice and Claim Form, reimbursement to nominee owners for forwarding the Notice and Claim Form to the beneficial owners, fees and costs incurred in searching for class members.  (Dkt. No. 212 ¶ 4.2.)

Lead Counsel estimates the average distribution as $0.15 per share purchased during the Settlement Class Period *before* deduction of fees and expenses.  (Dkt. No. 206 ¶ 17.)

**C.     Claims & Exclusion Procedures**

Class members may request exclusion by submitting a request for exclusion identifying their name, contact information, numbers of shares of Zynga common stock purchased during the class period along with the date of acquisition and price or other consideration paid, the date of sale of each share, number of shared held immediately before the Settlement Class Period commenced, and a statement of intent to be excluded from the class.  (Dkt. No. 212-1 ¶ 9.1.)

Class members may submit their exclusion request either in signed, written form or via email directly to the claims administrator. (*Id.*; *see also* Dkt. No. 212-1 at 60 (noting that exclusion requests can be submitted via email to admin@zyngasecuritieslitigation.com).)  Any class member who does not submitted a timely written request for exclusion within 70 days after Notice is mailed and published will be bound by the settlement.  (*Id.* ¶ 9.2.)

The remaining funds are then distributed to the class members who do not opt out of the class.  To share in the Settlement Fund, each class member must submit a claim form sent to the claim administrator.  (Dkt. No. 212-1 ¶ 1.5.)  Class members may submit a signed, written claim form in hard copy by regular mail or submit a copy via email to the claims administrator.  (Dkt. No. 212-1 at 52, 58, 70.) The claim must be filed by the actual beneficial purchaser or their legal representative, not by the record purchaser.  (*Id.* at 71.)  The claim form itself is a two-page document.  Part I of the claim form asks for the claimants' name, social security number or taxpayer identification number, phone number, email address, and identification of the purchaser of record if different from the beneficial purchaser of the Zynga common stock.  (*Id.* at 72.)  Part II of the claim form asks for information about transactions in Zynga common stock, including: the number of shares held at the end of trading on December 14, 2011; information—*e.g.*, trade date, number of shares purchased, price per share, and total purchase price—on purchases or acquisition of Zynga common stock between December 11, 2011 and October 23, 2012; the same information on sales of Zynga common stock during the same period; and the number of shares of Zynga common stock held at the close of trading on October 23, 2012.  (*Id.* at 73.)  The claim must be supported by broker confirmations or other documentations of the listed transactions.  (*Id.* at 71-72.)  The claim form instructs claimants to read the release of claims.  (*Id.*)  Any class member who neither timely excludes himself from the class nor timely submits a claim form will be barred from receiving a distribution.  (*Id.*)

If, however, the shares of Zynga common stock purchased during the Settlement Class Period by persons who timely and validly seek exclusion from the class exceeds a certain threshold, Zynga retains the option to terminate the agreement.  (*Id.* ¶ 12.2.)  The threshold number is set forth in a separate supplemental agreement between Lead Plaintiff and Defendants,

1  which the Court has reviewed *in camera*.  (Dkt. No. 213.)

2  **D.      Individual Distribution: Plan of Allocation**

3      Class members will receive a *pro rata* share of the fund based on the agreed-upon Plan of

4  Allocation.  Based on the number of shares that each class member purchased during the class

5  period, the Plan of Allocation—defined only in the Notice itself and not in the Settlement

6  Agreement—then determines each class member's funds in the following way:

7      For each share of Zynga common stock purchased between
8      December 15, 2011 and the close of trading on February 14, 2012,
       inclusive, and:

9      a) Sold prior to the close of trading on July 25, 2012, the
10     Recognized Loss is zero ($0.00).

11     b) Sold at a loss after the close of trading on July 25, 2012 through
       and including the close of trading on October 23, 2012, the
12     Recognized Loss shall be the lesser of 1) $0.12 per share; or 2) the
       difference between the purchase price per share and the sale price
13     per share.

14     c) Held as of the close of trading on October 23, 2012, the
       Recognized Loss shall be the lesser of $0.12 per share; or the
15     difference between the purchase price per share and $3.18 per share.

16     For each share of Zynga common stock purchased between February
       14, 2012 (including the after-hours market on February 14, 2012)
17     and the close of trading on July 25, 2012, inclusive, and:

18     a) Sold prior to the close of trading on July 25, 2012, the
       Recognized Loss is zero ($0.00).

19     b) Sold at a loss after the close of trading on July 25, 2012 through
20     and including the close of trading on October 23, 2012, the
       Recognized Loss shall be the lesser of 1) $1.14 per share; or 2) the
21     difference between the purchase price per share and the sale price
       per share.

22     c) Held as of the close of trading on October 23, 2012, the
       Recognized Loss shall be the lesser of $1.14 per share; or the
23     difference between the purchase price per share and $3.18 per share.

24 (Dkt. No. 212-1 at 65-66.)  No distribution will be made to any claimants who would receive less

25 than $10.00 or to any class member who had a gain from his or her overall transactions in Zynga

26 common stock during the class period.  (*Id.* at 64.)  The Recognized Loss will average $0.15 per

27 share if all class members participate.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

**E.      Release of Claims**

Class members agree to release all claims in the operative complaint (FAC) as well as those alleged in the dismissed Consolidated Complaint, as well as "Released Claims" against "Released Persons."  (Dkt. No. 212-1 at 74-76.)  The scope of "Released Claims" is defined as follows:

> [A]ny and all claims, demands, rights, liabilities, suits, debts, obligations and causes of action, of every nature and description whatsoever (including, without limitation, Unknown Claims, as defined in § 1.43 herein), whether known or unknown, contingent or absolute, mature or unmature, discoverable or undiscoverable, liquidated or unliquidated, accrued or unaccrued, including those that are concealed or hidden, regardless of legal or equitable theory (including without limitations, claims for negligence, gross negligence, recklessness, deliberate recklessness, intentional wrongdoing, fraud, breach of fiduciary duty, breach of the duty of care and/or loyalty, violation of any federal or state statute, rule or regulation, tort, breach of contract, violation of international law or violation of the law of any foreign jurisdiction) that Lead Plaintiff or any Member of the Settlement Class (i) asserted in this Action; (ii) could have or might have asserted in the Action and/or in any other litigation, action or forum that arise out of, are based upon or are related in any way directly or indirectly, in whole or in part, to (a) both: (1) the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth or referred to in the Action, and (2) any purchase, sale or acquisition of, or decision to hold Zynga common stock during the Settlement Class Period; and/or (b) Defendants' defense or settlement of the Action and/or Defendants' defense of settlement of the Released Claims.

 (Dkt. No. 212-1 ¶ 1.30.)  Not included are claims relating to enforcement of the Settlement Agreement and claims asserted on behalf of Zynga in a derivative action based on similar allegations, including a number of such suits now pending in other courts.  (*Id.*)  The parties define "Released Persons" as Defendants, their immediate family members or entities in which Defendants or their immediate family member has a controlling interest, any trust or estate for the benefit of an Individual Defendant, and the Underwriter Defendants and any associated entity.[7]

---

[7] In addition, "Released Persons" includes those Persons'

> respective past, present and future heirs, executors, administrators, predecessors, successors, assigns, employees, agents, affiliates, analysts, assignees, associates, attorneys, auditors, insurers and co-insurers and reinsurers, commercial bank lenders, consultants, controlling shareholders, directors, divisions, domestic partners, employers, financial advisors, general or limited partners and

1   (*Id.* ¶ 1.31.)

2   **F.      Cy Pres Distribution**

3          There will be no reversion of the Settlement Fund to Defendants.  (Dkt. No. 212-1 ¶ 4.4.)

4   Any funds remaining after distribution to class members will be donated to "a non-profit

5   charitable organization unaffiliated with Defendants, Lead Plaintiff or Lead counsel, selected by

6   Lead Plaintiff and subject to Court approval."  (*Id.*)  No particular organization is identified in the

7   parties' Settlement Agreement.

8   **G.      Deadlines**

9          Following preliminary approval, Defendants have 14 business days to deposit the principal

10  amount of the Settlement Fund ($23,000,000) into the settlement fund account, in a check issued

11  to the Zynga Securities Class Action Settlement Fund care of Lead Counsel.  (*Id.* ¶ 4.1.)  Lead

12  Counsel shall provide Defendants with any necessary tax forms within 10 calendar days of

13  execution of the settlement.  (*Id.*)

14         In addition, within 5 days of preliminary approval Defendants must provide to the claims

15  administrator a list of its common stockholders (including common stock holder names and

16  addresses during the Settlement Class Period) in electronic form.  (*Id.* ¶ 8.2.)  Within 7 days of the

17  Court's entry of an order granting preliminary approval, Defendants must mail and publish notice

18  of the settlement.  (Dkt. No. 205 at 31; Dkt. No. 212-1 at 44-45.)  Class Members then have 70

19  days after mailing and publication of notice to return the claim form with supporting

20  documentation or to submit a written request to opt out of the settlement.  (*Id.* ¶ 9.2.)  Written

21  objections to the settlement or to Lead Counsel's fee request are also due by the same claims

22  receipt deadline.  (Dkt. No. 205 at 31.)  There is no deadline for class members to cash their

23  checks.

24  _____

25          partnerships, investment advisors, investment bankers and banks,
        joint ventures and ventures, managers, managing directors, marital
26          communities, members, officers, parents, personal or legal
        representatives, principals, shareholders, spouses, subsidiaries
27          (foreign or domestic), trustees, underwriters and retained
        professionals, in their respective capacity as such.

28  (Dkt. No. 212-1 ¶ 1.31.)

United States District Court
Northern District of California

**DISCUSSION**

A class action settlement must be fair, adequate, and reasonable.  Fed. R. Civ. P. 23(e)(2).

When, as here, parties reach an agreement before class certification, "courts must peruse the

proposed compromise to ratify both the propriety of the certification and the fairness of the

settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  If the Court temporarily

certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation,"

then the class will be notified and a final "fairness" hearing scheduled to determine if the

settlement is fair, adequate, and reasonable pursuant to Federal Rule of Civil Procedure 23.

*Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA, 2012 WL 5878390, at *5 (N.D.

Cal. Nov. 21, 2012).

**A.     Conditional Certification of Settlement Class**

Class actions must meet the following requirements prior to certification:

> 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one

of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that

the questions of law or fact common to class members predominate over any questions affecting

only individual members, and that a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In evaluating the proposed

class, "pertinent" matters include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against the class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

United States District Court
Northern District of California

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Prior to certifying the class, the Court must determine that Lead Plaintiff has satisfied his burden to demonstrate that the proposed class satisfies each element of Rule 23.

    1.    <u>Rule 23(a)</u>

        a.    *Numerosity*

There is no exact class size that meets the numerosity requirement; rather, "[w]here the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied[.]"  *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 250-51 (N.D. Cal. 2005) (internal quotation marks and citation omitted).  "[I]n securities cases, when millions of shares are traded during the proposed class period, a court may infer that the numerosity requirement is satisfied."  *Howell v. JBI, Inc.*, 298 F.R.D. 649, 654-55 (D. Nev. 2014) (citations omitted); *see also Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) (numerosity is satisfied where the class period involved 120,000 transactions involving 21,000,000 shares); *In re Cooper Cos. Inc. Secs. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009); *In re Wireless Facilities, Inc. Sec. Litig.*, 253 F.R.D. 630, 634-35 (S.D. Cal. Sept. 2008).

Here, millions of Zynga common stock shares were publicly traded during the Settlement Class Period.  (Dkt. No. 205 at 21.)  Lead Plaintiff estimates that the Settlement Class, which consists of purchasers of Zynga common stock during the Settlement Class Period, numbers in the thousands.  (*Id.*)  Therefore, the Settlement Class is sufficiently numerous such that joinder of each member would be impracticable.

        b.    *Commonality*

Second, to certify a class there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  This case concerns a number of common questions of fact and law, including: (a) whether Defendants made statements to the investing public during the Settlement Class Period that omitted or misrepresented material facts about Zynga's bookings, guidance, and Facebook changes that may affect bookings; (2) whether Defendants acted willfully, knowingly, or with deliberate recklessness in making these omissions or misrepresentations; (3) whether Defendants' omissions or misrepresentations constituted fraud on the market by artificially

United States District Court
Northern District of California

inflating the market price of Zynga common stock during the Settlement Class Period; and (4) whether the class members have sustained damages caused by Defendants' statements.  While the amount to which each class member is entitled will differ, the issues described above are common to the proposed Settlement Class, so the commonality requirement is satisfied.

c.   *Typicality*

Lead Plaintiff claims that he and the members of the Settlement Class all purchased Zynga common stock at artificially inflated prices due to Defendants' conduct.  The proof that Lead Plaintiff would need to establish his claim would also prove the claims of the proposed Settlement Class.  Lead Plaintiff's injury would be common to the injury suffered by the Settlement Class. Although there may be differences in damages calculations depending on when Lead Plaintiff and the other class members purchased their shares of Zynga common stock—*i.e.*, in the Earlier Period dismissed from the initial consolidated complaint or the later FAC Class Period which provides for a higher recovery—the injury is common to the Settlement Class.  There is no indication that Lead Plaintiff, who purchased shares in both periods but only has Recognized Loss for shares purchased during the FAC Class Period—would face any unique defenses that could make his claims atypical of the Settlement Class.  Because the claims of Lead Plaintiff are typical, this element is satisfied.

d.   *Adequacy of Representation*

Finally, both Lead Plaintiff and Lead Counsel appear adequate.  Lead Plaintiff purchased Zynga common stock on the market during the Settlement Class Period and was injured by suffering losses in the same manner as the rest of the class.  Thus, he possesses the same interest and suffered the same injury as the rest of the Settlement Class, which supports his adequacy.  *Se Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997) ("Representatives must be part of the class and possess the same interest and suffer the same injury as the class members.").  Lead Plaintiff has clarified that he purchased stock during both periods, though he only has damaged shares from the FAC Class Period.  This ameliorates any concern that Lead Plaintiff accepted this Settlement Agreement to ensure recovery for the Earlier Period members at the expense of the FAC Class Period members, whom Lead Plaintiff concedes have stronger claims.

1    Lead Counsel is also adequate, as the District Court has already determined that Lead

2    Counsel "is highly qualified to represent the class." (*See* Dkt. No. 110 at 4.)  Since that Order,

3    Lead Counsel has demonstrated its adequacy by litigating several motions to dismiss, investigating

4    the class action claims, working with experts and damages consultants and ultimately arriving at

5    the instant Settlement Agreement.

6        2.    Rule 23(b)

7        Rule 23(b)(3) requires establishing the predominance of common questions of law or fact

8    and the superiority of a class action relative to other available methods for the fair and efficiency

9    adjudication of the controversy. *See* Fed. R. Civ. P. 23(b)(3).  Both prongs of this test are met

10   here.

11       Rule 23(b)(3) first requires "predominance of common questions over individual ones"

12   such that "the adjudication of common issues will help achieve judicial economy." *Valentino v.*

13   *Carter Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1986).  This "inquiry focuses on the

14   relationship between the common and individual issues." *Vinole v. Countrywide Home Loans,*

15   *Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (internal quotation marks and citations omitted).  In

16   particular, the predominance requirement "tests whether proposed classes are sufficiently cohesive

17   to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 594.  Here, common

18   questions of law and fact predominate.  The same set of operative facts and a single proximate

19   cause applies to each proposed class member, because each class member purchased and/or

20   acquired Zynga common stock during the Settlement Class Period and suffered losses in their

21   shares' value as a result of Defendants' misrepresentations that artificially inflated the prices then

22   allowed the price to plummet.

23       The second prong—that a class action is the superior means to adjudicate the claims

24   raised—is also easily met.  If Lead Plaintiffs and class members each brought individual actions,

25   they would each be required to prove the same wrongdoing to establish Defendants' liability.

26   Different courts could interpret the claims different, resulting in inconsistent rulings or unfair

27   results.  The Settlement Agreement efficiently resolves the claims of the entire Settlement Class at

28   once.  Thus, class resolution is superior to other methods and will avoid the possibility of

United States District Court
Northern District of California

14

1    repetitious litigation.

2    **B.      Preliminary Approval of the Class Action Settlement**

3             In determining whether a settlement agreement is fair, adequate, and reasonable, a court

4    typically considers the following factors:  "(1) the strength of the plaintiff's case; (2) the risk,

5    expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class

6    action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

7    completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the

8    presence of a governmental participant; and (8) the reaction of the class members of the proposed

9    settlement." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)

10   (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

11            However, when "a settlement agreement is negotiated *prior* to formal class certification,

12   consideration of these eight . . . factors alone is" insufficient.  *Id.*  In these cases, courts must

13   show not only a comprehensive analysis of the above factors, but also that the settlement did not

14   result from collusion among the parties.  *Id.* at 947.  Because collusion "may not always be

15   evident on the face of a settlement, . . . [courts] must be particularly vigilant not only for explicit

16   collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-

17   interests and that of certain class members to infect the negotiations."  *Id.*  In *Bluetooth*, the court

18   identified three such signs:

19                    (1) when class counsel receives a disproportionate distribution of the
                      settlement, or when the class receives no monetary distribution but
20                    counsel is amply rewarded;

21                    (2) when the parties negotiate a "clear sailing" arrangement
                      providing for the payment of attorney's fees separate and apart from
22                    class funds without objection by the defendant (which carries the
                      potential of enabling a defendant to pay class counsel excessive fees
23                    and costs in exchange for counsel accepting an unfair settlement);
                      and
24
                      (3) when the parties arrange for fees not awarded to revert to
25                    defendants rather than be added to the class fund.

26   *Id.*

27            The Court cannot fully assess all of these fairness factors until after the final approval

28

hearing; thus, "a full fairness analysis is unnecessary at this stage." *Alberto v. GMRI, Inc.,* 252 F.R.D. 652, 665 (E.D. Cal. 2008) (internal quotation marks and citation omitted).  Instead, "the settlement need only be *potentially* fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval, after such time as any party has had a chance to object and/or opt out." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007).  At this juncture, "[p]reliminary approval of a settlement and notice to the class is appropriate if [1] the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, [4] and falls within the range of possible approval." *Cruz v. Sky Chefs, Inc.*, No. 12-02705, 2014 WL 2089938, at *7 (N.D. Cal. May 19, 2014) (quoting *In re Tableware Antitrust Litig.,* 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).  Ultimately, "[t]he initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625-26 (9th Cir. 1982).

1.   The Fairness Factors

a.   *Means at Which Parties Arrived at Settlement*

The first factor concerns "the means by which the parties arrived at settlement."  *Harris v. Vector Mktg. Corp.*, No. 08-5198, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011).  For the parties "to have brokered a fair settlement, they must have been armed with sufficient information about the case to have been able to reasonably assess its strengths and value." *Acosta*, 243 F.R.D. at 396.  Particularly with pre-certification settlements, enough information must exist for the court to assess "the strengths and weaknesses of the parties' claims and defenses, determine the appropriate membership of the class, and consider how class members will benefit from settlement" in order to determine if it is fair and adequate.  *Id.* at 397 (internal quotation marks omitted).

The use of a mediator and the presence of discovery "support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement." *Villegas*, 2012 WL 5878390, at *6; *Harris*, 2011 WL 1627973, at *8 (noting that the parties' use of a mediator "further suggests that the parties reached the settlement in a procedurally sound manner and that it was not the result

of collusion or bad faith by the parties or counsel").  However, the use of a neutral mediator "is not on its own dispositive of whether the end of product is a fair, adequate, and reasonable settlement agreement."  *Bluetooth*, 654 F.3d at 948.

Here, prior to mediation, the parties engaged in limited discovery.  Specifically, the parties exchanged discovery requests and initial disclosures, but only Lead Plaintiff had responded to Defendants' requests for admission and interrogatories.  (Dkt. No. 206 ¶ 7.)  In preparation for mediation, the parties also exchanged mediation statements that explained their positions on liability and damages, and Defendants produced confidential internal Zynga documents in support of their position.  (*Id.* ¶ 9.)  In addition to these disclosures, the parties had engaged in two rounds of substantive briefing on Defendants' motions to dismiss and therefore had fulsome understandings of their respective positions on the legal and factual issues in the case.  For example, Defendants contend that (1) none of the challenged statements were false and misleading when made and that the guidance statements are protected by the statutory safe harbor for forward-looking statements; (2) Lead Plaintiff's scienter allegations fail because Zynga reported record bookings when the Individual Defendants committed to sell their stock; (3) the class members would have trouble establishing loss causation—*i.e.*, showing what part of the stock-price decline is attributed to the fraudulent statements rather than other bad news at Zynga.  (*Id.* ¶¶ 12-13.)  Indeed, a court in this District recently noted that in "any securities litigation case, it [is] difficult for [plaintiff] to prove loss causation and damages at trial."  *In re Celera Corp. Sec. Litig.*, No. 5:10-CV-02604-EJD, 2015 WL 1482303, at *5 (N.D. Cal. Mar. 31, 2015).  Thus, Lead Plaintiff has demonstrated that there is a substantial risk in litigating this case further.

On balance, based on the parties' litigation history, disclosure of information, representation by experienced counsel and use of a neutral mediator, the Settlement Agreement appears to be the product of serious, informed, non-collusive negotiation, which weighs in favor of preliminary approval.  Their participation in mediation along with the fact that there is no reversion to Defendants indicates the absence of collusion between the parties.

> b.    *Obvious Deficiencies*

The Court next considers "whether there are obvious deficiencies in the Settlement

United States District Court
Northern District of California

1   Agreement." *Harris*, 2011 WL 1627973, at *8.  No obvious deficiency is present here.

2       The first *Bluetooth* red flag is whether class counsel receives a disproportionate

3   distribution of the settlement, or the class receives no monetary distribution but counsel is amply

4   rewarded.  654 F.3d at 947.  Not so here.  Lead Counsel is seeking a maximum of 25% of the

5   Settlement Fund in attorneys' fees, totaling $5,750,000.  The Ninth Circuit has noted that 25

6   percent of the fund is considered the "benchmark" for a reasonable fee.  *Id.* at 942.  Thus, the first

7   sign of collusion is absent here.

8       The second sign of collusion is whether the parties' agreement contains a "clear sailing"

9   agreement, which "is one where the party paying the fee agrees not to contest the amount to be

10  awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling."  *In re*

11  *Toys R Us-Del., Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438,

12  458 (C.D. Cal. Jan. 17, 2014) (quotation marks and citation omitted).  Here, while Defendants

13  have agreed generally to "cooperate fully in seeking Court approval of the Preliminary Approval

14  Order and the Settlement" and to "cooperate to the extent reasonably necessary to effectuate,

15  implement and accomplish all of the terms and conditions of this Stipulation" (Dkt. No. 212-1

16  ¶ 14.18), there is no agreement that Defendants will not object to the attorneys' fees that Lead

17  Plaintiff seeks.  In fact, the Settlement Agreement itself does not include an amount of attorneys'

18  fees at all; instead, it merely states that Lead Counsel for the class "may apply to the Court for a

19  collective award of attorneys' fees to Lead Counsel" and "reimbursement of Litigation expenses."

20  (*Id.* ¶ 7.1.)  The agreement seems to contemplate some disagreement or litigation about attorneys'

21  fee awards, noting that such award is neither a necessary term nor a condition of the parties'

22  agreement.  (*Id.* ¶ 7.4.)  There is also no reversion here, which is a further indication of the

23  fairness of the parties' settlement.  Thus, the parties' settlement lacks obvious deficiencies that

24  would preclude preliminary approval.

25               c.    *Lack of Preferential Treatment*

26      Under this factor, "the Court examines whether the Settlement provides preferential

27  treatment to any class member."  *Villegas*, 2012 WL 5878390, at *7; *see also Portal Software*,

28  2007 WL 1991529, at *5 (examining whether the settlement "improperly grant[s] preferential

United States District Court
Northern District of California

treatment to the [Lead Plaintiff] or segments of the class").   Lead Plaintiff does not stand to receive any incentive award, enhancement payment, or distribution of any other funds beyond the Recognized Loss applicable to all class members according to the Plan of Allocation.

Notably, the Plan of Allocation separates recovery during the Settlement Class Period into two separate time periods—the Earlier Period and the FAC Class Period.  Lead Plaintiff elected not to replead the claims that fall in the Earlier Period for three reasons: (1) Zynga's first statement about its 2012 guidance was not made until February 14, 2012, so there were no claims based on that guidance statement until that date; (2) the allegations about the changes to Facebook games solely pertain to the later period; and (3) the allegations regarding statements about bookings declines are more compelling later in 2012, since trends in declining sales would be more defined later in the quarter.  (Dkt. No. 210 at 3; *see also* Dkt. No. 155 ¶¶ 85, 131.)  In ruling on Defendants' motion to dismiss the FAC, the district court upheld Lead Plaintiff's claims related to bookings, Facebook, and the 2012 guidance, but granted the motion as to misrepresentations about Zynga's pipeline.  (Dkt. No. 176.)

Under these circumstances, and with the help of a damages consultant, Lead Plaintiff concluded that claims in the Earlier Period are weaker and therefore entitled to a lower-valued recovery.  Lead Plaintiff himself will recover solely based on claims in the FAC Class Period; although he purchased shares in the Earlier Period, he sold them prior to July 25, 2012, so there is no Recognized Loss.  (Dkt. No. 210 at 6.)  Lead Plaintiff explains that this result is common: most investors who purchased Zynga common stock in the Earlier Period did not hold on to their shares through the close of the entire Settlement Class Period.  (*Id.* at 6 n.3.)  "Courts frequently endorse distributing settlement proceedings according to the relative strengths and weaknesses of the various claims."  *Portal Software*, 2007 WL 1991529, at *6.  Given Lead Plaintiff's explanation, the Plan of Allocation does just that, and therefore distributes the funds without giving undue preferential treatment to any class members.

> d.   *Range of Possible Approval*

Next, the Court must determine whether the proposed Settlement Agreement falls within the range of possible approval.  "To evaluate the range of possible approval criterion, which

United States District Court
Northern District of California

focuses on substantive fairness and adequacy, courts primarily consider plaintiff's expected recovery balanced against the value of the settlement offer."  *Harris*, 2011 WL 1627973, at (9 (internal quotation marks and citations omitted); *see In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (citations omitted); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 456 (instructing courts to compare the settlement amount to the parties' "estimates of the maximum amount of damages recoverable in a successful litigation").  "[A] cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair," however.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 456.

Here, the Settlement Agreement provides for a Settlement Fund of $23,000,000.  (Dkt. No. 212-1 ¶ 4.1.)  Lead Plaintiff argues that the Settlement Fund represents approximately 14% of its estimated damages.[8]  (Dkt. No. 206 ¶ 14.)  A review of securities litigation cases indicates that this percentage exceeds the typical recovery.  *See In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (citing studies noting that the average securities fraud class action settlement between 1995 and 2001 results in a recovery between 5.5 and 6.2% of the estimated losses); *see, e.g.*, *Celera Corp.*, 2015 WL 1482303, at *6 (granting preliminary approval in securities litigation class action where plaintiffs stood to recover 5.5% of their estimated losses).  But the total amount will not be distributed to class members.  Instead, the requested attorneys' fees, costs, and claims administrator costs bring the total down to $16,072,000 less some undisclosed amount in tax deductions to be distributed to class members.  This is still 10 percent of the total estimated losses, and therefore remains above the typical recovery in securities litigation.  This recovery also represents a substantial benefit to some class members: the class includes members who purchased Zynga common stock in the Earlier Period, whose claims were not included in the FAC.  Thus, the Settlement Agreement secures part of this recovery for Zynga investors who would be without a remedy at trial in these consolidated actions.

Turning to the recovery for each individual investor, Lead Counsel estimates that the average distribution *before* deduction of fees and costs is $0.15 per damaged share purchased in

---

[8] By this calculation, Lead Plaintiff anticipates that the Settlement Class would receive a damages award of just over $164,000,000 if it prevailed on all of its claims at trial.

United States District Court
Northern District of California

the entire Settlement Class Period—*i.e.*, Earlier Period plus FAC Class Period—compared to $1.14 per share if plaintiffs prevailed at trial.  (Dkt. No. 206 ¶ 17.)  This represents a per-share recovery that is approximately 13 percent of the estimated recovery at trial.  Plaintiffs do not include any total estimate of the per-share distribution after deduction of attorneys' fees and costs.  However, they indicate that the attorneys' fees and costs—without making clear whether "costs" also includes the $900,000 claims administration fee—will total $0.04 per share.  (*Id.* ¶ 16.)  This deduction would result in $0.11 per damaged share after deductions for attorneys' fees and costs, which is 9.6 percent of the estimated per share recovery at trial.  This number is still well above the average per-share recovery in a securities fraud class action.  *See In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d at 715; *Celera Corp.*, 2015 WL 1482303, at *6.  Thus, the Court is satisfied, at least for the purposes of preliminary approval, that the class members' potential recovery falls within the range of possible approval.

> e.   *Cy Pres Distribution*

Finally, the Settlement Agreement leaves open-ended the question of what non-profit organization will receive any remaining funds after the distributions.  A *cy pres* award must qualify as "the next best distribution" to giving the funds directly to class members.  *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012).  As a result, "[n]ot just any worthy recipient can qualify as an appropriate cy pres beneficiary."  *Id.*  The Ninth Circuit "require[s] that there be a driving nexus between the plaintiff class and the *cy pres* beneficiaries."  *Id.* (citation omitted).  A *cy pres* award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members, and must not benefit a group too remote from the plaintiff class[.]"  *Id.* (internal quotation marks omitted) (citing *Nachshin*, 663 F.3d 1034, 1039 (9th Cir. 2011), and *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 19990)).

Here, the *cy pres* distribution is a fallback plan: the parties' Settlement Agreement envisions distribution pursuant to the Plan of Allocation, and even a potential second round of distribution pursuant to the plan.  Only if the funds remaining makes it "not cost effective or efficient to redistribute the amount to the Settlement Class" will those remaining funds be donated to a charitable organization.  (*See* Dkt. No. 212-1 ¶ 4.4)  While normally a court must ensure that

the chosen *cy pres* distribution does not "little or nothing to do with the purposes of the underlying lawsuit or the class of plaintiffs involved[,]" *Nachsin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011), in light of the possibility of such a small amount of the funds being directed to a charitable organization, the Court is satisfied with the conditions that the organization be unaffiliated with either party and, in any event, subject to later court approval.

**C.      Plan of Allocation**

The Court also must preliminarily approve the Plan of Allocation.  Such a distribution plan is governed by the same legal standards that apply to the approval of a settlement: the plan must be fair, reasonable, and adequate.  *See In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).  "This means that, to the extent feasible, the plan should provide class members who suffered greater harm and who have stronger claims a larger share of the distributable settlement amount."  *Hendricks v. StarKist Co.*, No. 13-cv-00729-HSG, at *7 (N.D. Cal. July 23, 2015) (citations omitted); *see, e.g.*, *Rieckborn*, 2015 WL 468329, at *8; *In re Omnivision Techs., Inc.*, No. 04-cv—2297-SC, 2007 WL 4293467, at *7 (N.D. Cal. Dec. 6, 2007); *In re Oracle Sec. Litig.*, No. 90-cv-2297-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994). "A settlement in a securities class action case can be reasonable if it fairly treats class members by awarding a pro rata share to every Authorized Claimant, but also sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue."  *Vinh Nguyen v. Radient Pharms. Corp.*, No. 11-cv-00406, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) (quotation marks and citation omitted).  "[C]ourts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel."  *Id.* at *5.

The Plan of Allocation here uses a Recognized Loss value calculated for each damaged share.  The Settlement Fund will be distributed on a *pro rata* basis according to each class member's Recognized Loss.  The Plan of Allocation does not provide monetary recovery for shares bought during the relevant period but sold before the Settlement Class Period closed—*i.e.*, while the stock price was still benefitting from Zynga's alleged misrepresentations.  Lead Plaintiff

developed the allocation formulas in consultation with a damages expert.  The formulas provide that damaged shares purchased during the FAC Class Period receive a higher per-share recovery than those purchased during the Earlier Period.  Lead Plaintiff estimates that the average per-share recovery for all shares will be $0.15393; $0.01551 per damaged share for stock purchased during the Earlier Period; and $0.15506 per damaged share purchased during the FAC Class Period.  (*See* Dkt. No. 212-1 at 51.)

Courts in this District and elsewhere endorse distribution of settlement proceeds according to the relative strengths and weaknesses of the various claims.  *See Portal Software*, 2007 WL 4171201, at *6 (collecting cases).  The formula in the Plan of Allocation "meet[s] the PSLRA requirement of providing a calculation of the amount of settlement proposed to be distributed on a per share basis.  *See In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 969 (9th Cir. 2007).  While the Notice indicates that class members may receive more per share if fewer than all members submit claim forms, it is still sufficiently clear to give members notice of how their share is calculated.  *See Portal Software*, 2007 WL 4171201, at *6.  Other courts in this District have approved similar formulas for distribution in securities litigation cases.  *See, e.g.*, *Veritas Software*, 496 F.3d at 969; *Portal Software*, 2007 WL 4171201, at *6.

In his supplemental submission, Lead Plaintiff provides a fulsome explanation of the reasons for only bringing claims in the FAC for shares purchased during the FAC Class Period, instead of the Earlier Period.  *See supra* Section B.1.c.  The proposed Plan of Allocation gives only a fraction of the recovery to claims for shares purchased during the Earlier Period for those same reasons.  In addition, Lead Plaintiff's damages consultant estimates that a very small portion of the shares purchased during the Earlier Period are damaged shares—*i.e.*, shares with any Recognized Loss—because Zynga's common stock was heavily traded during the Earlier Period, especially following Zynga's December 12, 2011 initial public offering.  (*See* Dkt. No. 211 ¶ 2.) According to the damages consultant, stock is heavily traded following an initial public offering. (*Id.*)  Because the stock was so heavily traded, the damages consultant estimates that only a small portion of shares purchased during the Earlier Period were held through July 25, 2012, when Defendant disclosed the true facts about the company's status.  (*Id.*)  Notably, the damages

23

United States District Court
Northern District of California

consultant further estimates that because there are so few damaged shares from the Earlier Period, allowing a smaller recovery for those shares will not significantly change the recovery for shares purchased in the FAC Class Period.  (*Id.* ¶ 3.)  Specifically, the proposed Plan of Allocation provides for an average per share recovery of Zynga common stock purchased during the FAC Class Period of $0.15506.  (*Id.*)  The damages consultant estimates that there are so few damaged shares during the Earlier Period that if the Plan of Allocation was amended to preclude recovery for shares purchased during the Earlier Period, the per share recovery for the FAC Class Period would increase only slightly to $0.15519.  (*Id.*)  Given Lead Plaintiff's explanation of the relative strengths and weaknesses of the claims based on shares purchased in the Earlier Period versus the FAC Class Period and the low number of damaged shares purchased during the Earlier Period, the Court concludes that the Plan of Allocation is fair, reasonable, and adequate.

**D.** **Proposed Class Notice**

Affected natural persons are entitled to due process, so they must be given notice of the proposed settlement and their rights, including the right to exclude themselves and the opportunity to be heard.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).  For any class certified under Rule 23(b)(3), class members must be afforded the best notice practicable under the circumstances, which includes individual notice to all members who can be identified through reasonable effort.  The notice must clearly and concisely state in plain, easily understood language:

(i) the nature of the action;

(ii) the definition of the class certified;
(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  The Ninth Circuit has stated that "[n]otice is satisfactory if it

1  generally describes the terms of the settlement in sufficient detail to alert those with adverse

2  viewpoints to investigate and to come forward and be heard." *Churchill Vill., L.L.C. v. Gen Elec.*,

3  361 F.3d 566, 575 (9th Cir. 2004) (internal quotations omitted).

4      Lead Plaintiff submitted his 15-page Notice and 2-page Summary Notice for publication

5  one time in *Investor's Business Daily*.  (Dkt. No. 212-1 at 51-67 ("Notice"); *id.* at 80-81

6  ("Summary Notice").)  Though lacking in the initial submission, Lead Plaintiff's notice now fully

7  explains to the class members the rationale behind the Plan of Allocation.  Likewise, while the

8  initial notice included some potentially misleading information about class members' opportunity

9  to object, Lead Plaintiff's notice now clarifies that class members can object to the amount of

10 attorneys' fees and costs sought.  The information described in the notice otherwise meets the

11 requirements of Rule 23(c)(B)(2).

12     The Notice Plan itself is likewise adequate.  *See supra* Settlement Proposal Section G.

13 Lead Counsel's motion for final approval and motion for attorneys' fees are due 30 days before

14 the deadline to object to the settlement.  (*See* Dkt. No. 205 at 31; *see also* Dkt. No. 204.)  Thus,

15 class members have sufficient time to object to the fee motion in accordance, as required.  *See In*

16 *re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010) (requiring the "court to

17 set the deadline for objections to counsel's fee request on a date after the motion and documents

18 supporting it have been filed").

19     In addition, the claims administrator will maintain a website for the class members.  In his

20 supplemental submission, Lead Plaintiff expresses an intent to include thirteen different

21 documents identified as "key pleadings" on the website.  (Dkt. No. 210 at 8.)  The Court

22 welcomes Lead Plaintiff to include them all.  At a minimum, however, Lead Counsel shall ensure

23 that the website has a complete copy of the settlement agreement, the Notice and Claim form, the

24 Motion for Preliminary Approval, Lead Plaintiff's Supplemental Submission in Support of his

25 Motion for Preliminary Approval, this Order, the Motion for Attorneys' Fees and Costs, and the

26 Motion for Final Approval of the Class Action Settlement.

27                              **CONCLUSION**

28     The Court preliminarily finds that the proposed Settlement Class meets the requisite

25

certification standards and GRANTS conditional certification of the Settlement Class for settlement purposes.  The proffered settlement agreement, as amended by the parties' amended stipulation filed October 15, 2015 (Dkt. Nos. 210, 211, 212), meets the requisite requirements for fair, adequate, and reasonable settlement as this juncture of the settlement process.  For the reasons stated above, the Court therefore GRANTS the motion for preliminary approval of the class action settlement as follows:

       1.      Notice shall be provided in accordance with the notice plan and this Order.

       2.      Within 40 days after mailing and publication of notice, Lead Counsel shall file a motion seeking approval of attorneys' fees and costs.

       3.      Counsel shall return before this Court for a final fairness hearing, at which the Court shall finally determine whether the settlement is fair, reasonable, and adequate, on **January 28, 2016 at 9:00 a.m.** in Courtroom F, 450 Golden Gate Ave., San Francisco, California.

       4.      Lead Counsel shall file a noticed motion for final approval of the settlement no later than 35 days before the final approval hearing.

       **IT IS SO ORDERED**.

Dated: October 27, 2015

JACQUELINE SCOTT CORLEY
United States Magistrate Judge