Joseph J. Tabacco, Jr. (SBN 75484)
Nicole Lavallee (SBN 165755)
Kristin J. Moody (SBN 206326)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA  94111
Telephone: (415) 433-3200
Facsimile:  (415) 433-6282
Email: jtabacco@bermandevalerio.com
        nlavallee@bermandevalerio.com
        kmoody@bermandevalerio.com

Jeffrey M. Norton (Admitted *Pro Hac Vice*)
**NEWMAN FERRARA LLP**
1250 Broadway, 27th Floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
Email: jnorton@nflp.com

*Lead Counsel and Attorneys for Lead Plaintiff David Fee*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE ZYNGA INC. SECURITIES LITIGATION | Lead Case No.12-cv-04007-JSC |
| | Consolidated with Case Nos. 12-cv-4048-JSC; 12-cv-4059-JSC; 12-cv-4064-JSC; 12-cv-4066-JSC; 12-cv-4133-JSC; 12-cv-4250-JSC |
| | **CLASS ACTION** |
| | **LEAD COUNSEL'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Date:   January 28, 2016<br>Time:   9:00 a.m.<br>Ctrm:   F, 15th Floor<br>Judge: Hon. Magistrate Judge<br>          Jacqueline Scott Corley |

# TABLE OF CONTENTS

**PAGE**

NOTICE OF MOTION AND MOTION ................................................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 2

I.      INTRODUCTION ...................................................................................................... 2

II.     HISTORY OF THE LITIGATION ............................................................................ 4

III.    LEAD COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE ..................... 4

        A.      Consideration of Relevant Factors Supports the Fee Request of 25% of the
                Settlement Fund ............................................................................................. 5

                1.      The Result Achieved ............................................................................ 6

                2.      The Risks of Litigation ........................................................................ 8

                3.      The Skill Required and Quality of the Work ...................................... 11

                4.      The Contingent Nature of the Fee and the Financial Burden Carried by Lead
                        Counsel ............................................................................................... 13

                5.      Awards in Comparable Cases ............................................................. 15

                6.      Reaction of the Settlement Class ....................................................... 16

        B.      The Lodestar "Cross-Check" Supports the Fee Request ............................... 17

                1.      Lead Counsel's hourly rates are reasonable. ..................................... 18

                2.      Lead Counsel Have Spent a Reasonable Number of Hours Litigating this Action
                        ............................................................................................................ 20

                3.      Lead Counsel's Requested Lodestar Multiplier is Reasonable ........... 21

IV.     LEAD COUNSEL SHOULD BE REIMBURSED FOR LITIGATION EXPENSES
        REASONABLY INCURRED IN CONNECTION WITH THIS ACTION ............... 22

V.      CONCLUSION ........................................................................................................ 25

1

## TABLE OF AUTHORITIES

2

PAGE(S)

3

**Cases**

4

*Aboudi v. T-Mobile USA, Inc.*,
    No. 12cv2169 BTM (NLS), 2015 WL 4923602 (S.D. Cal. Aug. 18, 2015) ...................................... 17

5

6

*Alberto v. GMRI, Inc.*,
    No. Civ. 07-1895 WBS DAD, 2008 WL 4891201 (E.D. Cal. Nov. 12, 2008) ................................. 5

7

*Antonopulos v. N. Am. Thoroughbreds, Inc.*,
    No. 87-0969G(CM), 1991 WL 427893 (S.D. Cal. May 6, 1991) .................................................. 13

8

*Barbosa v. Cargill Meat Solutions Corp.*,
    297 F.R.D. 431 (E.D. Cal. 2013) ................................................................................................. 13

9

10

*Barnes v. The Equinox Grp., Inc.*,
    No. C 10-3586 LB, 2013 WL 3988804 (N.D. Cal. Aug. 2, 2013) ................................................... 5

11

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
    472 U.S. 299 (1985) ...................................................................................................................... 13

12

13

*Bellinghausen v. Tractor Supply Co.*,
    306 F.R.D. 245 (N.D. Cal. 2015)........................................................................................... 6, 8, 14

14

*Blum v. Stenson*,
    465 U.S. 886 (1984) .................................................................................................................. 5, 18

15

16

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) .................................................................................................................... 4, 5

17

*Burden v. SelectQuote Ins. Servs.*,
    No. C 10-5966 LB, 2013 WL 3988771 (N.D. Cal. Aug. 2, 2013) ................................................... 5

18

19

*Ching v. Siemens Indus., Inc.*,
    No. 11-cv-04838-MEJ, 2014 WL 2926210 (N.D. Cal. June 27, 2014)........................................ 5, 6

20

*Covillo v. Specialtys Café*,
    No. C-11-00594 DMR, 2014 WL 954516, (N.D. Cal. Mar. 6, 2014) ........................................... 17

21

*Craft v. Cty. of San Bernardino*,
    624 F. Supp. 2d 1113 (C.D. Cal. 2008) ...................................................................................... 21

22

23

*Dyer v. Wells Fargo Bank, N.A.*,
    303 F.R.D. 326 (N.D. Cal. 2014)................................................................................................. 21

24

*Farbotko v. Clinton Cty. of N.Y.*,
    433 F.3d 204 (2d Cir. 2005) ......................................................................................................... 19

25

26

*Fischel v. Equitable Life Assur. Soc'y of the U.S.*,
    307 F. 3d 997 (9th Cir. 2002) ...................................................................................................... 22

27

*Garner v. State Farm Mut. Auto. Ins. Co.*,
    No. CV 08 1365 CW, 2010 WL 1687829 (N.D. Cal. Apr. 22, 2010) ....................................... 6, 14

28

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................................ 4

*Harris v. Marhoefer*,
   24 F.3d 16 (9th Cir. 1994)................................................................................ 23, 25

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ............................................................................................ 6

*Hopkins v. Stryker Sales Corp.*,
   No. 11-CV-02786-LHK, 2013 WL 496358 (N.D. Cal. Feb. 6, 2013)............................................. 11

*In re Am. Apparel, Inc. S'holder Litig.*,
   No. CV 10-06352 MMM (JCGx), 2014 WL 10212865 (C.D. Cal. July 28, 2014).............. 12, 23, 24

*In re Apollo Grp., Inc. Sec. Litig.*,
   No. CV 04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008),
   *rev'd and remanded*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) ............................ 11

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ........................................................................ 4, 5, 18

*In re Charles Schwab Corp. Sec. Litig.*,
   No. C 08-01510 WHA, 2011 WL 1481424 (N.D. Cal. Apr. 19, 2011)................................ 5, 21

*In re Citigroup Inc. Sec. Litig.*,
   No. 09-md-2070 SHS, 2014 WL 2112136 (S.D.N.Y. May 20, 2014) ...................................... 10

*In re CV Therapeutics, Inc. Sec. Litig.*,
   No. C-03-3709 SI, 2007 WL 1033478 (N.D. Cal. Apr. 4, 2007)...................................... 16

*In re Equity Funding Corp. Sec. Litig.*,
   438 F. Supp. 1303 (C.D. Cal. 1977)................................................................... 13

*In re Heritage Bond Litig.*,
   No. 02-ML-1475-DT, 2005 WL 1594403, (C.D. Cal. June 10, 2005)............................ 8, 11

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-cv-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) .............................. 18

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000)..................................................................... 16

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) ................................................................... 10

*In re Immune Response Sec. Litig.*,
   497 F. Supp. 2d 1166 (S.D. Cal. 2007)..................................................... passim

*In re Informix Corp. Sec. Litig.*,
   No. 97-1289 CRB, 1999 U.S. Dist. LEXIS 23579 (N.D. Cal. Nov. 23, 1999)................ 16

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. C-02-1486 CW (EDL), 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007)............... 11, 13

*In re Keahey*,
   414 F. App'x 919 (9th Cir. 2011) ..................................................................... 19

*In re Media Vision Tech. Sec. Litig.*,
    913 F. Supp. 1362 (N.D. Cal. 1996) ............................................................................ 24, 25

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ............................................................................................... 15

*In re Mercury Interactive Corp. Sec. Litig.*,
    No. 5:05-CV-03395-JF, 2011 WL 826797 (N.D. Cal. Mar. 3, 2011) ............................................ 21

*In re Milken & Assocs. Secs. Litig.*,
    150 F.R.D. 46 (S.D.N.Y. 1993) ............................................................................................ 10

*In re Nuvelo, Inc. Sec. Litig.*,
    No. C 07-04056 CRB, 2011 WL 2650592, (N.D. Cal. July 6, 2011) ............................... 5, 14, 15

*In re OmniVision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................................................... passim

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ............................................................................................... 6

*In re Oracle Corp. Sec. Litig*,
    627 F.3d 376 (9th Cir. 2010) ............................................................................................... 9

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) ............................................................................................... 16

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005) ............................................................................................... 17

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
    535 F. Supp. 2d 249 (D.N.H. 2007) ..................................................................................... 16

*In re UnitedHealth Grp. Inc. PSLRA Litig.*,
    643 F. Supp. 2d 1094 (D. Minn. 2009) ................................................................................ 16

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ........................................................................................... passim

*Keller v. Elec. Arts, Inc.*,
    No. 4:09-cv-1967 CW, 2015 WL 5005057 (N.D. Cal. Aug. 18, 2015),
    *appeal docketed*, No. 15-16861 (Sept. 18, 2015) ............................................................ 6

*Knight v. Red Door Salons, Inc.*,
    No. 08-01520 SC, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ............................................ 17

*Larsen v. Trader Joe's Co.*,
    No. 11-cv-05188-WHO, 2014 WL 3404531 (N.D. Cal. July 11, 2014) ........................... 5, 23

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) ............................................................................................................. 13

*Miller v. Ghirardelli Chocolate Co.*,
    No. 12-CV-04936-LB, 2015 WL 758094, (N.D. Cal. Feb. 20, 2015),
    *appeals docketed*, No. 15-15524 (Mar. 19, 2015), No. 15-15539 (Mar. 20, 2015) .................. 4, 18, 22

*Missouri v. Jenkins*,
    491 U.S. 274 (1989) ........................................................................................................ 18

*Moore v. IMCO Recycling of CA, Inc.*,
    No. CV 04-1304 DSF (VBKx), 2005 WL 5887180 (C.D. Cal. Sept. 28, 2005) ............................. 25

*Nwabueze v. AT & T Inc.*,
    No. C 09-01529 SI, 2013 WL 6199596 (N.D. Cal. Nov. 27, 2013) ........................................... 6

*Parrish v. Manatt, Phelps & Phillips, LLP*,
    No. C 10-03200 WHA, 2013 WL 2405200, (N.D. Cal. May 31, 2013) ................................. 4, 6

*Ralston v. Mortg. Investors Grp., Inc.*,
    No. 5:08-cv-00536-JF (PSG), 2013 WL 5290240 (N.D. Cal. Sept. 19, 2013) ............................. 21

*Russell v. United States*,
    No. C 09-03239 WHA, 2013 WL 3988778 (N.D. Cal. Aug. 2, 2013) ......................................... 4

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ........................................................................................... 5

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939) ........................................................................................................ 5

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ............................................................................................. 4

*Steiner v. Am. Broad. Co.*,
    248 F. App'x 780 (9th Cir. 2007) ................................................................................... 6, 21

*Steinfeld v. Discover Fin. Servs.*,
    No. C 12-01118 JSW, 2014 WL 1309692 (N.D. Cal. Mar. 31, 2014) ....................................... 21

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) .............................................................................................. 15

*Vedachalam v. Tata Consultancy Servs., Ltd*,
    No. C 06-0963 CW, 2013 WL 3941319 (N.D. Cal. July 18, 2013) ........................................... 15

*Vincent v. Reser*,
    No. C 11-03572 CRB, 2013 WL 621865 (N.D. Cal. Feb. 19, 2013) ........................................ 25

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .................................................................................... passim

*Wakefield v. Wells Fargo & Co.*,
    No. 3:13-CV-05053 LB, 2015 WL 3430240 (N.D. Cal. May 28, 2015) ................................. 4, 18

*Wing v. Asarco*,
    114 F.3d 986 (9th Cir. 1997) ............................................................................................ 13

**Statutes**

15 U.S.C. §78u-4(a)(6) ............................................................................................................ 1

Federal Rules of Civil Procedure 23(h) ............................................................................. 1, 4, 22

**Other Authorities**

*Billing Rates across the Country*, National Law Journal (Jan. 13, 2014) ............................................. 19

Dr. Renzo Comolli, et al., *Recent Trends in Securities Class Action Litigation: 2014, Full Year Review* (January 20, 2015) ........................................................................................................... 16

Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2014 Review and Analysis*, Cornerstone Research (2015)........................................................................ 7

*Nationwide – Securities Lawyers & Law Firms – USA*, Chambers & Partners (Dec. 7, 2015)............... 13

**Rules**

*Booth v. Strategic Reality Trust, Inc.,*
   No. 13-cv-04921 JST (N.D. Cal. Oct. 15, 2015) ............................................................... 19

*In re Cox Enters. Inc. Set-Top Cable T.V. Box Antitrust Litig.,*
   No. 5:12-ml-02048 C (W.D. Okla. Nov. 12, 2015) ......................................................... 11

*In re Diamond Foods, Inc., Sec. Litig.,*
   No. 11-cv-05386-WHA (N.D. Cal. Jan. 10, 2014) ........................................................... 19

*In re OCZ Tech. Grp., Inc. Sec. Litig.,*
   No. 12-cv-05265-RS (N.D. Cal. Sept. 21, 2015).............................................................. 19

*Mulligan v. IMPAX Labs., Inc.,*
   No. 13-cv-01037-EMC (N.D. Cal. July 23, 2015) .......................................................... 19

*Rieckborn v. Velti PLC,*
   No. 13-cv-03889-WHO (N.D. Cal. Feb. 3, 2015) ............................................................ 19

1

**NOTICE OF MOTION AND MOTION**

2    PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 23(h), 15 U.S.C. §78u-4(a)(6) and the

3 Court's October 27, 2015 Order Granting Preliminary Approval of Class Action Settlement, Dkt. No. 214

4 ("Preliminary Approval Order"), on January 28, 2016 at 9:00 a.m. in Courtroom F, 15th Floor, the

5 Honorable Magistrate Judge Jacqueline Scott Corley presiding, located at 450 Golden gate Avenue, San

6 Francisco, California, Lead Counsel, Newman Ferrara LLP ("Newman Ferrara") and Berman DeValerio,

7 will move this Court for entry of an order awarding attorneys' fees of $5,750,000 (constituting 25% of the

8 Settlement Fund) and authorizing reimbursement of $184,681.29 in litigation expenses.[1]

9    As discussed in the accompanying memorandum, this motion is made on the grounds that the

10 requested award is fair, reasonable and justified under applicable law.  This motion is based on the

11 accompanying Memorandum of Points and Authorities, the Joint Declaration of Nicole Lavallee and

12 Jeffrey M. Norton In Support of (1) Lead Plaintiff's Motion For Final Approval of Class Action Settlement

13 and (2) Lead Counsel's Motion For Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint

14 Declaration" or "Joint Decl.") and the exhibits attached thereto,[2] the declarations of Lead Counsel detailing

15 the time and expenses each firm devoted to the successful prosecution of this Action,[3] Lead Plaintiff's

16 Motion for Final Approval of Proposed Class Action Settlement ("Final Approval Motion"), filed

17 concurrently herewith, all pleadings and matters of record filed herein, the argument of counsel, and such

18 oral and documentary evidence as may be presented at the hearing of this motion.

19

**STATEMENT OF ISSUES TO BE DECIDED**

20    Whether Lead Counsel's requests for attorneys' fees and reimbursement of litigation expenses

21 should be granted as reasonable.

22

23

24

---

[1]    All capitalized terms have the same meaning as defined in the Amended Stipulation of Settlement

25 dated October 15, 2015, Dkt. No. 212-1 ("Stipulation").  Unless otherwise stated, all citations and quotation marks have been omitted and all emphasis added.

26 [2]    To minimize the burden on the Court, Lead Counsel submits a single declaration providing factual

27 support both for this application for attorneys' fees and reimbursement of litigation expenses, and for Lead Plaintiff's motion for final approval of the Settlement.

28 [3]    Supporting declarations include the Declaration of Nicole Lavallee of Berman DeValerio (the "Lavallee Decl.") and the Declaration of Jeffrey M. Norton of Newman Ferrara (the "Norton Decl.").

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

Lead Counsel, on behalf of the Lead Plaintiff and the Settlement Class, negotiated a $23 million cash Settlement in this Action.  This constitutes approximately 14% of the most likely recoverable damages under the federal securities laws.  Lead Counsel now comes before the Court to request an award of attorneys' fees of 25% ($5,750,000) of the Settlement Fund for their skilled efforts in prosecuting this Action and obtaining this excellent recovery, as well as reimbursement of $184,681.29 in expenses they reasonably incurred in litigating and settling this matter.

As detailed below, in addition to being consistent with the 25% benchmark in this circuit, the fee request is fair and reasonable to Settlement Class Members given the significance of the result and the manner in which it was achieved.  Specifically, the fee request is justified under the factors considered by courts in this circuit in determining fee awards, including: (i) the immediate positive result achieved for the Settlement Class; (ii) the inherent risks involved in this litigation; (iii) the skill required and amount of work done by Lead Counsel; (iv) the contingent nature of the fee and financial burden carried by Lead Counsel; and (v) the amount of fees awarded by courts within this circuit and elsewhere in comparable cases.

The requests are also justified by Lead Counsel's commitment of time and resources in the face of a very real risk of receiving no remuneration, as evidenced by cross-checking it to Lead Counsel's lodestar.  The requested fee amounts to a blended 1.7 multiplier of the lodestar (number of hours x customary hourly rate), which is well within, if not at the low end of, the range of what is typically awarded in such cases in this jurisdiction and elsewhere.  As described in greater detail below, in the Final Approval Motion and in the Joint Declaration, this Action has been vigorously litigated since July 2012.  Lead Counsel has expended a substantial amount of time and money, on a contingent basis, to investigate and prosecute this Action and achieve the result obtained.  Joint Decl. ¶¶116-18, 121-22.  Unlike many securities litigation cases, there were no pre-existing investigations by government authorities or accounting restatements.  *Id.* at ¶¶66, 133.  Moreover, when this Action was commenced, Zynga Inc.'s ("Zynga" or the "Company") stock had fallen over 81% from its class-period high to $2.97 per share and analysts were reporting that Zynga's market value had reached the point where Zynga's business was

being valued at "nothing." *Id.*; Complaint ¶¶22-25.  Even today, the stock trades in the $2-3 range.  *Id.*

Nevertheless, Lead Counsel undertook this Action on a contingent basis and pursued it aggressively.  The legal and factual issues were carefully researched and evaluated by Lead Counsel, and, with the aid of in-house and outside investigators and consultants, and in-house forensic accountants, an extensive investigation was undertaken that included: (i) dozens of witness interviews; (ii) an in-depth analysis of Zynga's business model, its financial filings, and other public statements; (iii) analysis of the Individual Defendants'[4] stock sales; (iv) review and analysis of analyst reports and business news coverage; (v) review and analysis of documents, including confidential documents produced by Defendants in connection with mediation; (vi) extensive research and analysis of the legal issues; (vii) consultations with industry consultants; and (viii) analysis of loss causation and potential damage methodologies and amounts in consultation with a damages consultant.  Joint Decl. ¶6.

In pursuing the Settlement Class' claims, Lead Counsel, among other things: (i) expended significant efforts preparing detailed complaints based on their factual investigations and analysis of legal claims; (ii) prepared responses to two rounds of motions to dismiss and a subsequent motion for reconsideration; (iii) commenced initial preparation of a discovery plan and both served and responded to discovery requests; (iv) prepared a mediation statement to address the merits of the case and risks to defendants; (v) mediated the proposed Settlement and negotiated the terms of the Stipulation; and (vi) prepared papers in support of approval of the Settlement, which included consultation with the damage consultant regarding a fair and reasonable plan of allocation and notice to the Settlement Class.  Joint Decl. ¶¶6, 117.  Collectively, Lead Counsel have devoted more than 5,580.05 professional hours, representing a collective lodestar of $3,347,319.25.  Joint Decl. ¶118.  In addition, Lead Counsel incurred $184,681.29 in unreimbursed reasonable expenses.  *Id.* at ¶¶145-46.

The requested expenses of $184,681.29 are also reasonable, as they are of the type and level necessary to prosecute a complex case such as this and are of the type of expenses that are regularly reimbursed by courts.

---

[4]    The Individual Defendants are Mark Pincus, David M. Wehner and John Schappert (the "Individual Defendants") (collectively, with Zynga, "Defendants").

1   **II.      HISTORY OF THE LITIGATION**

2          The Joint Declaration (at ¶¶21-48) and the Final Approval Motion (at 2-7) detail the factual and

3   procedural background of this Action and the events that led to the instant Settlement.

4   **III.     LEAD COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE**

5          The United States Supreme Court has long recognized that "a lawyer who recovers a common

6   fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from

7   the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  Rule 23(h) of the Federal

8   Rules of Civil Procedure provides that, "[i]n a certified class action, the court may award reasonable

9   attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ.

10  P. 23(h).  Although the Court has discretion in assessing the amount of attorneys' fees, *see Hanlon v.*

11  *Chrysler Corp.*, 150 F.3d 1011, 1030 (9th Cir. 1998), it must ensure that such an award is "fair, reasonable

12  and adequate," *Russell v. United States*, No. C 09-03239 WHA, 2013 WL 3988778, at *3 (N.D. Cal. Aug.

13  2, 2013) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 963-64 (9th Cir. 2003)).

14          In the Ninth Circuit, a district court may use the either the percentage-of-the-fund method or the

15  lodestar method to calculate reasonable attorneys' fees.  *In re Bluetooth Headset Prods. Liab. Litig.*,

16  654 F.3d 935, 942 (9th Cir. 2011) ("Where a settlement produces a common fund for the benefit of the

17  entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery

18  method."); *Staton*, 327 F.3d at 967-68; *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296

19  (9th Cir. 1994); *Parrish v. Manatt, Phelps & Phillips, LLP*, No. C 10-03200 WHA, 2013 WL 2405200,

20  at *3 (N.D. Cal. May 31, 2013) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002)).

21  However, in common fund cases, use of the percentage method is dominant.  *Bluetooth*, 654 F.3d at 942

22  ("Because the benefit to the class is easily quantified in common-fund settlements, we have allowed courts

23  to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of

24  calculating the lodestar."); *Wakefield v. Wells Fargo & Co.*, No. 3:13-CV-05053 LB, 2015 WL 3430240,

25  at *5 (N.D. Cal. May 28, 2015) ("Where the settlement involves a common fund, courts typically award

26  attorney's fees based on a percentage of the total settlement."); *Miller v. Ghirardelli Chocolate Co.*, No.

27  12-CV-04936-LB, 2015 WL 758094, at *5 (N.D. Cal. Feb. 20, 2015) (same), *appeals docketed*, No. 15-

28  15524 (Mar. 19, 2015), No. 15-15539 (Mar. 20, 2015); *In re OmniVision Techs., Inc.*, 559 F. Supp. 2d

1036, 1046 (N.D. Cal. 2008) ("[U]se of the percentage method in common fund cases appears to be dominant."). Furthermore, the Supreme Court consistently has endorsed awarding attorneys' fees using the percentage-of-the-fund method.) *See, e.g.*, *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984); *Boeing Co.*, 444 U.S. at 478-79; *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-67 (1939).

Consistent with the trend, the percentage method is desirable here because it allows the Court to award fees in a way that "rewards counsel for success and penalizes it for failure." *Alberto v. GMRI, Inc.*, No. Civ. 07-1895 WBS DAD, 2008 WL 4891201, at *11 (E.D. Cal. Nov. 12, 2008); *see also Burden v. SelectQuote Ins. Servs.*, No. C 10-5966 LB, 2013 WL 3988771, at *4 (N.D. Cal. Aug. 2, 2013) (noting percentage method appropriate where "the amount of the settlement is fixed without any reversionary payment to the defendant"). By contrast, the "lodestar method does not necessarily achieve the stated purposes of proportionality, predictability and protection of the class and can encouraged unjustified work and protracting the litigation." *Barnes v. The Equinox Grp., Inc.*, No. C 10-3586 LB, 2013 WL 3988804, at *3 (N.D. Cal. Aug. 2, 2013).

In any event, as demonstrated below, Lead Counsel's fee request here meets all the relevant indicia under either analysis. Thus, Lead Counsel respectfully requests that the Court award the requested fees.

## A.    Consideration of Relevant Factors Supports the Fee Request of 25% of the Settlement Fund

The Ninth Circuit "benchmark" for a reasonable fee award in common fund cases is 25%. *Bluetooth*, 654 F.3d at 942; *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2011 WL 1481424, at *7 (N.D. Cal. Apr. 19, 2011). That is the percentage requested in this Action even though courts in this circuit often award a percentage of the fund that is higher than the 25% benchmark. *See e.g.*, *Vizcaino*, 290 F.3d at 1047 (in common fund cases, the "benchmark" award is 25% of the recovery obtained, with 20-30% as the usual range); *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *1 (N.D. Cal. July 11, 2014) (awarding 28% of the settlement fund, which was "in the acceptable range in the Ninth Circuit"), *appeal dismissed* (Nov. 17, 2014); *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *8 (N.D. Cal. June 27, 2014) (awarding 30% of common fund); *In re Nuvelo, Inc. Sec. Litig.*, No. C 07-04056 CRB, 2011 WL 2650592, at *3 (N.D. Cal. July 6, 2011) (awarding 30%); *Garner*

*v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW, 2010 WL 1687829, at *2-3 (N.D. Cal. Apr. 22, 2010) (awarding 30%); *OmniVision*, 559 F. Supp. 2d at 1047 ("[I]n most common fund cases, the award exceeds th[e] benchmark.").

Thus, Lead Counsel's fee request of 25% of the Settlement Fund is considered presumptively reasonable in the Ninth Circuit. *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 265 (N.D. Cal. 2015) (Corley, Mag. J.) ("The [25%] percentage [fee] sought is at the presumptively reasonable benchmark amount in this Circuit."); *Ching*, 2014 WL 2926210, at *7 ("[T]he Ninth Circuit considers [the 25% benchmark] presumptively reasonable."). As this Court has noted, "[w]hen deciding if a departure from the 25% benchmark is appropriate, courts may consider" a variety of facts such as: (1) the results achieved; (2) the risks of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and financial burden carried by the plaintiffs; (5) awards made in similar cases; (6) the reaction of the class to the proposed fee and expense request; and (7) the lodestar cross-check. *Bellinghausen*, 306 F.R.D. at 265 (*citing Nwabueze v. AT & T Inc.*, No. C 09-01529 SI, 2013 WL 6199596, at *10 (N.D. Cal. Nov. 27, 2013) (citing *Vizcaino*, 290 F.3d at 1047), *subsequent determination*, 2014 WL 324262 (N.D. Cal. Jan. 292014), *appeal dismissed* (Mar. 19, 2014); *Parrish*, 2013 WL 2405200, at *4). *See, also, In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-55 (9th Cir. 2015); *Vizcaino*, 290 F.3d at 1048-50; *Steiner v. Am. Broad. Co.*, 248 F. App'x 780, 782 (9th Cir. 2007); *Wash. Pub. Power Supply*, 19 F.3d at 1299; *Keller v. Elec. Arts, Inc.*, No. 4:09-cv-1967 CW, 2015 WL 5005057, at *2-3 (N.D. Cal. Aug. 18, 2015), *appeal docketed*, No. 15-16861 (Sept. 18, 2015); *OmniVision*, 559 F. Supp. 2d at 1046. For the following reasons, application of these factors here confirms that a 25% fee is justified.

### 1. The Result Achieved

Courts consistently have recognized that the result achieved is a major, and perhaps the most important, factor to be considered in making a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("the most critical factor is the degree of success obtained"); *OmniVision*, 559 F. Supp. 2d at 1046.

Here, as a result of their vigorous prosecution of the Action and settlement negotiations, Lead Counsel has succeeded in obtaining a $23 million cash Settlement for the Settlement Class, which, according to Lead Plaintiff's damage consultant, results in an average per-share recovery of approximately 14% of likely recoverable losses. *See* Joint Decl. ¶63. Even after deducting requested attorneys' fees and

costs, and administration costs, the portion of the Settlement Fund to be distributed to Settlement Class Members represents approximately 9.5% of total estimated damages.  *Id.*  This percentage of recovery compares favorably to recoveries in other securities fraud cases.  For example, the court in *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1175 (S.D. Cal. 2007), found a recovery of 12% of maximum damages, assuming complete success, to support a 25% fee award.  The *OmniVision* court found that a gross recovery of 9% of possible damages, which the court noted was three times the usual recovery in class securities settlements, and which was 6% of the potential damages after deducting attorneys' fees and costs, supported a 28% fee award.  559 F. Supp. 2d at 1042, 1046.

Significantly, this recovery is far superior to the average recovery in all post-PSRLA securities class actions.  The 2015 Cornerstone Research report found that securities class action settlements in both 2013 and 2014 recovered a median of 2.2% of plaintiffs' estimated damages.  *See* Cornerstone Research Rep.[5] at 8.  This was actually an increase from a median recovery of 2.1% in 2011 and 1.8% in 2012.  *Id.* Between 1996 and 2014, the median settlement as a percentage of estimated damages in cases, like here, involving only Exchange Act claims was 2.8%.  *Id.* at 13.  Even more indicative, the median securities class action settlement as a percentage of estimated damages in the Ninth Circuit for the period from 2005 to 2014 was 2.4%.  *Id.* at 22.  The Settlement before the Court here is multiple times higher than those percentages.

Moreover, this recovery was obtained relatively early in the litigation.  Had a settlement not been reached, the next major milestones would have been class certification, for which the hearing was scheduled for April 2016 or, far more importantly here, the close of fact discovery and the hearing on any motion for summary judgment, which were scheduled for August 2016 and May 2017, respectively.  *See* Civil Minute Order, June 12, 2015, ECF No. 187.  Had this Settlement not been reached, not only would Settlement Class Members have had to wait that much longer for a potential recovery, but the expenses would have increased exponentially – without any guarantee of any greater recovery or any recovery at

---

[5]   *See* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2014 Review and Analysis*, Cornerstone Research (2015) ("Cornerstone Research Rep."), at 8, *https://www.cornerstone.com/GetAttachment/701f936e-ab1d-425b-8304-8a3e063abae8/Securities-Class-Action-Settlements-2014-Review-and-Analysis.pdf*. Cornerstone analyzes and reports on various aspects of post-PSLRA all federal securities class actions.

1    all.  Joint Decl. ¶¶11, 12, 69, 70, 119.

2         The level of recovery here, coupled with the fact that there were significant potential risks

3    (discussed *infra*), and the fact that this Settlement was achieved relatively early in the litigation, renders it

4    an excellent result for the Settlement Class.  Because Lead Counsel have achieved a superior recovery for

5    Settlement Class Members, they should be awarded the requested fee as reasonable compensation for

6    obtaining this result.  *See Bellinghausen*, 306 F.R.D. at 261 (where class counsel achieved pre-certification

7    settlement after defending several motions to dismiss, amending the complaint, engaging in discovery and

8    successfully negotiating a seven-figure settlement for the class, result achieved rendered 25% benchmark

9    fee award reasonable).

10                    **2.       The Risks of Litigation**

11        As also discussed in the Joint Declaration and the Final Approval Motion, the risk that Defendants

12   would succeed in defeating the claims at summary judgment, trial or appeal was significant.  Even so,

13   Lead Counsel were able to obtain a significant and certain recovery for the Settlement Class.  Courts

14   recognize that risk is a relevant factor in determining a fair fee award.  *See, e.g.*, *Vizcaino*, 290 F.3d at

15   1048-49 ("Risk is a relevant circumstance."); *Wash. Pub. Power Supply*, 19 F.3d at 1299-302 (district

16   court's failure to apply multiplier to lodestar calculation was abuse of discretion where case was, "fraught

17   with risk and recovery was far from certain"); *OmniVision*, 559 F. Supp. 2d at 1046-47 ("The risk that

18   further litigation might result in Plaintiffs not recovering at all, particularly a case involving complicated

19   legal issues, is a significant factor in the award of fees."); *In re Heritage Bond Litig.*, No. 02-ML-1475-

20   DT, 2005 WL 1594403, at *21 (C.D. Cal. June 10, 2005) ("[T]he risk of non-payment or reimbursement

21   of expenses is a factor in determining the appropriateness of counsel's fee award.").

22        From the outset, Lead Counsel were aware of the risks in this litigation.  Joint Decl. ¶¶66, 133.

23   There was no government investigation or accounting restatement.  *Id.*  Moreover, as noted above, after

24   the July 25, 2012 pivotal disclosure of the Zynga's poor performance and weakened guidance for fiscal

25   2012, analysts questioned whether Zynga had any remaining value.  *Id.*; Complaint ¶¶22-25.  Indeed, the

26   stock price fell to $2.97 and remains in the $2-3 range.  Joint Decl. ¶¶133.  Thus, when they initiated this

27   Action, Lead Counsel understood that regardless of their ability to prove the case, there existed an issue as

28   to collectability.

1    In addition, notwithstanding Lead Counsel's investigation and belief in the merit of the claims,

2    given the nature of the alleged misleading statements, it was clear that regardless of their strength, these

3    claims would be challenging to prove.  Joint Decl. ¶¶64-69; 134.  For example, one of the three remaining

4    alleged categories of misrepresentations related to the Company's guidance. Because such statements are

5    deemed "forward looking," they are particularly challenging to succeed on.  *See, e.g.*, *In re Oracle Corp.*

6    *Sec. Litig*, 627 F.3d 376, 388-90 (9th Cir. 2010).  Moreover, a second alleged misrepresentation relates to

7    when Defendants learned of platform changes that Facebook, Inc. ("Facebook") intended to implement

8    and whether, at that time, Defendants understood that this would impact Zynga's business.  Joint Decl.

9    ¶64.  While obtaining proof of a defendant's actual knowledge is always difficult, that is particularly true

10   here given that Defendant Wehner is now a senior executive at Facebook, having joined Facebook as a

11   Vice President shortly after the Settlement Class Period and is currently Facebook's CFO.  *Id*.  The third

12   category of false statements poses a similar challenge as they relate to the "trends" in declining bookings,

13   requiring evidence of when Defendants observed these trends and at what point they should have disclosed

14   them.  *Id*.   Accordingly, even though Lead Counsel intended to aggressively pursue these claims,

15   Settlement Class Members faced a real and substantial risk of a lesser or no recovery if they could not be

16   proved in whole or in part.  *Id*.

17   Furthermore, these risks continued throughout the litigation.  Joint Decl. ¶¶64-69.  While the

18   Court ultimately denied, in large part, Defendants' second motion to dismiss, myriad risks remained in

19   this Action.  In the absence of a Settlement, Lead Plaintiff would face an aggressively opposed class

20   certification motion, a possible appeal of any class certification ruling, summary judgment and trial,

21   where liability and damages would be contested.  *Id*.  Indeed, at the June 12, 2015 CMC, the then-

22   presiding judge indicated that it would consider allowing Defendants to file an early motion for partial

23   summary judgment after some discovery had been taken regarding Zynga's reported record financial

24   results, including bookings, in the first quarter of 2012.  *Id*. at ¶40.  If such motion were allowed and

25   successful, that could have significantly narrowed the case and potential damages.

26   Furthermore, Defendants argued throughout the litigation that Lead Plaintiff would be unable to

27   prove that Defendants' statements were false and misleading when made or that they were made with

28   scienter, and further that Lead Plaintiff would be unable to prove loss causation.  Joint Decl. ¶65.

1    Defendants also argued that the 2012 guidance statements are protected by the statutory safe harbor for

2    forward-looking statements.  *Id*.  Defendants argued, and would continue to argue, that Lead Plaintiff did

3    not challenge the accuracy of Zynga's financial results, including its reported booking numbers, and could

4    not show that Defendants knew of a future Facebook platform change or any facts undermining the 2012

5    guidance.  *Id*.  With respect to scienter, Defendants argued, and would continue to argue, that Lead

6    Plaintiff's scienter allegations fail, including the allegations based on stock sales, because, *inter alia*, Zynga

7    reported record bookings when the Individual Defendants committed to sell their stock, Defendants only

8    sold a small percentage of their collective holdings in the Secondary Offering and because the purpose of

9    the secondary offering was to "facilitate an orderly distribution of shares and to increase Zynga's public

10   float."  *Id*.

11           Even if Lead Plaintiff could establish liability, Defendants asserted that Lead Plaintiff would have

12   trouble establishing loss causation because the news that caused the market drops at the end of the

13   Settlement Class Period did not reveal these alleged undisclosed risks.  Joint Decl. ¶67.  Moreover,

14   Defendants would likely have argued that Lead Plaintiff's experts could not apportion losses to the

15   Defendants' misstatements (particularly the ones that Lead Plaintiff was able to prove) as opposed to other

16   events and information in the market at the time, including information regarding Zynga's pipeline, which

17   allegations the Court had found were inactionable as a matter of law.  *See* Order Granting Motions to

18   Dismiss with Leave to Amend, Feb. 25, 2014, ECF No. 152; Joint Decl. ¶67.  Indeed, Defendants would

19   have argued that the July 2012 stock drops were caused by unexpected declines in its second quarter

20   results, delays in the launch of new games and the poor performance of Draw Something, facts which are

21   not specifically encompassed in the Action.  Joint Decl. ¶67.

22           Moreover, any resolution of damages issues necessarily involves a "battle of the experts," with

23   the concomitant risk that the jury could credit the Defendants' experts over Lead Plaintiff's experts.  *In re*

24   *Citigroup Inc. Sec. Litig.*, No. 09-md-2070 SHS, 2014 WL 2112136, at *4 (S.D.N.Y. May 20, 2014) ("the

25   magnitude of damages becomes a battle of experts at trial, with no guarantee of the outcome in the eyes

26   of the jury" (quoting *In re Milken & Assocs. Secs. Litig.*, 150 F.R.D. 46, 54 (S.D.N.Y. 1993))); *In re IMAX*

27   *Sec. Litig.*, 283 F.R.D. 178, 193 (S.D.N.Y. 2012) ("[I]t is well established that damages calculations in

28   securities class actions often descend into a battle of experts.").

1    While Lead Counsel believe that the case is meritorious and that they have strong rebuttals to

2    Defendants' arguments, if the Court at summary judgment, or trier of fact at trial, agreed with Defendants

3    in whole or in part, any recovery could be substantially reduced or eliminated altogether.  *See* Joint Decl.

4    ¶¶68-70.

5    Finally, even if Lead Plaintiff were to succeed, any final judgment could be appealed to the Ninth

6    Circuit, which would likely take significant time.  These efforts would continue to be costly and provide

7    absolutely no guarantee that Lead Plaintiff or any certified class would achieve any recovery, let alone a

8    recovery greater than the proposed Settlement.  Illustrating these risks, just weeks ago, a federal court

9    overturned a $6.31 million jury verdict in a bellwether antitrust class action that had been pending since

10   November 2012.  *See In re Cox Enters. Inc. Set-Top Cable T.V. Box Antitrust Litig.*, No. 5:12-ml-02048

11   C, slip op. (W.D. Okla. Nov. 12, 2015).  *See also In re Apollo Grp., Inc. Sec. Litig.*, No. CV 04-2147-

12   PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008) (substantial jury trial verdict overturned in post-

13   trial motions), *rev'd and remanded*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010); *In re JDS*

14   *Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW (EDL), 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (a

15   jury found Morrison & Foerster's clients not liable for securities fraud and insider trading).

16   Defendants had already, and were, most assuredly, prepared to continue to contest the claims

17   vigorously.  Defendants deny all liability and asserted repeatedly that they believe they would win the case

18   at trial, if not before.  Lead Counsel achieved a $23 million recovery for the Settlement Class in the face

19   of these very substantial risks.  Under these circumstances, the requested fee is fully justified.

20   **3.      The Skill Required and Quality of the Work**

21   The third factor in determining what fee to award is the skill required and the quality of the work

22   performed.  *See Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358, at *1 (N.D.

23   Cal. Feb. 6, 2013).  "The prosecution and management of a complex national class action require unique

24   legal skills and abilities.  This is particularly true in securities cases because the [PSLRA] makes it much

25   more difficult for securities plaintiffs to get past a motion to dismiss."  *OmniVision*, 559 F. Supp. 2d at

26   1047; *see also Heritage Bond*, 2005 WL 1594403, at *19-20 (looking at counsel's experience as factor in

27   determining fee award of 33%).

28   Here, Lead Counsel have many years of experience in complex federal civil litigation, particularly

the litigation of securities fraud and other class actions. Joint Decl. ¶¶126-27.[6] They are among the most experienced and skilled practitioners in the field and have long and successful track records in such cases. *Id.* Indeed, Berman DeValerio is a national law firm focusing on securities and antitrust class action with offices here in San Francisco. Lavallee Decl. ¶2 & Ex. 1. The firm has over 3 decades of experience, including trial experience, and has recouped billions of dollars for investors in securities class actions since the enactment of the PSLRA, including in numerous successful actions in this district. *Id*; Joint Decl. ¶126. Likewise, Newman Ferrara maintains a varied practice that focuses on class actions, multi-party litigation, and complex commercial matters in the areas of securities and shareholder litigation, consumer protection, civil rights, and real estate. The firm's attorneys currently handle and have handled numerous securities class actions and shareholder derivative actions and have recovered hundreds of millions of dollars for investors and class members. Norton Decl. ¶3 & Ex. 1; Joint Decl. ¶¶127. As detailed in the Joint Declaration, through Lead Counsel's diligent work, Lead Plaintiff was able to largely defeat Defendants' second motion to dismiss and develop arguments to support a persuasive case at mediation.

As discussed *infra*, Lead Counsel's thorough investigation and prosecution included: (i) dozens of interviews with former Zynga employees and other potential witnesses; (ii) comprehensive analysis of Zynga's business model, its financial disclosures and Defendants' stock sales; (iii) consultation with accounting and gaming consultants; (iv) detailed review of press releases, public filings, analysts' reports and documents produced by Zynga during the settlement process; (v) extensive legal research on a wide variety of complex issues; and (vi) extensive work analyzing the damages and causation issues with the assistance of consultants. As a result of these efforts, Lead Counsel analyzed and synthesized a tremendous amount of information, which enabled them to survive the motions to dismiss and negotiate a fair, reasonable and adequate settlement. Thus, the skill demonstrated by Lead Counsel supports the requested fee.

The quality and vigor of opposing counsel is also important in evaluating the services rendered by Lead Counsel. *See, e.g., In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352 MMM (JCGx), 2014 WL 10212865, at *22 (C.D. Cal. July 28, 2014) ("In addition to the difficulty of the legal and factual

---

[6] *See* also firm resumes of Berman DeValerio and Newman Ferrara, attached as Exhibit 1 to the Lavallee Declaration and Exhibit 1 to the Norton Declaration.

issues raised, the court should also consider the quality of opposing counsel as a measure of the skill required to litigate the case successfully." (citing *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977))); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013) ("The quality of opposing counsel is important in evaluating the quality of Class Counsel's work." (citing *Equity Funding*, 438 F. Supp. at 1337)). *See also Wing v. Asarco*, 114 F.3d 986, 989 (9th Cir. 1997) (affirming fee award and noting the district court's evaluation of the job done by class counsel "in light of the quality of opposition counsel and [defendant's] record of success in this type of litigation").

Defendants here have been represented by well-respected and experienced counsel from Morrison & Foerster LLP who aggressively defended the Action.  Defense counsel Morrison & Foerster is ranked by Chambers USA as a national leader in securities litigation.  Joint Decl. ¶129-31 (*see Nationwide – Securities Lawyers & Law Firms – USA*, Chambers & Partners (Dec. 7, 2015), *http://www.chambersandpartners.com/12788/ 680/editorial/5/1*).  Indeed, the Firm has successfully defended clients against private securities fraud claims at trial here in the Northern District of California. *See, e.g.*, *JDS Uniphase Corp.*, 2007 WL 4788556.  The fact that Lead Counsel achieved this Settlement in the face of formidable legal opposition further evidences the quality of their work and supports granting the requested fee.

### 4.    The Contingent Nature of the Fee and the Financial Burden Carried by Lead Counsel

Courts, including the Supreme Court, have long recognized that private securities actions provide a "most effective weapon in the enforcement of the securities laws and are a necessary supplement to [SEC] action." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985). *See also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) ("private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses").  As a corollary to this, courts also recognize that for this public interest to be carried out, plaintiff's counsel must be adequately compensated where successful, taking into account the enormous risks undertaken in prosecuting securities class actions.  *See, e.g.*, *Antonopulos v. N. Am. Thoroughbreds, Inc.*, No. 87-0969G(CM), 1991 WL 427893, at *2 (S.D. Cal. May 6, 1991).

Thus, a determination of a fair fee must include consideration of its contingent nature.  It is an established practice in the private legal market to reward attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases.  Courts in this circuit have consistently recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis to compensate them for the risk that they might be paid nothing at all for their work.  *Vizcaino*, 290 F.3d at 1051 (courts reward successful counsel in contingency cases "for taking the risk of nonpayment by paying them a premium over their normal hourly rates"); *Wash. Pub. Power Supply*, 19 F.3d at 1299 ("Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose."); *Bellinghausen*, 306 F.R.D. at 261 ("[T]hat class counsel had significant experience in this field and took on this matter on a contingent fee basis indicates that the 25 percent benchmark fee request is reasonable."); *Nuvelo*, 2011 WL 2650592, at *2  ("It is an established practice to reward attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all."); *Garner*, 2010 WL 1687829, at *2 ("Courts have long recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all for their work.").

The contingent nature of the fee here supports a 25% award.  Lead Counsel have, to date, received no compensation for their work, and have incurred and were prepared to continue to incur, significant expenses in litigating this matter for the benefit of the Lead Plaintiff and the Settlement Class.  Because the fee in this matter was entirely contingent, the only certainty was that there would be no fee without a successful result and that such result would only be realized after significant amounts of time, effort and money had been expended.  Lead Counsel risked non-payment of at least $184,681.29 in out-of-pocket expenses and at least $3,347,319.25 in time worked on this matter, knowing that if their efforts were not successful, no fee would be paid and no expenses reimbursed.

Further, because Lead Counsel took this case entirely on a contingent fee basis, they had to forego other financial opportunities. Joint Decl. ¶138. Lead Counsel have spent considerable outlays of time and

money by, among other things: (i) investigating the action; (ii) drafting complaints; (iii) defending two attacks on the pleadings; (iv) propounding and responding to discovery; (v) negotiating a settlement, including by participating in a full-day of mediation; (vi) consulting with consultants; (vii) drafting the preliminary approval motion and related settlement documents; and (viii) supervising the settlement administration. Joint Decl. ¶¶5, 6,117, 121-22; *see also*.

Lead Counsel's "substantial outlay, when there is a risk that none of it will be recovered, further supports the award of the requested fees" here. *Omnivision*, 559 F. Supp. 2d at 1047. *See also Torrisi v. Tucson Elec. Power Co*., 8 F.3d 1370, 1377 (9th Cir. 1993) (recognizing that contingent fee rewarded class counsel not only for the hours they had in the case to the date of the settlement, but for carrying the financial burden of the case); *Immune Response*, 497 F. Supp. 2d at 1176 ("Counsel has incurred thousands of hours of attorney time and put forth hundreds of thousands of dollars in expenses on an 'at-risk' basis.  In complex cases, such as this, the risk of no recovery is substantial and must be balanced against an expectation of a sizeable award.").  Consideration of this factor weighs in favor of approval of Lead Counsel's fee request.

### 5.    Awards in Comparable Cases

Courts often look at fees awarded in comparable cases to determine if the fee requested is reasonable. *Vizcaino*, 290 F.3d at 1050 n.4; *OmniVision*, 559 F. Supp. 2d at 1047-48; *Immune Response*, 497 F. Supp. 2d at 1176.

Lead Counsel seek a fee equal to the Ninth Circuit's 25% benchmark for common fund cases.  "However, in most common fund cases, the award exceeds that benchmark." *OmniVision*, 559 F. Supp. 2d at 1047 (approving 28% fee award in securities class action).

The fee requested here is supported by recent fee awards at or above the 25% benchmark in other class action cases. *See Vizcaino*, 290 F.3d at 1047, 1052 (affirming 28% fee award); *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 463 (9th Cir. 2000) (fee award of 33.33%); *Vedachalam v. Tata Consultancy Servs., Ltd*, No. C 06-0963 CW, 2013 WL 3941319, at *2 (N.D. Cal. July 18, 2013) (noting "the many cases in this circuit that have granted fee awards of 30% or more" and approving 30% fee of $29.75 million settlement); *Nuvelo*, 2011 WL 2650592, at *3 (approving 30% fee from $8.9 million net settlement fund); *In re Informix Corp. Sec. Litig*., No. 97-1289 CRB, 1999 U.S. Dist. LEXIS 23579 (N.D.

Cal. Nov. 23, 1999) (30% fee award); *In re CV Therapeutics, Inc. Sec. Litig.*, No. C-03-3709 SI, 2007 WL

1033478, at *1 (N.D. Cal. Apr. 4, 2007) (30% fee award); *Immune Response*, 497 F. Supp. 2d at 1176-77

(25% fee award); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194-95 (E.D. Pa. 2000) (fee

of 30% of $111 million); *Heritage Bond*, 2005 WL 1594403, at *18 (awarding 33.33% of $27,783,000

settlement fund).

In addition, NERA's most recent study of attorneys fee awards in securities class actions shows

that for settlements between $10 million and $25 million, the median attorneys' fee award for the period

January 1996 to December 2014 was 30.0% and for the most recent two-year period from January 2012

to December 2014, the median attorneys' fees award was 27.5%. *See* Dr. Renzo Comolli, et al., *Recent*

*Trends in Securities Class Action Litigation: 2014, Full Year Review,* at 34, Figure 29 (January 20, 2015)

("NERA 2014 Rep."), *http://www.nera.com/content/dam/nera/publications/2015/PUB_2014*

*_Trends_0115.pdf.*  The fees paid in these comparable cases support the 25% fee award requested here.[7]

### 6.       Reaction of the Settlement Class

In accordance with the Court's Preliminary Approval Order, 2,064 copies of the Notice and the

Proof of Claim and Release Form ("Claim Form") were mailed on November 3, 2015 to all registered

holders of Zynga common stock during the Settlement Class Period, as identified by Zynga's transfer

agent, and to a list of the largest and most common banks, brokers and other nominees maintained by the

Claims Administrator.  *See* Declaration of Stephanie A. Thurin Re Notice Dissemination and Publication

("Thurin Decl."), ¶¶4-10, attached as Ex. A to the Joint Decl.  The Claims Administrator also sent the

Notice and Claim Form to additional potential Settlement Class Members provided by Lead Counsel.  *Id.*

at ¶¶11-13.  Moreover, the Summary Notice was published in *Investor's Business Daily* on November 3,

---

[7]    As NERA notes, "[t]ypically fees grow with settlement size but less than proportionally (*i.e.*, the fee percentage shrinks as the settlement size grows)."  NERA 2014 Rep. at 34.  As explained by the Ninth Circuit and others, this inverse relationship exists because the efforts of counsel are not exponentially greater where megafund settlements are achieved.  *See Bluetooth*, 654 F.3d at 942-43 (in many instances an increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir. 1998)); *In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1105 (D. Minn. 2009) ("A declining percentage is appropriate…. it recognizes that the amount recovered owes at least as much to the defendant's size and solvency, as to counsel's skill."); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 267 (D.N.H. 2007) ("[T]hat super mega-fund cases warrant lower [percentage of the fund] awards than smaller cases because they require proportionally less work may well be true as a general matter.").

1    2015.  *Id.* at ¶14.  Among other things, the Notice described the Action and the proposed Settlement, as

2    well as Lead Counsel's intent to request an award of attorneys' fees of no more than 25% of the Settlement

3    Fund or approximately $5,750,000, and litigation expenses of up to $276,000.  The deadline for Settlement

4    Class Members to object to the Settlement and/or Lead Counsel's fee application or to seek exclusion from

5    the Settlement Class is January 12, 2016, so that members of the Settlement Class have 32 days to review

6    this fee application and make any objections.

7          To date, there have been no objections made to the amount of attorneys' fees requested or

8    reimbursement of expenses.  *Id.* at ¶25.  Thus, at this time, this factor supports granting the motion.  *Knight*

9    *v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367, at *7 (N.D. Cal. Feb. 2, 2009) (finding no

10   objections supports the 30% fee award); *OmniVision*, 559 F. Supp. 2d at 1047-48 (approving 28% fee

11   award, where there were few requests for exclusion and none of the objectors raised concern about the fee

12   request); *Immune Response*, 497 F. Supp. 2d at 1177.  Lead Counsel will respond to any later received

13   objection on January 18, 2015 or at the scheduled January 28, 2016 fairness hearing, as set forth in the

14   Court's September 25, 2015 Order Modifying the Schedule Concerning Preliminary and Final Approval

15   of Settlement, Dkt. No. 204.

16         For these reasons, Lead Counsel respectfully submit that their requests are fair and reasonable and

17   should be granted in full.

18         **B.     The Lodestar "Cross-Check" Supports the Fee Request**

19         Courts in the Ninth Circuit often examine the lodestar calculation as a cross-check on the

20   percentage fee award.  *Vizcaino*, 290 F.3d at 1050 ("[W]hile the primary basis of the fee award remains

21   the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given

22   percentage award."); *Aboudi v. T-Mobile USA, Inc.*, No. 12cv2169 BTM (NLS), 2015 WL 4923602, at

23   *7 (S.D. Cal. Aug. 18, 2015) ("Courts commonly use a rough calculation of the lodestar as a cross-

24   check.").[8]  Here, a cross-check with Lead Counsel's lodestar confirms that the request for $5,750,000

25   (25% of the settlement fund) is fair and reasonable.

26

27   _____

28   [8]     Court recognize that "[t]he lodestar cross-check calculation need entail neither mathematical precision
     nor bean counting .... [as courts] may rely on summaries submitted by the attorneys and need not review
     actual billing records."  *Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516, at *6 (N.D.
     Cal. Mar. 6, 2014) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005)).

There are two factors in the lodestar cross-check – the actual lodestar and then the appropriate multiplier to apply to the lodestar. *Bluetooth*, 654 F.3d at 941-42 ("The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation … by a reasonable hourly rate for the region and for the experience of the lawyer. Though the lodestar figure is 'presumptively reasonable,' the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors. …"); *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509-LHK, 2015 WL 5158730, at *9 (N.D. Cal. Sept. 2, 2015) (same).

The accompanying declarations of Lead Counsel set forth the number of hours worked and the billing rates used to calculate their lodestar. Joint Decl. ¶¶112, 118, 122-24 & Exs. B-C (and exhibits thereto). As described in those declarations, Lead Counsel and their staff devoted a total of approximately 5,580.05 hours to prosecuting this action, a number that will continue to grow as Lead Counsel devote additional hours to settlement administration and the distribution process. Joint Decl. ¶118. Their combined efforts yielded a lodestar of $3,347,319.25 at Lead Counsel's current billing rates. *Id.*

### 1.    Lead Counsel's hourly rates are reasonable.

Both the Supreme Court and courts in this circuit have long approved the use of current billing rates as appropriate given the deferred and contingent nature of counsel's compensation. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (use of current rates in civil rights action proper because, "compensation received several years after the services were rendered ... is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed"); *Wash. Pub. Power Supply*, 19 F.3d at 1305 ("The district court has discretion to compensate delay in payment in one of two ways: (1) by applying the attorneys' current rates to all hours billed during the course of the litigation; or (2) by using the attorneys' historical rates and adding a prime rate enhancement."); *Wakefield*, 2015 WL 3430240, at *5 ("The [current] rates counsel used are appropriate given the deferred and contingent nature of counsel's compensation."); *Miller*, 2015 WL 758094, at *5 (same).

In assessing the reasonableness of an attorney's hourly rate, courts consider whether the claimed rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11. Lead Counsel here are experienced, highly regarded members of the bar with extensive expertise in the area of class actions and

1  complex litigation involving securities class actions.  *See* Joint Decl. ¶¶126-27.  Lead Counsel submits that

2  the hourly billing rates of Lead Counsel here, which range from $580 to $875 for Partners and $390 to

3  $475 for Associates, are fair and reasonable.  *See* Joint Decl. ¶124; Lavallee Decl. ¶4-9 & Ex. 2; Norton

4  Decl. ¶¶6-12.  Each Lead Counsel has affirmed that their firm's current hourly rates used in this Action

5  are the regular rates generally charged by each firm for both hourly and non-contingent cases and are

6  consistent with the rates charged in each locale.  *See* Lavallee Decl. ¶6; Norton Decl. ¶10.

7  Similar or higher billing rates have been approved by other courts in this district.  *See*, *e.g.*,

8  *Rieckborn v. Velti PLC*, No. 13-cv-03889-WHO, slip op. at 37-39 (N.D. Cal. Feb. 3, 2015) and ECF Nos.

9  171-5 to 171-7 (finding rates of $535-$900 for partners, $275-$690 for associates and $150-$340 for

10  paralegals reasonable); *In re Diamond Foods, Inc., Sec. Litig.*, No. 11-cv-05386-WHA, slip op. at 5-6, 9

11  (N.D. Cal. Jan. 10, 2014) and ECF Nos. 299-4, 299-6 (finding rates of $550-$925 for partners, $350-$490

12  for associates and $265-$400 for paralegals as reasonable); *Mulligan v. IMPAX Labs., Inc.*, No. 13-cv-

13  01037-EMC, slip op. at 7-9 (N.D. Cal. July 23, 2015) and ECF Nos. 127-5, 127-6 (finding rates of $655-

14  $915 for partners, $310-$625 for associates and $200-$260 for paralegals as reasonable); *In re OCZ Tech.*

15  *Grp., Inc. Sec. Litig.*, No. 12-cv-05265-RS, slip op. at 1 (N.D. Cal. Sept. 21, 2015) and ECF Nos. 103 to

16  105 (finding rates of $525-$975 for partners, $350-$650 for associates and $180-$265 for paralegals as

17  reasonable); *Booth v. Strategic Reality Trust, Inc.,* No. 13-cv-04921 JST, slip op. at 11-13 (N.D. Cal. Oct.

18  15, 2015) and ECF Nos. 101-6, 102 (finding rates of $250-$460 for associates and $550-$875 for partners

19  as reasonable).[9] *See also* Joint Decl. ¶124.

20  Moreover, Lead Counsel's hourly billing rates are also lower than those charged by Morrison &

21  Foerster LLP, defense counsel in this Action.  Joint Decl. ¶125.  According to figures published in the

22  National Law Journal's 2014 Billing Survey, Morison & Foerster's rates are: (i) for partners, between

23  $595-1,195; and (ii) for associates, between $230 and $725.  *Id.* (citing *Billing Rates across the Country*,

24  National Law Journal (Jan. 13, 2014), *http://www.nationallawjournal.com/id=1202636785489/Billing-*

25  *Rates-Across-the-Country?slreturn=20151107172753*).

26

27

28  [9]  Courts may take judicial notice of billing rates awarded in prior cases. *In re Keahey*, 414 F. App'x 919, 923 (9th Cir. 2011); *Farbotko v. Clinton Cty. of N.Y.*, 433 F.3d 204, 209 (2d Cir. 2005).

1

**2.      Lead Counsel Have Spent a Reasonable Number of Hours Litigating this Action**

2       Lead Counsel's hours spent were reasonable and necessary.  Lead Counsel's time was spent

3    primarily on the following tasks:

4
- Investigating the factual and legal basis for claims of Lead Plaintiff and Settlement Class Members.  This included identifying over a hundred potential witness and speaking with dozens of witnesses as well as working with an outside investigative firm on this investigation.

5

6

7
- Reviewing and analyzing news and analyst reports.

8
- Investigating and analyzing the factual issues underlying the claims, which included an in depth analysis of Zynga's business model, its financial filings, other public statements and Defendants' stock sales, including with the efforts of Lead Counsel's in-house forensic accountant.

9

10
- Researching certain legal issues regarding the claims.

11
- Preparing detailed complaints.

12
- Responding to two rounds of motions to dismiss and one motion for reconsideration.

13
- Consulting with a gaming consultant.

14
- Commencing a discovery plan and propounding and responding to discovery requests.

15
- Analyzing loss causation and potential damage methodologies and amounts in consultation with a damages consultant.

16

17
- Reviewing and analyzing confidential Zynga documents produced in connection with mediation.

18
- Preparing for and participating in mediation and extensive settlement discussions.

19
- Drafting the preliminary approval motion and related settlement documents.

20
- Supervising the settlement administration.

21    Joint Decl. ¶¶5-6, 117, 121-22; *see also* ¶¶21-60, 83-111.

22       Counsel submits that the substantial time devoted to litigating the claims against Defendants

23   reflects the tremendous effort needed to prosecute those claims and to bring them to a positive resolution.

24   Lead Counsel coordinated efforts between the firms to avoid duplication and delegated tasks to lower level

25   attorneys where appropriate.  *See* Joint Decl. ¶¶120-21.  Thus, Lead Counsel respectively submits that

26   their lodestar is fair and reasonable.  Joint Decl. ¶116.

27

28

### 3.    Lead Counsel's Requested Lodestar Multiplier is Reasonable

Lead Counsel's efficient and competent prosecution of the Action results in a 1.7 times multiplier. Joint Decl. ¶118.  Courts regularly approve fee awards resulting in multipliers which are far higher than that requested here.  Indeed, in *Vizcaino*, 290 F.3d at 1050-51, the Ninth Circuit upheld the court's use of a lodestar cross-check and concluded that a percentage award that corresponded to a 3.65 multiplier was reasonable as within the range of multipliers applied in common fund cases.

Courts have approved greater multipliers in other large common fund cases.  *See, e.g., Charles Schwab*, 2011 WL 1481424, at *8 (approving multiplier of 2.68); *In re Mercury Interactive Corp. Sec. Litig.*, No. 5:05-CV-03395-JF, 2011 WL 826797, at *2 (N.D. Cal. Mar. 3, 2011) (lodestar cross-check multiplier of 3.08 "is within the acceptable range"); *OmniVision*, 559 F. Supp. 2d at 1048 ("[C]ourts have approved multipliers ranging between 1 and 4."); *Steiner*, 248 Fed. App'x at 783 (upholding 25% fee award yielding multiplier of 6.85, finding that it "falls well within the range of multipliers that courts have allowed"); *Steinfeld v. Discover Fin. Servs.*, No. C 12-01118 JSW, 2014 WL 1309692, at *2-3 (N.D. Cal. Mar. 31, 2014) (finding a 3.5 multiplier reasonable); *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (approving attorneys' fees that resulted in lodestar multiplier of 2.83); *Ralston v. Mortg. Investors Grp., Inc.*, No. 5:08-cv-00536-JF (PSG), 2013 WL 5290240, at *5 (N.D. Cal. Sept. 19, 2013) ("Application of a multiplier of 2.8 would result in the requested award of fees and costs.").

These multipliers reflect the principle that attorneys should not be discouraged from obtaining early victories that benefit the class.  *See, e.g., Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123-27 (C.D. Cal. 2008) (awarding 25% of fund, which amounted to 5.2 multiplier, in part because of the numerous drawbacks and disincentives associated with a pure lodestar approach).  Specifically, courts recognize that counsel should not be penalized for achieving an excellent result relatively quickly as this would defeat the goal of the percentage of the fund method which is intended to create incentives for efficient prosecution of actions.  *See Vizcaino*, 290 F.3d at 1050 n.5 ("We do not mean to imply that class counsel should necessarily receive a lesser fee for settling a case quickly; in many instances, it may be a relevant circumstance that counsel achieved a timely result for class members in need of immediate relief.").  Here, Lead Counsel's multiplier reflects the fact that it obtained this excellent recovery at a relatively early stage of the litigation.

The rationale for enhancing the lodestar figure derives in part from the established practice in the private legal market of rewarding attorneys who take contingency cases with the risk of non-payment by paying them "a premium over their normal hourly rates" when they win. *Vizcaino*, 290 F.3d at 105. Moreover, the multiplier incentivizes counsel to resolve litigation as quickly as possible, rather than cause delay merely to generate additional attorneys' fees. Thus, the Ninth Circuit has found that, even though a district court generally has discretion to apply a multiplier to compensate for the risk of nonpayment, "[i]t is an abuse of discretion to fail to apply a risk multiplier ... when: (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky." *Fischel v. Equitable Life Assur. Soc'y of the U.S.*, 307 F. 3d 997, 1008 (9th Cir. 2002).

This is precisely the case here.  First, the lodestar alone in this case does not reflect the risk of nonpayment. *See* Joint Decl. ¶115.  Second, in pursuing this litigation, Lead Counsel reasonably believed that they would receive additional compensation for the risk of nonpayment in light of Ninth Circuit law requiring a multiplier where there is such a risk.  *Id.*; *Wash. Pub. Power Supply*, 19 F.3d at 1299-301. Thus, basing the award of attorneys' fees in this case on hourly rates alone would contradict controlling Ninth Circuit authority.  *See Fischel*, 307 F. 3d at 1010 ("[T]he district court failed fully to analyze the risk factor and thus abused its discretion in determining whether to award a risk multiplier.").  Finally, as noted above, Lead Counsel undertook this case at great risk and produced an excellent and timely settlement. Joint Decl. ¶¶114-19.  Thus, a multiplier enhancing the lodestar figure to compensate for the risk of non-payment and for the benefit of resolving litigation in a timely and efficient manner is appropriate.

Accordingly, the lodestar "cross-check" fully supports the requested percentage fee.

## IV.   LEAD COUNSEL SHOULD BE REIMBURSED FOR LITIGATION EXPENSES REASONABLY INCURRED IN CONNECTION WITH THIS ACTION

It is well-established that Lead Counsel are entitled to reimbursement of reasonable out-of-pocket expenses.  *See* Fed. R. Civ. P. 23(h); *see, e.g., Miller*, 2015 WL 758094, at *7 ("Class counsel are entitled to reimbursement of reasonable out-of-pocket expenses.").   Lead Counsel therefore request reimbursement for the reasonable and necessary expenses advanced to prosecute this litigation since its inception.

1    Lead Counsel have submitted declarations attesting to the reasonableness and necessity of these

2    expenses, which collectively total $184,681.29.  *See* Joint Decl. ¶¶145-57 & Exs. B at ¶¶10-11 (and Ex. 3

3    thereto) and Ex. C at ¶¶13-16.[10]  These expenses are below $276,000, the maximum amount for which

4    Lead Counsel advised Settlement Class Members they would seek reimbursement in the Notice.  Joint

5    Decl. ¶158.

6        The appropriate analysis to apply in deciding which expenses are compensable in a case of this

7    type is whether the particular costs are the type typically billed by attorneys to paying clients in the

8    marketplace.  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (allowing recovery of "out-of-pocket

9    expenses that would normally be charged to a fee paying client"); *see also OmniVision*, 559 F. Supp. 2d

10   at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients

11   in non-contingency matters.").  Here, all of the expenses are types that are routinely billed to clients and

12   were necessary for the prosecution and resolution of this Action.  Joint Decl. ¶156.  Since the categories

13   of expenses for which Lead Counsel seek reimbursement are the type of expenses routinely charged to

14   hourly clients and have benefited the Settlement Class, the full requested amount of $184,681.29 should

15   be reimbursed.  *Larsen*, 2014 WL 3404531, at *10.

16       For example, the most significant expense incurred by Lead Counsel on behalf of the Settlement

17   Class were consulting expenses, totaling $79,837.50.  Joint Decl. ¶148.  As described above, Lead Counsel

18   retained a damage consultant at the inception of the case to assist in terms of loss causation analysis,

19   damage calculations (including for mediation purposes) and preparing a plan of allocation for the

20   Settlement.  *Id.*  Moreover, Lead Counsel also retained a gaming industry consultant to understand its

21   operations and to assist in crafting discovery.  *Id.* at ¶¶42, 148.  These consultants were necessary to,

22   among other things, plead a case that survived a motion to dismiss, help craft discovery and assist with

23   how the Net Settlement Funds should be allocated amount all Settlement Class Members in accordance

24   with the legal principles guiding loss causation and damage calculations under the PSRLA.  *See, e.g., Am.*

25   *Apparel*, 2014 WL 10212865, at *29 ("To plead causation and damages adequately, and to arrive at an

26

27   ———————————
     [10]   Because Lead Counsel were aware that they might not recover any of their expenses, and, at the very

28   least, would not recover anything until the case was successfully resolved, Lead Counsel were incentivized
     to, and did, take steps to minimize expenses wherever practicable without jeopardizing the vigorous and
     efficient prosecution of the Action.  Joint Decl. ¶147.

1    informed assessment concerning the reasonableness of the settlement and create a plan of allocation, class

2    counsel needed to retain damages and loss causation experts.").

3            Another significant expense was investigative expenses incurred by outside investigators who

4    identified nearly a hundred witnesses and contacted dozens, which totaled $30,340.50. Joint Decl. ¶149.

5    Given the nature of the allegations here and the lack of an accounting restatement or government

6    investigation, Lead Plaintiffs' informal investigation was crucial to successfully alleging securities fraud

7    as opposed to simple missed earnings.  Indeed, the Honorable Jeffrey S. White denied Defendants' second

8    motion to dismiss based largely on the strength of the Confidential Witness statements.  *See, e.g.*, Order

9    Denying Defs.' Mot. to Dismiss, March 25, 2015, Dkt. No. 176, at 8 ("The Court finds that the confidential

10   witnesses state sufficient personal knowledge of the daily reports of game users and money spent on

11   games.").

12           Such investigative expenses are the types of expenses that are routinely reimbursed.  *See, e.g.*, *In

13   re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1367 (N.D. Cal. 1996) ("It is the opinion of this

14   Court that the request for investigator expenses be granted.  In a class action case, such as the one at bar, it

15   often becomes essential to locate and contact potential witnesses and class members."); *Am. Apparel*,

16   2014 WL 10212865, at *27-29 (awarding reimbursement of $50,314.54 for investigative services because

17   class counsel incorporated information obtained from these interviews in their complaints and the court

18   had relied on allegations concerning the witnesses' testimony in deciding defendants' motions to dismiss).

19           The expenses also include expenses for computer research, totaling $34,303.88.  Joint Decl. ¶152.

20   These computer expenses include the following: (i) Lexis/Westlaw; (ii) Bloomberg; (iii) PACER; and

21   (iv) a variety of subscription databases that Lead Counsel's investigators used to locate and identify

22   witnesses.  Courts recognize that such expenses should be reimbursed.  *See, e.g.*, *Media Vision Tech.*,

23   913 F. Supp. at 1371 ("Given the complexity of the issues, this Court does not doubt that computerized

24   research played an essential role in the litigation at hand.  The request for computerized legal expenses

25   should be granted in full."); *Am. Apparel*, 2014 WL 10212865, at *29 ($35,963.52 expended for online

26   legal and factual research was awarded here it included not only fees paid to online legal research

27   companies such as LexisNexis, but also fees charged by online databases and services providers that the

28   investigator used to identify and locate witnesses and former American Apparel employees).

1    Another significant expense was the mediator costs, which totaled $ $6,675.00.   These costs are

2 entirely reasonable given the caliber of the Honorable Edward Infante (Ret.) and the incredible guidance

3 and efforts he brought to the mediation.   Joint Decl. ¶153.   Courts recognize that the assistance of a

4 qualified mediator is often a prerequisite for settlement of a complex securities class action.   *Moore v.*

5 *IMCO Recycling of CA, Inc.*, No. CV 04-1304 DSF (VBKx), 2005 WL 5887180, at *3 (C.D. Cal. Sept.

6 28, 2005) (recognizing the importance of mediation as a way to avoid trial and that awards of mediation

7 expenses are "reasonably necessary to the conduct of litigation").

8    In sum, these expenses – as well as the reasonable copying costs, court costs, mailing/delivery,

9 telephone costs and travel costs incurred here – were necessary to reach this Settlement and are the types

10 that should be reimbursed.   *Vincent v. Reser*, No. C 11-03572 CRB, 2013 WL 621865, at *5 (N.D. Cal.

11 Feb. 19, 2013) (the cost of "three experts and the mediator, photocopying and mailing expenses, travel

12 expenses, and other reasonable litigation related expenses" approved); *Media Vision Tech.*, 913 F. Supp.

13 at 1367-72 (reasonable costs related to retention of experts, investigator, photocopying, telephone, legal

14 research fees, travel expenses, postage and filing fees may be reimbursed); *Harris*, 24 F.3d at 19

15 (prevailing plaintiff may be entitled to costs including, among other things, postage, investigator, copying

16 costs, hotel bills, and meals that "would normally be charged to a fee paying client"); *Immune Response*,

17 497 F. Supp. 2d at 1177 (approving reimbursement request for meals, hotels, transportation, photocopies,

18 postage, telephone, fax, filing fees, messenger and overnight delivery, online legal research, class action

19 notices, experts, consultants, investigators, and mediation fees).

20 **V.     CONCLUSION**

21    For the foregoing reasons, Lead Counsel respectfully request that the Court award them attorneys'

22 fees of $5,750,000 (25% of the Settlement Fund) and reimbursement of $184,681.29 in out-of-pocket

23 expenses.

24 ///

25 ///

26 ///

27

28

---

DATED:  December 11, 2015

Respectfully submitted,

**BERMAN DEVALERIO**


By:  _/s/ Nicole Lavallee_
         Nicole Lavallee

Joseph J. Tabacco, Jr.
Kristin J. Moody
One California Street, Suite 900
San Francisco, CA  94111
Telephone: (415) 433-3200
Facsimile:  (415) 433-6282
Email:  jtabacco@bermandevalerio.com
           nlavallee@bermandevalerio.com
           kmoody@bermandevalerio.com

Jeffrey M. Norton
**NEWMAN FERRARA LLP**
1250 Broadway, 27th Floor
New York, NY 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
Email: jnorton@nfllp.com

*Lead Counsel and Attorneys for Lead Plaintiff
David Fee*