1

2

3

4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7  MARK H. DESTEFANO, et al.,              Case No.  12-cv-04007-JSC

8               Plaintiffs,

9        v.                                **ORDER GRANTING MOTION FOR
                                            FINAL APPROVAL OF CLASS
10  ZYNGA, INC., et al.,                    ACTION SETTLEMENT AND MOTION
                                            FOR ATTORNEYS' FEES**

11               Defendants.                Re: Dkt. Nos. 215, 216

12

13        Lead Plaintiff David Fee ("Lead Plaintiff") brings this pre-certification securities class

14  action against Defendants Zynga Inc. ("Zynga" or the "Company"), Mark Pincus, David M.

15  Wehner, and John Schappert (the "Individual Defendants," and collectively, "Defendants"),

16  alleging that Defendants artificially inflated Zynga's stock price by misleading investors about

17  Zynga's core business metrics and engaging in insider trading in violation of the federal securities

18  laws.  On October 27, 2015, the Court issued an Order granting Lead Plaintiff's unopposed

19  Motion for Preliminary Approval of Class Action Settlement.  *In re Zynga Inc. Secs. Litig.*, No.

20  12-cv-4007-JSC, 2015 WL 6471171, at *1 (N.D. Cal. Oct. 27, 2015).

21        Now pending before the Court is Lead Plaintiff's motion for final approval of a class

22  action settlement (Dkt. No. 215),[1] and Lead Counsel's motion for attorneys' fees and

23  reimbursement of litigation costs (Dkt. No. 216).  Defendants do not oppose the motions.  There

24  are no objections from any Class Members.  The Court held a final fairness hearing on February

25  11, 2016.

26

27  ─────────────────────
[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the

28  ECF-generated page numbers at the top of the documents.

# BACKGROUND

## A.      Factual Background

This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Zynga during the relevant class period, defined below.  Zynga develops, markets and operates online social game services that generate revenue primarily through in-game sale of virtual currency and goods to users, monitored mainly through a financial metric called "bookings."  (Dkt. No. 155 ¶ 3.)  In the lead up to its December 15, 2011 initial public offering ("IPO"), the Individual Defendants and other corporate insiders had access to real-time data showing declines in user numbers, user spending, and bookings.  Just three months after the IPO, and despite an IPO restriction that barred them from selling for a certain time period, aware of the Company's poor financial condition the Individual Defendants and some officers sold their shares for hundreds of millions of dollars in a Secondary Offering on April 3, 2012. (*Id.* ¶¶ 7-8.)  Just three months later, on July 25, 2012, Zynga disclosed its poor financial results to the public.  (*Id.* ¶ 10.)  The officers' actions allowed them to shift the Company's revenue losses from the first quarter to the second quarter of 2012, thereby artificially inflating the price of Zynga shares during the first quarter.  (*Id.* ¶¶ 11-12.)  As part of their effort to artificially inflate the price of Zynga stock, Defendants issued a series of false and misleading statements regarding Zynga's bookings, game pipeline, Facebook changes, and 2012 guidance, all while the Company's finances were actually deteriorating.  (*See id.* ¶¶ 13-21.)  By the time the truth about the Company's financial status was actually disclosed, Zynga's stock price had fallen 37% in a single day. (*Id.* ¶ 23.)

## B.      Procedural History

Beginning on June 30, 2012, twelve class actions were filed in this Court against Zynga and certain of its directors and officers, as well as certain underwriters that served in connection with the Company's IPO and secondary offering of personally held shares (Secondary Offering").[2]  By Stipulation and Order of September 26, 2012, the district court

---

[2] *DeStefano v. Zynga Inc.*, Case No. 12-cv-4007-JSW; *Campus v. Zynga Inc.*, No. 12-cv-4048-JSW; *Diemand v. ZyngaInc.*, No. 12-cv-4059-JSW; *Phillips v. Zynga Inc.*, No. 12-cv-4064-

consolidated seven related class actions then pending in this District into this single class action entitled *In re Zynga Inc. Securities Litigation*, Lead Case No. 12-cv-4007-JSW.[3]  (Dkt. No. 30; *see also* Dkt. No. 206 ¶ 2.)  On October 23, 2012, the Court related an additional five actions into this class action.[4]  (Dkt. No. 92; *see also* Dkt. No. 206 ¶ 2.)  On January 23, 2013, the district court appointed David Fee as Lead Plaintiff for the putative class pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B), and Section 27D(a)(3)(B) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77z-1(a)(3)(B), and approved the law firms of Berman DeValerio and Newman Ferrara LLP as Lead Counsel in this class action.

On April 3, 2013, after extensive investigation by Lead Counsel, Lead Plaintiff and named plaintiff Joy Arjoon-Singh filed a Consolidated Complaint alleging claims under the Exchange Act and the Securities Act on behalf of all persons who purchased Zynga common stock between December 15, 2011 and July 25, 2012, inclusive.  (Dkt. No. 125; *see also* Dkt. No. 206 ¶ 3.)  The Consolidated Complaint asserted (1) claims under Section 20 of the Exchange Act against the Officer Defendants; (2) claims under Section 11 of the Securities Act against the Director Defendants and Underwriter Defendants; (3) claims under Section 12(a)(2) of the Securities Act against Zynga and the Underwriter Defendants; and (4) claims under Section 15 of the Securities Act against the Officer Defendants and Director Defendants. (See generally Dkt. No. 125.) The district court granted Defendants' motion to dismiss the entire Consolidated Complaint with leave to amend.  (Dkt. No. 152; *see also* Dkt. No. 206 ¶ 3.)

After further investigation, Lead Plaintiff filed the First Amended Complaint ("FAC"), which is the operative pleading in this action.  (Dkt. No. 155; *see also* Dkt. No. 206 ¶ 4.)  The two-

---

JSC;*Walker v. Zynga Inc.*, No. 12-cv-4066-JSW; *Gaines v. Zynga Inc.*, No. 12-cv-4133-SBA; *Moayyad v. Zynga Inc.*, No. 12-cv-4250-JSW; *Draper v.Zynga Inc.*, No. 12-v-4017-RS; *Yan v. Zynga Inc.*, No. 12-cv-4360-LHK;*Choukri v. Zynga Inc.*, No. 12-cv-4629-CRB; *Westley v. Zynga Inc.*, No. 12-cv-4833-LHK; *Reyes v. Zynga Inc.*, No. 12-cv-5065-CRB.

[3] Specifically, the Court consolidated civil actions numbered 12-cv-4007-JSW, 12-cv-4048-JSW, 12-cv-4059-JSW, 12-cv-4064-JSW, 12-cv-4066-JSW, 12-cv-4133-SBA, and 12-cv-4250-JSW.

[4] These cases related civil actions numbered 12-cv-4017-RS, 12-cv-4360-LHK, 12-cv-4629-CRB, 12-cv-4833-LHK, and 12-cv-5065-CRB with the consolidated action.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    count FAC brings causes of action only under the Exchange Act.  Plaintiff no longer brings claims

2    against the Underwriter Defendants; instead, only Zynga and certain officers and directors are

3    named as defendants.  The first cause of action alleges that Defendants violated Section 10(b) of

4    the Exchange Act and Rule 10b-5 by making materially false statements that operated as a fraud

5    and deceit upon Lead Plaintiff and the other class members in connection with their purchases

6    of Zynga common stock.  The second cause of action is a control-person liability claim against the

7    Individual Defendants under Section 10(a) of the Exchange Act.  In the FAC, Lead Plaintiff

8    elected not to replead claims for shares purchased between December 14, 2011 and July 25, 2012

9    (the "Earlier Period") and instead shortened the relevant time period to only five months, running

10   from February 14, 2012 to July 25, 2012 (the "FAC Class Period").  (*See* Dkt. No.

11   210; *Compare* Dkt. No. 125 at 5, *with* Dkt. No. 155 ¶ 2.)  Lead Plaintiff made this tactical decision

12   for three reasons: (1) Zynga's first statement about its 2012 guidance was not made until February

13   14, 2012, so there were no claims based on that guidance until that date; (2) the allegations about

14   the changes to Facebook games solely pertain to the later period; and (3) the allegations regarding

15   statements about bookings declines are more compelling later in 2012, since trends in declining

16   sales would be more defined later in the quarter.  (Dkt. No. 210 at 3; *see also* Dkt. No. 155 ¶¶ 85,

17   131.)

18        Defendants moved to dismiss the FAC, and the Court determined that Lead Plaintiff had

19   adequately alleged all claims—including those based on declining bookings, the Facebook issue,

20   and the 2012 guidance—except those as to Defendants' statements regarding Zynga's game

21   pipeline, which the Court concluded were inactionable business puffery.  (Dkt. No. 176; *see*

22   *also* Dkt. No. 206 ¶ 5.)  The Court then denied Defendants' motion for reconsideration of their

23   motion to dismiss.  (Dkt. No. 183; *see also* Dkt. No. 206 ¶ 5.)  Thus, the FAC is the operative

24   pleading in this action.

25        The district court held a case management conference on June 12, 2015.  (Dkt. No.

26   187; *see also* Dkt. No. 206 ¶ 8.)  Prior to the conference, the parties had agreed to participate in a

27   mediation session.  (Dkt. No. 186.)  By the parties' consent, the action was then reassigned to the

28   undersigned magistrate judge for all further proceedings.  (Dkt. Nos. 190, 193.)  In August 2015,

4

the parties reached a settlement.  Following a hearing on October 8, 2015, the parties filed an

Amended Stipulation of Settlement and Revised Class Notice to address concerns that the Court

raised.[5]  (Dkt. Nos. 210, 212-1.)  The Court granted the parties' motion for preliminary approval of

settlement on October 27, 2015.  2015 WL 6471171, at *1.

 In accordance with the order granting preliminary approval, Lead Plaintiff filed a motion

for final approval and Lead Counsel filed a motion for attorneys' fees and reimbursement of

litigation expenses on December 11, 2015.  (Dkt. Nos. 215, 216.)  The Court and counsel received

a single objection: the Isaacson-Weaver Family Trust filed a "preliminary objection" to the

Settlement Agreement and notice of intent to appear at the final fairness hearing, but later

withdrew the objection stating that it no longer wished to challenge the Settlement or Plan of

Allocation as unreasonable, and instead submitted a request for exclusion from the Settlement

Class, acknowledging that this meant they had no standing to challenge the Settlement.  (Dkt. Nos.

220, 225.)  *See also In re Equity Funding Corp. of Am. Sec. Litig.*, 603 F.2d 1353, 1360-61 (9th

Cir. 1979) (noting that one who is not a class member potentially bound by a settlement "lacks

standing to object").  Due to unexpected delays during the Notice period—specifically, significant

delays from certain institutional brokers in providing the claims administrator with names and

addresses of Zynga stock's beneficial owners—the claims administrator mailed Notice Packets to

certain potential Settlement Class Members with insufficient time to respond.  (*See* Dkt. No. 224

at 2-3.)  Accordingly, the Court extended the deadline for those Settlement Class Members

impacted by the delay to request exclusion or to object to the Settlement, Lead Plaintiff's deadline

to respond to objections and submit a final reply brief in support of final approval, and the final

approval hearing itself.  (Dkt. No. 224 at 4.)  Ultimately, objections and exclusion requests were

due on January 12, 2016 for the bulk of the Settlement Class Members and on January 29, 2016

for those Settlement Class Members affected by the brokers-associated delayed notice.  By the

date of the final fairness hearing, there have been no objections filed and 32 requests for exclusion.

---

[5] In this Order, the Court refers to the Amended Stipulation of Settlement and Revised Class
Notice as the Settlement Agreement and Class Notice, respectively.

United States District Court
Northern District of California

1     (Dkt. No. 228 ¶¶ 8-9.)

2     <div align="center">**SETTLEMENT TERMS**[6]</div>

3         On August 4, 2015, the parties participated in intensive, arm's-length settlement

4 negotiations under the supervision of experienced mediator, Hon. Edward A. Infante (Ret.) of

5 JAMS.  (Dkt. No. 206 ¶¶ 9-10.)  At the negotiations, the parties had the benefit of having already

6 exchanged extensive analyses of the legal and factual issues—including the falsity of Defendants'

7 statements, scienter, and loss causation—in connection with their briefing on the motions to

8 dismiss.  (*Id.* ¶ 12.)  The parties had already served discovery requests and exchanged initial

9 disclosures, and Lead Plaintiff had responded to Defendants' Requests for Admission and

10 Interrogatories.  (Dkt. No 206 ¶ 7.)  At the conclusion of the August 4 mediation, the parties

11 reached an agreement on all material terms, including the amount of the settlement.  (*Id.* ¶ 13.)

12 Thereafter, the parties engaged in further negotiations and ultimately entered the Settlement

13 Agreement before the Court, as amended following the hearing.  (*See* Dkt. No. 212-1.)  The key

14 provisions are as follows.

15         In short, the Settlement Agreement provides for a Settlement Fund of $23 million with

16 interest earned until entry of final approval.  (Dkt. No. 212-1 ¶¶ 4.1, 4.3.)  Reduced from that fund

17 are (1) attorneys' fees up to 25% of the fund, or $5,750,000; (2) actual litigation costs of up to

18 $276,000; and (3) claims administration expenses up to $900,000.  (Dkt. No. 212-1 at 61; Dkt. No.

19 206 6.)  The remaining funds are then distributed to Settlement Class Members who do not opt out

20 of the class.  (Dkt. No. 212-1 ¶ 5.2.)  The Settlement Class is defined as "all Persons who

21 purchased or otherwise acquired Zynga's common stock during the Class Settlement Period[,]"

22 except those who opt out.  (*Id.* ¶ 1-34.)  Settlement Class Members will receive a *pro rata* share of

23 the fund based on the Plan of Allocation, which sets forth a different formula for calculating

24 Recognized Loss depending on when the shares were purchased.  Specifically,

25            For each share of Zynga common stock purchased between

26

27 ──────────────

[6] A more thorough description of the background of this case, the settlement negotiations, and the terms of the Settlement Agreement can be found in the Preliminary Approval Order, which the

28 Court incorporates here in full.  *See Zynga*, 2015 WL 6471171, at *2-5.

<div align="center">6</div>

<div style="writing-mode: vertical-rl;">United States District Court<br>Northern District of California</div>

December 15, 2011 and the close of trading on February 14, 2012, inclusive, and:

a) Sold prior to the close of trading on July 25, 2012, the Recognized Loss is zero ($0.00).

b) Sold at a loss after the close of trading on July 25, 2012 through and including the close of trading on October 23, 2012, the Recognized Loss shall be the lesser of 1) $0.12 per share; or 2) the difference between the purchase price per share and the sale price per share.

c) Held as of the close of trading on October 23, 2012, the Recognized Loss shall be the lesser of $0.12 per share; or the difference between the purchase price per share and $3.18 per share.

For each share of Zynga common stock purchased between February 14, 2012 (including the after-hours market on February 14, 2012) and the close of trading on July 25, 2012, inclusive, and:

a) Sold prior to the close of trading on July 25, 2012, the Recognized Loss is zero ($0.00).

b) Sold at a loss after the close of trading on July 25, 2012 through and including the close of trading on October 23, 2012, the Recognized Loss shall be the lesser of 1) $1.14 per share; or 2) the difference between the purchase price per share and the sale price per share.

c) Held as of the close of trading on October 23, 2012, the Recognized Loss shall be the lesser of $1.14 per share; or the difference between the purchase price per share and $3.18 per share.

(Dkt. No. 212-1 at 65-66.)

Lead Plaintiff estimates that the average distribution will be $0.15 per share before deduction of fees and expenses if all Settlement Class Members participate. (Dkt. No. 206 ¶ 17.) However, no Settlement Class Member will be issued a check for a Recognized Loss of less than $10.00 due to the expenses associated with administering the claims. (Dkt. No. 212-1 at 64.) Any funds remaining after distribution to Settlement Class Members will be donated to a charitable organization selected by Lead Plaintiff and subject to Court approval. (*Id.* ¶ 4.4.) None of the Settlement Fund will revert to Defendants. In exchange for their participation, Settlement Class Members will release all claims asserted in this action or that could have been asserted in this action or that arise out of the same facts or purchases, except for claims relating to enforcement of the Settlement Agreement and claims alleged in a number of derivative actions filed on Zynga's behalf now pending in other courts. (*Id.* ¶ 1.30.)

7

**DISCUSSION**

Judicial policy strongly favors settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "To vindicate the settlement of such serious claims, however, judges have the responsibility of ensuring fairness to all members of the class presented for certification." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Where the "parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Id.* In the first stage of the process, the court preliminarily approves the settlement pending a final fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class. *See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012). "At the [final] fairness hearing . . . after notice is given to putative class members, the court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must reach a final determination as to whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See id.*; *Nat'l Rural Telecomm'cns Corp. v. DIRECTV, Inc.*, 221 F.R.D. 523, 535 (C.D. Cal. 2004).

**I.     Final Approval of the Settlement Agreement**

    A.     Final Class Certification of the Settlement Class

        1.     *Rule 23(a) Requirements*

Class actions must meet the following requirements prior to certification:

> 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequacy protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are known as numerosity, commonality, typicality, and adequacy of representation, respectively. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). The Court must determine that Lead Plaintiff has satisfied his burden to demonstrate

*United States District Court*
*Northern District of California*

that the proposed class satisfies each element of Rule 23.  These requirements "demand undiluted, even heightened, attention in the settlement context . . . for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (citations and footnote omitted).

The Court previously found that the putative class satisfied the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a).  *Zynga*, 2015 WL 6471171, at *6-7.  The Court is unaware of any changes that would alter its analysis, and the parties did not indicate either in their papers or at the fairness hearing that any such developments had occurred. Nor has any Settlement Class Member objected to class treatment on the grounds that the Settlement Class lacks any of the Rule 23(a) requirements.  Thus, all four of Rule 23(a)'s requirements have been met.

### 2.    *Rule 23(b) Requirements*

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In evaluating the proposed class, "pertinent" matters include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigations concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Again, the Court previously found that both prerequisites of Rule 23(b)(3) were satisfied.  *Zynga*, 2015 WL 6471171, at *7.  The Court is unaware of any changes that would alter its analysis, and the parties did not indicate either in their papers or at the fairness

United States District Court
Northern District of California

1    hearing that any such developments had occurred.  There were no objections from Class Members,

2    let alone objections that raised any issue with the predominance of common questions or

3    superiority of class action treatment.

           3.    *Rule 23(c)(2) Notice Requirements*

5    Finally, if the Court certifies a class under Rule 23(b)(3), it "must direct to class members

6    the best notice that is practicable under the circumstances, including individual notice to all

7    members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule

8    23(c)(2) governs both the form and content of a proposed notice.  *See Ravens v. Iftikar*, 174 F.R.D.

9    651, 658 (N.D. Cal. 1997) (citation omitted).  The notice must be "reasonably certain to inform the

10    absent members of the plaintiff class," but Rule 23 does not require actual notice.  *Silber v.*

11    *Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (citation omitted).

12    As the Settlement Agreement provides, the claims administrator, Epiq Systems, Inc.

13    ("Epiq"), complied with the Court-approved notice plan.  On November 3, 2015, Epiq caused the

14    Summary Notice to be published in *Investor's Business Daily*.  (Dkt. No. 217-1 ¶ 14.)  Epiq also

15    complied with the mailing requirements.  Specifically, Epiq mailed the Notice Packet on

16    November 3, 2015 to three categories of recipients: (1) the list of 439 known Zynga stock holders

17    that Defendants provided; (2) brokerage firms, banks, institutions, and other third-party nominees

18    ("brokers"), along with a request that the brokers either send a copy of the Notice Packet to the

19    beneficial owner of the stock within 10 days or provide to Epiq the names and addresses of the

20    beneficial owners within 10 days after receipt of the Notice Packet; and Epiq's own internal list of

21    1,625 of the largest and most common banks, brokers, and other nominees.  (*Id.* ¶¶ 5-13.)  In total,

22    Epiq mailed 2,064 Notice Packets on the Notice Date.  (*Id.* ¶ 10.)  After that mailing, Epiq also

23    mailed, emailed, or called the 53 potential Settlement Class Members who had contacted Lead

24    Counsel and requested information about the Settlement prior to the Notice Date.  (*Id.* ¶ 11.)

25    Ultimately, after receiving contact information from brokers, Epiq mailed a total of 235,580

26    Notice Packets to potential Class Members.  (Dkt. No. 228 ¶¶ 3-4.)

27    However, a number of brokers did not comply with Epiq's request to provide names of the

28    beneficial owners or forward the Notice Packet to the beneficial owners in a timely manner.  (*See*

United States District Court
Northern District of California

10

United States District Court
Northern District of California

Dkt. No. 224 at 3.)  A number of institutional brokers did not provide Epiq with names and addresses until mid-to-late December; Epiq mailed the Notice Packet to these 58,037 names and addresses within a matter of days, and no later than January 5, 2016.  (*See id.*)  But some brokers did not provide the names and addresses until after that date.

Specifically, on January 6, 2016, National Financial provided 4 additional names and addresses; Epiq mailed the Notice Packet to them on January 11, 2016.  Fidelity provided an additional 3,701 names and addresses on January 8, 2016; Epiq mailed the Notice Packet to them on January 12, 2016—the deadline for objections.  (*See id.*)  Given the parties' concessions that these delays meant that "certain Settlement Class Members may not have received their Notice Packets with sufficient time to respond" (*id.* at 4), the Court extended the deadline for those affected Settlement Class Members to respond by over two weeks, to January 29, 2016.  (Dkt. No. 224 at 7.)  Notice of the extension was posted on the settlement website that Epiq maintains; the change in deadline was set off in bold font in a bright red text box at the top of the website's homepage and all other pages.  *See* www.zyngasecuritieslitigation.com (last visited Feb. 5, 2016).  (*See also* Dkt. No. 228 ¶ 6.)  Epiq also updated its phone and email responses to reflect the extended deadlines.  (*Id.* ¶ 7.)  While a new Notice Packet was not mailed to the Settlement Class Members notifying them of the change, the Notice Packet states in all capital letters that the final approval hearing date may change, and directs Settlement Class Members to check the settlement website and Court's PACER docket to remain apprised of the appropriate timing.  (Dkt. No. 217-1 at 19.)  The manner of notice need not be perfect.  *In re TD Ameritrade Account Holder Litig.*, Nos. C 07-2852 SBA, C 07-4903 SBA, 2011 WL 4079226, at *10 (N.D. Cal. Sept. 13, 2011) ("[T]here is no requirement that notice be perfect.");  *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *6 (N.D. Cal. No. 16, 2007); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) ("The notice in this case was not perfect, but the court did not abuse its discretion in approving the notice plan and ultimately approving the settlement.").  Under the circumstances presented, the Court is satisfied that this system of providing notice was reasonably calculated to provide notice to Settlement Class Members and was the best form of notice available under the circumstances.

United States District Court
Northern District of California

1    Likewise, the content of the Notice Packet is sufficient: it clearly identifies the options

2    available to putative Settlement Class Members: do nothing; object to the terms of the settlement

3    and/or amount of attorneys' fees; or opt out—and also thoroughly explained the nature and

4    mechanics of the Settlement Agreement.  (Dkt. No. 217-1 at 10-29.)

5    While the Isaacson-Weaver Family Trust withdrew its objection and, having done so,

6    concedes that it now lacks standing to challenge the Notice Packet or any other aspect of the

7    Settlement Agreement, because there have been some complications relating to notice, the Court

8    addresses the concerns raised in the withdrawn objection here.  The Isaacson-Weaver Family Trust

9    objected on the grounds that the notice procedure did not give it sufficient time to respond or

10   object, and thus failed to comport with due process.  But given that the response deadline was

11   extended, this objection is overruled.  The Isaacson-Weaver Family Trust next faulted the first

12   page of the Notice Packet, titled "Overview of the Settlement," which indicates that each

13   Settlement Class Member will receive a *pro rata* share of the Settlement Fund based on the price

14   per share depending on the time of purchase.  (*Id.* at 10.)  The Isaacson-Weaver Family Trust

15   appeared to concede that this description is correct, and instead contended that the overview is

16   wanting because it does not notify Settlement Class Members that those beneficial owners whose

17   Recognized Loss under the formula is less than $10.00 will not receive a distribution.  (Dkt. No.

18   220 at 4.)  But the summary explicitly directs the reader to read the rest of the Notice Packet

19   carefully.  (Dkt. No. 217-1 at 11.)  In its description of the Plan of Allocation, the Notice Packet

20   clearly and unequivocally states in bold, set-off language that "[n]o distribution to Authorized

21   Claimants who would receive less than $10.00 will be made because of the administrative

22   expenses of processing and mailing such checks" and that such Authorized Claimants are

23   nevertheless bound by the terms of the Settlement.  (*Id.* at 21.)  That this statement was not

24   included in the overall summary does not render the Notice Packet unfair, unreasonable, or

25   inadequate.

26   The same is true of the Isaacson-Weaver Family Trust's challenge of the Notice Packet's

27   description of the attorneys' fees that Lead Counsel seeks.  As the objector correctly noted, the law

28   requires a notice to set forth "the amount of fees and costs that will be sought (including the

1    amount of such fees and costs determined on an average per share basis), and a brief explanation

2    supporting the fees and costs sought." 15 U.S.C. §§ 77z-1(a)(7)(C), 78u-4(7)(C).  Such

3    information shall be clearly summarized on the cover page of any notice to a party of any

4    proposed or final settlement agreement.  *See id.* §§ 77z-1(a)(7), 78u-4(7).  The overview on the

5    first page of the Notice Packet does just that, notifying the Settlement Class that Lead Counsel will

6    seek:

> 7    25% of the Settlement Fund, or approximately $5,750,000.00, and
> 8    litigation expenses of up to $276,000.00 incurred in investigating the
> facts, litigating the case and negotiating the Settlement.  These
> 9    payments, if approved, will come out of the $23 million Settlement
> Fund, and are estimated to be an average of $0.04 per damaged
> 10   share[.]

11    (Dkt. No. 217-1 at 10.)  The Isaacson-Weaver Family Trust contended that there is "no

12    explanation supporting the fees and costs sought" (Dkt. No. 220 at 4), but the summary does

13    provide a brief explanation: investigation, litigation, and negotiation efforts.  Moreover, while the

14    Isaacson-Weaver Family Trust argued that the Notice is insufficient because the overview does

15    not include an "indication of the attorneys' lodestar . . . let alone of the fact that counsel seek a

16    substantial enhancement of the lodestar" (*id.*), they did not cite any authority holding that

17    information is required to be in the notice, and the Court has found none.  Thus, contrary to the

18    Isaacson-Weaver Family Trust's argument that the Notice Packet is "clearly deficient," the Court

19    concludes that the content of the Notice Packet is sufficient to satisfy Rule 23(c)(2)(B).  *See*

20    *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it

21    generally describes the terms of the settlement in sufficient detail to alert those with adverse

22    viewpoints to investigate and to come forward and be heard.") (internal quotation marks and

23    citation omitted).

24        The Court is therefore satisfied that the form and content of the Notice Packet was

25    adequate, and thus that the notice given in this case was reasonably calculated to provide notice to

26    Settlement Class Members and was the best form of notice available under the circumstances.

27        B.    Approval of the Settlement

28        Having determined that class treatment is warranted, the Court now addresses whether the

United States District Court
Northern District of California

terms of the parties' settlement appears fair, adequate, and reasonable under Rule 23(e).  In making this determination, a court typically considers the following factors initially set forth in *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004): "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a government participant; and (8) the reaction of the class members to the proposed settlement." *Id.* at 575.  The Court need not consider all of these factors, or may consider others.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("The factors in a court's fairness assessment will naturally vary from case to case[.]").

But in *Bluetooth*, the Ninth Circuit explained that when "a settlement agreement is negotiated *prior* to formal class certification, consideration of these eight . . . factors alone" is insufficient.  *Id.* at 946 (emphasis in original).  In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties.  *Id.* at 947.  Because collusion "may not always be evident on the face of a settlement, . . . courts [ ] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.*  The court identified three such signs:

> (1) when class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply awarded[;]
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds without objection by the defendant which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class[;] and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than to be added to the class fund.

*Id.* (internal quotation marks and citations omitted).  For the reasons stated below, a review of these factors indicates that on balance this Settlement is fair, adequate, and reasonable.

United States District Court
Northern District of California

1.    *The Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation*

The first relevant factor is the risk of continuing litigation, including the strengths and weaknesses of Lead Plaintiff's case on the merits, balanced against the certainty and immediacy of recovery from the Settlement.  *See Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454, 458 (9th Cir. 2000); *Rieckborn v. Velti PLC*, No. 13-cv-3889-WHO, 2015 WL 468329, at *4 (N.D. Cal. Feb. 3, 2015) (citations omitted).  Although this action reached settlement before the Court had occasion to consider the claims' merits, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (citations omitted).  To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010).  Instead, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Rodriguez*, 563 F.3d at 965 (internal quotation marks and citation omitted).  "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.*  "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *DIRECTV, Inc.*, 221 F.R.D. at 526 (quotation marks and citation omitted).

Here, Lead Plaintiff contends that his Section 10(b) claims have significant merit, but he acknowledges a number of risks and uncertainties should he proceed towards summary and judgment and trial.  (Dkt. No. 215 at 13-17.)  Defendants have vigorously denied liability throughout this litigation.  Defendants' position is that (1) none of the challenged statements was false or misleading when made; (2) Lead Plaintiff's scienter allegations fail for a number of reasons; and (4) Lead Plaintiff will be unable to demonstrate loss causation because the July 2012

United States District Court
Northern District of California

1    disclosures were not related to the alleged fraud but to previously disclosed risks.  (Dkt. No. 217

2    ¶¶ 35, 64-65.)  Indeed, a court in this District recently noted that in "any securities litigation case,

3    it [is] difficult for [plaintiff] to prove loss causation and damages at trial."  *In re Celera Corp. Sec.*

4    *Litig.*, No. 5:10-CV-02604-EJD, 2015 WL 1482303, at *5 (N.D. Cal. Mar. 31, 2015).

5         As for the statements at issue here, while Lead Plaintiff believes he can prove they were

6    false and misleading when made, he nevertheless faces a number of challenges relating to each

7    statement.  For example, Defendants argue that the alleged misrepresentations about Zynga's

8    guidance are protected by the statutory safe-harbor for forward-looking statements.  (*Id.* ¶ 64.)

9    Lead Plaintiff concedes that forward-looking statements can be particularly difficult to prove (Dkt.

10   No. 215 at 15), as they require proof that the speaker actually did not believe the statement, had no

11   reasonable basis to believe the statement, or is aware of undisclosed facts tending to disprove the

12   statement's accuracy.  *See Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996) (citation

13   omitted); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387-88 (9th Cir. 2010) (affirming grant of

14   summary judgment for defendants where plaintiffs alleged that defendants violated Section 10(b)

15   by, among other things, issuing a quarterly forecast that lacked a reasonable basis and making

16   intra-quarter statements without knowledge of facts tending to seriously undermine those

17   statements).  Further, proving the alleged misrepresentations about Facebook platform changes

18   requires establishing when Defendants learned of the changes and whether and when they learned

19   that the changes would impact Zynga's business.  (Dkt. No. 217 ¶ 64.)  Lead Plaintiff contends

20   that this will be particularly hard to prove given that Defendant Wehner is now a senior executive

21   at Facebook, having become its Vice President shortly after the Settlement Class Period and

22   having recently become its Chief Financial Officer.  (*Id.*)  Lead Plaintiff maintains that the

23   bookings-related statements will likewise be difficult to prove as they require evidence of when

24   Defendants observed the trends and at what point the trends should have been disclosed.  (*Id.*)

25   Moreover, as to all of the alleged misrepresentations, some typical hallmarks of scienter in

26   securities fraud cases, such as a restatement, SEC action or investigation, or criminal action or

27   investigation are absent here.  (*Id.* ¶ 66.)  Lead Plaintiff thus believes that he can prove that these

28   statements were false when made, but acknowledges that doing so will be difficult.

In addition to scienter, loss causation might have been particularly difficult for Lead Plaintiff to prove, as Defendants would have argued that Lead Plaintiff's expert could not apportion losses to Defendants' misstatements as opposed to other events and information available on the market, including information about Zynga's game pipeline, which the Court found inactionable as a matter of law as well as unexpected declines in second quarter results, delays in the launch of new games, and poor performance of one particular game.  (*Id.* ¶ 67; *see also* Dkt. No. 152.)  Given these challenges, Lead Plaintiff would likely face a summary judgment motion before given the opportunity to prove his claims at trial.  Indeed, at the June 12, 2015 Case Management Conference, the court entertained allowing Defendants to file an early motion for partial summary judgment after limited discovery into Zynga's reported record financial results, including bookings.  (Dkt. No. 217 ¶ 40.)  Thus, the availability of multiple stages of summary judgment briefing even before trial would present a significant hurdle to recovery for Lead Plaintiff.

Lead Plaintiff identifies still other risks associated with continued litigation notwithstanding his confidence in the success of his claims.  For example, Lead Counsel notes that the parties entered this Settlement Agreement when over a year remained until the close of discovery.  (*Id.* ¶ 70; *see also* Dkt. No. 187.)  Thus, the parties faced costly discovery.  Similarly, Lead Counsel anticipated having to invest substantial labor and expenses briefing class certification, motions for summary judgment, pre-trial and evidentiary motions, and possible appeals.  (Dkt. No. 217 ¶¶ 69-70, 119.)  A trial would also be costly.  (*Id.*)  Thus, continuing litigation would not only be costly—representing expenses that would take away from any ultimate classwide recovery—but would also delay resolution and recovery for Settlement Class Members.  And even before Lead Plaintiff were able to reach these challenges to establishing liability, he would also have the hurdle of class certification which, as discussed below, would be contested.  In short, setting aside certification, although Lead Plaintiff believes in the strength of his claims, he still faces a number of problems in proving his case on the merits which indicate that further litigation is likely to be costly and time-intensive, with no guarantee of a more beneficial outcome for Class Members as a result.

Against all of this, the Settlement Agreement, which offers an immediate and certain award for a large number of potential Class Members, appears a much better option. Accordingly, it is reasonable for Lead Plaintiff to decide that the guarantee of an immediate recovery outweighs the uncertainties of pursuing a possibly more favorable outcome by continuing to litigate. These factors therefore weigh in favor of approval.

### 2.    *The Risk of Maintaining Class Action Status Throughout Trial*

In considering the third factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed. First, the Settlement Class includes Class Members whose claims are no longer part of the operative complaint—that is, Class Members who purchased their shares of Zynga stock during the "Earlier Period" (between December 15, 2011 and the close of trading on February 14, 2012) who would not be part of any class subject to a fully litigated, contested motion for class certification because Lead Plaintiff did not include their claims in the operative complaint and instead the claims are limited to shares purchased during the FAC Period (between February 14, 2012 and the close of trading on July 26, 2012). Thus, certification for the purposes of settlement is broader than the certification Lead Plaintiff could hope to achieve were litigation to continue. As a result, the scope of recovery is broader with the Settlement Agreement than it would be otherwise. This factor therefore weighs in favor of approving the Settlement.

### 3.    *The Amount Offered in Settlement*

The fourth fairness factor, the amount of recovery offered, also favors final approval of the Settlement. This factor "is generally considered the most important, because the critical component of any settlement is the amount of relief obtained by the class." *Bayat v. Bank of the W.*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015) (citation omitted). Because "the interests of class members and class counsel nearly always diverge, courts must remain alert to the possibility that some class counsel may urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) (internal quotation marks, citation, and footnote omitted).

When considering the fairness and adequacy of the amount offered in settlement, it "is the

1    complete package taken as a whole, rather than the individual component parts, that must be

2    examined for overall fairness." *DIRECTV*, 221 F.R.D. at 527 (citation omitted); *see also*

3    *Rodriguez*, 563 F.3d at 965 (noting that assessing the fairness, adequacy, and reasonableness of

4    the amount offered in settlement is not a matter of applying a "particular formula"). "[I]t is well-

5    settled law that a proposed settlement may be acceptable even though it amounts to only a fraction

6    of the potential recovery that might be available to the class members at trial." *DIRECTV*, 221

7    F.R.D. at 527 (citations omitted).

8         The Court previously concluded that the amount of the settlement was within the range of

9    possible approval. *Zynga*, 2015 WL 6471171, at *11.  The Court again finds that the $23 million

10   offered in settlement is reasonable.  Lead Plaintiff's damages expert estimates that the Settlement

11   Amount represents approximately 14 percent of likely recoverable aggregate damages at trial

12   (Dkt. No. 217 ¶ 63), which would be a total of $164 million.  According to Lead Plaintiff's

13   damages expert, after deductions for attorneys' fees and costs and administration costs, the payout

14   to the Settlement Class will be approximately 9.5 percent of those likely recoverable damages.

15   (*Id.*)  This is well within the range of percentages approved in other securities-fraud related actions

16   in this District.  *See, e.g.*, *Celera Corp.*, 2015 WL 7351449, at *6 (granting final approval on a

17   settlement fund of $24,750,000, which represented 17 percent of the plaintiff's total estimated

18   damages with a per-share recovery of $1.02); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036,

19   1042 (N.D. Cal. 2008) (granting final approval of a settlement fund of $13.75 million where the

20   gross class recovery was 9 percent of maximum potential recovery, which totaled 6 percent after

21   deductions for attorneys' fees and costs).

22        In addition, Lead Plaintiff cited, and the Court reviewed, a recent report prepared by

23   Cornerstone Research, which indicates that in securities class action cases between 2013 and

24   2015, settlements involved a median recovery of 2.2 percent of estimated damages.  *See* Laarni T.

25   Bulan et al., *Securities Class Action Settlements: 2014 Review & Analysis*, Cornerstone Research,

26   at 8 (2015).[7]  This was an increase from prior years: the median recovery was 2.1 percent in 2011

27   _____

28   [7] *Available at* https://www.cornerstone.com/GetAttachment/701f936e-ab1d-425b-8304-
     8a3e063abae8/Securities-Class-Action-Settlements-2014-Review-and-Analysis.pdf (last visited

United States District Court
Northern District of California

and 1.8 percent in 2012.  *Id.*  The median settlement as a percentage of estimated damages in the Ninth Circuit hovered around at 2.4 percent from 2005 through 2014.  *Id.* at 22.  The portion of the Settlement Fund to be distributed to Class Members here is nearly four times greater than these amounts, which further suggests the Settlement's reasonableness.  Turning to the recovery for each individual investor, the per-share recovery amounts to a distribution of $0.15 per damaged share purchased in the entire Settlement Class Period, compared to $1.14 per share if Lead Plaintiff were to prevail at trial.  (Dkt. No. 206 ¶ 17.)  After deductions, the per-share recovery is estimated to be $0.11 per damaged share during the entire Settlement Class Period, or 9.6 percent of the estimated per-share recovery at trial.  (*See id.* ¶ 16.)  Thus, the per-share recovery falls squarely within the settlement amounts approved in other securities class action cases.  *See, e.g.*, *Celera*, 2015 WL 7351449, at *6; *Omnivision*, 559 F. Supp. 2d at 1042.

The per-share recovery is quite different if the numbers for the Earlier Period and the FAC Class Period are separated.  Specifically, the per-share recovery amounts to an average distribution of $0.01551 per damaged share purchased in the Earlier Period, and $0.15506 per damaged share purchased in the FAC Class Period.  (Dkt. No. 217-1 at 10.)  However, courts have approved settlements that offer less recovery for claims deemed weaker and, thus, less likely to prevail.  *See Vinh Nguyen v. Radient Pharms. Corp.*, No. 11-cv-00406, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) (noting that a "settlement in a securities class action case" can "sensibly make[ ] interclass distinctions based upon," among other things, "the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue") (quotation marks and citation omitted); *see, e.g.*, *In re Patriot Am. Hospitality Inc. Sec. Litig.*, No. MDL C-00-1300 VRW et al., 2005 WL 3801594, at *4 (N.D. Cal. Nov. 30, 2005) (granting final approval of a securities class action settlement that provided for different recovery depending on when class members purchased and sold their stock shares).  For the reasons discussed in the Court's Order granting preliminary approval of the Settlement, so it is here.  *See Zynga*, 2015 WL 6471171, at *12.

Feb. 9, 2016).

The Isaacson-Weaver Family Trust's withdrawn objection to the amount of the Settlement Fund does not change the Court's conclusion.  The Isaacson-Weaver Family Trust argued that the "total settlement fund as a percentage of the losses suffered by the class is trifling, suggesting a settlement for nuisance value not founded upon the actual scale of the damages from the alleged misconduct." (Dkt. No. 220 at 7.)  But Section 10(b) securities fraud damages do not include an investor's *total* loss.  Instead, a plaintiff is entitled to recover only those damages he proves were caused by the fraud, not by other market conditions.  *See Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  In accordance with that principle, the total Settlement Fund here (along with the Plan of Allocation discussed in detail below) was determined in consultation with a damages expert who examined market conditions to create a formula that estimates the portion of economic loss attributable to the fraud alleged.

In sum, while the percentage may seem small compared to the potential maximum investor loss identified, which totals $164 million, Lead Plaintiff's willingness to accept a smaller certain award rather than attempt to seek full recovery but risk getting nothing is reasonable in light of the risk, expense, complexity, and likely duration attached to the litigation of these claims.  This factor, too, weighs in favor of approval.

4.    *The Extent of Discovery Completed*

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table[.]"  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quotation marks and citation omitted).  Rather, the court focuses on whether "the parties carefully investigated the claims before reaching a resolution."  *Ontiveros*, 303 F.R.D. at 371 (citation omitted).

The extent of discovery completed and stage of the proceeding supports settlement here.  By the time the parties reached the Settlement, litigation had proceeded to a point in which both parties had "a clear view of the strengths and weaknesses of their cases."  *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *4 (N.D. Cal. Nov. 26, 2007) (quotation marks and citation omitted).  The Settlement reflects three and a half years of

United States District Court
Northern District of California

completed work, including pre-filing investigation, which included review and analysis of Zynga's SEC filings, earnings calls, and other public statements, analysis reports, and media coverage, as well as interviews with confidential witnesses; drafting the complaint; opposing two rounds of Defendants' motions to dismiss and a motion for reconsideration; working with damages, gaming, and accounting consultants; propounding and responding to some discovery; and preparing for and participating in mediation, which involved drafting a detailed mediation statement after reviewing Zynga's confidential, internal financial documents.  (Dkt. No. 217 ¶¶ 5-7, 24, 30, 53-55, 117.) The Settlement also followed a full-day mediation with an experienced mediator and follow-up private negotiations between the parties.  (*Id.* ¶ 48.)  On this record, the Court is persuaded that Lead Plaintiff has conducted sufficient discovery to make an informed decision regarding the adequacy of the Settlement.  *See In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007) (finding this factor weighed in favor of approval where the parties had conducted informal discovery and investigation into the matters alleged and had litigated defendants' motions to dismiss).

> 5.     *The Experience and Views of Counsel*

 Parties "represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation[.]"  *Rodriguez*, 563 F.3d at 967 (quotation marks and citation omitted).  "A district court is entitled to give consideration to the opinion of competent counsel that the settlement is fair, reasonable, and adequate."  *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *5 (N.D. Cal. June 27, 2014) (internal quotation marks, citation, and modifications omitted).

The experience and views of counsel also weigh in favor of approving the Settlement. Lead Counsel and counsel for Defendants have substantial experience in securities class actions and other complex class action litigation.  (Dkt. No. 217 ¶¶ 126-128.)  In particular, Lead Counsel from both Berman DeValerio and Newman Ferrara have litigated numerous class action securities cases and have worked on numerous mediations and settlements, including in this District.  (*See id.* ¶¶ 126-127.)  Lead Counsel recommend the Settlement and attest that it is a strong result given the substantial risks in continuing the action.  (*See, e.g.*, Dt. No. 217 ¶ 62.)  The Court is not aware

1   of any evidence to contradict this assertion.  Accordingly, Lead Counsel's endorsement weighs in

2   favor of approving the Settlement.  *See, e.g.*, *Omnivision*, 559 F. Supp. 2d at 1043 (finding class

3   counsel's recommendation in favor of settlement presumptively reasonable, as counsel

4   demonstrated knowledge about the case and securities litigation in general).

5                    6.        *The Presence of a Government Participant*

6            Although no government entity is a party to this action, the United States Attorney

7   General, as well as the Attorneys General for the relevant states, were notified of the settlement

8   pursuant to the notice provision of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715 on

9   October 7, 2015.  (Dkt. No. 217 ¶ 82.)  "Although CAFA does not create an affirmative duty for

10  either state or federal officials to take any action in response to a class action settlement, CAFA

11  presumes that, once put on notice, state or federal officials will raise any concerns that they may

12  have during the normal course of the class action settlement procedures."  *Garner*, 2010 WL

13  1687832, at *14 (internal quotation marks and citation omitted).

14                   7.        *The Reaction of Class Members to the Proposed Settlement*

15           The number of class members who object to a proposed settlement is a factor to be

16  considered.  *Mandujano v. Basic Vegetable Prods., Inc.*, 541 F.2d 832, 837 (9th Cir. 1976).

17  "[T]he absence of a large number of objections to a proposed class action settlement raises a

18  strong presumption that the terms of a proposed class settlement are favorable to the class

19  members."  *Omnivision*, 559 F. Supp. 2d at 1043 (quotation marks and citation omitted).  Put

20  another way, a "court may appropriately infer that a class action settlement is fair, adequate, and

21  reasonable when few class members object to it."  *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-

22  WHO, 2014 WL 3404531, at *5 (N.D. Cal. July 11, 2014) (internal quotation marks and citation

23  omitted); *see also Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the

24  class willingly approved the offer and stayed in the class presents at least some objective positive

25  commentary as to its fairness.").

26           Here, there is no exact number of Settlement Class Members identified, but Lead Counsel

27  notes that there were millions of Zynga common stock shares sold, so there are "likely thousands"

28  of class members.  (Dkt. No. 205 at 21.)  The Claims Administrator mailed the Notice Packet to

United States District Court
Northern District of California

235,580 potential Settlement Class Members.  (*See* Dkt. No. 228 ¶¶ 3-4.)  Notice was also published in the national edition of *Investor's Business Daily*.  (*Id.* ¶ 14.)  Epiq also set up a website, www.zyngasecuritieslitigation.com, which allowed visitors to view the Settlement Agreement, Notice Packet, and Plan of Distribution, and a telephone line for questions.  After receiving notice of the proposed settlement, the Settlement Class has largely expressed approval: the Claims Administrator has received 24,574 Proofs of Claim from potential Settlement Class Members, and there have been no objections.[8]  (Dkt. No. 228 ¶¶ 9-10.)  By any standard, the lack of objection of the Class Members favors approval of the Settlement.  *See, e.g.*, *Churchill Vill.*, 361 F.3d at 577 (affirming settlement with 45 objections out of 90,000 notices sent); *Rodriguez v. W. Publ'g Corp.*, No. CV05-3222 R, 2007 WL 2827379, at *10 (C.D. Cal. Sept. 10, 2007) (affirming settlement of 54 objections out of 376,000 notices).

In addition, a low number of exclusions representing a small fraction of shares in the public float also supports the reasonableness of a securities class action settlement.  *See, e.g.*, *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (noting that where there were no objections and 16 opt-outs representing 4.86 percent of the class "strongly supports settlement"); *In re AIG, Inc. Sec. Litig.*, No. 04 Civ. 8141 DAB, 2010 WL 5060697, at *2 (S.D.N.Y. Dec. 2, 2010) (concluding that where there were only 105 requests for exclusion, and only 61 that were valid and timely, out of 2 million notice packets sent, the reaction of the class is positive and favors settlement).  Here, as of the final fairness hearing, the Claims Administrator had received 32 requests for exclusion.  (Dkt. No. 228 ¶ 8.)  None of the 32 exclusion requests were from large, institutional investors.  (*Id.*)  Of those, 16 of the requests did not indicate the number of shares purchased during the Settlement Class Period, as required.[9]  (*Id.*)  The 16 remaining exclusion requests that did include the number of shares purchased represent a total of 34,852 shares.  (*Id.*)  This represents only .0176 percent of the total number of shares in the hands

---

[8] Again, the Court received one preliminary objection that has since been withdrawn and, given the entity's request for exclusion, it lacks standing to object anyway.  (Dkt. Nos. 220, 225.)

[9] At oral argument, Lead Counsel confirmed the parties' agreement that the putative Class Members whose exclusion requests failed to include the number of shares purchased were nevertheless deemed excluded from the Settlement Class.

United States District Court
Northern District of California

of public investors during the Settlement Class Period.  (Dkt. No. 227 ¶ 5.)  Thus, the small number of exclusions representing a very small portion of the total shares at issue further supports settlement.  *See Chun-Hoon*, 716 F. Supp. 2d at 852; *AIG*, 2010 WL 5060697, at *2.  For each of these reasons, the reaction of the class strongly supports final approval of the Settlement Agreement.

### 8.    *Absence of Collusion*

The first *Bluetooth* factor weighs against a finding of collusion.  Lead Counsel moves for an award of $5,750,000 in fees, or 25 percent of the Settlement Fund.  (Dkt. No. 216 at 8.)  In addition, Lead Counsel requests an award of $189,427.69 in expenses and up to $900,000 in administration expenses.  (Dkt. No. 212-1 at 61; Dkt. No. 226 at 15; Dkt. No. 206 ¶ 19.)  Subtracting these amounts from the Settlement Fund, the Class will be left with at least $16,160,572.31—nearly three times more than either Lead Counsel or the Claims Administrator stands to receive.  That the class payout is far more than double the fees sought weighs against a finding of collusion.  *See, e.g.*, *Rieckborn*, 2015 WL 468329, at *8 (finding no collusion where the estimated class payout of $6,405,530.33 was more than double plaintiff's counsel's requested $219,469.67 award); *Larsen*, 2014 WL 3404531, at *8 (finding no collusion where the estimated class payout of $1,906,884.85 was more than double plaintiffs' counsel's requested $950,000.00 award).  The second *Bluetooth* factor also weighs against such a finding, because the Settlement Agreement does not contain a clear sailing provision.  As to the third factor, the Settlement Agreement provides that unclaimed or undistributed funds, after a possible second round of redistribution, will go to a *cy pres* beneficiary unaffiliated with either party and subject to later court approval.  (Dkt. No. 212-1 ¶¶ 4.4.)  Under no circumstances does the Settlement Agreement provide for unclaimed funds to revert to Defendants.

The absence of any *Bluetooth* factor suggests that the Settlement Agreement did not result from, and was not influenced by, collusion.  And indeed, aside from the absence of any *Bluetooth* factor, the Settlement adequately satisfies Class Members' claims, which is reflected at least in part by the complete absence of objections to the Settlement.  Further, the Court finds no evidence of explicit collusion here, where after considerable motion practice the parties engaged in

United States District Court
Northern District of California

settlement negotiations overseen by an experienced neutral mediator before reaching this Settlement Agreement.  Considering the scope of the litigation and nature of the negotiations at issue here, the Court is satisfied that the Settlement Agreement is the product of successful arms-length negotiations.

9.    *Plan of Allocation*

"Approval of a plan of allocation of settlement proceeds in a class action . . . is governed by the same standards of review applicable to the settlement as a whole: the plan must be fair, reasonable and adequate.  It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits."  *Omnivision*, 559 F. Supp. 2d at 1045 (internal quotation marks and citations omitted); *see also In re Oracle Sec. Litig.*, No. 90-cv-00931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.") (citation omitted).  Courts "recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel." *Vinh Nguyen*, 2014 WL 1802293, at *5 (internal quotation marks and citation omitted).

The Plan of Allocation that Lead Plaintiff proposes here meets those criteria.  The Settlement Class includes anyone who bought shares of Zynga common stock during the Settlement Class Period but divides the class into two distinct groups: (1) individuals who purchased shares during the Earlier Period, which was before many of the misstatements alleged, whose claims were not included in the FAC; and (2) individuals who purchased shares during the FAC Class Period.

The Plan of Allocation sets forth a formula for calculating recognized loss for shares purchased in each period.  Lead Plaintiff contends that the Plan of Allocation was prepared in consultation with experts and will result in fair and equitable distribution.  (Dkt. No. 217 ¶¶ 103-104.)  Lead Plaintiff's damages consultant analyzed movements in the price of Zynga common stock after the alleged disclosures on July 25, 2012 and assessed the portion of the price drop allegedly attributable to the fraud.  (Dkt. No. 217 ¶ 85.)  For shares purchased in both time periods, the recognized loss is zero for Class Members who sold their shares before the Settlement

1   Class Period closed—*i.e.*, while the stock price was still benefitting from Zynga's alleged

2   misrepresentations, and there will be no distributions to any Authorized Claimant (a Class

3   Member who submits a timely Claim Form) whose recognized loss is less than $10.00.  (*Id.* ¶ 92.)

4   Lead Counsel aver that they concluded that claims for shares purchased during the Earlier Period

5   are significantly weaker for several reasons, including:

> (a) the 2012 guidance was first issued on February 14, 2012 [the
> beginning of the FAC Class Period]; (b) the allegations regarding
> the Facebook platform changes solely pertain to the [FAC Class
> Period]; (c) the allegations that Defendants were aware of declining
> trends in bookings were stronger during the [FAC Class Period]; and
> (d) the Court had dismissed the allegations regarding Zynga's game
> pipeline [which applied to both periods] as inactionable as a matter
> of law.

11   (*Id.* ¶ 86.)  With those principles in mind, Lead Counsel and the damages consultant concluded

12   that the shares purchased during the Earlier Period were entitled to a significantly lower price per

13   damaged share.  (*See id.* ¶¶ 90-91.)  According to Lead Plaintiff's damages consultant, only a

14   small number of shares purchased during the Earlier Period are damaged, because Zynga stock

15   was heavily traded during the Earlier Period resulting in stock that was bought and sold before the

16   disclosures—*i.e.*, no recognized loss caused by the fraud.  (*Id.* ¶ 107.)

17         Courts have approved similar distribution plans.  *See, e.g.*, *Rieckborn*, 2015 WL 468329, at

18   *10; *Portal Software*, 2007 WL 4171201, at *5-6.  Indeed, "governing law recognizes that

19   shareholders are damaged differently according to when they purchased and sold their shares in

20   relation to the corrective disclosures."  *Rieckborn*, 2015 WL 468329, at *10 (citations omitted);

21   *see also Vinh Nguyen*, 2014 WL 1802293, at *5.  Thus, it is reasonable here to craft a distribution

22   plan based on this principle.  For example, in *Rieckborn*, addressing several class members'

23   objections to a distribution plan in a securities class action, the court noted that "[i]t is certainly

24   possible that a fair and reasonable distribution plan could be created that would award a greater

25   recovery" to purchasers from the time period awarded lesser recovery, "[b]ut plaintiffs have

26   provided an explanation of their chosen allocation that is reasonable and that corresponds to the

27   allegations in the [complaint]."  2015 WL 468329, at *10.  So it is here.

28                                    *   *   *

United States District Court
Northern District of California

1    In sum, the *Churchill* fairness factors support approval, the *Bluetooth* factors do not

2    indicate collusion, and the Plan of Allocation is fair, reasonable, and adequate.  The Court is

3    therefore satisfied that the Settlement was not the result of collusion between the parties and

4    instead is the product of arms-length negotiations between experienced and professional counsel.

5    There are no objections to address.  For each of these reasons, the Settlement Agreement passes

6    muster under Rule 23(e) and final approval is appropriate.  The Court will therefore GRANT Lead

7    Plaintiff's motion for final approval and will enter the Proposed Judgment submitted by Lead

8    Plaintiff.

9    **II.    Attorneys' Fee Award**

10    Next, the Court must determine whether the requested attorneys' fees and litigation

11    expenses and the claims administrator costs are fair and reasonable.  Lead Counsel seeks an award

12    of $5,750,000 in attorneys' fees, or 25 percent of the $23 million Settlement Fund, as well as

13    $189,427.69 in litigation expenses.  For the reasons set forth below, the Court GRANTS the

14    requests in full.

15    A.    Attorneys' Fee Award

16    When a negotiated class action settlement includes an award of attorneys' fees, the fee

17    award must be evaluated in the overall context of the settlement.  *Knisley v. Network Assocs.*, 312

18    F.3d 1123, 126 (9th Cir. 2002).  At the same time, the court has "an independent obligation to

19    ensure that the award, like the settlement itself, is reasonable, even if the parties have already

20    agreed to an amount."  *Bluetooth*, 654 F.3d at 941 (citations omitted); *see also Zucker v.*

21    *Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir. 1999) ("[T]he district court must

22    exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees

23    are fair and proper.") (footnote omitted).

24    The Ninth Circuit has approved two methods of determining attorneys' fees in cases

25    where, as here, the amount of the attorneys' fee award is taken from the common fund set aside for

26    the entire settlement: the "percentage of the fund" method and the "lodestar" method.  *Vizcaino v.*

27    *Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted).  The district court retains

28    discretion in common fund cases to choose either method.  *Id.*  Under either approach,

United States District Court
Northern District of California

1   "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it

2   yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance*

3   *Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002) (quotation marks and citation omitted).

4        Under the percentage of the fund method, the court may award class counsel a given

5   percentage of the common fund recovered for the class. *Id.* "The percentage method is

6   particularly appropriate in common fund cases where 'the benefit to the class is easily

7   quantified.'" *Ontiveros*, 303 F.R.D. at 372 (quoting *Bluetooth*, 654 F.3d at 942). In common fund

8   cases in the Ninth Circuit, the "benchmark" award is 25 percent of the recovery obtained, with 20-

9   30 percent as the usual range. *See Vizcaino*, 290 F.3d at 1047; *see also Rieckborn*, 2015 WL

10  468329, at *21 ("A fee award of 25 percent of the common fund is the benchmark identified by

11  the Ninth Circuit and is squarely within the range of awards generally approved by district courts

12  in this circuit.") (citation omitted). Because this case involves a common settlement fund with an

13  easily quantifiable benefit to the Class, the Court will primarily determine attorneys' fees using the

14  percentage method but will incorporate a lodestar cross-check to ensure the reasonableness of the

15  award. *See id.*; *see, e.g.*, *Nwabueze v. AT&T, Inc.*, No. C 09-01529 SI, 2014 WL 324262, at *3

16  (N.D. Cal. Jan. 29, 2014); *Ontiveros*, 303 F.R.D. at 372 (adopting a common fund percentage

17  model to determine attorneys' fees but using the lodestar method to cross-check the amount).

18            1.    *Percentage of the Fund*

19        In assessing whether the percentage requested is fair and reasonable, courts generally

20  consider the following factors: (1) the results achieved; (2) the risk of litigation; (3) the skill

21  required and the quality of work performed; (4) the contingent nature of the fee and the financial

22  burden; and (5) the awards made in similar cases. *Online DVD-Rental*, 779 F.3d at 954-55

23  (citation omitted); *see also Vizcaino*, 290 F.3d at 1047.

24        Here, Lead Counsel requests an award of attorneys' fees which amounts to 25 percent of

25  the total settlement value, or $5,750,000. This request is consistent with the Settlement

26  Agreement, which does not provide a maximum amount of attorneys' fees that counsel may seek,

27  and with the Notice, which indicates that Lead Counsel will request a 25 percent award. (Dkt. No.

28  212-1 ¶¶ 7.1; *id.* at 61.) Lead Counsel contends that this request is presumptively reasonable, as it

United States District Court
Northern District of California

29

United States District Court
Northern District of California

1   is consistent with the Ninth Circuit's 25 percent benchmark, and fair and reasonable given the

2   *Vizcaino* factors.

3          Indeed, the circumstances of this case support the 25 percent of the Settlement Fund that

4   Lead Counsel requests.  The overall result and benefit to the class from the litigation is the most

5   important factor in granting a fee award.  *See Omnivision*, 559 F. Supp. 2d at 1046 (citing *In re*

6   *Heritage Bond Litig.*, No. 02-ML-1475 DT et al., 2005 WL 1594403, at *8 (C.D. Cal. June 10,

7   2005)).  As discussed above, the result achieved for the Class—especially at this early stage—is

8   favorable considering the potential vulnerabilities of Lead Plaintiff's case.

9          As to the second factor, as discussed above, the risks associated with this case were

10  substantial given the challenges of obtaining class certification and establishing the falsity of the

11  misrepresentations and loss causation.  Lead Counsel submits that the risks were particular high

12  here because (1) there was no government investigation or accounting restatement—ordinarily,

13  hallmarks of securities fraud that might suggest a case has merit—and (2) following Zynga's

14  disclosures, Zynga's stock value plummeted, and Lead Counsel understood this to mean there

15  would always be an issue as to collectability of any judgment achieved.  (Dkt. No. 217 ¶¶ 66,

16  133.)  The Court agrees.

17         The third factor, the skill required and quality of work performed, likewise supports the 25

18  percent benchmark award.  The "prosecution and management of a complex national class action

19  requires unique legal skills and abilities." *Omnivision*, 559 F. Supp. 2d at 1047 (internal quotation

20  marks and citation omitted).  "This is particularly true in securities cases because the Private

21  Securities Litigation Reform Act makes it much more difficult for securities plaintiffs to get past a

22  motion to dismiss." *Id.* (citation omitted).  Here, Lead Counsel engaged in significant pre-filing

23  investigation, shepherded this case past two motions to dismiss and a motion for reconsideration,

24  and reached a settlement quickly before expending resources that would otherwise have gone to

25  the Class after further litigation.  Lead Counsel is highly experienced in class actions, including

26  securities class actions.  (Dkt. No. 217 ¶¶ 126-127; Dkt. No. 217-2 ¶ 2 & Ex. 1; Dkt. No. 217-3 ¶ 3

27  & Ex. 1.)  The quality of opposing counsel is also relevant to the quality and skill that class

28  counsel provided, *see Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 449 (E.D. Cal.

2013); *see also Wing v. Asarco*, 114 F.3d 986, 989 (9th Cir. 1997) (affirming fee award and noting that the court's evaluation of class counsel's work considered "the quality of opposition counsel and [defendant's] record of success in this type of litigation"), and here, Defendants were represented by a law firm ranked as a national leader in securities litigation.  (Dkt. No. 217 ¶¶ 129-131.)  For each of these reasons, the skill required and quality of work performed supports the fee award sought.

With respect to the contingent nature of the litigation—the fourth factor—courts tend to find above-market-value fee awards more appropriate in this context given the need to encourage counsel to take on contingency-fee cases for plaintiffs who otherwise could not afford to pay hourly fees.  *See, e.g.*, *In re Wash. Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994).  This is especially true where, as here, class counsel has significant experience in the particular type of litigation at issue; indeed, in such contexts, courts have awarded an even higher 33 percent fee award.  *See, e.g.*, *Heritage*, 2005 WL 1594403, at *19 (awarding attorneys' fees equal to 33 percent of the common settlement fund based in part on the effort, skill, and experience of class counsel and collecting cases regarding the same).  Moreover, when counsel takes on a contingency fee case and the litigation is protracted, the risk of non-payment after years of litigation justifies a significant fee award.  *See id.*  So it is here, where Lead Counsel have litigated this case since 2012 and, to date, have incurred at least $189,427.69 in out-of-pocket expenses and over $3 million in time worked on the matter all with the possibility of little to no recovery, as described above.  (*See* Dkt. No. 216 at 21.)  Thus, that Lead Counsel here have significant experience in this field and took on this matter on a contingent basis further indicates that the 25 percent benchmark fee request is reasonable.

As to the fifth factor and awards in similar cases, several other courts—including courts in this District—have concluded that a 25 percent award was appropriate in complex securities class actions.  *See, e.g.*, *Rieckborn*, 2015 WL 468329, at *21.  Indeed, in many securities class actions, the award has exceeded the 25 percent benchmark.  *See, e.g.*, *Mego Fin. Corp.*, 213 F.3d at 463 (affirming a 33.33 percent of the fund fee award); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (affirming a 33 percent of the fund fee award); *Omnivision*, 559 F. Supp. 2d at 1047 (approving a

28 percent fee award); *In re Nuvelo, Inc. Sec. Litig.*, No. C 07-04056 CRB, 2011 WL 2650592, at

*3 (approving a 30 percent fee); *In re CV Therapeutics, Inc. Sec. Litig.*, No. C 03-3709 SI, 2007

WL 1033478, at *1 (N.D. Cal. Apr. 4, 2007) (approving a 30 percent fee); *Vinh Nguyen*, 2014 WL

1802293, at *3 (approving a 28 percent fee).  Lead Counsel also cites a study published by

National Economic Research Associates ("NERA") Economic Consulting, which found that for

nationwide settlements between $10 million and $25 million, the median attorneys' fee award for

the period January 1996 to December 2014 was 30.0 percent and for the most recent two-year

period from January 2012 to December 2014, the median award was 27.5 percent of the common

fund.  *See* Dr. Renzo Comolli et al., *Recent Trends in Securities Class Action Litigation: 2014

Full-Year Review*, at 34 (Jan. 20, 2015).[10]  The cases from the Ninth Circuit and this District and

the NERA study suggest that the 25 percent benchmark fee award here on the $23 million

settlement is fair and reasonable.

Finally, the lack of objection by any Class Members also supports the 25 percent fee

award.  *See Omnivision*, 449 F. Supp. 2d at 1048 (finding factor favored approval where no

objections to fee were raised in response to 57,630 copies of the notice being sent).

### 2.     *Lodestar Cross-Check*

The Ninth Circuit encourages district courts "to guard against an unreasonable result" by

cross-checking attorneys' fees calculations against a second method.  *In re Bluetooth*, 654 F.3d at

944; *see also Vizcaino*, 290 F.3d at 1050 ("[W]hile the primary basis of the fee award remains the

percentage method, the lodestar may provide a useful perspective on the reasonableness of a given

percentage award.") (footnote omitted).  "The 'lodestar' is calculated by multiplying the number

of hours . . . reasonably expended on the litigation by a reasonable hourly rate."  *Morales v. City of

San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996) (citation omitted).  "Once the court has fixed the

lodestar, it may increase or decrease that amount by applying a positive or negative multiplier to

take into account a variety of other factors, including the quality of the representation, the novelty

United States District Court
Northern District of California

---

[10] *Available at*
*http://www.nera.com/content/dam/nera/publications/2015/Full_Year_Trends_2014_0115.pdf* (last
visited Feb. 5, 2016).

and complexity of the issues, the results obtained, and the contingent risk presented." *Thayer v. Wells Fargo Bank, N.A.*, 92 Cal. App. 4th 819, 833 (2001) (citation omitted).

### a.   Reasonable Rate

"In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986) (citation omitted), *amended on other grounds by* 808 F.2d 1373 (9th Cir. 1987).  The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted).  In addition to affidavits from the fee applicant himself, other evidence of prevailing market rates may include affidavits from other area attorneys or examples of rates awarded to counsel in previous cases.  *See Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (citation omitted).

Here, Lead Counsel submitted declarations setting forth the hourly rates for all of the attorneys, paralegals, and other staff from the two law firms who contributed to this litigation. (Dkt. No. 217-2 ¶ 4 & Ex. 2 (showing rates ranging from $300 to 615 for forensic accountants, financial analysts, investors, and paralegals to $390 to 875 for attorneys); Dkt. No.217-3 ¶ 7 (showing rates ranging from $185 to 850 for attorneys).)  Lead Counsel aver that the rates charged in this case are fair and reasonable (Dkt. No. 217 ¶ 124; Dkt. No. 217-2 ¶¶ 4-9; Dkt. No. 217-3 ¶¶ 6-12), and are the regular rates that each firm generally charges for both contingency and hourly-fee cases (Dkt. No. 217-2 ¶ 6; Dkt. No. 217-3 ¶ 10).  The rates are in line with those prevailing in the community, as courts in this District have approved similar or higher billing rates for attorneys and paralegals.  (*See* Dkt. No. 216 at 26 (collecting cases).)  As part of their attorneys' fee award, Lead Counsel here also seek an award covering the cost of financial analysts and related professionals, which courts have also found compensable as part of the fee award. *See, e.g.*, *B-K Lighting, Inc. v. Vision3 Lighting*, No. CV 06-02825 MMM (PLAx), 2009 WL 3838264, at *12 (C.D. Cal. Nov. 16, 2009), *vacated on other grounds by* 2010 WL 2653274 (Fed. Cir. 2010) (approving award of fees for a financial analyst on counsel's staff).

United States District Court
Northern District of California

1    Lead Counsel's attorneys' fee request also includes cost for on-staff investigators.

2    Investigators' work is more often deemed compensable as litigation costs rather than as part of the

3    attorneys' fee award. *See, e.g.*, *Bay Area Painters & Tapers Pension Trust Fund v. Golden Vas*

4    *Printing*, No. C-10-02934 CW (DMR), 2011 WL 6119161, at *8 (N.D. Cal. Nov. 7, 2011);

5    *Symantec Corp. v. Logical Plus, Inc.*, No. C 06-7963 SI, 2010 WL 3504850, at *1 (N.D. Cal. Sept.

6    7, 2010); *In re Daou Sys., Inc. Sec. Litig.*, No. 98-CV-1537-L(AJB), 2008 WL 2899726, at *1

7    (S.D. Cal. July 24, 2008).  In those cases, however, the attorneys hired outside investigators.

8    Here, in contrast, the investigators were on Lead Counsel's staff, so it makes sense to include their

9    wages in the attorneys' fee calculation.  Lead Counsel is also requesting reimbursement for

10   $30,340.50 in investigator fees (Dkt. No. 217 ¶ 146), which gave the Court pause as to whether

11   duplicative investigation costs were being sought.  However, Lead Counsel aver that their

12   experienced in-house investigators began the investigation, but given its scope, which involved

13   searching for hundreds of witnesses and interviewing dozens, Lead Counsel decided to retain an

14   outside investigative firm to assist the internal team.  (*Id.* ¶ 149.)  Given this explanation, the

15   Court will include in the attorneys' fees award compensation for Lead Counsel's in-house

16   investigators, and separately will reimburse costs for hiring the outside firm.

17   The Court therefore concludes that the requested attorneys' rates, and rates of associated

18   staff, are reasonable.

19                         b.      Reasonable Hours

20   As to the number of hours billed, they must equal the number of hours that can reasonably

21   be billed to a private client.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

22   Thus, the court should only award fees based on "the number of hours reasonably expended on the

23   litigation" and should exclude "hours that are excessive, redundant, or otherwise unnecessary[.]"

24   *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983).  "There is no precise rule or formula for

25   making these determinations[,]" and the court "necessarily has discretion in making this equitable

26   judgment."  *Id.* at 436-37.

27   Here, Lead Counsel's time records from both Berman DeValerio and Newman Ferrara

28

34

reflect more than 5,580.05 hours of work performed on this case.[11]  (Dkt. No. 217 ¶ 118.)  While the case had not yet proceeded to motions for summary judgment, significant work was still done on this case: Lead Counsel has shown that in prosecuting Lead Plaintiff's claims, they conducted an extensive investigation into the underlying facts, which including interviews with a number of confidential witnesses, examination of complex financial records, and education about the gaming market; thoroughly researched relevant law; prepared and filed the complaint, and then later, the 114-page consolidated complaint; defended two motions to dismiss and a motion for reconsideration; analyzed Defendants' financial condition; prepared a detailed mediation statement; consulted with experts regarding loss causation and damages; participated in the day-long mediation session with Judge Infante; and continued thereafter to negotiate with Defendants to reach this Settlement.  (Dkt. No. 217 ¶¶ 6-7.)  Given the amount of work done, the Court concludes that the number of hours expended was reasonable.  While two law firms both contributed to the work done, Lead Counsel aver that they coordinated efforts between the two firms to avoid duplication of efforts and delegated tasks to lower-level attorneys where appropriate, to keep costs down.  (*Id.* ¶¶ 120-121.)  In light of the volume and scope of work done and counsel's efforts to avoid duplicitous work, the Court concludes that the number of hours Lead Plaintiff worked on this matter could reasonably be billed to a private, hourly-fee client and therefore are compensable.  *Gonzalez*, 729 F.3d 1196, 1202

### c.      Lodestar Calculation

Lead Counsel therefore dedicated a combined total of 5,580.05 litigating this case, for which they accrued $3,347,319.25 in attorneys' fees based on their hourly rates.  (*Id.* ¶ 118.)  After determining the lodestar, the Court divides the total fees sought by the lodestar to arrive at the multiplier.  *See Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358, at *4

---

[11] Lead Counsel submitted summaries of hours worked.  (*See* Dkt. No. 217 ¶¶ 112, 118, 122-124; Dkt. No. 217-2 at 59; Dkt. No. 217-3 ¶ 4.)  The Court may rely on these summaries, as actual billing records are unnecessary in the context of assessing the lodestar cross-check.  *See Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516, at *6 (N.D. Cal. May. 6, 2014) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean counting . . . [courts] may rely on summaries submitted by the attorneys and need not review actual billing records.") (alterations in original) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 206-07 (3d Cir. 2005)).

(N.D. Cal. Feb. 6, 2013) (citation omitted).  "The purpose of this multiplier is to account for the risk Class Counsel assumes when they take on a contingent-fee cases." *Id.* (citation omitted).  If the multiplier falls within an acceptable range, it further supports the conclusion that the fees sought are, in fact, reasonable.  *Id.*  In determining whether a multiplier is reasonable, courts consider a number of factors similar to those considered when determining the appropriate percentage of the fund, including:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, a(9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* (citations omitted).  "Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases."  *Id.* (citation omitted); *see also Vizcaino*, 290 F.3d at 1051 (affirming application of a 3.65 multiplier based on complexity of case and risks involved, among others); *see also Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) ("Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation.") (citation omitted).  In securities class actions in particular, courts have applied multipliers ranging from 1.25 up to 4.  *See, e.g.*, *Rieckborn*, 2015 WL 468329, at *22 (approving a 25 percent fee that constituted a 1.25 multiplier); *Omnivision*, 559 F. Supp. 2d at 1048 (approving a 28 percent fee that constitute a 1.33 multiplier); *see also Portal Software*, 2007 WL 4171201, at *16 (noting that a negative multiplier on a lodestar cross-check is an "unusual situation").

Here, based on the lodestar amount of $3,347,319.25, if the Court were to grant Lead Counsel's request for a 25 percent award, the multiplier would be 1.7.  In light of the results of this action, the contingent nature of Lead Counsel's fee arrangement, the complexity of this case and the risks involved in litigating it, the skill and experience required to do so properly, and the typical range of multipliers in securities class actions, the Court concludes that the 1.7 multiplier—towards the lower end of the Ninth Circuit's scale—is reasonable.  *See Vizcaino*, 290

1    F.3d at 1051 n.6.  This is especially true given that the percentage sought is at the presumptively

2    reasonable benchmark amount in this Circuit.

3                   3.        *Withdrawn Objections to the Attorneys' Fee Request*

4           The Isaacson-Weaver Family Trust's withdrawn objection to this fee request is unavailing.

5    First, the Isaacson-Weaver Family Trust objected on the grounds that the PSLRA requires courts

6    to make a finding regarding counsel's compliance with Federal Rule of Civil Procedure 11 before

7    granting a fee award as part of the statute's fee-shifting scheme.  (Dkt. No. 220 at 7.)  Rule 11(b)

8    requires an attorney who is presenting to the court a pleading or motion, to certify to the best of

9    the person's knowledge, information, and belief, after an inquiry reasonable under the

10   circumstances, that it is not being presented for an improper purpose; that the legal contentions are

11   warranted by existing law or a nonfrivolous argument for new law; that the factual contentions

12   have, or likely will have, evidentiary support; and that denials of factual contentions are warranted

13   or reasonable.  Fed. R. Civ. P. 11(b).  In any private action arising under the PSLRA, courts are

14   required to make Rule 11 findings "upon final adjudication of the action."  15 U.S.C. § 78u-

15   41(c)(1).[12]  Section 78u-4(c)(2) requires the court to impose mandatory sanctions for any Rule

16   11(b) violation, and the presumptive sanction is attorneys' fees and litigation expenses.  *Id.* § 78u-

17   4(c)(3).  The goal of these provisions, entitled "Sanctions for Abusive Litigation," is to "reduce

18   significantly the filing of meritless securities lawsuits[.]"  *Great Dynasty Int'l Fin. Holdings Ltd.*

19   *v. Haiting Li*, No. C-13-1734-EMC, 2014 WL 3381416, at *4 (N.D. Cal. July 10, 2014) (quotation

20   marks and citation omitted).  During the course of this action, the parties and their attorneys have

21   at all times complied with Rule 11(b)'s requirements.  For all of the reasons described above, far

22   from "abusive litigation," which Section 78u-41(c)(1)'s inquiry is meant to combat, Lead Plaintiff

23   had a legal basis for bringing this action.

24                                            *    *    *

25   _____

26   [12] Section 78u-41(c)(1) provides that "[i]n any private action arising under this chapter, upon final
     adjudication of the action, the court shall include in the record specific findings regarding
27   compliance by each part and each attorney representing any party with each requirement of Rule
     11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or
28   dispositive motion.

1    Given that Lead Counsel seeks the benchmark percentage of the fund, and the lodestar

2    calculation with a reasonable multiplier confirms the amount sought, the requested attorneys' fees

3    are reasonable.  The Court will therefore award Lead Counsel the $5,750,000 it seeks.

4         B.    Reimbursement of Litigation Expenses

5         Lead Counsel also seeks to recover $189,427.69 in litigation expenses, including copying,

6    court costs, computer research, delivery fees, expert and investigator fees, mediation, telephone,

7    and travel costs.[13]  (Dkt. No. 217 ¶ 146.)  "There is no doubt that an attorney who has created a

8    common fund for the benefit of the class is entitled to reimbursement of reasonable litigation

9    expenses from that fund."  *Ontiveros*, 303 F.R.D. at 375 (quotation marks and citations omitted).

10   To that end, courts throughout the Ninth Circuit regularly award litigation costs and expenses—

11   including photocopying, printing, postage, court costs, research on online databases, experts and

12   consultants, and reasonable travel expenses—in securities class actions, as attorneys routinely bill

13   private clients for such expenses in non-contingent litigation.  *See Harris v. Marhoefer*, 24 F.3d

14   16, 19 (9th Cir. 1994) (noting that a prevailing plaintiff may be entitled to costs including, among

15   other things, "postage, investigator, copying costs, hotel bills, meals," and messenger services);

16   *see, e.g.*, *Rieckborn*, 2015 WL 468329, at *22 (approving $219,469.67 in expenses after nearly

17   two years of litigation); *Omnivision*, 559 F. Supp. 2d at 1048 (approving $560,489.90 in costs

18   after three years of litigation).

19        The Notice informed Class Members that Class Counsel would seek up to $276,000 in

20   litigation expenses.  (Dkt. No. 217 ¶ 158; Dkt. No. 217-1 at 10.)  No Class Member objected to

21   this figure.  Given that Lead Counsel requests reimbursement of costs that are reasonable,

22   regularly billed to clients in hourly fee cases, routinely awarded in contingency fee cases, and

23   substantially below the maximum amount stated in the Notice, Lead Counsel is entitled to recover

24

25   [13] In their motion for final approval, Lead Counsel initially requested $184,681.29 in expenses, but
26   noted that the request did not include future expenses relating to final approval, include preparing
     a reply brief, additional expenses from consulting with their damages expert, and travel expenses
27   for the final fairness hearing.  (Dkt. No. 217 ¶ 155.)  In their reply brief, Lead Counsel represented
     that their expenses then totaled $189,427.69, and provided to the Court an accounting of the
28   additional expenses incurred since the attorneys' fees motion was filed. (Dkt. No. 226 at 15; Dkt.
     No. 227 ¶ 4.)  Accordingly, the Court uses the updated expenses amount.

United States District Court
Northern District of California

1    $189,427.69 in litigation expenses.

2        C.      Administration Costs[14]

3        The Settlement Agreement also allocated up to $900,000 in settlement administration

4    costs, which includes fees and expenses incurred by the claims administrator in connection

5    providing notice to the Settlement Class and administering the claims process.  (Dkt. No. 212-1

6    ¶¶ 1.26, 5.2; Dkt. No. 217-1 at 18.)  The parties selected Epiq as the claims administrator and its

7    duties included: preparing and disseminating the Class Notice, publishing Class Notice in

8    *Investor's Business Daily*, operating and maintaining a toll-free phone number for the Settlement

9    with interactive voice recording; establishing and maintaining a website on which users can

10   request a copy of the Notice Packet; managing requests for exclusion; and reporting on proofs of

11   claim.  (Dkt. No. 217-1 ¶¶ 4-24.)  The Notice informed Class Members that up to $900,000 of

12   administration costs would be deducted from the Settlement Fund, and no Class Members

13   objected.  Neither the motion for final approval nor the attorneys' fees motion indicated the total

14   administration costs to date, but as of the final fairness hearing, Lead Counsel represented that the

15   cost of settlement administration to date have been approximately $350,000, and Lead Counsel

16   still estimates the total cost will near $900,000.  Courts regularly award administrative costs

17   associated with providing notice to the class.  *See, e.g.*, *Bellinghausen v. Tractor Supply Co.*, 306

18   F.R.D. 245, 266 (N.D. Cal. 2015).  The Court therefore concludes that Epiq's costs were

19   reasonable incurred for the benefit of the class and approves the full amount to be deducted from

20   the total Settlement Fund.

21                                    **CONCLUSION**

22       For the reasons described above, the Court GRANTS Lead Plaintiff's motion for final

23   approval of the parties' Settlement Agreement.  The Court concludes that the parties and their

24   counsel have at all times complied with Rule 11.  In addition, the Court GRANTS Lead Counsel's

25   motion for attorneys' fees and costs and awards Lead Counsel $5,750,000 in attorneys' fees and

26   $189,427.69 in litigation costs.  The Court will enter the Proposed Judgment that Lead Counsel

27

28   [14] Though not part of Lead Counsel's motion for attorneys' fees and costs, the Court reviews the
     request for administration costs here.

United States District Court
Northern District of California

submitted.

The Clerk is directed to close this case.

This Order disposes of Docket Nos. 215 and 216.

**IT IS SO ORDERED.**

Dated: February 11, 2016

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California